UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

AVANOS MEDICAL, INC.
Petitioner,

v.

STRATUS MEDICAL, LLC,
Patent Owner.

_____

IPR2024-01209
U.S. Patent No. 10,966,782

_____

**PATENT OWNER'S NOTICE OF APPEAL**

Pursuant to 35 U.S.C. §§ 141(c) and 319, the patent owner, Stratus Medical, LLC ("Stratus") hereby gives notice that it appeals to the United States Court of Appeals for the Federal Circuit from the final written decision entered by the Patent Trial and Appeal Board on March 10, 2026 (Paper 70) in this *inter partes* review (IPR) and all underlying orders, decisions, rulings, and opinions. A copy of the final written decision is attached to this notice of appeal.

This notice of appeal is timely filed within 63 days of the final written decision. *See* 37 C.F.R. §§ 90.3(a)(1), 90.3(b)(1).

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Stratus indicates that the issues on appeal include the Board's determinations that the petitioner satisfactorily proved unpatentability of one or more of claims 1-27 of U.S. Patent No. 10,966,782. The issues may include, for example, one or more of the following:

(1) The Board's determinations that the petitioner met its burden to show any claim unpatentable under 35 U.S.C. § 103 as obvious over at least Racz (Ex. 1009), Ftiz (Ex. 1010) and Lee (Ex. 1011) – those three documents alone or in combination with one or more other cited references;

(2) The Board's finding that Racz teaches a neurotomy needle larger than 16 gauge;

(3)     The Board's finding that the petitioner met its burden to demonstrate that one of ordinary skill in the art would have had a reasonable expectation of success to make the so-called "Racz's modified device," the petitioner's combination of teachings of Racz, Fitz, and Lee alleged to render the claims obvious;

(4)     The Board's evaluation of (or failure to evaluate) Stratus's arguments and evidence that the prior art references do not enable one of ordinary skill in the art to make and/or use Racz's modified device; and

(5)     The Board's determination that Stratus failed to show that its "Nimbus device" is a commercial embodiment of the claimed invention and the Board's consequent refusal to consider Stratus's evidence of objective indicia of non-obviousness.

The issues on appeal may also include (6) the Board's findings that the cited references teach or suggest all claim limitations; (7) the Board's findings that the references cited in the petition are analogous art; (8) the Board's finding of a motivation to combine the teachings of the cited references, or any other supporting rationale, to arrive at "Racz's modified device"; (9) the Board's failure to credit teachings away from the claimed invention by the cited references; (10) the Board's definitions of the field of art and/or a person of ordinary skill in the art; (11) the Board's decision to credit the testimony of the petitioner's alleged expert witness;

(12) the Board's decision that the challenges in the petitions complied with the particularity, specificity, precision, and/or completeness required by applicable statutes, regulations, and/or other authorities, including for example 35 U.S.C. § 312 and 37 C.F.R. §42.104; (13) the Board's admission of evidence that Stratus moved to exclude, including Ex. 1063; (14) the Board's refusal to consider Exs. 2044 and 2045; (15) the Board's grant of additional discovery sought by the petitioner; (16) the Board's requirements regarding the time, place, and manner of the deposition of Dr. Marc Russo, Stratus's clinician expert witness; (17) the Board's rulings on the parties' motions to seal; (18) the Board's failure to issue the final written decision before the statutory deadline without a showing of good cause to extend that deadline; (19) the Board's decision to permit the petition to exceed the word-count limit set forth in 37 C.F.R. § 42.24; (20) any claim constructions explicitly or implicitly made by the Board in reaching the decisions above; (21) the Board's failure to address arguments made by Stratus; (22) the Board's mischaracterization of Stratus's arguments; (23) the Board's failure to explain adequately the basis for its decision; (24) the Board's improper assignment of the burden of proof on Stratus; and (25) the Board's failure to afford Stratus its full due-process and/or other procedural rights guaranteed by the U.S. Constitution, the Administrative Procedure Act, and/or any other authority, including, for example, providing adequate notice, opportunity to be heard, and opportunity to present rebuttal evidence.

Stratus also appeals from any and all findings, determinations, statutory interpretations, regulatory interpretations, and/or procedures supporting or relating to the aforementioned issues, as well as all other issues decided adversely to Stratus in any written or verbal orders, decisions, rulings, or opinions.

Respectfully submitted,

Date: _2026 May 4_          By: _/ M.C. Phillips /_

Matthew C. Phillips
Registration No. 43,403
Lead Counsel for Patent Owner

**CERTIFICATE OF SERVICE**

I hereby certify that on **May 4, 2026**, copies of the foregoing PATENT OWNER'S NOTICE OF APPEAL and all documents filed with it were served via electronic mail, as agreed to by counsel, upon the following petitioner's counsel:

| | |
|---|---|
| Warren Thomas | wthomas@mcciplaw.com |
| Gregory Carlin | gcarlin@mcciplaw.com |
| Lee Hamilton | lhamilton@mcciplaw.com |

I further certify that on the same date, the foregoing PATENT OWNER'S NOTICE OF APPEAL was sent by Priority Mail Express® to the Director of the United States Patent and Trademark Office, at the following address:

Director of the U.S. Patent & Trademark Office

c/o Office of the General Counsel

P.O. Box 1450

Alexandria, VA 22313-1450

I further certify that on the same date, the foregoing PATENT OWNER'S NOTICE OF APPEAL and a copy of the Final Written Decision and the required fee were filed with the United States Court of Appeals for the Federal Circuit via its CM/ECF electronic filing system.

/ M.C. Phillips /

Matthew C. Phillips
Registration No. 43,403

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

AVANOS MEDICAL, INC.,
Petitioner,

v.

STRATUS MEDICAL, LLC,
Patent Owner.

————————

IPR2024-01209
Patent 10,966,782 B2

————————

Before MICHAEL J. FITZPATRICK, SUSAN L. C. MITCHELL, and
ARTHUR M. PESLAK, *Administrative Patent Judges*.

MITCHELL, *Administrative Patent Judge*.

JUDGMENT
Determining All Challenged Claims Unpatentable
Dismissing the Parties' Motions to Exclude
*35 U.S.C. § 318(a)*

I.  INTRODUCTION

*A.  Background and Summary*

Petitioner, Avanos Medical, Inc., filed a Petition to institute an *inter partes* review of claims 1–27 of U.S. Patent No. 10,966,782 B2 (Ex. 1001 ("the '782 patent")) pursuant to 35 U.S.C. § 311(a).  Paper 1 ("Pet.").  Patent Owner, Stratus Medical, LLC, waived filing of a preliminary response pursuant to 37 C.F.R. § 42.107(b).  Paper 6.  We granted the Petition and instituted an *inter partes* review.  Paper 8 ("Inst. Dec.").

During the review, Patent Owner filed a Patent Owner Response to the Petition (Paper 68 ("PO Resp.")[1]), Petitioner filed a Reply (Paper 31 ("Reply")), and Patent Owner filed a Sur-Reply (Paper 41 ("Sur-Reply").  Additionally, each party filed a motion to exclude.  Paper 49 ("Pet. Mot. To Exclude"); Paper 47 ("PO Mot. To Exclude").

An oral hearing was held November 6, 2025.  A transcript of the hearing is of record in this case.  Paper 62 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6, and this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial.  For the reasons discussed below, we

---

[1] The Patent Owner Response was originally filed under seal as Paper 13 and publicly with redactions as Paper 14.  Those papers were later expunged and replaced with versions reflecting updates to the information considered confidential in light of the Board's November 6, 2025, Order entering a protective order and resolving several motions to seal.  *See* Paper 60; Ex. 3004.  Patent Owner has represented that Paper 68 is identical to the now expunged Paper 14.  Ex. 3004.

determine that Petitioner has proved, by a preponderance of the evidence, that claims 1–27 of the '782 patent are unpatentable.

### B.  Real Parties-In-Interest

Petitioner identifies itself, Avanos Medical, Inc., as the real party-in-interest and states that "Diros Technology, Inc. of Markham, Ontario, Canada is a wholly owned subsidiary" of Petitioner.  Pet. 82.

Patent Owner identifies itself, Stratus Medical, LLC, as the real party-in-interest.  Paper 4, 2.

### A.  Related Matters

Petitioner filed three related *inter partes* reviews:  IPR2024-01210 (regarding U.S. Patent No. 10,733,688 B2); IPR2024-01211 (regarding U.S. Patent No. 10,733,688 B2); and IPR2024-01212 (regarding U.S. Patent No. 10,925,664 B2).  In addition, Patent Owner identifies three related applications, U.S. Patent Application Nos. 17/190,224, 18/378,138, and 19/272,521, and one lawsuit, *Stratus Med., LLC v. Avanos Med., Inc.*, No. 1:25-cv-00546 (D. Del. Filed May 2, 2025).  Paper 44, 2.

### B.  The '782 Patent

The '782 patent is titled "Needles and Systems for Radiofrequency Neurotomy."  Ex. 1001, code (54).  The '782 patent is directed "to thermal ablation systems and methods, and more particularly to systems and methods for radio frequency (RF) neurotomy, such as spinal RF neurotomy."  *Id.* at 1:28–31.  The '782 patent provides the following background for thermal ablation, RF ablation, and RF neurotomy:

Thermal ablation involves the creation of temperature changes sufficient to produce necrosis in a specific volume of tissue within a patient. The target volume may be, for example, a nerve or tumor. A significant challenge in ablation therapy is to provide adequate treatment to the targeted tissue while sparing the surrounding structures from injury.

RF ablation uses electrical energy transmitted into a target volume through an electrode to generate heat in the area of the electrode tip. The radio waves emanate from a non-insulated distal portion of the electrode tip. The introduced radiofrequency energy causes molecular strain, or ionic agitation, in the area surrounding the electrode as the current flows from the electrode tip to ground. The resulting strain causes the temperature in the area surrounding the electrode tip to rise. RF neurotomy uses RF energy to cauterize a target nerve to disrupt the ability of the nerve to transmit pain signals to the brain.

Ex. 1001, 1:35–52.

The Specification discloses neurotomy system 100 for use in performing RF neurotomy on a patient. Ex. 1001, 6:64–65, 8:56–9:26, 9:39–56, Fig. 1. "The system 100 may include an RF generator 102 capable of generating an RF energy signal sufficient to ablate target tissue," a needle 103 capable of conducting the RF energy to the patient, and an "imaging system 105 capable of producing internal images of the patient 101 and the needle 103, for example to facilitate navigation of the needle 103 during a procedure." *Id.* at 8:63–9:6, 9:40–42.

In some embodiments in which the needle 103 is a monopolar device, a return electrode pad 104 may be attached to the patient 101 to complete a circuit from the RF generator 102, through the needle 103, through a portion of the patient 101, through the return electrode pad 104 and back to the RF generator 102.

*Id.* at 9:6–11.

Needle 103 may include "a self-contained mechanical mechanism, in the form of deployable filaments 206a, 206b, operable to expand the volume of effective RF energy delivery as compared to known single-electrode RF probes." Ex. 1001, 10:18–21, Fig. 2A. Figure 2A is reproduced below.



FIG. 2A

Figure 2A, reproduced above, shows the needle with elongate member 203 having tip 201 and deployable filaments 206a–b. *Id*. at 9:57–60, 9:65–10:1. The filaments are deployed/retracted by a rotating actuator 216. *Id.* at 10:33–35. According to the Specification, "variation in the shape, position, and/or size of lesions . . . may be achieved by different configurations of filaments," including varying the number, length, position, and angle of the filaments. *Id.* at 25:34–43.

With reference to Figure 2B (not shown), actuator 216 may be fitted with Luer fitting 220 at the proximal end of needle 103, and configured for inserting (i) removable RF probe 401 through lumen 222 of elongate member 203, and (ii) fluid delivered through the lumen (when probe 401 is removed). Ex. 1001, 30:12–19.

Figures 3A and 3B are reproduced below.



Figure 3A, reproduced above left, shows a cut away view of distal end 202 of needle 103 with filaments 206a–b deployed. Ex. 1001, 7:11–12. Figure 3B, reproduced above right, shows a cut away view of distal end 202 of needle 103 with filaments retracted (and thus not visible). *Id.* at 3:13–14. Figures 3A and 3B also show tip (201) including fluid port 210 (e.g., for delivering anesthetic and/or image enhancing dye during an RF neurotomy procedure) *via* Luer fitting 220 when the probe 401 is removed, and sharpened point 301 for piercing the skin of a patient and facilitating advancement through tissue. *Id.* at 11:21–23, 12:66–13:6, 30:12–21.

According to the '782 patent, tip 211 and tube 207 containing lumen 222 may be constructed from stainless steel, or other conductive material, such that when RF probe 401 is inserted into tube 207, the RF energy emitted by RF probe 401 may be conducted through tube 207 and into and through tip 201 and filaments 206a, 206b. *Id.* at 11:58–61, 9:49–52. "The configuration of the filaments 206a, 206b illustrated in FIGS. 2A, 3A, 3D, 5 and 6 may be operable to produce lesions that are radially offset from the central longitudinal axis 223 and distally offset from the point 301 as compared to a lesion created by the tip 201 without the filaments or a

lesion created with the needle 103 with the filaments 206a, 206b in the retracted position." *Id.* at 25:6–12.

The '782 patent's filing date is July 20, 2020. Ex. 1001, code (22). However, it claims priority back to five applications, the earliest of which was a provisional application filed on May 21, 2010. *Id*. at codes (60), (63), 1:7–22. Whether any of the challenged claims is entitled to the benefit of the filing date of any of the priority applications is not at issue. All of the asserted prior art references predate the earliest, May 21, 2010, date. *See infra* nn.3–10. Moreover, Patent Owner does not dispute that any of the asserted references is prior art to the challenged claims. *See generally* PO Resp.

### C. The Challenged Claims

Petitioner challenges 1–27 of the '782 patent. Of the challenged claims, only claims 1 and 24 are independent. Claim 1 is illustrative and reproduced below as partitioned in the Petition with Petitioner's bracketed labels.

1.    A system comprising:

[1a] a radiofrequency probe; and

[1b] a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising:

[1c] a conductive portion at a distal end of the radiofrequency neurotomy needle;

[1d] a tip configured to pierce tissue of a patient;

[1e] an elongate member comprising a lumen configured to accept the radiofrequency probe

therein such that the radiofrequency probe physically contacts and is electrically connected to the conductive portion, the tip being at a distal end of the elongate member;

[1f] a filament electrically connected to the conductive portion and the tip due to physical contact of conductive materials at the distal end of the radiofrequency neurotomy needle such that the filament and the tip operate together as a single electrode;

[1g] the filament being movable between a retracted position, in which the filament is at least partially in the elongate member, and a deployed position, in which at least a portion of the filament is out of the elongate member; and

[1h] an actuator interconnected to the filament to move the filament between the retracted position and the deployed position,

[1i] wherein the filament and the tip are configured to transmit radiofrequency energy from the radiofrequency probe and operate together as the single electrode in a monopolar mode when the filament is in the deployed position and the radiofrequency probe is accepted in the lumen and is in physical contact with the conductive portion at the distal end of the radiofrequency neurotomy needle.

Ex. 1001, 52:19–53; Pet. 83.

*D. The Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Ground | Claims Challenged | 35 U.S.C. § | Basis |
|--------|-------------------|-------------|-------|
| A | 1–27 | 103(a)[2] | Racz,[3] Fitz,[4] Lee[5] |
| B | 1–27 | 103(a) | Racz, Fitz, Lee, Young '965[6] |
| C | 1–27 | 103(a) | Racz, Fitz, Lee, Scheibe[7] |
| D | 1–27 | 103(a) | Racz, Fitz, Lee, Young '965, Scheibe |
| E | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542[8] |
| F | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542, Young '965 |
| G | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542, Scheibe |
| H | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542, Young '965, Scheibe |
| I | 13 | 103(a) | Racz, Fitz, Lee, Young '2001[9] |

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, which was enacted September 16, 2011, made amendments to 35 U.S.C. §§ 102 and 103. AIA § 3(b)–(c). Those amendments became effective eighteen months later on March 16, 2013. *Id*. § 3(n). Because the application from which the '782 patent issued was filed before March 16, 2013, any citations herein to 35 U.S.C. §§ 102 and 103 are to their pre-AIA versions. *Id*. § 3(n)(1).

[3] US 6,146,380, issued November 14, 2000. Ex. 1009.

[4] US 2005/0059964 A1, published March 17, 2005. Ex. 1011.

[5] US 2007/0016183 A1, published January 18, 2007. Ex. 1010.

[6] US 2006/0084965 A1, published April 20, 2006. Ex. 1012.

[7] US 2007/0260223 A1, published November 8, 2007. Ex. 1013.

[8] US 7,976,542 B1, issued July 12, 2011. Ex. 1014.

[9] US 2009/0112201, published April 30, 2009. Ex. 1016.

| Ground | Claims Challenged | 35 U.S.C. § | Basis |
|--------|-------------------|-------------|-------|
| J | 13 | 103(a) | Racz, Fitz, Lee, Young '201, Young '965 |
| K | 13 | 103(a) | Racz, Fitz, Lee, Young '201, Scheibe |
| L | 13 | 103(a) | Racz, Fitz, Lee, Young '201, Young '965, Scheibe |
| M | 15 | 103(a) | Racz, Fitz, Lee, Godara[10] |
| N | 15 | 103(a) | Racz, Fitz, Lee, Godara, Young '965 |
| O | 15 | 103(a) | Racz, Fitz, Lee, Godara, Scheibe |
| P | 15 | 103(a) | Racz, Fitz, Lee Godara, Young '965, Scheibe |

Pet. 12–13. As noted above, each of the 16 grounds presented relies on a combination of at least Racz, Fitz, and Lee. The majority of the parties' dispute is focused on the combination of Racz, Fitz, and Lee. Therefore, analysis of the combination will be our primary focus in our discussion of the issues set forth below.

## II. ANALYSIS

### A. Claim Construction

The challenged claims should be read in light of the specification, as it would be interpreted by one of ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Thus, we generally give claim terms their ordinary and customary meaning. *See In re Translogic Tech.,*

---

[10] US 2007/0027449, published Feb. 1, 2007. Ex. 1015.

*Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question." (internal quotation marks omitted)); *see also* 37 C.F.R. § 42.100(b) (stating that claims are construed in IPRs according to the same standard as used in federal court).

With respect to the challenged claims, Petitioner contends that no claim term requires express construction. Pet. 12 (citing Ex. 1031 ¶106 (Dr. Robert D. Tucker's[11] testimony that "the terms in the Challenged Claims would be understood by a POSA to have their plain and ordinary meaning and do not require a special construction or definition")). In instituting the IPR, we found no need to provide an express construction of any claim term. Inst. Dec. 12. We likewise find no need to do so now, as neither party has proposed a construction for any claim term and none of the parties' arguments turns on a disputed meaning of any claim language.

## B. Obviousness Generally

A claim is unpatentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). "Obviousness is a question of law based on underlying facts." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015). The underlying facts include (i) the scope and content of the

---

[11] Dr. Tucker has a Ph.D. in biophysics as well as a medical degree. Ex. 1031 ¶2.

prior art, (ii) any differences between the prior art and the claimed invention, (iii) the level of ordinary skill in the field of the invention, and (iv) any relevant objective indicia, or secondary considerations, of nonobviousness. *Id.* (citing *Graham v. John Deere of Kan. City*, 383 U.S. 1, 17–18 (1966)). Further, if all the elements of an invention are found in a combination of prior art references, then:

> a proper analysis under § 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success.

*Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006).

*C. Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

The parties dispute the level of ordinary skill in the art, and their main dispute is the scope of the art itself, which logically is intertwined with determining the level of skill in the pertinent art at the time of the invention.

*See, e.g., Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the *pertinent prior art*." (emphasis added)). Indeed, several factors for consideration are premised on the scope of the art. *See id.* ("Factors that may be considered in determining level of skill include: type of problems encountered in art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.").

Petitioner argues that the art is "'thermal ablation systems and methods,' which includes RF neurotomy systems," as set forth in the '782 patent's express description of the "Field" of invention. Pet. 11 (quoting Ex. 1001, 1:28–31); Reply 2. Petitioner argues that a person of ordinary skill in such art:

> would have had at least (i) a bachelor's degree in biomedical engineering, or a related field, such as mechanical engineering, biomechanical engineering, or bioengineering, who also has at least 3 years of experience with thermal ablation system[s] and methods; or (ii) an advanced degree in the same areas of academic study with at least 1 year[] of experience with thermal ablation systems and methods.

*Id.* (citing Ex. 1031 ¶105).

Patent Owner argues that the art should be limited to RF neurotomy alone—to the exclusion of other types of ablation such as tumor ablation and cardiac ablation. *See, e.g.,* PO Resp. 25 ("[T]he central focus of the '782 Patent is RF neurotomy, which is one specialized field among many diverse and non-overlapping fields, like tumor ablation and cardiac ablation, within the broad class of RF ablation."). Thus, according to Patent Owner, "[b]y

failing to specifically include RF neurotomy, the petition's definition diverts attention to unrelated and inappropriate fields of RF ablation." *Id.* (citing Ex. 2001 ¶ 177; Ex. 2006 ¶¶ 47–49 (describing RF ablation encompasses many subfields "wholly unrelated to RF neurotomy"). In further support of its narrower proposal, Patent Owner quotes from the same "Field of the Invention" section of the '782 patent to which Petitioner cites. *Id.* The entirety of that section states: "The present application generally relates to thermal ablation systems and methods, and more particularly to systems and methods for radio frequency (RF) neurotomy, such as spinal RF neurotomy." Ex. 1001, 1:28–31.

Although it is true that the '782 patent relates "more particularly" to RF neurotomy and the challenged claims require a "radiofrequency neurotomy needle," the '782 patent also expressly relates to "thermal ablation" systems and methods generally. *See* Ex. 1001, 1:28–31; 52:21, 54:28. Petitioner also points to a statement in the '782 patent that indicates the described needles "may be adapted (e.g., modified or scaled) for use in other medical procedures" than neurotomy. Reply 2 (citing Ex. 1001, 48:28–32; Ex. 1054, 30 (provisional)). The Specification of the '782 patent also describes using RF needles for creating endocardial lesions, for cauterizing feeder vessels in ulcers, and for cardiac ablation generally. *See* Reply (citing Ex. 1001, 19:36–54, 48:32–47; Ex. 1046, 34:7–10, 142:9–145:8). Further, the "Detailed Description of the Invention" concludes by emphasizing that the scope of the invention encompasses "the delivery of RF energy to tissue in the anatomy . . . for a multitude of reasons," stating as follows:

It will be appreciated that the delivery of RF energy to tissue in the anatomy can be practiced for a multitude of reasons, and embodiments of the needles described herein may be adapted (e.g., modified or scaled) for use in other medical procedures. For example, embodiments of needles described herein could be used to deliver RF energy as a means to cauterize "feeder vessels," such as in bleeding ulcers and/or in orthopedic applications. For another example, embodiments of the needles described herein could be adapted for use in procedures such as cardiac ablation, in which cardiac tissue is destroyed in an effort to restore a normal electrical rhythm in the heart. Certain such uses could further benefit from the ability of embodiments of needles described herein to deliver fluid through a lumen since, for example, emerging procedures in cardiac therapy may require the ability to deliver stem cells, vascular endothelial growth factor (VEGF), or other growth factors to cardiac tissue. The ability to steer embodiments of the needle described herein may provide significant benefit in the field of cardiovascular drug delivery.

Ex. 1001, 48:28–47; *see also id.* at 1:37–38 (target volume may be nerve or *tumor*).

In the Sur-Reply, Patent Owner reasonably concedes that "the patent mentions some non-neurotomy ablation applications." Sur-Reply 20. Patent Owner argues, however, that such non-neurotomy ablation applications are beyond the field of the invention as evidenced by the '782 patent's statement that "the invention can be 'adapted,' 'modified,' 'scaled,' or 'tailored' for [such] other RF ablation procedures," and thus, "the invention itself is not directed to those procedures." *Id.* (citing Ex. 1001: 48:28–47; Ex. 1054, 30). This argument is not persuasive as it is directly at odds with the '782 patent, which states: "it will be understood by those skilled in the art that the invention extends beyond the specifically disclosed embodiments to other

alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof." Ex. 1002, 51:64–52:1.

Further, in determining a patent's field of invention or art, it is the patent's broader description that controls.

> We determine the field of endeavor by reference to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention. The field of endeavor is not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field.

*Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1359 (Fed. Cir. 2023) (quotations marks and internal citations omitted).

In sum, the field of the invention is thermal ablation. It encompasses RF neurotomy, but it is not limited to RF neurotomy. With that settled, we turn now to the person of ordinary in the field/art (POSITA or POSA).

Patent Owner's proposal is reproduced below:

> [A] combination of (1) an interventional pain-specialist physician with significant experience performing RF neurotomy procedures and (2) an engineer with a degree in biomedical engineering or a related field and experience in the design and development of devices and methods for applying electromagnetic energy to nerves. The POSITA should have either a bachelor-level degree with three years of the design/development experience noted above or an advanced degree with one year of the design/development experience noted above. Such a POSITA could be a team of two or more people working together.

PO Resp. 30 (citing Ex. 2006 ¶ 58). Patent Owner's proposal is too narrow in two respects. First, it mandates certain education and experience in RF neurotomy specifically. This is too narrow as the description of the scope of the invention set forth in the '782 patent as described above is not limited to

RF neurotomy. Second, it requires the POSA to be both a physician who performs thermal ablation (RF neurotomy specifically) and an engineer with training and experience "in the design and development of devices and methods" for performing the same. *Id.* This is too narrow because it excludes physicians and other advanced degree holders who research and design devices and methods for performing thermal ablation but do not actually operate on patients.

We adopt the Petitioner's definition of a POSA, quoted above, as it is reflective of the level of skill in the art when viewed in light of the disclosure of the '782 patent. *Supra* (quoting Pet. 11).

### D. The Racz, Fitz, Lee Combination Common to All Grounds of Unpatentability

#### 1. The Asserted Prior Art

##### a) Racz (Ex. 1009)

Racz is titled "Bent Tip Electrical Surgical Probe" and discloses discloses an "apparatus for pain relief that delivers electrical stimulation pulses or high-frequency signals to the vicinity of a neural structure via an electrical needle or cannula." Ex. 1009, code (54), 1:4–9.

Racz Figure 1 is reproduced below.



FIG_1

Figure 1, reproduced above, shows a schematic diagram of Racz's system comprising "radio-frequency electrode cannula 10 having a shaft 12 inserted into a portion P of a patient's body." *Id.* at 3:24–26, 38–40. "The cannula 10 can be inserted directly through the skin of the body portion P to locate the tip 14 in a target position within the body." *Id.* at 3: 42–44. RF "cannula 10 further comprises a hub 20. The hub 20 is capable of accommodating an electrical probe 22, which includes a segment that is inserted into and received by the shaft 12 of the cannula 10." *Id.* at 3:60–63. "[E]lectrical connection 24 couples the cannula 10 to an external signal generator 28 by way of the hub 20 and the probe 22. A second electrical connection 26 connects the external signal generator 28 to a reference electrode 30 in contact with the patient's body portion P." *Id.* at 4:1–5. "[S]ignal generator 28 can be a source of electrical stimulation, pulsed high-frequency stimulation signals, high frequency signals, pulsed radio-frequency output, or other electrical waveforms." *Id.* at 4:6–9.

Racz Figure 2B is reproduced below.



Figure 2B, reproduced above, shows a specific embodiment of the system diagramed in Figure 1. *Id.* at 3:27–30; 4:59–62, 5:7–51. The cannula, reference numeral 33 in this embodiment,[12] includes shaft 34 defining an internal lumen. *Id.* at 5:41–45. Shaft 34 "comprises a hollow metal tube with an insulated portion 36 illustrated by hatched lines," and exposed distal tip 38. *Id.* at 4:62–65. Distal tip 38 includes a pointed end (40), which "can be useful in penetrating tough tissue." *Id.* at 5:3–5.

---

[12] According to Petitioner, Racz uses different reference numerals for corresponding elements of its figures such that, for example, cannula 10 of Figure 1 corresponds to cannula 33 of Figures 2A–2B. Thus, Petitioner identifies multiple reference numerals for the same element such as, for example, "cannula (10/33)." Pet. 19. Patent Owner does the same thing. *See, e.g.*, PO Resp. 19 ("Racz discloses an RF neurotomy 'needle or cannula' 10/33 with a shaft 12/34 and curved tip 14/38, which enables it to go around anatomical structures 16. *See* Racz 4:44–58. A shaft 54 of a removable electrical probe 22/52 is insertable in the cannula 10/33. *See id.* 5:26–30. The probe 22/52 connects to a signal generator 28/58 at its proximate end."). We follow suit.

In operation, cannula 33 "with a stylet positioned in the shaft 34 is inserted into the patient's body portion P." *Id.* at 5:31–33. "The stylet is then removed, and probe 52 is inserted into the shaft 34." *Id.* at 5:37–38. "The probe 52 is connected to the signal generator 58" in order to generate high-frequency heating, or other electrical stimulation. *Id.* at 3:60–63, 4:18–23, 4:18–20. When the probe 52 is fully inserted into cannula 33, "physical contact" between probe 52 and the cannula's tip 38 conducts the RF energy to tip 38. *Id.* at 3:60–65, 4:18–23, 5:41–48. Racz's cannula 33 thus provides "electrical stimulation or high frequency heating of tissue near the exposed electrical tip." *Id.* at 3:60–4:23, 5:41–51, Fig. 1.

### b) Fitz (Ex. 1011)

Fitz discloses "improved-coverage RF neurotomy instrumentation, including an introducer used to deploy a set of electrodes to an area to be treated." Ex. 1011 ¶9.

Fitz discloses that a known problem with single-tip RF neurotomy devices was "that they do not allow for adequate coverage of the target area," and produce lesions that "extend[] only a few millimeters at the diameter of the midportion of the lesion" from the exposed needle tip. *Id.* ¶4. "Although multiple lesions may be created to enhance coverage, this is more time-consuming and usually more painful for the patient." *Id.* ¶5. Moreover, "creation of multiple lesions also exposes the patient to more radiation, as fluoroscopy is used to place and replace the needles." *Id.*

To address inadequate coverage in single-tip neurotomy devices, Fitz discloses "an introducer used to deploy a set of electrodes." *Id.* ¶9. The introducer features a plurality of elongated, co-extensive cannulae, each cannula including an insulated and electrically conductive electrode. *Id.*

Each electrode has a proximal end configured for attachment to a source of energy, an exposed distal tip to deliver the energy to a localized region, and each electrode slides within its respective cannula so as to enhance the energy coverage area. *Id.* According to Fitz, "at least some of the electrodes [may be] constructed of a shape-memory material to control deployment. The cannulae are generally parallel, and may either lie in the same plane or may be arranged otherwise, including spoke-like cross-sections." *Id.* ¶10. "At least some of the electrodes may slide independently, and at least some of the electrodes may slide in unison." *Id.* ¶11.

Fitz Figure 4 is reproduced below.



Figure 4, reproduced above, shows an embodiment of Fitz's invention having a side port introducer. *Id.* ¶15. In this embodiment, "introducer 402 is curved, and a plurality of electrodes are deployed through the tip and/or multiple side ports." *Id.* ¶20.

c)     *Lee (Ex. 1010)*

Lee discloses a radio frequency ablation device having a plurality of deployable electrodes or "ablation antennae." *See, e.g.*, Ex. 1010, code (57), ¶8. Lee Figure 1 is reproduced below.



Figure 1, reproduced above, shows a perspective view of the distal portion of Lee's "multiple antenna ablation device" or "ablation trocar." *Id.* ¶¶32, 91.

Ablation trocar 10 includes trocar point 14 having "forward piercing edge surface 18." *Id.* ¶91. "[T]rocar point 14 is mounted on a cannula 16[, which] may be made of . . . metal covered with a plastic insulating layer, to prevent ablative energy from leaking out of the device along the length of the cannula." *Id.* "Cannula 16 defines an internal lumen 20 which carries a plurality of stylets 22" each of which "comprises a long and straight springy wire-like member . . . . made of a springy conductive material such as springy nickel titanium alloy." *Id.* ¶92.[13] Each of stylets 22 "may be housed wholly within lumen 20 of cannula 16." *Id.* (referencing Fig. 2). But in the

---

[13] Petitioner reasonably refers to Lee's conductive stylets/electrodes as "filaments." *See, e.g.*, Pet. 19, 37 (citing Ex. 1031 ¶¶125–126, 162–163, repectively). Patent Owner does not dispute that Lee's stylets/electrodes are "filaments" as that term is used in the claims. *See* PO Resp. 23–25.

deployed configuration shown in Figure 1, "the ends of the wire-like stylets 22 are exposed," such that RF energy may be conducted from the tips of the stylets after they exit trocar 10 and "define an ablation volume in the target tissue." *Id.* ¶¶12, 92. "The electrodes may be used in a monopolar fashion with the ablation stylets excited with RF energy and a return electrode being applied usually in the form a conductive pad in contact with a remote surface on the patient." *Id.* ¶24.

As illustrated in Figure 1, stylets 22 are positioned around the perimeter of tip 14 and extend outwardly in a "cone" orientation around the central stylet (labeled 24*a* to indicate a sharpened piercing point), which is deployed through the center of trocar point 14. *Id.* ¶¶92, 102, 103, 128, Figs. 1–3. Lee discloses that stylets 22 "may be connected to suitable advancement and retraction mechanisms." *Id.* ¶106. During deployment, the electrically conductive stylets around tip 14 are guided by "deflection surfaces," which may comprise a plurality of channels and ramps. *Id.* ¶¶16, 18, 87 (the "electrodes are directed into the tissue at a variety of angles by a mandrel like delivery member which serves as a deflection surface"), 91, 102. The ends of the exposed stylets transmit RF energy to define an ablation volume. *Id.* ¶¶7, 12, 123, 129.

### d) Whether Lee Is Analogous Art

Patent Owner argues that Lee is not analogous art. PO Resp. 2, 34–36. "Although § 103 does not, by its terms, define the 'art to which [the] subject matter [sought to be patented] pertains,' this determination is frequently couched in terms of whether the art is analogous or not, i.e., whether the art is 'too remote to be treated as prior art.'" *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992) (quoting *In re Sovish*, 769 F.2d 738, 741

(Fed. Cir. 1985)). "Whether a reference in the prior art is 'analogous' is a fact question." *Clay*, 966 F.2d at 658. "Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *Id.* at 658–59.

Patent Owner argues that Lee is not analogous art under the first criterion because "Lee does not relate to neurotomy at all." PO Resp. 34. However, as discussed above, the field of the invention is not limited to neurotomy. The field of the invention is thermal ablation generally, which encompasses RF neurotomy, but which is not limited to RF neurotomy. Accordingly, we are not persuaded by Patent Owner's argument.

To the contrary, we are persuaded by Petitioner's argument that Lee is analogous art, under at least the first *Clay* criterion, because it "discloses various techniques for deploying electrodes from the tip of an RF ablation device." Pet. 18.

### 2. The Proposed Combination – "Racz's modified device"

Petitioner argues that "a POSA would have been motivated to implement deployable filaments on the distal tip (14/38) of Racz's electrode cannula (10/33)," as "Fitz and Lee disclose a known technique for solving a known problem in RF ablation devices—providing deployable filaments at a distal tip to expand and control the ablation volume compared to single-tip devices with inadequate energy coverage." Pet. 22–23. The Petition repeatedly refers to the proposed combination as "Racz's modified device."

*See, e.g.*, Pet. 44, 54, 57. The Petition also provides a definition for the term in a glossary, namely "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee." *Id.* at vii. Patent Owner likewise employs the same term. *See, e.g.*, PO Resp. 23–25. We follow suit below.

Patent Owner begins by asserting that "Racz does not teach or suggest deployable filament(s)," and "neither Fitz nor Lee teaches energizing those filaments at a distal end using an insertable RF probe." PO Resp 36. Therefore, Patent Owner concludes, "[w]hat is missing from all three references are deployable filament(s) that are energized at the distal end by an insertable RF probe. That feature, which is recited in each independent claim, is beyond what the references themselves teach." *Id*. Patent Owner's argument misses the mark.

The point of an obviousness challenge is that no one reference teaches all of the limitations of a claim, but a POSA would have found it obvious to combine known teachings to arrive at the claimed invention. So, although Patent Owner's statements are true as no single reference of record includes an RF probe *and* deployable filaments that are energized at the distal end of that probe, Patent Owner's argument is not persuasive. Rather, it is a classic case of attacking references individually, which is inapposite when a prior art combination is asserted as obvious, as is the circumstance here. *Keller*, 642 F.2d 413, 426 (C.C.P.A. 1981).

Patent Owner further asserts that the proposed combination (Racz's modified device) is "[t]oo [v]ague," and thus the Petition fails to comply with 35 U.S.C. § 312 ("requiring petitions to set forth grounds 'with particularity'"), 37 C.F.R. § 42.104 ("requiring petitions to be 'precise' and

'with specificity'"[14]), and 5 U.S.C. § 554(b) ("requiring timely notice of 'the matters of fact and law asserted'").  PO Resp. 37–38.

In support of these assertions, Patent Owner lists eight criticisms purportedly demonstrating "ambiguities, omissions, and lack of clarity that frustrate Stratus's ability to meaningfully respond to the petition."  *Id.* at 41; *see id*. at 37–42.  As discussed below, however, none of Patent Owner's criticisms is well taken, and none demonstrates a lack of compliance by the Petition with 35 U.S.C. § 312, 37 C.F.R. § 42.104, or 5 U.S.C. § 554(b).

The first such criticism is that the Petition provides "just one partial view of Racz's modified device, from just one perspective."  PO Resp. 38–39.  Patent Owner reproduces an image from the Petition to illustrate the point.  *See* PO Resp. 39.  We reproduce this illustration below and in addition add the related text appended to the image in the Petition.

---

[14] Contrary to Patent Owner's argument (*see* PO Resp. 37), Rule 104 does not include the phrase "with specificity."  37 C.F.R. § 42.104.



Dr. Tucker Declaration at ¶143 (showing one example
of how a POSA would modify Racz to include Lee's filaments)

Pet. 28; *see also* Ex. 1031 ¶143. According to Petitioner what is shown

above is "one example of how a POSA would modify Racz to include Lee's

filaments." Pet. 28. Dr. Tucker elaborates on that point, testifying:

> The figure shows *one example* of how a POSA (motivated by both Fitz and Lee) would have incorporated Lee's deployable filaments (22/1622) as monopolar electrodes at Racz's distal tip (14/38). This figure is not intended to be limiting or represent the only way Racz's device would have been modified, but I am providing it as a helpful illustration of how the references would be combined in one example.

Ex. 1031 ¶143.

Patent Owner does not identify any legal requirement for petitions to

*illustrate* proposed combinations of prior art features. Indeed, the very

statute identified by Patent Owner as "requiring petitions to set forth grounds

'with particularity'" (*see* PO Resp. 37) calls for the requisite particularity to

be "in writing," not by illustration. *See* 35 U.S.C. § 312(a)(3) ("A petition

filed under section 311 may be considered only if . . . (3) the petition

identifies, in writing and with particularity . . . the grounds on which the challenge to each claim is based.").  Simply put, there is no legal requirement to provide multiple illustrations of a proposed combination of prior art features (as Patent Owner implies), let alone a single illustration (as Petitioner has done).

The rest of the criticisms are that the Petition does not provide enough specific details.  *See* PO Resp. 39 ("Second, no dimensions are provided."), 40 ("Third, [regarding the filaments and their channels,] it is unclear how far proximally (left as shown [in the figures]) those channels continue (*i.e.*, where those channels begin on the proximal end) or how the filaments enter those channels."), 40 ("Fourth, it is unknown whether the tip remains bent, as taught by Racz, or has been straightened to accommodate the filaments in Racz's modified device."), 41 ("Fifth, it is unknown whether Racz's modified device includes anchors, which Lee says are necessary to prevent backward migration of the needle when Lee's filaments are deployed."), 41 ("Sixth, it is also unknown, for example, whether the filaments are electrically connected to an RF signal source, as taught be Lee, or not, as that may be unnecessary in view of Racz's RF probe."), 41 ("Seventh, it appears that no features of Fitz are incorporated into this modified device, but that is not clear."), 41 ("Eighth, Dr. Tucker refers to two examples of Racz's modified device, but the differences between them are not clear."). None of these criticisms is persuasive.

With respect to the second through sixth criticisms set forth above, Patent Owner has not explained, nor is it apparent to us, that any such detail is necessary in light of the claim requirements.  For example, the challenged

claims do not specify dimensions, mandate or preclude the use of anchors, or mandate or preclude a bent tip.

As for the "[s]eventh" criticism that it is not clear whether a feature from Fitz is being utilized, we are not persuaded. Lee and Fitz are somewhat duplicative or redundant of one another as both teach the use of deployable filaments at the distal end of an ablation device. *See, e.g.*, Pet. 18 ("Like Fitz, Lee discloses that a deployable-electrode technique can be used to deliver RF energy to a targeted area of tissue." (citing Ex. 1010 ¶¶32, 84, code (54)). It is true that the Petition illustrates "one example of how a POSA would modify Racz to include Lee's filaments" with no mention of Fitz. Pet. 27–28. The Petition clearly articulates, however, that "Racz's modified device" is "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee." Pet. vii. Thus, "Racz's modified device" is not limited to incorporating Lee's filaments. Further, even in the example of incorporating Lee's deployable filaments, the cited teachings of Fitz nonetheless are relevant as they provide further support for why a POSA would have been motivated to incorporate any deployable filaments into Racz. *See* Pet. 16 ("Fitz discloses that a known problem with single-tip RF neurotomy devices was 'that they do not allow for adequate coverage of the target area.'") (citing Ex. 1011 ¶4)), 17 ("To solve the problem of inadequate coverage in single-tip neurotomy devices, Fitz suggests providing a deployable 'set of electrodes' that extend outwardly from the 'exposed distal tip' of an RF neurotomy cannula." (citing Ex. 1011 ¶9, code (57), Claim 1; Ex. 1031 ¶ 120).

Patent Owner's last criticism regarding the purported vagueness of Racz's modified device is that "Dr. Tucker refers to two examples of Racz's

modified device, but the differences between them are not clear." PO Resp. 41 (citing Ex. 2006 ¶¶195–197; Ex. 2020, 112:9–113:5). What Patent Owner refers to, despite not citing to it in its brief, is Dr. Tucker's testimony offering two examples of how deployable filaments could be implemented in Racz. *See* Ex. 1031 ¶145 ("As a first example, it is my opinion that a POSA would be able to define channels (as disclosed in Lee) as an integral part of Racz's cannula and dimension the channels to accommodate Lee's filaments."), ¶147 ("As a second example, it is also my opinion that a POSA would also have been able to implement the combination of Racz and Lee using a separate tip defining channels (as disclosed in Lee)."). We are not moved by Patent Owner's criticism. Patent Owner does not cite any legal authority that would preclude a Petitioner (or its witness) from identifying multiple examples of how a POSA could have combined the prior art.[15]

---

[15] Patent Owner also states that it is not clear "if there are other (unillustrated) examples that [Dr. Tucker] or the petitioner intends to rely upon." PO Resp. 41. To the extent this is an argument, it is not persuasive. Petitioner relies on "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee." Pet. vii. That there may be additional permutations of how the prior art might be combined that Petitioner has not articulated does not undermine Petitioner's obviousness challenge. In fact, the law does not require Racz to be physically combinable with Lee or Fitz for their combination to be obvious. *See Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) ("Contrary to Allied's position, it is not necessary that [Caterpillar and Ogawa] be physically combinable to render obvious the ['489 patent]." (quotes and citation omitted); *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined but whether the

Further, as Petitioner points out, "obviousness does not require the art be 'physically combinable,' much less in the exacting detail [Patent Owner] Stratus suggests." Reply 12 (citing *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016)). Petitioner is correct. The Federal Circuit has held:

> To justify combining reference teachings in support of a rejection it is not necessary that a device shown in one reference can be physically inserted into the device shown in the other. The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.

*In re Keller*, 642 at 425 (citations omitted).

In sum, the proposed combination, which Petitioner refers to as "Racz's modified device" and defines as "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee" (*see* Pet. vii.), is not "vague," as Patent Owner asserts. *See* PO Resp. 37.

### 3. *Reason To Combine*

Petitioner cites *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373 (Fed. Cir. 2023) as holding that, "if there's a known technique to address a known problem using prior art elements according to their established functions, then there is a motivation to combine." *Id.* at 1380; Pet. 22–23. Petitioner cites Fitz and Lee as evidence that implementing deployable

---

claimed inventions are rendered obvious by the teachings of the prior art as a whole.").

filaments on the distal tip of an RF ablation device was a known technique for expanding and controlling the ablation volume. Pet. 23 (citing Ex. 1011, ¶¶9–10, code (57); Ex. 1010 ¶¶12, 84, 123–131); *see also* Ex. 1031 ¶¶60–65, 69–72 (Dr. Tucker testifying, among other things, that deployable electrodes were well known in the art). In addition, Petitioner cites declaration testimony of Dr. Tucker that "a POSA would have been motivated to implement deployable filaments on the distal tip (14/38) of Racz's electrode cannula (10/33)" of the proposed combination, as he "would have recognized that the Fitz/Lee technique would improve the energy coverage area of Racz's single-tip device." Ex. 1031 ¶132, *cited in* Pet. 22.

Petitioner presents additional arguments and evidence to support that a POSA would have had an apparent reason to make Racz's modified device. Pet. 22–28. We need not address these additional arguments and evidentiary citations, however, as Petitioner has demonstrated by a preponderance of the evidence that implementing deployable filaments on the distal tip of an RF ablation device was a known technique for expanding and controlling the ablation volume. Thus, so long as there would have been a reasonable expectation of success in making Racz's modified device (addressed *infra*), the combination would have been obvious. *See Intel Corp.*, 61 F.4th at 1380 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."); *Medichem*, 437 F.3d at 1165 ("[A]n obviousness determination requires not only the existence of a motivation to combine elements from different prior art

32

references, but also that a skilled artisan would have perceived a reasonable expectation of success in making the invention via that combination.").

Patent Owner argues that Petitioner presents an inadequate motivation to combine Racz, Fitz, and Lee. PO Resp. 57. In that regard, Patent Owner summarizes testimony of Mr. Crosby as demonstrating that "the art was generally characterized by two alternative approaches: (1) tine-less devices with removable RF probes for distal energization and (2) probe-less tined devices in which deployable tines or filaments are energized at the proximal end." *Id.* at 57 (citing Ex. 2006 ¶¶161–167). According to Patent Owner, prior to the '782 patent, these "two distinct approaches . . . had never before been attempted together" and "were considered mutually exclusive." *Id.*

The legal significance of this line of argument is not clear. To the extent it is an attack on the references individually, it is not persuasive. *See In re Keller*, 642 F.2d at 426 ("But one cannot show non-obviousness by attacking references individually where, as here, the rejections are based on combinations of references."). To the extent it is a preview of Patent Owner's teaching away arguments, such arguments are addressed further below.

Patent Owner presents numerous additional arguments attempting to show that a POSA would not have had an adequate reason to combine the prior art as proposed by Petitioner. PO Resp. 50–56. These arguments are not persuasive, first and foremost, because they do nothing to rebut the following facts established by Petitioner: (1) it was known in the art that deployable filaments could be provided at a distal tip of an RF ablation device to expand and control the ablation volume compared to single-tip

devices, (2) a POSA would have recognized that deployable filaments similarly would improve Racz's electrode cannula in the same way.

Still, we address Patent Owner's arguments. In general, Patent Owner presents two main arguments—the asserted prior art teaches away from Racz's modified device, and a POSA would have combined the prior art in a manner outside the scope of the challenged claims. PO Resp. 51–59.

As for the teaching away argument, Patent Owner offers three explanations. First, Patent Owner argues that "Racz teaches away from the addition of filaments." PO Resp. 51. This is so, according to Patent Owner, because, "[f]or Racz's modified device to be usable as a neurotomy needle, the filaments would need to be extraordinarily thin or narrow" such that they would be unworkable. *Id.* "Assuming they could even be constructed at all, [Patent Owner continues,] such small filaments would be so flexible as to be bent by tissue in unpredictable manners as they exit the needle or possibly not even being able to pass through the tissue." *Id.* (citing Ex. 2006 ¶282).

Patent Owner argues that Racz expressly teaches away from such filaments in the following passage.

> Stimulation and high frequency electrodes having expandable and flexible curved tips are known. Examples of such electrodes are the TEW Electrode Kit and the ZHK Electrode Kit, both manufactured by Radionics. Those electrodes both have flexible, curved tips, which extend from the straight shaft of an enclosing cannula to extend off-axis in an arc. This is useful in certain neural regions such as the trigeminal ganglion or the pituitary gland, or any area where the target region is very soft or fluid filled. *Such flexible off-axis electrodes have a limitation that there [sic] tips cannot penetrate tough tissue or encounter hard bone <u>without being damaged or diverted</u>*.

PO Resp. 52 (quoting Ex. 1009, 2:26–37 (colored text converted to black)).

Petitioner replies that Racz does not teach away from flexible electrodes (or deployable filaments) because Racz endorses them in some situations, including some RF neurotomy procedures.  Reply 14.  Petitioner is correct.  In fact, in the sentence immediately preceding the purported teaching away (in italics *supra*), Racz states that such flexible electrodes are "useful in certain neural regions such as the trigeminal ganglion or the pituitary gland, or any area where the target region is very soft or fluid filled."  Ex. 1009, 2:35–34.

Second, Patent Owner argues that, "[b]ecause Racz teaches that a curved tip is a necessity, Racz teaches away from the petition's proposal *to the extent that Racz's modified device would have a straight tip*."  PO Resp. 55 (emphasis added)[16]; *see also* Ex. 1009, code (54) ("Bent Tip Electrical Surgical Probe"), code (57) ("A medical needle or cannula for stimulation or ablation includes a rigid bent tip for simplified placement at target sites within a patient's anatomy.  The curved tip or shaft is used to

---

[16] A fair reading of the Petition shows that Petitioner's challenge is based on a modification of Racz's improved electrode cannula, which has a bent tip, not a straight tip.  *See* Pet. 22 (asserting that "a POSA would have been motivated to implement deployable filaments on the distal tip (14/38) of *Racz's electrode cannula (10/33)*" (emphasis added)); Ex. 1009, Figs. 1 (showing Racz's cannula 10 with a bent tip), 2A–B (showing Racz's cannula 33 with a bent tip)).  However, a fair reading of the Petition further shows that Petitioner's challenge is not premised on Racz's modified device having a bent tip; rather, it is indifferent as to that feature.  *See, e.g.,* Pet. 13–16 (summarizing Racz's disclosure and not noting the bent tip); *compare* Pet. 14 (annotated Racz Fig. 1 – curved tip shown), *with* Pet. 15 (annotated Racz Fig. 2B – straight tip shown).

steer the device within the patient's body and to avoid critical anatomical structures.").

Petitioner replies that, "[a]t most, Racz suggests a preference for a bent tip in limited scenarios but never requires it." Reply 14 (citing Ex. 1009, 2:3–25, 2:39–41; Ex. 1045, 129:15–131:2, 133:17–134:10). Petitioner is correct insofar as Racz does not require a bent tip or teach away from a straight tip in all scenarios. Rather, Racz (1) substantiates that a POSA would have known about RF ablation devices with straight tips and that such devices were suitable for some applications, and (2) teaches a bent tip as an improvement for other applications. *See, e.g.*, Ex. 1009, 1:32–35 ("Radiofrequency electrodes are commonly used; these typically have an insulated straight tubular metal shaft with an electrically exposed tip."), 4:56–58 ("This procedure can be more effective when performed with the rigid bent tip 14 of the invention than with a traditional straight or flexible tip.").

In sum, Petitioner's proposal is not conditioned on Racz's modified device having a straight tip or a bent tip.[17]

---

[17] The degree of bend or curvature of Racz's tip can vary widely per Racz. *See* Ex. 1009, 8:58–9:1 ("Various forms and embodiments of the bent tip needle or cannula are provided herein involving various shapes, sizes, forms, and configurations of the cannula" and, within the scope of the invention, "various configurations of tip geometry, bluntness or sharpness, degree of curvature, position of fluid injection ports, and the insulation configuration may be devised."). Dr. Tucker interpreted this to mean that it could be varied to zero, resulting in a straight tip. Ex. 2020, 48:1–3. Regardless, of whether a straight tip would be considered part of Racz's invention, as Dr. Tucker testifies, Racz clearly shows that straight tips were known in the art.

Third, Patent Owner argues "it is unclear whether Racz's modified device would have anchors as taught by Lee," as the Petition does not address anchors. PO Resp. 56. Thus, according to Patent Owner, Lee teaches away from Racz's modified device because, "[a]ccording to Lee, such anchors are a necessity to prevent movement of the needle when Lee's [filaments] are deployed, unless the [filaments] are deployed 'one at a time.'" *Id.* (quoting Ex. 1010 ¶¶89, 104).

Petitioner replies that Lee does not teach what Patent Owner asserts it to teach. Rather, according to Petitioner, "Lee is unequivocal that its anchors are optional." Reply 14 (citing Ex. 1010 ¶¶90, 104). Petitioner is correct. *See* Ex. 1010 ¶90 ("It is also contemplated in accordance with the invention that there are circumstances where anchors might not be applied at all."), ¶104 ("[I]f desired, anchors may not be deployed.").

We are not persuaded that any of the asserted prior art teaches away from the claimed invention.

We turn now to Patent Owner's related argument that, if a POSA would have combined the prior art, the POSA would have done so exclusively in a manner outside the scope of the challenged claims. PO Resp. 58–59. Specifically, Patent Owner argues that a POSA would consider the use of deployable filaments in an ablation device, as taught by Fitz or Lee, only in lieu of, and not in addition to, a removable RF probe, as taught in Racz. *Id.* In other words, according to Patent Owner, if a POSA sought to improve Racz "to achieve the expanded-ablation-volume objective stated in the petition," the POSA "could simply replace Racz's probe 52 with Fitz's electrodes." *Id.* at 58. Thus, as Patent Owner concludes, "Racz's

modified device is far more complicated and problematic than necessary." *Id.*

This line of argument does not demonstrate that a POSA would not have combined the prior art in the manner proposed by Petitioner. It merely demonstrates that a different combination, one lacking an RF probe and thus not encompassed by the claims,[18] also may have been obvious to a POSA and ostensibly would have been considered superior to Petitioner's proposed combination. But "just because [allegedly] better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012); *see also In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."). Thus, even if Racz's modified device were inferior to the alternative combination identified by Patent Owner, such a fact would not rebut or undermine Petitioner's reason to combine the art into Racz's modified device.

In sum, we are persuaded that Petitioner has shown sufficiently that a POSA would have had an adequate reason to combine the prior art as proposed by Petitioner.

### 4. *Reasonable Expectation of Success*

Patent Owner disputes that there would have been a reasonable expectation of success in making the proposed combination. PO Resp. 43–

---

[18] Independent claims 1 and 24 recite "an radiofrequency probe."

49.  Patent Owner argues both that Petitioner's evidence does not support a reasonable expectation of success, and that Patent Owner's evidence demonstrates a lack of it.  *Id.* at 43.

As for the former point, Patent Owner argues that "[t]he sole" evidence for a reasonable expectation of success that Petitioner presents "is Dr. Tucker's bald conclusion, which is entitled to no weight."  PO Resp. 43.

Dr. Tucker's testimony is not a bald conclusion.  His conclusion as to a reasonable expectation of success is set forth in paragraph 148 of his declaration.  Ex. 1031 ¶148.  It is supported extensively with testimony regarding what the prior art teaches (*see id.* ¶¶110–117 (Racz), ¶¶118–123 (Fitz), ¶¶124–131 (Lee)) and why and how a POSA would have combined the prior art teachings (*see id.* ¶¶132–147).

Dr. Tucker's testimony clearly is entitled to weight.  Since 1983, he has "been a Professor at the University of Iowa where [he] direct[s] an active research program in radiofrequency electrosurgical procedures and instrumentation."  Ex. 1031 ¶3.  He has a Ph.D. in biophysics, and he is also a medical doctor (albeit he is not Board certified as pointed out by Patent Owner[19]).  *Id.* ¶2.  He also has additional training and experience that is relevant, but which is not necessary, but further establishes that he is well qualified to offer the opinions set forth in his declaration.  *Id.* ¶¶2–11.

Patent Owner argues that Dr. Tucker is not qualified to testify here because "he is not Board certified" and he is "not a pain-specialist physician and has never performed a neurotomy."  PO Resp. 30.  Dr. Tucker explained, however, that he is not Board certified nor does he operate on

---

[19] *See* PO Resp. 30 (citing Ex. 2020, 10:19–12:20).

patients because his work focuses on the development of instrumentation, not the use of it, explaining on cross-examination:

> I have a Ph.D. in engineering and had no intention of doing pathology on patient samples day-to-day. I wanted to combine my Ph.D. in engineering with pathology to develop instrumentation. Medical instrumentation. So I never was Board-certified. Instead of Boards, I got a Ph.D.

Ex. 2020, 11:7–13. We are persuaded that Dr. Tucker is qualified to offer testimony in this proceeding, and that his testimony adequately supports Petitioner's asserted reasonable expectation of success.

We turn now to whether there would have been a reasonable expectation of success.

It is not disputed that Racz discloses a cannula with a removable RF probe, and Lee and Fitz both disclose cannulas with deployable filaments ("electrodes" in Fitz and "stylets" in Lee). Pet. 13–21; PO Resp. 19–23. These disclosures are presumed to be enabling. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003) ("[W]e hold a presumption arises that both the claimed and unclaimed disclosures in a prior art patent are enabled."); *Apple Inc. v. Corephotonics, Ltd.*, No. 2020-1438, 2021 WL 2577597, at *4 (Fed. Cir. June 23, 2021) (nonprecedential) (holding that in the context of AIA trial proceedings, "regardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art" and that "[i]t was error for the Board to suggest otherwise"). Accordingly, it is clear that there would have been a reasonable expectation of success in making a cannula with an RF probe as well as a cannula having deployable filaments, as taught by Racz and Fitz/Lee, respectively.

The question before us is whether there would have been a reasonable expectation of success in combining the prior art features into Racz's modified device.[20] Petitioner answers that question in the affirmative, pointing to the testimony of Dr. Tucker. Pet. 28 (citing Ex. 1031 ¶148). As discussed above, Dr. Tucker's conclusion is supported extensively with testimony regarding what the prior art teaches (*see* Ex. 1031 ¶¶110–117 (Racz), ¶¶118–123 (Fitz), ¶¶124–131 (Lee)) and why and how a POSA would have combined the prior art teachings (*see id.* ¶¶132–148). For example, Dr. Tucker explains that, because Lee discloses that deployable filaments can be arranged around the inner perimeter of a cannula such that they surround and provide space for a central element, a POSA would have understood that they could be arranged to accommodate Racz's centrally located removable RF probe. Ex. 1031 ¶140. Dr. Tucker further testifies that a POSA could make the combination "using ordinary skill and routine engineering," and it "would involve nothing more than using prior art elements like the filaments (22/1622), cannula (10/33), active tip (14/38),

---

[20] Separately, Patent Owner argues that Racz's modified device is not enabled. PO Resp. 49–51. In particular, Patent Owner argues that the "references used in an obviousness challenge must collectively teach a POSITA how to make the claimed invention . . . without undue experimentation." *Id.* (citing *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *Bristol-Myers Squibb v. Ben Venue Labs, Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001); *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The cited cases, however, do not support Patent Owner's argument. To be clear, the law does not require that a combination of prior art teachings "enable" what they render obvious. Rather, Patent Owner's arguments in this regard appear to be a rehashing of its unpersuasive reasonable expectation of success arguments.

and removable probe (22/52) according to their established functions, which would have been known to a POSA." *Id.* ¶¶143–144; *see also* Pet. 6 ("This would have been a matter of routine engineering with entirely predictable results"). Consistent with this testimony, Petitioner accurately points out that the '782 patent itself does not teach how to manufacture its claimed invention. *See* Reply 16 (Patent Owner "Stratus argues that the proposed combination would be too challenging to manufacture, leaving a POSA with no expectation of success. [PO Resp.] 43–51. But the specification belies Stratus's position—nowhere does it teach how to manufacture the disclosed system or devices."). Patent Owner does not dispute this point. Sur-reply 5–6.[21]

Patent Owner argues there would not have been a reasonable expectation of success because of the difficulty of incorporating deployable filaments into Racz while retaining its removable RF probe given the purported size constraints applicable to neurotomy. In particular, Patent Owner argues that Racz's modified device would have required that the deployable filaments longitudinally slide through channels extending within the sidewall of Racz's cannula, but such narrow channels "would be extremely challenging, if not impossible, to fabricate." PO Resp. 43

---

[21] Although Patent Owner does not dispute that the '782 patent omits how to manufacture the claimed invention, Patent Owner argues that the omission is irrelevant because "Stratus's invention is ***different***" than Racz's modified device. Sur-reply 5–6. Patent Owner does not explain sufficiently why the alleged differences excuse the lack of manufacturing details in the '782 patent while a lack of manufacturing details in the Petition would be fatal to Petitioner's challenge.

(quoting Ex. 2006 ¶225).[22]  According to Patent Owner, "[i]f reduced to a size suitable for RF neurotomy, those channels would be so long and thin that there would be no reasonable expectation of success to make them.  At its largest an RF neurotomy needle would be 16 gauge, with a 1.65-mm outer diameter and 1.19-mm inner diameter, meaning that the sidewall is 0.22 mm thick."  *Id.* at 43–44 (citing Ex. 2006 ¶235; Ex. 2001 ¶¶158–160, 230–236).[23]  Patent Owner's argument is not persuasive.

Petitioner replies with persuasive evidence that 16 gauge is *not* the maximum size for neurotomy.  Reply 19–20.  In particular, Petitioner relies on the following disclosure of Racz: "Those individuals skilled in the art

---

[22] Patent Owner raises a related argument, that Racz's modified device "would be even more difficult to fabricate if the tip is bent or curved, as emphatically taught by Racz."  PO Resp. 43–44.  However, Petitioner's challenge is not premised on preserving Racz's bent tip.  Nor does Racz require any particular bend or curvature to the tip.  Rather, Racz expressly contemplates wide variations in the geometry of the tip.  *See* Ex. 1009, 8:58–9:1 ("Various forms and embodiments of the bent tip needle or cannula are provided herein involving various shapes, sizes, forms, and configurations of the cannula" and, within the scope of the invention, "various configurations of tip geometry, bluntness or sharpness, degree of curvature, position of fluid injection ports, and the insulation configuration may be devised.").  Thus, if a certain tip's shape or curvature proved difficult to work with, a POSA would have known, based on this explicit disclosure, that the tip could be altered as needed.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (The obviousness analysis "can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."), 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

[23] *See* Ex. 2001 ¶99 ("Gauge refers to the inner measurement or opening of the needle, and the higher the number, the smaller the needle."); Ex. 2006 ¶228 ("The smaller the gauge number, the bigger the needle.").

will recognize that many variations of the electrode geometries depicted in FIGS. 1–3 are possible without departing from the invention.  Various sized electrodes can be made, from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge)."  Ex. 1009, 8:10–15, *cited in* Reply 19.

Patent Owner responds that Racz's teaching of 10-gauge electrodes is referring exclusively to non-neurotomy applications because it "does not actually say that a ***neurotomy*** needle could be as big as 10-gauge."  Sur-Reply 8.  Patent Owner posits that the 10-gauge teaching must be referring instead to *non*-neurotomy applications because Racz states that its "invention is not limited to use in such [previously discussed] applications, and ***other medical and surgical procedures*** would be apparent to a practitioner of ordinary skill."  *Id.* (quoting Ex. 1009, 9:12–18).

We are not persuaded by Patent Owner's characterization of Racz. The teaching that Petitioner relies on from Racz is expressly applicable to "variations of the electrode geometries depicted in FIGS. 1–3 [that] are possible without departing from the invention."  Ex. 1009, 8:11–13. Notably, Patent Owner concedes that the embodiments disclosed in Racz Figures 1 and 2 are for RF *neurotomy*.  *See* PO Resp. 19 ("Racz discloses an RF neurotomy 'needle or cannula' 10/33 with a shaft 12/34 and curved tip 14/38, which enables it to go around anatomical structures 16." (citing Ex. 1009, 4:44–58)); *see also* Ex. 1009, Fig.1 (labeling the cannula of Figure 1 with reference numeral "10"), Fig. 2 (labeling the cannula of Figure 2 with reference numeral "33").  Thus, Racz's teaching that "[v]arious sized electrodes can be made[] from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge)" applies to RF neurotomy needles and cannulas.  Ex. 1009, 8:13–15.

We are cognizant that Patent Owner cites declaration testimony that supports its contrary argument that, "[a]t its largest[,] an RF neurotomy needle would be 16 gauge." PO Resp. 44 (citing Ex. 2006 ¶235; Ex. 2001 ¶¶158–160, 230–236). However, we find Racz—an issued patent—to be inherently more credible than witness testimony prepared specifically for litigation, and we give it more weight.

In sum, we are not persuaded by Patent Owner's foundational argument that Racz's modified device could not be larger than 16 gauge. According, we likewise are not persuaded by Patent Owner's conclusion that it "would be extremely challenging, if not impossible, to fabricate" Racz's modified device. PO Resp. 42. Instead, we are persuaded by Petitioner's arguments and evidence showing that there would have been a reasonable expectation of success in making the proposed combination, as the prior art features were known and could have been combined through ordinary skill in the art.

## E. Ground 1

Petitioner asserts that claims 1–27 of the '782 patent would have been obvious over Racz, Fitz, and Lee. Pet. 13–67. Claims 1 and 27 are independent. Claims 2 through 23 ultimately depend from independent claim 1. Claims 25–27 ultimately depend from independent claim 24. We begin our analysis with claim 1.

### 1. Claim 1

Petitioner relies on the disclosure of Racz to teach all of the limitations of claim 1 that do not involve a filament. *See* Pet. 29–36. Petitioner provides a detailed explanation supported with the testimony of

Dr. Tucker that Racz teaches a system comprising "a radiofrequency probe and a radiofrequency neurotomy needle operable with the radiofrequency probe" where the radiofrequency neurotomy needle comprises "a conductive portion at a distal end of the radiofrequency neurotomy needle, a tip configured to pierce tissue of a patient, [and] an elongate member comprising a lumen configured to accept the radiofrequency probe therein such that the radiofrequency probe physically contacts and is electrically connected to the conductive portion, the tip being at a distal end of the elongate member." *See id*.; Ex. 1031 ¶¶149–160. Patent Owner does not dispute that Racz teaches these limitations of claim 1. *See generally* PO Resp. After reviewing the evidence, we find that Petitioner has shown sufficiently that Racz teaches these limitations.

Each of the remaining limitations of claim 1 involves a filament, and Petitioner relies on Racz's modified device as explained by Dr. Tucker to teach these remaining limitations of claim 1. Pet. 36–47; *see* Ex. 1031 ¶¶161–180. As discussed above, *see supra* Section II.D., Patent Owner challenges whether the asserted combination of Racz, Fitz, and Lee teach or suggest Racz's modified device. *See* PO Resp. 32–60. We have addressed Patent Owner's concerns above and found them unpersuasive. We also determined above that Petitioner has shown sufficiently that a POSA would have had an adequate reason to combine the prior art as proposed by Petitioner to arrive at Racz's modified device with a reasonable expectation of success. *See supra* Section II.D. Thus, we determine that Petitioner has shown sufficiently that Racz's modified device teaches or suggests each of the remaining limitations of claim 1 involving filaments as explained by Petitioner with the support of Dr. Tucker's testimony.

*Objective Indicia*

Patent Owner argues that "the following objective indicia show nonobviousness: (1) long-felt-but unmet need; (2) copying by others; (3) industry praise; and (4) commercial success." PO Resp. 61.

Objective indicia evidence "must always be considered when present en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). However, "to be accorded substantial weight in the obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019). Patent Owner bears the burden of proving nexus. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("The burden of proof as to this connection or nexus resides with the patentee.").

Nexus can be established in one of two ways. First, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392). "That is, presuming nexus is appropriate 'when the patentee shows that the asserted objective evidence is tied to a specific product and that product

47

[1] 'embodies the claimed features, and [2] is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)); *see also Fox Factory, Inc. v. SRAM, LLC*, 813 F. App'x 539, 542, 2020 WL 2517105 (Fed. Cir. 2020) ("[A] product is not coextensive with a claimed invention simply because it falls within the scope of the claim.").

The second way to prove nexus is directly, by showing that the presented evidence of secondary considerations is "a direct result of the unique characteristics of the claimed invention." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *Fox Factory*, 944 F.3d at 1373–74 (In the absence of a presumption, nexus can be proved "by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention.").

Patent Owner argues that "[t]his is a case in which a nexus should be presumed." PO Resp. 74. This is so, according to Patent Owner because the "Nimbus devices embody at least challenged claim 1 and are coextensive with claim 1." PO Resp. 73 (citing Ex. 2006 ¶21; Ex. 2008).

In the cited testimony, Mr. Crosby states:

> I understand that Stratus makes and sells an RF neurotomy device called the "Nimbus® Multi-tined Expandable Electrode" (Nimbus Device). I have personally inspected the Nimbus Device and compared it to the claims of the Stratus Patents. Details of that comparison are included in Exhibit 2008, which I incorporate into this declaration as part of my testimony. It is my opinion that the Nimbus Device is covered by at least some claims of each of the Stratus Patents.

Ex. 2006 ¶21.

The term "Stratus Patents" refers to the '782 patent and the two related patents that are the subject of *inter partes* reviews No. IPR2024-01210, IPR2024-001211, and No. IPR2024-01212. Ex. 2006 ¶¶17–19. Exhibit 2008 is a claim chart purporting to map Patent Owner Stratus's products to claim 1 of each of the three Stratus Patents. However, as pointed out by Petitioner (*see* Reply 26), what the claim chart compares to claim 1 of the '782 patent (as well as claim 1 of the other Stratus Patents) is not the Nimbus Device, but rather the Nimbus Device *in combination with a second product*, either a reusable or disposable RF Probe. *See* Ex. 2008.

Both Mr. Crosby and Patent Owner expressly define the Nimbus Device to be the "Nimbus® Multitined Expandable Electrode" *without the RF probe*. *See* Ex. 2006 ¶21 ("I understand that Stratus makes and sells an RF neurotomy device called the 'Nimbus® Multi-tined Expandable Electrode' (Nimbus Device)."). PO Resp. 13 ("Stratus markets a device known as the Nimbus® Multitined Expandable Electrode ('Nimbus device') and RF probes usable therewith that are covered by the '782 Patent."). As Petitioner points out, "[i]t is undisputed that all claims require an RF probe." Reply 26.

Patent Owner—perhaps anticipating this shortcoming—vacillates between referring to the singular "Nimbus device," which Patent Owner defines as excluding an RF probe, and the plural "Nimbus devices," which Patent Owner does not define but which it implies is a combination of the Nimbus device and one of Stratus's two RF probes. There is a clear disconnect between Patent Owner's position and its evidence. For example, Patent Owner argues that "the Nimbus *devices* embody at least challenged claim 1 and are coextensive with claim 1." PO Resp. 73 (emphasis added;

citing Ex. 2006 ¶21; Ex. 2008). However, the cited testimony of Mr. Crosby refers only to the Nimbus *device* (without the RF probe).

> 21. I understand that Stratus makes and sells an RF neurotomy device called the "Nimbus® Multi-tined Expandable Electrode" (Nimbus Device). I have personally inspected the Nimbus Device and compared it to the claims of the Stratus Patents. Details of that comparison are included in Exhibit 2008, which I incorporate into this declaration as part of my testimony. It is my opinion that the Nimbus Device is covered by at least some claims of each of the Stratus Patents.

Ex. 2006 ¶21. Exhibit 2008 does not support Mr. Crosby's testimony. For limitation [1a] (i.e., "an RF probe"), the claim chart fails to map any portion of the Nimbus device. Instead, the claim chart maps limitation [1a] to one of two separate Nimbus products: "Stratus offers two types of RF probes, reusable and disposable, for use with its needle." Ex. 2008, 1.

In its Sur-reply, Patent Owner argues that, for presumption of nexus purposes, "there is no legal or logical requirement that all components of the claimed invention be sold together in one transaction." Sur-reply 26. Patent Owner does not cite any legal authority for this proposition. Under binding precedent, to be afforded a presumption of nexus, Patent Owner must show that its objective indicia evidence "is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory*, 944 F.3d at 1373 (quoting *Demaco*, 851 F.2d at 1392). Patent Owner has failed to do this.

Accordingly, Patent Owner has failed to show that its objective indicia evidence bears a nexus to the claimed invention, and we give it no weight.

*Conclusion as to Claim 1*

We determine that Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious over Racz, Fitz, and Lee.

### 2. Claims 2–27

Petitioner offers a detailed explanation as to how the combination of Racz, Fitz, and Lee also teaches each limitation of claims 2 through 27 supported by the testimony of Dr. Tucker. *See* Pet. 48–67; Ex. 1031 ¶¶181–220. Patent Owner does not challenge this showing apart from the arguments regarding Racz's modified device that we have previously addressed and found unpersuasive. *See* PO Resp. 32–59; *supra* Section II.D.

We have reviewed the Petitioner's assertion and evidence and determine that Petitioner has shown by a preponderance of the evidence that claims 2–27 would have been obvious over Racz, Fitz, and Lee.

### F. Remaining Grounds

In each of the remaining grounds, Petitioner challenges the same claims or a subset of the claims that it challenges in Ground 1, but adds one or more additional references (i.e., Scheibe, Young '965, Cosman, Young '201, Godara). Pet. 12–13.

We have already determined, in connection with Ground 1, that Petitioner has shown by a preponderance of the evidence that claims 1–27 would have been obvious over Racz, Fitz, and Lee. Thus, for reasons explained above in connection with Ground 1, we are persuaded that claims 1–27 also would have been obvious over the various combinations presented in the remaining grounds.

### III. MOTIONS TO EXCLUDE

Each of the parties filed a motion to exclude. Paper 49 ("Pet. Mot. To Exclude"); Paper 47 ("PO Mot. To Exclude").

Petitioner's Motion seeks to exclude (1) paragraphs 16–27, 47, 54, and 55 from a declaration of Cody Jorgensen (Exhibits 2015, 2016, 2039[24], and 1037) and (2) Exhibits 2021–2026 in their entireties.

Patent Owner's Motion seeks to exclude Petitioner's Exhibit 1063 if Patent Owner's Exhibits 2044 and 2045 are excluded or otherwise not considered.[25] *See* PO Mot. To Exclude 1 ("Stratus conditionally requests that, if its Exhibits 2044 and 2045 are struck from the record or otherwise not considered by the Board, then Exhibit 1063 must be excluded under Federal Rule of Evidence ("FRE") 106 for violating the doctrine of completeness.").

The instant Decision not rely on any of the evidence either party seeks to exclude. Accordingly, both Motions are dismissed as moot.

### IV. CONCLUSION

We conclude, based on a preponderance of the evidence, that claims 18–27 are unpatentable. In summary:

---

[24] The record contains three copies of Mr. Jorgensen's declaration. Exhibit 2015 is an unredacted copy that is under seal. Exhibit 2016 is publicly filed copy with redactions of confidential information. Exhibit 2039 is a third copy of Mr. Jorgensen's declaration that Patent Owner Stratus filed, which copy "identifies the redactions that Stratus propose[d] to remove in gold highlighting and those it propose[d] to maintain in violet highlighting." Paper 27, 5.

[25] Exhibits 2044 and 2045 were filed by Patent Owner with its Sur-reply contrary to 37 C.F.R. § 42.23(b). We do not rely on either of these exhibits.

| Claims | 35 U.S.C. § | Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–27 | 103(a) | Racz, Fitz, Lee | 1–27 | |
| 1–27 | 103(a) | Racz, Fitz, Lee, Young '965 | 1–27 | |
| 1–27 | 103(a) | Racz, Fitz, Lee, Scheibe | 1–27 | |
| 1–27 | 103(a) | Racz, Fitz, Lee, Young '965, Scheibe | 1–27 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542 | 7–9 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542, Young '965 | 7–9 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542, Scheibe | 7–9 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman '542, Young '965, Scheibe | 7–9 | |
| 13 | 103(a) | Racz, Fitz, Lee, Young '2001 | 13 | |
| 13 | 103(a) | Racz, Fitz, Lee, Young '201, Young '965 | 13 | |
| 13 | 103(a) | Racz, Fitz, Lee, Young '201, Scheibe | 13 | |

| Claims | 35 U.S.C. § | Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 13 | 103(a) | Racz, Fitz, Lee, Young '201, Young '965, Scheibe | 13 | |
| 15 | 103(a) | Racz, Fitz, Lee, Godara | 15 | |
| 15 | 103(a) | Racz, Fitz, Lee, Godara, Young '965 | 15 | |
| 15 | 103(a) | Racz, Fitz, Lee, Godara, Scheibe | 15 | |
| 15 | 103(a) | Racz, Fitz, Lee Godara, Young '965, Scheibe | 15 | |
| **Overall Outcome** | | | 1–27 | |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–27 of U.S. Patent No. 10,966,782 B2 are proven unpatentable;

FURTHER ORDERED that both Motions to Exclude are dismissed as moot; and

FURTHER ORDERED that, because this Decision is final, a party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2024-01209
Patent 10,966,782 B2

FOR PETITIONER:

Christopher Kelly
Gregory Carlin
Warren Thomas
Lee Hamilton
MEUNIER CARLIN & CURFMAN LLC
ckelly@mcciplaw.com
gcarlin@mcciplaw.com
wthomas@mcciplaw.com
lhamilton@mcciplaw.com

FOR PATENT OWNER:

Daniel Higgs
Kevin Laurence
Matthew Phillips
Derek Meeker
Joseph Hawkins
LAURENCE & PHILLIPS IP LAW
dhiggs@lpiplaw.com
klaurence@lpiplaw.com
mphillips@lpiplaw.com
dmeeker@lpiplaw.com
joe@lpiplaw.com