**2026-1795, 2026-1797**

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**STRATUS MEDICAL, LLC,**
*Appellant*

v.

**AVANOS MEDICAL, INC.,**

*Appellee*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Case Nos.
IPR2024-01209 and IPR2024-01212

---

# STRATUS MEDICAL, LLC'S CORRECTED APPELLANT BRIEF

---

Matthew C. Phillips (503-964-1129)
Kevin B. Laurence (202-558-6180)
Daniel C. Higgs (801-703-1961)

LAURENCE & PHILLIPS IP LAW
1050 Connecticut Ave. NW, Suite 500
Washington, DC 20036

*Counsel for Appellant*

September 15, 2026

## REPRESENTATIVE CLAIMS

U.S. PATENT NO. 10,966,782

1. A system comprising:

a radiofrequency probe; and

a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising:

a conductive portion at a distal end of the radiofrequency neurotomy needle;

a tip configured to pierce tissue of a patient;

an elongate member comprising a lumen configured to accept the radiofrequency probe therein such that the radiofrequency probe physically contacts and is electrically connected to the conductive portion, the tip being at a distal end of the elongate member;

a filament electrically connected to the conductive portion and the tip due to physical contact of conductive materials at the distal end of the radiofrequency neurotomy needle such that the filament and the tip operate together as a single electrode, the filament being movable between a retracted position, in which the filament is at least partially in the elongate member, and a deployed position, in which at least a portion of the filament is out of the elongate member; and

an actuator interconnected to the filament to move the filament between the retracted position and the deployed position,

wherein the filament and the tip are configured to transmit radiofrequency energy from the radiofrequency probe and operate together as the single electrode in a monopolar mode when the filament is in the deployed position and the radiofrequency probe is accepted in the lumen and is in physical contact with the conductive portion at the distal end of the radiofrequency neurotomy needle.

U.S. PATENT NO. 10,925,664

**1.** A method comprising:

inserting a needle into a patient, the needle comprising:

an elongate member;

a piercing tip at a distal end of the elongate member;

a lumen within the elongate member; and

a filament in a retracted position in which the filament is at least partially disposed within the elongate member;

moving the filament to a deployed position within the patient in which at least a distal end of the filament is out of the elongate member and disposed away from the tip;

inserting a radiofrequency probe into the lumen of the needle such that the radiofrequency probe contacts a conductive portion of the needle at a distal end of the needle to thereby establish an electrically conductive path from the radiofrequency probe to the filament; and

operating the radiofrequency probe, the tip, and the filament as a monopolar electrode, with radiofrequency energy from the radiofrequency probe being conducted to the filament through the electrically conductive path and transmitted by the filament.

**10.** The method of claim 1, further comprising:

after said inserting the needle into the patient, moving the needle to a target volume within the patient that includes a nerve; and

ablating the nerve to relieve pain of the patient

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1795, 2026-1797

**Short Case Caption** Stratus Medical, LLC v. Avanos Medical, Inc.

**Filing Party/Entity** Stratus Medical, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/15/2026

Signature: /s/ M.C. Phillips

Name: Matthew C. Phillips

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Stratus Medical, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Derek Meeker | Joseph Hawkins | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

REPRESENTATIVE CLAIMS .......... i

CERTIFICATE OF INTEREST .......... iii

TABLE OF CONTENTS .......... vi

TABLE OF AUTHORITIES .......... ix

STATEMENT OF RELATED CASES .......... xiii

I. JURISDICTIONAL STATEMENT .......... 1

II. STATEMENT OF ISSUES .......... 1

III. STATEMENT OF THE CASE AND FACTS .......... 3

A. Technological Background .......... 3

B. The Stratus Patents .......... 11

C. Proceedings Below .......... 13

1. Racz .......... 14

2. Lee and Fitz .......... 19

3. Racz's modified device .......... 22

4. The IPR trial .......... 33

a. Reasonable expectation of success .......... 34

b. Enablement .......... 42

c. Objective indicia of non-obviousness .......... 43

D. Subsequent developments .......... 46

IV. SUMMARY OF ARGUMENTS .......... 46

V. ARGUMENTS ..... 49

A. Standards of Review ..... 49

1. Enablement ..... 50

2. Reasonable expectation of success ..... 50

3. Objective indicia of nonobviousness ..... 52

B. The Board Erred by Failing to Appreciate the Requirement That Prior Art Used in an Obviousness Combination Must be Enabling. ..... 53

C. The Board's Expectation-of-Success Rulings Cannot Stand: One Decision Resolved The Dispositive Factual Dispute With an Invented Rule of Evidence, and the Other Refused to Resolve it at All ..... 58

1. What the petitioner and Dr. Tucker said, what Stratus showed, and how the petitioner responded and Dr. Tucker disappeared. ..... 59

2. The Board's ruling regarding RF neurotomy needle size cannot stand. ..... 63

a. The Board resolved the neurotomy-needle-size dispute with a rule of its own invention ..... 63

b. Substantial evidence does not support the Board's interpretation of Racz's needle-size teachings. ..... 66

3. The Board erred by basing its reasonable-expectation-of-success finding on the fact that some claims are not limited to RF neurotomy. ..... 69

4. The lack of corresponding manufacturing detail in the Stratus patents cannot excuse the petitioner's failure to show a reasonable expectation of success. ..... 72

5. Motivation alone cannot supply the reasonable expectation of success. ....75

6. The bodily-incorporation doctrine does not save the absence of a reasonable expectation of success. ....75

D. Objective Indicia of Nonobviousness ....78

1. The Board erred when it declined to evaluate the objective indicia based entirely on a misunderstanding of Stratus's showing that its Nimbus system practices the claimed inventions. ....78

2. The Board committed further reversible error when it applied its erroneous reasoning to all indicia. ....84

3. The Board committed further reversible error when it applied its erroneous reasoning to the method claims of the '664 Patent. ....85

4. The Board's analysis would fail even under the substantial-evidence standard. ....86

VI. CONCLUSION ....87

# TABLE OF AUTHORITIES

## Cases

*Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.,*
522 U.S. 359 (1998) .......... passim

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) .......... 52

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) .......... 51, 86

*Beckman Instruments, Inc. v. LKB Produkter AB*,
892 F.2d 1547 (Fed. Cir. 1989) .......... 53, 54

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*,
305 U.S. 197 (1938) .......... 51

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010) .......... 78

*Dickinson v. Zurko*,
527 U.S. 150 (1999) .......... 51

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
81 F.4th 1368 (Fed. Cir. 2023) .......... 75

*Fed. Commc'n Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 86

*In re Brunetti*,
151 F.4th 1367 (Fed. Cir. 2025) .......... 49

*In re Chudik*,
851 F.3d 1365 (Fed. Cir. 2017) .......... 51

*In re Kumar*,
418 F.3d 1361 (Fed. Cir. 2005) .......... 56

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016)............................................52, 71, 83, 85

*In re Payne*,
606 F.2d 303 (CCPA 1979)..................................................................53, 55

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016)....................................................51, 70, 76

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002)..............................................................50

*Motorola, Inc. v. Interdigital Tech. Corp.*,
121 F.3d 1461 (Fed. Cir. 1997)..............................................................56

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015)..............................................................49

*Raytheon Techs. Corp. v. Gen'l Elec. Co.*,
993 F.3d 1374 (Fed. Cir. 2021)........................................................50, 56

*Rockwell Int'l Corp. v. U.S.*,
147 F.3d 1358 (Fed. Cir. 1998)..............................................................56

*SAS Inst. Inc. v. Iancu*,
584 U.S. 357 (2018)..............................................................................72

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)................................................................................68

*Sisvel Int'l S.A. v. Sierra Wireless, Inc.*,
82 F.4th 1355 (Fed. Cir. 2023)..............................................................50

*Therasense, Inc. v. Becton, Dickinson & Co.*,
593 F.3d 1289 (Fed. Cir. 2010)..............................................................56

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019)..............................................................62

**Statutes**

28 U.S.C. § 1295(a)(4)(A)....................1

35 U.S.C. § 312....................76

35 U.S.C. § 318(a)....................1

35 U.S.C. § 319....................1

5 U.S.C. § 554....................82

5 U.S.C. § 702....................49

5 U.S.C. § 704....................49

5 U.S.C. § 706....................50

5 U.S.C. § 706(2)(A)....................52

**Regulations**

37 C.F.R. § 42.104....................76

## STATEMENT OF RELATED CASES

The appellant, Stratus Medical, LLC ("Stratus"), is unaware of any other appeals in or from the same proceedings as these matters previously before this or any other appellate court.

The following other proceedings may directly affect or be directly affected by the Court's decision in this case:

- *Stratus Med., LLC v. Avanos Med., Inc.*, No. 1:25-cv-00546 (D. Del. filed May 2, 2025) (including causes of action for infringement of the '782 and '664 Patents at issue in this appeal) (stayed pending this appeal and the underlying IPRs).
- U.S. Patent Application No. 17/190,224 is a continuation of the '782 Patent at issue in this appeal.
- U.S. Patent Application No. 19/272,521 is a grandchild continuation of the '782 Patent at issue in this appeal.
- U.S. Patent Application No. 18/378,138 is a grandchild continuation of the '664 Patent at issue in this appeal.

- U.S. Patent Application No. 19/467,760 is a great grandchild continuation of the ’664 Patent at issue in this appeal.
- U.S. Patent Application No. 19/664,743 is an application to reissue U.S. Patent No. 10,736,688, which was the subject of IPR2024-01210 and IPR2024-01211, which were conducted jointly with IPR2024-01209 and IPR2024-01212, both of which are under review in this appeal.

The patent applications noted above are shown in blue in the following family-tree diagram:



## I. JURISDICTIONAL STATEMENT

The Board entered a final written decisions in IPR2024-01212 (Appx0056-0152) and IPR2024-01209 (Appx0001-0055) on March 5 and 6, 2026, respectively, pursuant to 35 U.S.C. § 318(a), finding all challenged claims unpatentable. *See* Appx0054, Appx0151. Those decisions are appealable per 35 U.S.C. § 319, and this Court has jurisdiction per 28 U.S.C. § 1295(a)(4)(A). Stratus has standing to bring this appeal as the owner of the patents. Stratus filed timely notices of appeal on May 4, 2026.

## II. STATEMENT OF ISSUES

1. Did the Board legally err when it held that prior art used to assert obviousness need not be enabling?

2. Did the Board err when it declined to evaluate any of Stratus's objective indicia of nonobviousness based entirely on the Board's mistaken belief that Stratus failed to show that its product is a commercial embodiment of the claimed invention?

3. Regarding reasonable expectation of success:

a. Did the Board legally err when it categorically credited a statement in a patent over undisputed, thoroughly explained, well-reasoned, experientially-based, and corroborated testimony from a clinical physician regarding needle sizes used in RF (radio frequency) neurotomies?

b. Does substantial evidence support the Board's factual finding that the "Racz" patent teaches that an RF neurotomy needle can be larger than 16 gauge?

c. Did the Board err when it changed the nature of the prior-art combination set forth in the IPR petition?

d. Did the Board err when it concluded that the absence of manufacturing detail in the Stratus patents implies a reasonable expectation of success to modify the prior art, even though the Stratus design lacks the one feature of the modified prior art that undisputed evidence shows would have been impossible to manufacture?

## III. STATEMENT OF THE CASE AND FACTS

### A. Technological Background

An RF neurotomy relieves pain by driving radiofrequency current through nerve tissue until the tissue is ablated. The targets are afferent nerves, which carry pain signals to the brain, rather than efferent nerves, which carry control signals from it. The procedure has become an important tool in modern pain management, and over 99.5% of RF neurotomies are performed along the spine. *See* Appx5193 ¶ 86; Appx5051 ¶ 111, Appx5087 ¶ 239; Appx1237; Appx2016.

Interventional pain-specialist physicians perform the procedure. *See* Appx5035-5036 ¶¶ 78-80, Appx5038 ¶ 85. The usual target is a medial branch nerve exiting the spine near a vertebra. *See* Appx5038-5044 ¶¶ 84-88, Appx5087 ¶ 239; Appx0204 8:40-55. The patient lies prone under sedation — but awake, so that responses to nerve stimulation can be monitored — while the physician

advances a needle[1] to place its tip near the target nerve. *See* Appx5049-5050 ¶ 108. Placement is verified as well as it can be by X-ray fluoroscopy before the tip is energized to ablate the nerve. *See* Appx5049-5050 ¶ 108 Appx5058-5059 ¶ 126.

Accuracy is difficult to achieve. Medial branch nerves are "about 10 times thicker than a human hair," Appx5051 ¶ 111, Appx5087 ¶ 239, do not appear on X-rays, and sit differently in different patients, so an ablation may miss the nerve or destroy only part of it. *See* Appx5069-5070 ¶ 174, Appx5087-5088 ¶¶ 241-245. A misplaced needle also ablates tissue that should be left alone. *See* Appx5057-5058 ¶ 124.

Before Stratus's invention, the only prevalent commercially available RF neurotomy needles were single-electrode needles — insulated along most of their

---

[1] The terms "cannula" and "lumen" are frequently used with this type of needle, which is a metal tube, sometimes called a "hypotube" or the "needle." The cannula is the metal portion — a closed round sidewall having, in cross-section, an inner diameter and an outer diameter, the difference being the thickness of the sidewall. *See* Appx5202 ¶ 115, Appx5240 ¶ 235. The lumen is the cylindrically shaped space interior from the cannula's inner perimeter. Medical needles come in standard sizes, specified by "gauge." A bigger gauge number means a smaller diameter cannula (and lumen).

length and energized at the tip — which produced a small "prolate spheroid" ablation volume along the needle axis. Appx5051-5052 ¶ 112. Because that small volume left little margin for placement error, procedures took longer, cost more, and carried greater risk, *see* Appx5053-5058 ¶¶ 114, 117, 123-125, and few physicians were willing to use — or even to learn — the procedure. *See* Appx5058-5059 ¶¶ 126-127.

Against that backdrop, Drs. Robert E. Wright and Scott A. Brandt, both pain-specialist physicians, invented the first multi-tined RF neurotomy needle, the subject of the patents at issue. Stratus commercialized it as the "Nimbus" system. Two filaments deploy from the needle's distal end; energized together with the tip, they create a teardrop-shaped ablation volume far larger than the prior art's:



Appx5056 ¶ 121; Appx1297; Appx2076.

That larger volume changed how the needle is placed. A single-electrode needle had to be laid alongside the nerve, parallel to its length; perpendicular placement would have demanded pinpoint accuracy that the narrow distal end of a prolate spheroid could not forgive:



Appx5049-5055 ¶¶ 108-119; Appx1242-1243; Appx1296; Appx2021-2022; Appx2075.

With Nimbus, the physician advances the needle perpendicularly toward a prominent bone feature until striking bone, which acts as a backstop, then retracts the tip slightly and deploys the filaments. *See* Appx5057-5059 ¶¶ 122-

126; Appx1243-45; Appx1298; Appx2022-2024; Appx2076-2077. That takes less skill, so more practitioners can perform the procedure. *See* Appx5059 ¶ 127; Appx1243-45; Appx1298; Appx2022-2023; Appx2077.



Appx5057 ¶ 122; Appx1244; Appx2023.

For spinal medial branch neurotomy, the bone target may be the "eye of the Scotty dog," a well-defined radiographic landmark that is readily identified under X-ray to verify placement:




Appx5058-5059 ¶ 126; Appx1244-1245; Appx2023-2024.

RF neurotomy is accordingly available to more practitioners, and to more patients living with back pain. *See* Appx5059 ¶ 127; Appx1296-1298; Appx2075-2078. Nimbus also shortened procedures and reduced the number of needle insertions, X-rays, and ablation cycles, while lessening damage to surrounding tissue and improving safety. *See* Appx5051 ¶ 111, Appx5056-5058 ¶¶ 121-125; Appx1298-1299; Appx2077-2078. And it inspired a new "multifidus-sparing" technique — for which the Nimbus device is especially well suited — that ablates a medial branch nerve without damaging the multifidus muscle. *See* Appx5059-5061 ¶¶ 128-136; Appx5159-5170; Appx1245; Appx1298; Appx2024; Appx2077.

Dr. Andrew Russo, an interventional pain-specialist physician experienced in RF neurotomies who has written the history of the procedure (Appx5148-5158) and who developed the multifidus-sparing technique, testified for Stratus that the field had "experienced somewhat of an 'ice age'" because of the limits of single-electrode needles. Appx5053 ¶ 115; Appx1296-1299; Appx2075-2078. He called Nimbus a "game changer," Appx5054 ¶ 117, Appx1296-1299, Appx2075-2078, that brought about "a sea change" in RF neurotomy. Appx5155.

The Nimbus system is a needle used with a removable RF probe, which may be reusable or disposable:




***Stratus's Nimbus RF Neurotomy Needle***



***Stratus's Reusable RF Probe***



***Stratus's Disposable RF Probe***

Appx1247-1248; Appx2026-2027.

The needle is a cannula surrounding a lumen, with a sharp tip at its distal end. Appx5272. An actuator at the proximal end connects to two filaments that run down the lumen and deploy near the tip, Appx5273, rotating one direction to deploy them and the other to retract them. Appx5276 . A Luer fitting at the proximal end allows fluid to be injected (*e.g.*, anesthetic) or aspirated through the needle. *See* Appx5277. The RF probe is inserted so that its distal wire portion lies fully within the lumen. *See* Appx5277. With the probe connected to an RF signal generator and the filaments deployed, the ablation can be performed. *See* Appx5279-5280.

About a year before filing its IPR petitions, the petitioner acquired Diros Technologies, Inc., which makes and sells a device called "Trident" that is similar to Nimbus:




***Diros's "Trident DTR" RF Neurotomy Needle***



***Diros's Reusable RF Probe***



***Diros's Disposable RF Probe***

Appx1248-1250; Appx2027-2029.

### B. The Stratus Patents

Stratus holds patents on the Nimbus inventions in eleven countries, including five granted United States patents, and has five pending United States applications. *See supra* at xv. The patents disclose a needle whose cannula — the claimed "elongate member" — defines a lumen, with a tip at the distal end. Two filaments run down the lumen and deploy outward, distally and radially, from near the tip, as the petitioner's own annotated figures show:



















Appx0293-0294 (colors and annotations added by petitioner); Appx1349-1350 (same for Figs 3A-3B from IPR2024-01212 Petition, showing different sharp

point and separate tube in the main lumen for the probe); Appx0169-0170, Appx0187, Appx0192; Appx1349-1350; Appx0240-0241.

As can be seen, the filaments 206 (violet/blue) are ***inside*** the lumen 308 defined by the elongate member 203 (yellow), and so is the RF probe 401 (green). When the probe is withdrawn from the lumen, fluid can be injected through the lumen and out the fluid port 210 at the end of the tip 211. These drawings accurately depict the Nimbus system.

### C. Proceedings Below

The petitioner filed four IPR petitions against three Stratus patents at once: IPR2024-01209 against the ’782 Patent, IPR2024-01210 and IPR2024-01211 against the ’688 Patent (not at issue in this appeal), and IPR2024-01212 against the ’664 Patent. The Board instituted all four, tried them on a common schedule before the same three-judge panel with one set of exhibits, many jointly captioned papers, consolidated depositions, and a consolidated hearing.

All challenges were materially alike, each attacking every claim on the same combination of at least three references — Racz, Lee, and Fitz — which the

petitions named "Racz's modified device." Appx0285; Appx1341; Appx0024-0025. The parties and the Board used that label.

After extending its one-year deadline, *see* Appx1131-1137, the Board issued four final written decisions holding every challenged claim of all three patents obvious. Stratus appeals the decisions in IPR2024-01209 and IPR2024-01212, concerning the '782 and '664 Patents. Meanwhile, Stratus has filed an application to reissue the '688 Patent with claims narrowed to RF neurotomy. *See* Appx7039-7064.

#### 1. Racz

"Racz" is a United States patent naming two inventors — Drs. Gabor Racz and Philip Finch, both interventional pain-specialist physicians with extensive experience in neurotomies, especially RF neurotomies. Dr. Racz was a pioneer in RF neurotomies. In fact, he personally taught Dr. Russo how to perform RF neurotomies and what sizes of needles would be appropriate for those procedures. *See* Appx7065-7066 ¶¶ 5-6; Appx0861; Appx1865. Unfortunately, Dr. Racz passed away during the trials. *See* Appx7065 ¶ 4. Dr. Finch submitted

a declaration in Stratus's application to reissue the '688 Patent. *See* Appx7068-7071. So did Dr. Russo. *See* Appx7065-7067.

Racz is entitled "BENT TIP ELECTRICAL SURGICAL PROBE." According to Racz's abstract, "A medical needle or cannula for stimulation or ablation includes a rigid bent tip for simplified placement at target sites within a patient's anatomy." Appx3818 Abstract. Racz describes a problem with "straight needles" and "flexible electrodes," namely, that they do not "have the desired characteristics for use in difficult-to-reach target regions." Appx3821 2:39-41. Racz's solution was "a firmly curved tip needle electrode" "for delivering anesthesia, pain relief, or other treatment." Appx3821 2:46-48. Racz illustrates this bent-tip design in Figure 1:




FIG_1

Appx3819. The curved tip "can be steered around the anatomical structure 16" and positioned to "hug" its contour, which "can be more effective . . . than with a traditional straight or flexible tip." Appx3822 4:49-58; *see also id.* 3:39-59 (describing ability to position point 18 in desired position around structure 16 by rotating shaft as shown by arrow A).

Racz's needle is used with an insertable and removable electrical probe 22/52:



Racz's preferred embodiment concerns RF neurotomy, but Racz expressly contemplates other clinical applications: "precision nerve blocks by injection of local anesthetic . . . other options . . . and other procedures," Appx3823 6:2-7; "access to the lumbar sacral disc," Appx3823 6:59–7:10; "cervical discography," Appx3824 7:26-33; "lateral entry to the tarricopalatine fossa via the tarricomaxillary fissure," Appx3824 7:34-42; passage of a "stylet or endoscopic instrument" through the lumen, *see* Appx3823 5:15-18; and generic "insertion of instruments through the cannula or needle," Appx3818 Abstract. Racz adds that "the invention is not limited to use in such applications, and other medical and surgical procedures would be apparent to a practitioner of ordinary skill. . . . [T]he invention is not so limited, and its scope is to be determined according to the claims set forth below." Appx3825 9:12-22.

Racz's claims are correspondingly broad. Each of the three independent claims recites "a target region in the patient's body," not a nerve. Appx3825 9:24-43; 10:16-34; 10:35-49.

The petitioner acknowledged that breadth, describing Racz as "directed to . . . thermal ablation systems and methods," Appx0298; Appx1354 (same), and as

describing and claiming *"RF ablation devices,"* Appx0631 (emphasis in original); Appx1651 (same) — even though the proposed "Racz's modified device" was built starting from an RF neurotomy version of Racz's needle. Dr. Robert Tucker, the petitioner's expert, agreed that Racz's device is not limited to neurotomy. *See* Appx6578 43:15-44:17.

On needle size, Racz says this:

> Those individuals skilled in the art will recognize that many variations of the electrode geometries depicted in FIGS. 1-3 are possible without departing from the invention. Various sized electrodes can be made, from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge).

Appx3824 8:10-15. As explained more below, the Board read that passage to mean that a neurotomy needle may be anywhere from 10 to 30 gauge, *see* Appx0044-0045, and credited that over Dr. Russo's testimony that a neurotomy needle cannot be larger than 16 gauge, *see* Appx5066-5068 ¶¶ 157, 163-168. That conflict is a key issue in this appeal.

The Board did not have the benefit of Dr. Finch's later testimony, given in a related proceeding, that the broad range was written to reach Racz's non-neurotomy applications:

> The broad needle size range in the [8:10-22] paragraph of the [Racz] Patent was stated to provide flexibility to claim the subject matter of that patent in various ways. But someone knowledgeable about RF neurotomy would understand that the full range of needle sizes mentioned in that paragraph of the patent cannot possibly apply to an RF neurotomy needle. . . . In other words, we (Dr. Racz and I, the inventors) were trying to provide a basis to apply our bent-tip innovation to non-neurotomy needles.

Appx7070 ¶ 7.[2]

### 2. Lee and Fitz

Lee is a published United States patent application whose first-named inventor, Dr. Bruce Lee, is a gynecologist. *See* Appx6652-6658. Lee discloses an RF ablation device for destroying uterine fibroids — targets orders of magnitude

[2] Exhibit 2052 did not exist at the time of the final written decisions and was thus not part of the record on which the Board based its decisions.

larger than nerves. A nerve is the size of a few hairs; a fibroid ranges from the size of a blueberry to a grapefruit or larger by the time it is treated. *See* Appx5239-5240 ¶¶ 230-232; Appx1090 45:16-21.

Lee's needle carries electrically conductive, deployable/retractable stylets 22 that spread in a conical pattern to enlarge the ablation volume enough to destroy an entire fibroid, along with a stylet 24 that extends straight out of the center:



Appx3827 (reference numbers made more legible); Appx1256-1257; Appx2035-2036.

Lee has no separate electrical probe; its stylets connect to an RF signal source at the proximal end of the device. *See* Appx3852 ¶ [0092], Appx3856 ¶ [0146]; Appx5215 ¶ 146. Lee's trocar point 14 seats partly within the lumen at the distal end of the cannula 16, with a fatter portion projecting beyond the cannula. *See* Appx3827, Appx3852 ¶ [0091]. The stylets 22 run down the lumen and then along ramped deflection surfaces on the exterior of that fatter portion, *see id.*, which deflect them radially outward as they advance. *See* Appx3852 ¶ [0092], Appx3854 ¶ [0126].

Fitz, also a published United States patent application, discloses a variety of RF neurotomy "introducers" having one or more cannulas or sleeves that house electrodes and along which the electrodes move longitudinally to deploy and increase ablation volume. *See* Appx3861 ¶¶ [0001], [0009].



Appx3860.

### 3. Racz's modified device

The IPR2024-01209 petition explained how "Racz's modified device" would allegedly be derived from Racz, Fitz, and Lee at pages 22-27 (Appx0307-0312), first illustrated it at page 28 (Appx0313), and illustrated it in detail at pages 42-43 (Appx0327-0328). *See also* Appx1362-1367 (same explanation in IPR2024-01212 petition), Appx1368 (first illustration in IPR2024-01212 petition), Appx1377-1378 (other illustrations in IPR2024-01212 petition). Dr. Tucker presented supporting testimony.

"Racz's modified device" is Racz's device fitted with the deployable/retractable stylets — "filaments," as the parties call them — taught by Fitz and Lee, for the purpose of expanding ablation volume. The illustrations below show only the distal end of the device, but Racz's tip is simply a continuation of its cannula. *See* Appx4238 ¶ 39 ("'tip portion 38 is an extension of the metal tube.'" (quoting Racz)); Appx7210 ¶ 39 (same).


Lee's Filaments (22/1622) guided by deflection surfaces (12/1612)
Racz's RF Probe (22/52)
Racz's Active Tip (14/38)


Lee's Filaments (22/1622)
Channels and ramps defined as deflection surfaces (12/1612) within Racz's tip (14/38) to guide the filaments (22/1622) in/out of the cannula
Racz's RF Probe (22/52)
Racz's Tip (14/38)




Appx0313, Appx0327-0328, Appx0343; Appx1368, Appx1377-1378, Appx1386, Appx1393; Appx4305, Appx4328-4329, Appx4349; Appx7276, Appx7290-7291, Appx7301, Appx7310. Dr. Tucker confirmed that these drawings are "cartoons," not drawn to scale. Appx6595 112:1-6. A standard 16-gauge needle's sidewall is about 14% of its outer diameter, not the roughly one third the drawings depict. *See* Appx5239 ¶ 228.

The petitions specified each modification required to match the claims at issue.

First, the starting point is a neurotomy version of Racz's needle (red above), because many of the claims — all '782 Patent claims and '664 Patent claims 10-

19 and 26-29 — recite a neurotomy needle or a nerve target, and the petitions applied the same "Racz's modified device" to every claim.

Second, Racz's probe (green above) is retained, because every Stratus claim requires a probe insertable down the needle's central lumen. *See* Appx0226-0228 52:19-53; 54:26-58; 55:6-56:20; Appx0270 31:32-53; 32:58-33:1-10. According to Dr. Tucker, the probe extends the full length of the lumen. *See* Appx4317-4318 ¶¶ 157-158; Appx7298-7299 ¶¶ 175-176. The petitions proposed no modification to Racz's probe.

Third, the probe fits snugly in the central lumen, so that the probe and the conductive cannula's interior surface are in physical contact and thus electrically connected, thus satisfying further claim limitations. *See* Appx0226-0228 52:27-31, 46-47; 54:51-58; 55:13-18, 56:11-17; Appx0270-0271 31:44-53; 32:66–33:10. The petitions and Dr. Tucker illustrated and expressly called out that fit:




***Dr. Tucker Declaration at ¶170***

Appx6821; *see also* Appx0328-0329; Appx1384-1386; Appx4328-4330 ¶¶ 170-172; Appx7290-7292 ¶¶ 163-164. According to the petitions and Dr. Tucker, Racz's "probe (22/52) would necessarily contact the shaft (12/34) along its full length." Appx0320; Appx1384 (same); Appx4318 ¶ 158; Appx7299 ¶ 176 (same).

Fourth, because the probe occupies the lumen snugly, there is no room there for the filaments (blue above). The petitions therefore placed them ***within*** the sidewall itself, proposing "channels within the cannula," not within the lumen, of Racz's needle. Appx0290; Appx1346. The petitions explained why:

> [A]rranging the perimeter filaments, ***channels***, and ramps ***around the inner perimeter of Racz's cannula*** (10/33) . . . without obstructing Racz's cannula (10/33) . . . would preserve the functionality of Racz's electrical probe (22/52), which is needed to transmit RF energy.

Appx0326 (emphases added); Appx1376 (same); Appx4325-4326 ¶ 167; Appx7288-7289 ¶ 161; *see also* Appx0311 (Lee's deployable filaments "can be arranged ***around the inner perimeter of the cannula*** such that they surround and provide space for a central element," which "would have confirmed to a POSA that Lee's deployable filaments (22/1622) would be easily arranged to accommodate Racz's centrally located removable probe (22/52)") (emphasis added); Appx1366 (same); Appx4303 ¶ 140; Appx7273-7274 ¶ 140.

The "inner perimeter of the cannula" is shown in yellow below:[3]

[3] 220 µm on the cross-section view is incorrect. That should be 229 µm. *See* Appx1087-1088 42:24-43:15. A micrometer or "micron" (µm) is one millionth of a meter or one thousandth of a millimeter (mm). 229 µm is slightly more than 0.009 inches.




Appx6820; Appx0895-0897; Appx1899-1901.

In "Racz's modified device," then, each filament slides in a thin lengthwise tunnel — a "channel" — running within the needle's sidewall. *See* Appx0290, Appx0326-0328, Appx0333 (emphasizing that "Racz's modified device" must have "channels" in the cannula or outside the lumen); Appx1346, Appx1376-1378 (same). On the petitions' account, "The resulting [Racz's modified] device (Racz's ***cannula*** modified to include Lee's filaments) would include every limitation of Claims 1-27" of the '782 Patent. Appx0313; *see also* Appx1368 (similar statement for '664 Patent).

Fifth, the channels open near the distal end onto slanted deflection surfaces that deflect the filaments radially outward as they deploy. *See* Appx0311 ("[A] POSA would understand that providing deflection surfaces in Racz's tip (14/38) would result in Lee's perimeter filaments (12/1622) both physically contacting Racz's active tip (14/38) and being deployed outwardly . . . ."); Appx1366-1367 (same). The petitions called out that feature in two illustrations of "Racz's modified device":




Appx0313 (purple box added); Appx1368 (same); Appx4305 ¶ 143 (same); Appx7276 ¶ 143 (same).




Appx0327 (purple box added); Appx1377 (same); Appx4328 ¶ 169 (same); Appx7290 ¶ 162 (same).

<u>Sixth</u>, the needle sidewall and the filaments are in physical and electrical contact, so that the probe energizes the cannula and the cannula in turn energizes the filaments, thereby satisfying further claim requirements. *See* Appx0226-0228 52:27-31, 46-53; 54:51-58; 55:13-18, 56:11-17; Appx0270-0271 31:44-53; 32:66-33:10. The petitions called out that feature in another illustration:




Appx0328; Appx1378 (same); Appx4329 ¶ 170; Appx7290-7291 ¶ 163.

"Racz's modified device" has one channel for each filament. Two are highlighted in pink on the petitioner's drawing below, followed by a cross-sectional view of the same:






Appx0758; Appx1769; Appx6840.

Neither the petitions nor Dr. Tucker's declarations explained how those channels could be formed in the sidewall of Racz's needle. They illustrated what the finished device would look like, not how it could be made.

The petitions and Dr. Tucker described their illustrations as just "one example," Appx0312-0313; Appx1367-1368; Appx4305 ¶ 143, Appx7275-7276 ¶ 143, but the only other example they offered was a two-piece needle whose tip

end is a separate piece. *See* Appx0327; Appx1377; Appx4327-4328 ¶ 169; Appx7289-7290 ¶ 162. They identified no others. *See* Appx4306 ¶ 144 (Dr. Tucker: "I provide two examples"); Appx7276 ¶ 144 (same); Appx6595-6596 112:9-113:5 (Dr. Tucker admitting he considered only those two examples); Appx1009 (noting "Unitary Tip" and "Separate Tip" as only examples). And the two examples are the same at the distal end. *See* Appx6591 93:14–95:22 (Dr. Tucker explaining difference would be left of what's illustrated); Appx5080 ¶ 213 (Dr. Russo agreeing); Appx5211 ¶ 135 (Mr. Crosby agreeing); Appx6601 133:12-134:15 (Dr. Tucker explaining filaments must go in the sidewall at least near the tip and free-floating filaments in the lumen would be a "problem" and "a bad idea").

#### 4. The IPR trial

Dr. Russo and Mr. Peter Crosby testified for Stratus as its physician and engineering experts. *See* Appx5017-5089; Appx5171-5261. Dr. Russo began his career as an anesthesiologist before becoming an interventional pain-specialist physician. *See* Appx5022-5023 ¶¶ 11-15. He has performed thousands of RF neurotomies, performs about a dozen a day, and is considered one of the world's

leading clinical practitioners of the procedure. *See* Appx5022 ¶ 8, Appx5024 ¶ 23, Appx5027 ¶ 33. In 2021 he wrote "A History of the Development of Radiofrequency Neurotomy." *See* Appx5021 ¶7; Appx5148-5158. Mr. Crosby is an experienced medical-device engineer who has designed numerous medical devices and founded and led companies to make them, including successful electrostimulation devices. *See* Appx5175-5177 ¶¶ 4-14.

**a. Reasonable expectation of success**

Stratus made two reasonable-expectation-of-success arguments below: that one skilled in the art would not have had a reasonable expectation of success (1) making the filament channels in "Racz's modified device," or (2) using that device in a neurotomy procedure, because the filaments would be too weak and flimsy to deploy reliably through human tissue and predictably create a desired ablation volume. Only the first is at issue in this appeal. It developed as follows.

The petitioner proposed "Racz's modified device" as the basis for challenging every claim, and Dr. Tucker said repeatedly that building it would take nothing more than "routine engineering." Appx4305-4306 ¶¶ 143-144, Appx4308-4309 ¶¶ 147-148, Appx4320 ¶ 161, Appx4323 ¶ 165; Appx0313,

Appx0321, Appx0324 ; Appx7280 ¶ 148, Appx7283 ¶ 155, Appx7285-7286 ¶ 159; Appx1368, Appx1371, Appx1374 (citing same). His declarations likewise said the device would be "easily" implemented, formed, and accommodated. *See* Appx4302 ¶ 137, Appx4308 ¶ 146, Appx4326-4327 ¶¶ 167, 169, Appx4364 ¶ 228; Appx0310-0311; Appx0327; Appx0355; Appx7272-7273 ¶¶ 137, 140, Appx7278 ¶ 146, Appx7288-7289 ¶¶ 161-162, Appx7324 ¶ 217; Appx1365-1366; Appx1376-1377; Appx1411. Neither the petitions nor the declarations explained how the channels would be formed in the sidewall.

Asked to explain at his deposition, Dr. Tucker declined, saying that manufacturing lay outside his expertise. *See* Appx6589 87:15-88:1 ("I'm not a manufacturing engineer . . . . I think a person of ordinary skill in the art that's a manufacturing guy would know how to do that."); Appx6600 131:10-11 ("I don't know, Matt, I'm not . . . a manufacturing engineer."); Appx6601 133:16-17 ("I'm not an industrial engineer."); Appx6589 88:4-5 ("[T]his is not a manufacturing patent."); Appx6607 159:10; Appx6600 130:6-7; Appx6612 178:5-7 ("[N]o comment on making it."); *id.* 180:3 ("I have no comments on manufacturing."). He had not consulted a manufacturing engineer, Appx6589 88:2-5, had never

attempted to build "Racz's modified device," Appx6590 89:20-90:2, and agreed that not every design on paper can be physically realized. Appx6612 179:8-14.

On needle size, Dr. Tucker also disclaimed knowledge, explaining that he would have to ask the physicians who use such needles, and describing Racz's 10-to-30-gauge range as only a starting point:

> Q[uestion:] Is it your opinion that this [10-30 gauge] size range [stated in Racz near column 8, line 10] is appropriate for a neurotomy needle?
>
> A[nswer:] I think it's a good point to start, and I would go out and canvass physicians that do this and ask them how big can you tolerate and how small can you tolerate, and I think that's how you decide. Those are starting points. 10 to 30.

Appx6603 142:15-21; *see also* Appx6604-6605 145:4–146:16 (concluding "I have no information on this subject" of neurotomy needle size); Appx6570-6571 11:15–12:20 (never having performed an RF neurotomy on a human patient).

Dr. Russo testified that a neurotomy needle can be no larger than 16 gauge:

> **158**. Quite simply, RF neurotomy needles are 22 gauge through 16 gauge in size. RF neurotomy needles

> are most typically available in 22, 20, 18, and 16 gauges, although some RF neurotomy needles fall between these sizes.
>
> **159**. Cannulae larger than 16 gauge (e.g., 10 gauge) or smaller than 22 gauge (e.g., 30 gauge) are not suitable for RF neurotomy because they:
>
> (a) are not suitably navigable to target nerves; and
>
> (b) pose too great a risk of harming patients.
>
> **160**. In the case of cannulae that are larger than 16 gauge (e.g., 10 gauge), the cannulae are:
>
> (a) too stiff to navigate within the constraints of the relevant anatomy; and
>
> (b) so large that they damage delicate anatomic structures through which they pass when being advanced to a target nerve.
>
> For reference, a 10-gauge needle has a diameter larger than one tenth of an inch.

Appx5066-5067 ¶¶ 158-160; *see also* Appx5066-5068 ¶¶ 157, 163-168. The petitioner never attempted to refute this testimony.

Other contemporaneous documents consistently identify 16 gauge as the largest RF neurotomy needle. The Tullis patent, cited by the petitioner, gives a

neurotomy needle diameter of "preferably 16 G[auge] or more and more preferably 18 G[auge] or more." Appx4060 7:17-36. The Cosman patent, also cited by the petitioner, states that "the tubing can range in gauge size from 23 gauge for the smaller range to 22, 20, 19, 18, 17, or 16 gauge for larger target sites." Appx3897 7:15-36. And the Stratus patents disclose 16 gauge and smaller needles, but none larger. *See* Appx0210 19:1-7; Appx0258 8:8-19. Every reference in the record to a larger needle concerns a non-neurotomy needle.

Mr. Crosby then testified that one skilled in the art would not have had a reasonable expectation of success in making the channels in "Racz's modified device" at 16 gauge or smaller. *See* Appx5237-5248 ¶¶ 221-260, Appx5251-5252 ¶¶ 272-273. He testified that it would have been impossible. *See* Appx5248 ¶ 260. He considered every technique by which such channels could conceivably be made — machine drilling, laser drilling, drawing, casting, sintering, injection molding, extrusion, and 3D printing — and explained why each fails at that scale and at any neurotomy-needle length. *See* Appx5240-5245 ¶¶ 235-251. He further explained that even if the channels could somehow be created, the

sidewall would be structurally too weak, *see* Appx5241-5242 ¶ 239, and that a bent tip, as Racz teaches, would compound the difficulty. He concluded:

> In summary, I cannot conceive of any way to make the channels in Racz's modified device, as proposed by Dr. Tucker. Nor would a POSITA have been able to do so, and particularly with technology available at the priority date of the Stratus Patents.

Appx5248 ¶ 260. That conclusion applied to every example of "Racz's modified device," *see* Appx5246-5247 ¶¶ 255-259; Appx1280 (same); Appx2059 (same), and applied whether the channels run the entire length of the needle or only some portion of it at the tip end. *See* Appx5213 ¶ 139, Appx5240 ¶ 234; Appx1097 52:5-15, Appx1128 83:12-21.

Dr. Tucker did not testify on the issue again. He did not answer Mr. Crosby's criticism, and no other witness addressed it. The petitioner did not argue in any later paper, testimony, or exhibit that it had met its burden to show a reasonable expectation of success if "Racz's modified device" is a 10-gauge needle, *see* Appx1096-1097 51:21–52:15, or that it had shown a reasonable

expectation of success for channels significantly shorter than the full length of the needle.

The Board addressed reasonable expectation of success at pages 38-45 of the IPR2024-01209 final written decision (Appx0038-0045) and pages 55-66 of the IPR2024-01212 final written decision (Appx0115-0121).

In IPR2024-01209, the Board first concluded that "Racz's modified device" could be larger than 16 gauge. *See* Appx0044. On that linchpin issue it credited Racz's reference to 10-to-30-gauge needles over Dr. Russo's testimony, which it characterized as "witness testimony prepared specifically for litigation." Appx0045. Having so decided, the Board did not assess Mr. Crosby's testimony. It then gave weight to Dr. Tucker's account of "why and how a POSA would have combined the prior art teachings," Appx0039 (citing Appx4298-4309 ¶¶ 132-147), specifically crediting his assertion that the combination required no more than "routine engineering," Appx0041-0042. Finally, it found it significant that the Stratus patents "do[] not teach how to manufacture its claimed invention," Appx0042, without acknowledging that the devices claimed in the Stratus patents are of a fundamentally different design — having a single lumen that

accommodates both the RF probe and the filaments — not requiring the impossible-to-manufacture sidewall channels required of "Racz's modified device."

In IPR2024-01212, the Board did not decide the needle-size issue. It held instead that Stratus's reasonable-expectation-of-success arguments were "unavailing" because no '664 Patent claim recites a needle size. Appx0118, Appx0120. It then found that Stratus had identified no "part of the '664 patent Specification describ[ing] a technique for forming the lumens with channels in the sidewalls of the elongate member described in the Specification," Appx0118, and reasoned from that absence, and from a similar absence in Lee, that "techniques for making lumens either in the tip or along the length of the elongate member in the proposed combination would have been within the knowledge of an ordinarily skilled artisan." *Id.* Finally, it applied the motivation to combine the references in support of a reasonable expectation of success. *See* Appx0120-0121.

**b. Enablement**

Stratus argued below that the prior art collectively would not have enabled one of ordinary skill to make "Racz's modified device" — specifically, its filament channels — without undue experimentation. *See* Appx1283-1285; Appx0747; Appx2062-2064; Appx1758; Appx6856. Mr. Crosby supported the argument with an analysis of the *Wands* factors. *See* Appx5248-5251¶¶ 260-271.

The petitioner never addressed enablement. Its replies contain no section on the issue, *see* Appx0617-0618; Appx1637-1638, no form of the term "enable" in reference to the prior art or the channels, and no citation to *Wands* or any other enablement case. No petitioner witness addressed the issue in reply or disputed Mr. Crosby's *Wands* analysis. Stratus stressed this in its surreplies. *See* Appx0747; Appx1758.

The Board assessed none of the enablement evidence and made no factual findings. In IPR2024-01209, it expressed its view, in a footnote, that "the law does not require that a combination of prior art teachings 'enable' what they render obvious." Appx0041 n. 20. It explained more fully in IPR2024-01212:

> Patent Owner's arguments are inapposite. The law does not impose an "enablement" requirement in

> regards to a combination of references in an obviousness challenge.

Appx0124-0125.

#### c. Objective indicia of non-obviousness

Stratus presented evidence of four objective indicia: long-felt-but-unmet need, copying of the invention by others, praise for the invention, and commercial success. *See* Appx1295-1308; Appx0765-0771; Appx2074-2087; Appx1776-1782.

<u>Long-felt need</u>. Stratus relied on Dr. Russo's testimony about the "ice age" in the art before the invention and the "game changer" that ended it, ushering in widespread, economical adoption of the vastly superior perpendicular approach and the multifidus-sparing technique. Appx5049-5059 ¶¶ 108-136; *see also* Appx1295-1299; Appx2074-2078; Appx0765-0766; Appx1776; Appx5159-5170. The petitioner responded that the perpendicular approach was possible with a prior-art cooled-tip RF neurotomy needle and that the claims require neither a particular ablation volume nor the perpendicular approach. *See* Appx6045-6046; Appx1665-1666. It made no nexus argument.

Copying. Stratus pointed to the similarities between Nimbus and the petitioner's Trident product, and to the petitioner's admission to the FDA that Trident was "equivalent" to Nimbus. *See* Appx1300-1301; Appx2079-2080. The petitioner noted differences between the two needles but made no nexus argument. *See* Appx0646-0648; Appx1666-1668.

Praise. Stratus showed that, on the strength of the Nimbus line — essentially its only product line — it had been recognized as one of the fastest growing and most fundable companies in North America. *See* Appx1301-1302; Appx2080-2081. The petitioner responded that the praise was directed at the company rather than the Nimbus system. *See* Appx0648-0649; Appx1668.

Commercial success. Stratus first showed that its Nimbus system is a commercial embodiment of the claimed invention. Mr. Crosby, who personally inspected the system, presented claim charts (Appx5271-5280) mapping it to representative claims. *See* Appx5179 ¶ 21; Appx5271 ("Stratus's Nimbus® RF Multitined Expandable Electrode (Nimbus RF Neurotomy Needle) and Stratus's RF Probe together form a system that meets the limitations of the claimed system as provided below."); Appx5274 (same); Appx5278 (same). Stratus also provided

a needle and probes to the petitioner. *See* Appx4423 ¶ 5; Appx0531-0532; Appx1557-1558; Appx4488 ¶ 14. It then presented its Nimbus sales data, market share, trends, and analysis of the same. *See* Appx1303-1307; Appx2082-2086. The petitioner disputed that Nimbus was successful and argued that, because Stratus kept separate sales figures for its needle and its RF probes, the data did not show sales of the claimed needle-probe system and so established no nexus. *See* Appx0649-0650; Appx1669-1670.

At no point, as to any indicium, did the petitioner dispute that Stratus practices the claimed invention. Nor did it ever dispute nexus for long-felt need, copying, or praise. *See* Appx0617-0618, Appx1637-1638; Appx0765-0768; Appx1776-1779.

The Board analyzed none of this evidence. It dismissed all four indicia on a threshold ground: That Stratus had failed to show that it practiced the claimed invention. Specifically, the Board found that Stratus's "Nimbus Device" *per se* does not practice the claimed invention. Appx0049; Appx0132. Treating "Nimbus Device" as a defined phrase meaning the RF neurotomy needle without its accompanying RF probe, the Board held that the needle alone does not meet

every claim limitation. Appx0049-0050; Appx0132-0133. It did not consider whether the overall Nimbus system — needle and removable probe — practices the claimed inventions.

### D. Subsequent developments

In the reissue application for the ’688 Patent, Dr. Finch filed a declaration explaining the needle-size disclosure in Racz, and Dr. Russo filed a declaration explaining more thoroughly his opinions on RF neurotomy needle size. *See* Appx7065-7067 (Russo), Appx7068-7071 (Finch).

And in the pending grandchild application of the ’782 Patent, in an Office action mailed in April 2026 — after the IPR final written decisions — Examiner Eun Hwa Kim allowed similar claims over the same prior art, stating reasons for allowance that identify specific disagreements with the Board’s reasoning in those decisions. *See* Appx6924-6927 ¶¶ 7-14.

## IV. SUMMARY OF ARGUMENTS

The Board committed three reversible errors.

First, the Board made a clear legal error when it misstated the law regarding enablement of the prior art. Despite numerous cases from this Court

and its predecessors (and despite Stratus citing some of those cases to the Board), the Board said that there is no requirement that the prior art used to assert obviousness must have enabled those skilled in the art make the allegedly obvious system. Based on that misstatement, the Board ducked a critical issue in this case.

Second, the Board erred when it ducked the reasonable-expectation-of-success issue. This time, the Board ignored the evidence from Stratus that one of ordinary skill in the art would not have had a reasonable expectation of success to make the narrow filament channels (tunnels) in the extremely thin sidewall of "Racz's modified device." Stratus presented undisputed evidence that it would have been impossible to make such channels. Rather than address that issue, the Board — based on one sentence in Racz, which the Board misunderstood — found that a neurotomy needle could be larger than 16 gauge. It was error for the Board to base its factual finding on that statement. It was also error for the Board to reason that "Racz's modified device" would have a reasonable expectation of success simply because the petitioner and its expert said so in purely conclusory fashion and because the Stratus patents presented no details

how to manufacture the claimed device, which is a fundamentally different needle design that does not have the impossible-to-form filament channels required in "Racz's modified device."

Third, the Board erred by refusing to consider any of Stratus's objective indicia of nonobviousness. Specifically, the Board erred by mistakenly concluding that Stratus had not shown that its Nimbus system practices the claimed inventions. Stratus presented, via unrefuted expert testimony, detailed claim charts mapping the Nimbus system (RF neurotomy needle plus probe) to representative claims of each patent. Rather than engaging those claim charts, the Board found that the "Nimbus Device" (meaning the needle only) does not alone meet the claim limitations. The Board then stopped, concluding that no nexus to ***any*** objective indicia could be shown. The Board did not consider the actual mapping of the needle and RF probe together as a system to the patent claims. In this way, the Board saved itself from having to analyze the considerable evidence of long-felt need, copying, praise, and commercial success.

The Board's shortcuts in this case denied Stratus of consideration of three key issues: (1) Enablement of the prior art, (2) reasonable expectation of success,

and (3) objective indicia of nonobviousness. Without considering those issues, the Board made incorrect patentability determinations, which should be reversed. At a minimum, these cases should be remanded to the Board to fully consider those three issues.

## V. ARGUMENTS

### A. Standards of Review

"Proceedings of the board are governed by the Administrative Procedure Act ('APA'), 5 U.S.C. §§ 702, 704, which 'establishes a scheme of reasoned decisionmaking,'" *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015) (quoting *Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359, 374 (1998)). Such "reasoned decisionmaking" requires that "the process by which [an agency] reaches [a] result must be logical and rational." *Allentown Mack*, 522 U.S. at 372. "Courts enforce this principle with regularity when they set aside agency regulations [or adjudications] which . . . are not supported by the reasons that the agencies adduce." *Id.* at 374; *see also In re Brunetti*, 151 F.4th 1367, 1379 (Fed. Cir. 2025) (same). The APA also requires that this Court "set aside the Board's actions if they are 'arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law' or 'unsupported by substantial evidence.'" *Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, 82 F.4th 1355, 1361 (Fed. Cir. 2023) (quoting 5 U.S.C. § 706; other citations omitted).

The Board's ultimate obviousness conclusion is reviewed de novo. *Id.*

**1. Enablement**

"Whether a prior art reference is enabling is a question of law based upon underlying factual findings." *Raytheon Techs. Corp. v. Gen'l Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002)). However, in this case, the Board made no underlying factual findings. Instead, the Board brushed aside Stratus's enablement argument, believing that the prior art used to establish obviousness need not be enabling. *See* Appx0041 n. 20; Appx0124-0125. Whether that understanding of the law is correct is purely a legal question reviewed de novo.

**2. Reasonable expectation of success**

To the extent the Board weighed evidence to make a factual finding regarding RF neurotomy size or the feasibility of forming filament channels in the needle sidewall of "Racz's modified device," that would be reviewed under

the substantial-evidence standard. *See Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938). "[S]ubstantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1356 (Fed. Cir. 2018) (quotation marks and citations omitted). Although the substantial-evidence standard of review may be somewhat deferential, the Supreme Court "has stressed the importance of not simply rubber-stamping agency factfinding" while reminding that judicial review of agency fact finding must be "meaningful." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (citations omitted). Thus, this court has explained, "Though our review [under the substantial-evidence standard] is deferential, we have not hesitated to reverse the Board when substantial evidence does not support its findings." *In re Chudik*, 851 F.3d 1365, 1371 (Fed. Cir. 2017).

However, in this case, the Board did not assess the reasonable-expectation-of-success evidence. Rather, the IPR2024-01209 decision's categorical rule that issued patents are inherently more credible than expert testimony is a legal ruling about how evidence should be weighed, reviewed de novo; its application without engaging contrary record evidence is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). And, the IPR2024-01212 decision's affirmance of a combination theory absent from the petition is legal error under *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380-81 (Fed. Cir. 2016), reviewed de novo.

### 3. Objective indicia of nonobviousness

Usually, whether there is a nexus between commercial success and the claimed invention is a question of fact, the Board's findings on which would be reviewed under the substantial-evidence standard. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1068 (Fed. Cir. 2016). But, in this case, the Board did not perform a traditional nexus assessment. Instead, the Board decided as a threshold matter that Stratus had not shown that it practices the claimed invention. The Board thereby summarily dismissed all of Stratus's objective indicia. This was not an evidentiary assessment to which the substantial-

evidence standard of review should be applied. Rather, the Board committed a reasoning error on a threshold issue that prevented it from actually evaluating the evidence of objective indicia of nonobviousness. The Board's failure to engage in reasoned decisionmaking was reversible error. *See Allentown Mack*, 522 U.S. at 372-74.

### B. The Board Erred by Failing to Appreciate the Requirement That Prior Art Used in an Obviousness Combination Must be Enabling.

"In order to render a claimed apparatus or method ***obvious***, the prior art must enable one skilled in the art to make and use the apparatus or method." *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) (emphasis added) (citing *In re Payne*, 606 F.2d 303, 314 (CCPA 1979)). Mr. Crosby gave detailed testimony, applying the *Wands* factors, that the prior art did not enable one skilled in the art to make the filament channels in the sidewall in "Racz's modified device." *See* Appx5248-5251 ¶¶ 260-271; Appx1283-1285; Appx0747; Appx2062-2064; Appx1758. The petitioner never even attempted to dispute that evidence or respond in any way to the prior-art enablement issue. *See* Appx0616-0656; Appx1636-1676. Dr. Tucker, in particular, never testified again to try to show how "Racz's modified device" would be enabled by the prior

art and a skilled artisan's knowledge and skills. *See id.*; Appx4481-4499. Nor did any other witness for the petitioner address enablement.

Rather than assess the evidence — completely one-sided as it was — and decide the issue, the Board brushed aside Stratus's enablement argument, making no factual findings. The Board did so — in a footnote in IPR2024-01209 — under the mistaken belief that "the law does not require that a combination of prior art teachings 'enable' what they render obvious." Appx0041 n. 20; *see also* Appx0124 ("The law does not impose an "enablement" requirement in regards to a combination of references in an obviousness challenge.").

The Board's understanding of the law in this respect is incorrect. As this Court has said — in the very *Beckman* case that Stratus cited and the Board misunderstood: "In order to render a claimed apparatus or method ***obvious***, the prior art must enable one skilled in the art to make and use the apparatus or method." *Beckman*, 892 F.2d at 1551 (emphasis added). *Beckman* cites *Payne*, which in turn, says, "References relied upon to support a rejection ***under 35 USC 103*** must provide an enabling disclosure, [i.]e., they must place the claimed

invention in the possession of the public." 606 F.2d at 314 (emphasis added) (citations omitted).

The Board made this clear legal error despite Stratus's citation to *Beckman*, *see* Appx1283, Appx2062, and despite the fact that petitioner did not dispute this indisputable legal requirement, *see* Appx0576-0577, Appx1596-1597.

The IPR2024-01212 decision attempted to distinguish *Beckman* as a case that "involved anticipation," in which this Court "merely explained that '[e]ven if a reference discloses an inoperative device, it is prior art for all that it teaches.'" Appx0124 (quoting 892 F.2d at 1551). While that proposition may be true for what it states, it misses the salient point here. Indeed, immediately after the sentence the Board quoted, this Court held that the challenged jury instruction was "a correct statement of the law," and that instruction stated the very rule the Board declared nonexistent: "In order to render a claimed apparatus or method obvious, the prior art must enable one skilled in the art to make and use the apparatus or method," and "[r]eferences relied upon to support a rejection for obviousness must provide an enabling disclosure." 892 F.2d at 1551. The Board

read one sentence of a page and stopped — the same type of shortcut, in miniature, that runs through the Board's decisions.

This Court has — for decades — reiterated the obviousness-enablement requirement many times. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1297 (Fed. Cir. 2010) ("In order to render a claimed apparatus or method ***obvious***, the cited prior art as a whole must enable one skilled in the art to make and use the apparatus or method." (emphasis added)), modified on other grounds, 649 F.3d 1276, 1296 (Fed. Cir. 2011) (en banc); *Raytheon*, 993 F.3d at 1380 ("To render a claim ***obvious***, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention." (emphasis added)); *In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir. 2005) ("Although published subject matter is 'prior art' for all that it discloses, in order to render an invention unpatentable for ***obviousness***, the prior art must enable a person of ordinary skill to make and use the invention.") (emphasis added); *Rockwell Int'l Corp. v. U.S.*, 147 F.3d 1358, 1365 (Fed. Cir. 1998) (same); *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1471 (Fed. Cir. 1997) (same).

The Board appended an aside to its incorrect legal ruling: That Stratus's enablement argument "appear[ed] to be a rehashing of its unpersuasive reasonable expectation of success arguments," Appx0041 n. 20, or a "repackag[ing]" of the same, Appx0124. That aside cannot rescue the decisions for two reasons. First, prior-art enablement and reasonable expectation of success are distinct requirements asking distinct questions, even if the relevant evidence overlaps. Second, the Board never engaged the relevant evidence at all — not under any doctrine. Instead, much as it ducked the obviousness-enablement issue (by legal error), the Board ducked the reasonable-expectation-of-success issue (by conveniently yet incorrectly deciding a threshold needle-size issue, as explained below) so that it could reach a decision more easily.

Given that Stratus made a strong and unanswered showing of non-enablement — by pointing out that no one at the time of the invention could have fabricated the proposed "Racz's modified device" with both a central lumen as well as channels in the needle sidewalls for the filaments in a needle appropriately sized for RF neurotomy — the Court should reverse on this issue

alone. At a minimum, the case should be remanded to force the Board to address this issue as legally required.

### C. The Board's Expectation-of-Success Rulings Cannot Stand: One Decision Resolved The Dispositive Factual Dispute With an Invented Rule of Evidence, and the Other Refused to Resolve it at All.

Stratus's expectation-of-success case rested on a physical premise and unrebutted proof: An RF neurotomy needle can be no larger than 16 gauge — a sidewall 229 microns thick — and no evidence established that filament channels could be fabricated down a sidewall this size. The two final written decisions responded to that showing in two ways. In IPR2024-01209, the Board resolved the needle-size dispute against Stratus by announcing that Racz, "an issued patent," is "inherently more credible than witness testimony prepared specifically for litigation." Appx0045. In IPR2024-01212, on the same record, the Board expressly declined to resolve the same dispute and held the dispute irrelevant because no claim recites a needle size. Appx0118-0120. Neither path is sound. The first rests on a *per se* evidentiary rule found nowhere in this Court's law, applied to evidence the Board misread. The second sustains the petition on a theory the petition never advanced. Both must be vacated.

### 1. What the petitioner and Dr. Tucker said, what Stratus showed, and how the petitioner responded and Dr. Tucker disappeared.

The petitions presented "Racz's modified device" as the centerpiece of its case. "Racz's modified device" was carefully pieced together from multiple prior-art references to meet all claim limitations, including multiple deployable/retractable filaments, a removable RF probe that can extend to the distal end of the needle's lumen, and physical and electrical contact from the probe to the needle to the filaments. To accomplish that, the petitions said clearly (and illustrated) that the filaments must be outside of the main lumen. *See* Appx0326 ("[A] POSA would have arranged the perimeter filaments, channels, and ramps ***around the internal perimeter of Racz's cannula*** . . ." (emphasis added)); Appx1376 (same); Appx4325 ¶ 167 (same); Appx7288 ¶ 161 (same); Appx0311 ("Lee's deployable filaments (22/1622) can be arranged ***around the inner perimeter of the cannula*** such that they surround and provide space for a central element . . . to accommodate Racz's centrally located removable probe (22/52)." (emphasis added)); Appx1366 (same); Appx4303 ¶ 140; Appx7273-7274 ¶ 140.

The petition and Dr. Tucker presented only two examples of "Racz's modified device": A one-piece design and a two-piece design, in which the tip is a separate piece. *See* Appx4306 ¶ 144; Appx7276 ¶ 144; Appx6595-6596112:9-113:5; Appx1009. But, at the distal end, both examples would look the same — as illustrated in the petition. *See* Appx6591 93:14–95:22; Appx5080 ¶ 213; Appx5211 ¶ 135. In both examples, there are channels in the sidewall of the needle — for at least some appreciable length near the tip — where the filaments go. Placing the filaments so, outside of the needle's central lumen, leaves room for the probe, which must contact the interior surface of the cannula. *See* Appx6821; Appx0328-0329; Appx1385-1386; Appx4328-4329; Appx7290-7291; Appx0320; Appx1384; Appx4318 ¶ 158; Appx7299 ¶ 176; Appx0041; Appx0163-0164. The petition and Dr. Tucker's supporting (practically verbatim) declaration described and illustrated what the final result would look like and how it would function, and they frequently stated in nothing more than conclusory fashion that it could be "easily" done and would entail mere "routine engineering." *See* Appx4302-4303 ¶¶ 137, 140, Appx4305-4306, ¶¶ 143-144, Appx4308-4309 ¶¶ 146-148, Appx4320 ¶ 161, Appx4323 ¶ 165, Appx4326-4327 ¶¶ 167, 169, Appx4364 ¶ 228; Appx0310-0311, Appx0313, Appx0321, Appx0324,

Appx0327, Appx0355; Appx7272-7273 ¶¶ 137, 140, Appx7278 ¶ 146, Appx7280 ¶ 148, Appx7283 ¶ 155, Appx7285-7286 ¶ 159, Appx7288-7289 ¶¶ 161-162, Appx7324 ¶ 217; Appx1365-1366; Appx1368, Appx1371, Appx1374, Appx1376-1377, Appx1411 (citing same). But they never explained how the filament channels could be formed in the sidewall of the cannula — not for any length, not for any size needle. That is a hole in the petition that was never filled at any point in these cases.

In deposition, when pressed to explain how "Racz's modified device" could be made, Dr. Tucker constantly deflected, asserting that was an irrelevant "manufacturing" issue about which he need not concern himself. *See* Appx6589 87:15-88:5, Appx6600-6601 130:6-7, 131:10-11, 133:16-17, Appx6607 159:10, Appx6612 178:5-7, 180:3.

Stratus then showed, through the only clinical testimony in the record, that a neurotomy needle can be no larger than 16 gauge: A 1.651 mm outer diameter, a 1.19 mm inner diameter, and a sidewall 229 μm thick. *See* Appx1278; Appx2057; Appx5239-5240 ¶¶ 228, 233, 235; Appx5066-5067, Appx5085-5086 ¶¶ 158, 160, 230, 236. Dr. Russo, who has performed thousands of RF neurotomy

procedures, so testified. The petitioner offered no clinical witness in response. Mr. Crosby, a medical-device engineer, testified that channels small enough to fit within that sidewall "would be extremely challenging, if not impossible, to fabricate." Appx1277-1278; Appx2056; Appx5237-5238 ¶¶ 221-225, Appx5248-5251 ¶¶ 261-271.

No witness contradicted the testimony of either Dr. Russo regarding neurotomy needle size or Mr. Crosby regarding forming the filament channels in a needle's sidewall. Dr. Tucker, in particular, vanished regarding those issues. He submitted a reply declaration, but it addressed only copying and the definition of ordinary skill in the art. *See* Appx4481-4499. He never again testified about "Racz's modified device," and no one else attempted to fill those holes in the petition. No one stepped up to defend his conclusory assertions of a reasonable expectation of success or any related issue. *See TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) ("[C]onclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review.").

### 2. The Board's ruling regarding RF neurotomy needle size cannot stand.

#### a. The Board resolved the neurotomy-needle-size dispute with a rule of its own invention

The IPR2024-01209 decision acknowledged Stratus's evidence, then disposed of it in one sentence: "[W]e find Racz — an issued patent — to be inherently more credible than witness testimony prepared specifically for litigation, and we give it more weight." Appx0045. That is not a credibility finding; it is a categorical rule of evidence. No decision of this Court holds that a patent is more credible than sworn expert testimony, and such a rule would go way too far: Every expert declaration in every IPR is "prepared specifically for litigation," including Dr. Tucker's — which the Board credited extensively in the same decision. *See, e.g.,* Appx0041.

Nor is there any reason to categorically give special credence to statements in patents. Patents are not peer-reviewed publications. Patents are essentially self-published. A patent applicant can write anything it wants in a patent application. Unless a statement in a patent application is germane to the patentability of a claim, a patent examiner has no reason to question the

statement (and is incentivized not to spend time doing so). Here, Racz's statements regarding needle size are not material in any way to Racz's claims, and there is no evidence in Racz's prosecution history that its needle-size statements were given any scrutiny whatsoever. As will be explained more in the next section, the needle size statement in Racz was nowhere tied to the type of needle under consideration. Racz discloses many clinical applications and correspondingly a wide range of needle sizes, but that is not the same as saying that the 10-30 size necessarily applies to all uses, which is the erroneous interpretation adopted by the Board.

On the other hand, Dr. Russo's testimony was reasoned, experientially based, corroborated, and undisputed. Dr. Russo did not just say that an RF neurotomy needle must be no larger than 16 gauge; he explained why, namely, that a larger needle would be "(a) too stiff to navigate within the constraints of the relevant anatomy; and (b) so large that they damage delicate anatomic structures through which they pass when being advanced to a target nerve." Appx5067 ¶ 160. Dr. Russo is a world-renowned RF neurotomy practitioner who does about a dozen per day and has done thousands. *See* Appx5022 ¶ 8,

Appx5071 ¶ 178. Each time, he held an RF neurotomy needle in his hands, inserted it in a patient under his care, guided that needle to a nerve in the patient's body, and used the needle to ablate a nerve. When he says a needle larger than 16 gauge is too stiff to navigate and would cause too much tissue damage, he knows what he's talking about.

Dr. Russo's reasoned testimony on this point is corroborated by at least Cosman, Tullis, and the Stratus patents. Cosman — applied by the petitioner against some claims — notes 16 gauge ("more preferably 18 G[auge] or more.") as the largest size of an RF neurotomy needle. *See* Appx3897 7:15-36. Tullis — cited by the petitioner to show the state of the art — also mentions 16 gauge as the largest size. *See* Appx4060 7:17-36. And the Stratus patents disclose no needles larger than 16 gauge. *See* Appx0210 19:1-7; *See* Appx0258 8:8-15. All references in the record to larger needles concern non-neurotomy needles.

Not only was Dr. Russo's needle-size testimony well-reasoned, uniquely experientially based, and corroborated, it was also undisputed. No other witness refuted any aspect of his testimony regarding neurotomy needle sizes. Nor could Dr. Tucker (or anyone else) credibly have done so after he admitted that he knew

nothing about RF neurotomy needle sizes and would have to ask doctors like Dr. Russo. *See* Appx6603 142:15-21; *see also* Appx6604-6605.

The Board's discounting of Dr. Russo's testimony under a novel and non-sensical categorical rule is the antithesis of reasoned decisionmaking. *See Allentown Mack*, 522 U.S. at 372-74.

#### b. Substantial evidence does not support the Board's interpretation of Racz's needle-size teachings.

Substantial evidence cannot be found to support the Board's interpretation of Racz regarding RF neurotomy size — not in Racz itself, not in any other document, and not from any witness.

Racz itself refutes the reading the Board adopted. The Board cited one sentence at 8:10-15 ("Various sized electrodes can be made, from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge)") and stopped, failing to even acknowledge, let alone analyze any other germane part of Racz's disclosure. But there is nothing in Racz expressly stating or even implying that the entire 10-30 gauge range mentioned at 8:10-15 is applicable to RF neurotomy, given all the non-neurotomy applications that Racz discloses. Racz discloses a multi-application tool — useful for RF neurotomy — but also for precision nerve

blocks by anesthetic injection, lumbar sacral disc access, cervical discography, tarricopalatine fossa access, passage of other instruments, and "other medical and surgical procedures." Appx3823-3825 Abstract, 4:15-18, 6:2-7, 6:16, 6:59–7:10, 7:26-42, 9:12-22. Racz's 30-to-10-gauge range spans all of those applications and embodiments, including the blunt, closed-end injection embodiment of Figure 3, which is not an RF neurotomy needle at all. *See id.* 5:55 – 6:7 (describing "certain other applications").

Racz's title, abstract, problem-solution description, and claims verify that Racz's innovative rigidly bent tip is not limited to RF neurotomy. *See* Appx3818, Appx3821-3822 2:39–3:17 (referring to generic "target regions," broad "clinical applications," and "delivering anesthesia, pain relief, or other application"), Appx3825 (every independent claim reciting generic "target region in the patient's body"). And, the petitioner repeatedly acknowledged Racz's breadth. *See* Appx0298; Appx1352; Appx0631; Appx1651; Appx6578 43:15–44:17.

The Board never even acknowledged Racz's non-neurotomy applications, even though Stratus clearly pointed them out. *See* Appx0749-0751; Appx1760-1762. A decision that credits a reference over unrebutted clinical testimony,

while bypassing the reference's own contrary teaching, does not rest on substantial evidence and is not the product of reasoned decisionmaking, *see Allentown Mack*, 522 U.S. at 372-74; under either label, it cannot stand.

Nor can Dr. Tucker's testimony constitute substantial evidence in support of the Board's interpretation of Racz's needle-size teachings. Dr. Tucker said 10-30 gauge in Racz was merely a "starting point" and that he would canvass physicians like Dr. Russo to learn what needles sizes are appropriate for RF neurotomy — an inquiry he clearly did not undertake or he would have learned that RF neurotomy needles cannot be as big as he claims. Appx6603 142:15-21. No other witness for the petitioner addressed the needle-size issue, and the petitioner cited no other documents supporting its position. All other documents addressing needles larger than 16 gauge concerned non-neurotomy needles. *See* Appx0749-0751; Appx1760-1762.

In any event, the Board did not ground its interpretation of Racz's needle-size teachings on anything other than Racz itself. As a result, the Board's interpretation cannot be sustained on any other basis than Racz itself, which the Board misinterpreted. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Moreover, the Board's fabricated rule favoring Racz over Dr. Russo also mismatches the evidence it was invoked to override. The sentence the Board drew from Racz is a manufacturing statement: "Various sized electrodes can be ***made***, from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge)." Appx3824 (emphasis added). Dr. Russo's testimony answered a different question: What size needle can safely be used in an RF neurotomy procedure on a patient. Those propositions do not conflict — a 10-gauge electrode can exist and still be clinically unusable for neurotomy — so there was no credibility contest to resolve. The Board manufactured one, and resolved it with a manufactured rule. That is not reasoned decisionmaking. *See Allentown Mack*, 522 U.S. at 372-74.

#### 3. The Board erred by basing its reasonable-expectation-of-success finding on the fact that some claims are not limited to RF neurotomy.

The IPR2024-01212 decision sustained a theory the petition never advanced. It acknowledged the parties' dispute over Racz's needle size — and declined to resolve it. *See* Appx0119. It held needle size "irrelevant" because claims 1-9 and 20-26 "are not limited to ablating nerve tissue . . . and do not recite

any needle size," so "even if we accept Patent Owner's position that RF neurotomy needles can be no larger than 16 gauge," the size problem does not matter. Appx0118. Stratus's arguments, the Board said, rested on "an inappropriate incorporation of an exemplary embodiment . . . into the claims." Appx0119.

That reasoning answers a question nobody asked. Stratus did not ask the Board to read a 16-gauge limit into the claims; it argued that the petitioner's own proposed combination could not feasibly be built and therefore lacked a reasonable expectation of success. The petition proposed only modifying Racz's ***RF neurotomy*** embodiment to add Lee's deployable filament, for the stated purpose of improving ***RF neurotomy*** ablation.[4] The petitioner's burden was to show a reasonable expectation of success for ***that*** combination. *See Intelligent Bio-Systems*, 821 F.3d at 1367-68. The Board's answer — that the claims are broad enough to cover some other, larger, non-neurotomy device — substitutes a combination the petition never proposed and Stratus never had notice to rebut.

[4] The petitioner mentioned two examples of this combination (Racz's modified device), but both were RF neurotomy needles (and both required tunnels in the cannula sidewall for filaments).

The Board "must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *Magnum Oil Tools*, 829 F.3d at 1381.

Moreover, claims 10-19 and 26-29 of the '664 Patent are limited to neurotomy. Both claims 10 and 26 expressly require "a target volume within the patient that includes a nerve." Appx0270 32:27-28; Appx0271 33:9-10. Claims 11-19 depend from claim 10, and claims 27-29 depend from claim 26. Thus, claims 10-19 and 26-29 are limited to "neurotomy" even though that exact term is not expressly used. The Board acknowledged what these claims recite, but the Board nonetheless dismissed these claims because they "do not recite any needle size." Appx0118. That reasoning fails. The petition proposed "Racz's modified device" as an RF neurotomy device to reach these claims (and all others). As such, there must be a reasonable expectation of success that "Racz's modified device" could be made to function as a neurotomy needle.

To be clear, the petitions presented only a ***neurotomy*** version of "Racz's modified device" to reach ***all*** claims, some of which are specific to RF neurotomy. That was the petitioner's choice as master of the petition. *See SAS Institute, Inc.*

*v. Iancu*, 584 U.S. 357, 363 (2018) ("[I]n an inter partes review the petitioner is master of its complaint . . ."), 364 (describing IPR as "party-directed"), 366 ("[T]he petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion"). The petitioner could have presented — but did not — one smaller version of "Racz's modified device" as a neurotomy needle applicable to all neurotomy-specific claims and one larger version of "Racz's modified device" as a non-neurotomy needle applicable to all other claims. Had the petitioner done so, however, the contrast between the larger and smaller versions of "Racz's modified device" would have highlighted the precise weakness that the petitioner could not risk exposing — the lack of a reasonable expectation of success in making the channels in the smaller version.

#### 4. The lack of corresponding manufacturing detail in the Stratus patents cannot excuse the petitioner's failure to show a reasonable expectation of success.

Both decisions reasoned that, because neither Lee nor Stratus's own specifications describe how to fabricate filament channels in the sidewall of a cannula, fabrication must lie within ordinary skill. *See* Appx0042; Appx0118.

Stratus answered below: Its invention is structurally different from "Racz's modified device." *See* Appx0747-0748 (paragraph under heading "1. Comparisons to Stratus's invention are inapt"); Appx1758-1759 (same); Appx1103-1105 58:12–60:22 (discussing the same). Specifically, Stratus's filaments go in the lumen defined by the cannula ("elongate member"), whereas the filaments in "Racz's modified device" go in tunnels in the cannula sidewall. In other words, Stratus's filaments are inside the tube, not inside the tube's wall. This difference is especially clear looking at the two designs side by side:



**"Racz's Modified Device"**



**Stratus's Design**

Appx0313, Appx0294. In Stratus's design (right), the filaments 206 are in the lumen 308, not in the "elongate member" sidewall 203.

In a footnote, the IPR2024-01209 decision faulted Stratus for insufficiently explaining the differences. *See* Appx0042 n.21. But, as noted above, Stratus did

clearly point out the pertinent differences. *See* Appx0747-0748 (paragraph under heading "1. Comparisons to Stratus's invention are inapt"); Appx1758-1759 (same); Appx1103-1105 58:12–60:22 (discussing the same). And, the differences are abundantly clear, and the Board's failure to appreciate those clear differences further reflects the Board's troubling inattention to details and unwillingness to engage in the key issues: Stratus's filaments are ***inside*** the inner perimeter of the main cannula, not ***outside*** that inner perimeter (and thus in the cannula's sidewall), as the petition repeatedly emphasized. That is, Stratus locates its filaments inside the inner diameter of the cannula sidewall — not tunneled (somehow) through a 229-micron-wide sidewall itself. The Board's decision even quoted a passage of the '664 Patent that says so. *See* Appx0117.

Even worse, the IPR2024-01212 decision plainly miscomprehended Stratus' invention, stating, "Patent Owner does not direct us to any part of the '664 patent Specification describing a technique for forming the lumens with channels ***in the sidewalls of the elongate member*** described in the Specification. Our review of the Specification of the '664 patent does not reveal any such description." Appx0118 (emphasis added). That is because the Stratus patents

are based on a different design that does not require channels in the sidewall of the elongate member, because Stratus's filaments are in a different place — inside the lumen defined by the sidewall's inner perimeter. The Board thus failed to engage in reasoned decisionmaking. *See Allentown Mack*, 522 U.S. at 372-74.

#### 5. Motivation alone cannot supply the reasonable expectation of success.

The IPR2024-01212 decision invoked *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368 (Fed. Cir. 2023) for the proposition that intertwined motivation evidence can support expectation of success. *See* Appx0120-0121. *Elekta* permits that inference where the evidence overlaps. *See Elekta* at 1376-77. Here it does not: The manufacturability evidence — sidewall geometry, channel fabrication, clinical size limits — is independent of the motivation record, and no analysis in either decision engages it under any heading. A motivation finding cannot carry an expectation-of-success burden it never addresses.

#### 6. The bodily-incorporation doctrine does not save the absence of a reasonable expectation of success.

The Board also erred to the extent it based a reasonable expectation of success on the principle that obviousness does not require bodily incorporation

of one reference into another. *See* Appx0030-0031 n. 15; Appx0123. Regardless of that principle, the petition put forward "Racz's modified device" with considerable specificity. It had to. *See* 35 U.S.C. § 312 (requiring petition to set forth challenge grounds "with particularity"); 37 C.F.R. § 42.104 (requiring petition to be "precise" and "with specificity"); *Intelligent Bio-Systems*, 821 F.3d at 1369 (emphasizing the same). Moreover, the petitioner knew it would have to answer the eventual question of ***how*** the filament teachings of Fitz or Lee could be incorporated into Racz in a way that would result in the claimed invention. Thus, the petitions said clearly (and illustrated) that the filaments must be outside of the main lumen. *See* Appx0326 ("[A] POSA would have arranged the perimeter filaments, channels, and ramps ***around the internal perimeter of Racz's cannula*** . . ." (emphasis added)); Appx1376 (same); Appx4325 ¶ 167 (same); Appx7288 ¶ 167 (same); Appx0311 ("Lee's deployable filaments (22/1622) can be arranged ***around the inner perimeter of the cannula*** such that they surround and provide space for a central element . . . to accommodate Racz's centrally located removable probe (22/52)." (emphasis added)); Appx1366 (same); Appx4303 ¶ 140; Appx7273-7274 ¶ 140. Thus, the channels in the sidewall of Racz's cannula is an absolutely essential feature of "Racz's modified device." No

matter what other variations may be made to the illustrated "example" of "Racz's modified device," all versions must have that feature, at least for some appreciable, if not the entire, length of the cannula. *See* Appx6591 Tr. 93:14–95:22; Appx5080 ¶ 213; Appx5211 ¶ 135.

* * *

Because the petitioner failed to carry its burden to show a reasonable likelihood of success for its proposed "Racz's modified device," the Court should reverse on this issue alone. At a minimum, the case should be remanded for the Board to resolve the expectation-of-success issue on the record, weighing Dr. Russo's clinical testimony and Mr. Crosby's fabrication testimony against the petitioner's evidence without resort to any categorical preference for documentary prior art, reading Racz's size disclosure in light of the whole reference — including its broad variety of clinical applications — confining its analysis to the combination the petitions actually proposed, and understanding that Stratus's design in irrelevant to the expectation-of-success problems posed by the proposed "Racz's modified device."

### D. Objective Indicia of Nonobviousness

Objective indicia "can be the most probative evidence of non-obviousness." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (citation omitted). In this case, Stratus presented evidence of four objective indicia: (1) Long-felt need, (2) copying, (3) praise, and (4) commercial success. *See* Appx1287; Appx3456; Appx2074-2087; Appx1776-1782. The Board erroneously refused to consider any of that evidence.

#### 1. The Board erred when it declined to evaluate the objective indicia based entirely on a misunderstanding of Stratus's showing that its Nimbus system practices the claimed inventions.

The Board disposed of all four objective indicia in a single threshold ruling. It held that there was no nexus for any objective indicia because Stratus's claim charts mapped the claims not to the Nimbus needle alone, but to the needle "in combination with a second product, either a reusable or disposable RF Probe." Appx0049; Appx0132. The Board thus understood precisely what Stratus's evidence showed — that the needle and probe together practice the claimed system — and noted that system is not the needle alone. Having done so, the Board went no further. It made no findings on long-felt need, copying, praise,

or commercial success. It gave the entirety of Stratus's objective-indicia evidence "no weight" in IPR2024-01209, Appx0050. That was error, reviewed de novo for failure of reasoned decisionmaking — not substantial evidence — because the Board never reached the factual questions the objective indicia present.

The Board grounded its ruling in a minor terminology inconsistency. Because Stratus and Mr. Crosby sometimes used the shorthand "Nimbus Device" for the needle alone, and because paragraph 21 of Mr. Crosby's declaration opined that "the Nimbus Device is covered by at least some claims of each of the Stratus Patents," the Board found "a clear disconnect between Patent Owner's position and its evidence." Appx0049; Appx0132. But the Board itself recognized the substance of that evidence (exhibit 2008, Appx5271-5280): Charts mapping the needle and probe together, element by element, to claim 1 of each patent — including the probe limitation, which the chart maps to Stratus's "two types of RF probes, reusable and disposable, for use with its needle." Appx0049-0050 (quoting Appx5271); Appx0132 (quoting Appx5279). What the system was and what the charts mapped were never in doubt; no witness disputed the mapping. The Board nonetheless elevated a shorthand's imprecision over the

acknowledged substance of the evidence — and on that basis declined to weigh any of it. An agency ruling that turns on a label rather than on the undisputed content of the record is not reasoned decisionmaking. *See Allentown Mack*, 522 U.S. at 372-74.

To be clear, the exhibit-2008 claim charts, which Mr. Crosby incorporated into his declaration, clearly explained that "Stratus's Nimbus® . . . Needle[] and Stratus's RF Probe together form ***a system that meets the limitations of the claimed system*** as provided below" (emphasis added):

Claim 1 of U.S. Patent No. 10,966,782

| | Claim Language | Illustrative Evidence and Notes |
|---|---|---|
| [1Pre] | A system comprising: | Stratus's Nimbus® RF Multitined Expandable Electrode (Nimbus RF Neurotomy Needle) and Stratus's RF Probe together form a system that meets the limitations of the claimed system as provided below. |
| [1a] | a radiofrequency probe; and | Stratus offers two types of RF probes—reusable and disposable—for use with its needle.<br>Stratus's Reusable RF Probe<br><br>Stratus's Disposable RF Probe<br> |
| [1b] | a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising: | Stratus's Nimbus RF Neurotomy Needle, depicted below, is operable with either RF probe of [1a].<br> |

Appx5271; *see also* Appx5278-5280 (same for claim 1 of '664 patent); *see also* Appx5179 ¶ 21 (incorporating exhibit 2008 into Mr. Crosby's declaration); *see also* Appx1307 (citing Appx5179 ¶ 21); Appx2086 (same).

Stratus too made clear in its papers that the Nimbus needle and probe together correspond to the claimed invention. *See, e.g.*, Appx1222-1223 ("[A] ***Nimbus device is*** (quoting parts of claim 1) ***a*** 'neurotomy ***needle' together with a*** removeable 'radiofrequency ***probe***.'" (emphases added)); Appx2002-2003 (same); *see also* Appx1217-1218; Appx1996-1997; Appx1163-1164 (illustrating the Nimbus needle and probes and explaining how they are used together); Appx1942-1943 (same).

The record reveals that the parties sometimes referred to the overall system as a "device." *See, e.g.,* Appx1223-1224 ("[A] ***Nimbus device is*** (quoting parts of claim 1) ***a*** 'neurotomy ***needle' together with a*** removeable 'radiofrequency ***probe***.'" (emphases added)); Appx2002-2003 (same). That is understandable. The terms "device" and "system" are generally synonymous, and when the probe is inserted in the needle — exactly what they are designed to do — the result is a singular "device." And it is also understandable to focus on the needle, which is where all innovative filaments are; there is nothing novel about the probe *per se*.

Notably, the petitioner did not dispute that the Nimbus needle and probe together are a system within the scope of the claims. The petitioner presented

no expert testimony disputing Mr. Crosby's mapping of the Nimbus system to the Stratus patent claims. In fact, the petitioner did not dispute that the Nimbus system is coextensive with the claims and therefore entitled to a presumption of nexus.

The petitioner's nexus argument was far different from what the Board adopted. Against commercial success only — not long-felt need, copying, or praise — the petitioner argued that there are two parts to the claimed system and that separate sales figures of each part cannot establish commercial success of the combined system. *See* Appx1175-1176; Appx1954-1955. The Board distorted that argument into a new and different proposition: That Stratus had not established that it practiced the claimed invention and thus had not established any nexus for any of the four objective indicia at issue. *See* Appx0047-0050; Appx0130-0134. The Board did so in its final written decisions without providing notice of that change. That was a violation of Stratus's due-process right to fair notice. *See* 5 U.S.C. § 554 (requiring administrative agency to provide fair notice and opportunity to be heard); *see also Magnum Oil Tools*, 829

F.3d at 1381 ("Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.").

To the extent the Board believed that a nexus categorically cannot exist when components of a claimed system are sold separately, that was legal error. Stratus noted in its sur-replies that nothing in this Court's law requires that all components of a claimed invention be sold in a single transaction. *See* Appx0768; Appx1778-1779. The Board rejected that argument for one stated reason: Stratus "does not cite any legal authority for this proposition." Appx0050; Appx0133. But the Board cited no authority for the opposite proposition, and there is none. Precisely because every claim requires both a needle and a probe, the needle-plus-probe system is the only correct comparator regardless of how the needle and probe traveled through commerce before they became a combined system. The Board's contrary rule — never announced before the final written decisions, and supported by no authority — would categorically deny a nexus to every multi-component system claim whose components are separately sold, no matter how completely the assembled system embodies the claims. That is not this Court's law, and adopting it was legal error.

#### 2. The Board committed further reversible error when it applied its erroneous reasoning to all indicia.

The Board compounded its initial error by concluding — incorrectly — that as a result of the "Nimbus Device" not being a commercial embodiment of the claimed inventions, all four objective indicia (including long-felt need, copying, and praise) lacked a nexus. *See* Appx0047-0050; Appx0130-0132.

There is no basis for the Board to have extended the petitioner's nexus argument, which focused only on commercial success, to the other three objective indicia. Stratus showed that the Nimbus system was a commercial embodiment of the claimed invention solely for the purpose of demonstrating that the commercial success of the Nimbus needle, which must necessarily be used with a probe, was commercial success of the claimed invention. The petitioner challenged that, contending that sales data for the Nimbus needle and the Nimbus probes were separate and could not be used to establish sales of the overall system. That issue was unique to just the commercial-success issue. That issue and the related but different issue of whether the "Nimbus Device" or the Nimbus system practices the claimed invention have no logical bearing on long-felt need, copying, or praise. It was error for the Board to assume otherwise.

The petitioner did not dispute long-felt need, copying, or praise based on the needle and the probe being separately sold parts. In fact, the petitioner did not dispute nexus at all for long-felt need, copying, or praise. In fact, those three objective indicia do not even have a nexus requirement. Unlike commercial success, which may be attributable to reasons other than the claimed invention (*e.g.*, marketing, price cutting, superior distribution, brand name, quality), other possible drivers of long-felt need, copying, and praise need not be ruled out. Evidence of long-felt need, copying, and praise each stands on its own and indicatives non-obviousness to whatever extent makes sense.

The Board erred by dismissing *sua sponte* those three objective indicia for lack of so-called nexus. It was wrong legally. It was wrong procedurally. *See Magnum Oil Tools*, 829 F.3d at 1381 (Board cannot base its decision on arguments not advanced by a party).

#### 3. The Board committed further reversible error when it applied its erroneous reasoning to the method claims of the ’664 Patent.

The Board compounded its initial error yet again by extending its incorrect conclusion to reach the ’664 Patent’s method claims, which cover actions that a

physician performs using the needle and probe. The Board's fixation with the "Nimbus Device" as just a part of the overall system does not in any way detract from Stratus's undisputed showing that the method claims were practiced using the Nimbus needle and probe.

#### 4. The Board's analysis would fail even under the substantial-evidence standard.

Assuming *arguendo* that the substantial-evidence standard of review would apply to this issue, the Board's determination fails under that standard as well. "[E]xamin[ing] the record as a whole [and] taking into account both the evidence that justifies and detracts from an agency's opinion," it is clear that a reasonable mind would not find that Stratus had failed to demonstrate that it practiced the claimed invention. *Applications in Internet Time*, 897 F.3d at 1356. Taken as a whole, Mr. Crosby and Stratus clearly said (and established) that Stratus practiced the claimed invention. Only a highly selective and unreasonable distortion of the record evidence could support the Board's contrary finding. *See Fed. Commc'n Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (decision is reversibly arbitrary if outside "a zone of reasonableness").

* * *

Because the Board wrongly ducked the objective-indicia issues, the Board's final written decisions must be vacated and, if the cases are remanded, the Board must reassess obviousness in light of the objective indicia.

Unfortunately, the Board's erroneous handling of the objective indicia is emblematic of a pattern of its overall failure to appreciate the record as a whole and its eagerness to take shortcuts to simplify its analysis of the disputed issues, like reasonable expectation of success and enablement.

## VI. CONCLUSION

The Board's final written decisions should be reversed because the petitioner failed to (1) establish a reasonable expectation of success for its proposed prior-art combination called "Racz's modified device" and (2) rebut Stratus's showing that the prior art did not contain enabling teachings sufficient to make "Racz's modified device." Alternatively, at a minimum, both decisions should be vacated and remanded for consideration of Stratus's argument and evidence regarding reasonable expectation of success, enablement, and objective indicia of nonobviousness.

Respectfully submitted,

Date: Sept. 15, 2026

By: /s/ M.C. Phillips

Matthew C. Phillips
Kevin B. Laurence

LAURENCE & PHILLIPS IP LAW
1050 Connecticut Ave. NW, Suite 500
Washington, D.C. 20036
Phone: 503-964-1129
Fax: 202-558-6081
mphillips@lpiplaw.com

*Counsel for Appellant Stratus Medical, LLC*

# CERTIFICATE OF COMPLIANCE UNDER FEDERAL RULE OF APPELLATE PROCEDURE 32(g)(1) & FEDERAL CIRCUIT RULE 32(b)(3)

This brief has a proportionally spaced 14-point typeface, contains 13,709 words, and complies with Federal Rule of Appellate Procedure 32(a) and Federal Circuit Rule 32(b). That word count is based on the "Word Count" feature of Microsoft Word for Office 365 MSO®, including footnotes and words added by Stratus to images in this brief, but not including parts excluded by Federal Circuit Rule 32(b)(2) or Federal Rule of Appellate Procedure 32(f).

Date: Sept. 15, 2026

By: /s/ *M.C. Phillips*
Matthew C. Phillips

# ADDENDUMS


| | |
|---|---|
| 1 – IPR2024-01209 Final Written Decision | pp. Appx0001-0055 |
| 2 – IPR2024-01212 Final Written Decision | pp. Appx0056-0152 |
| 3 – U.S. Patent No. 10,966,782 | pp. Appx0153-0228 |
| 4 – U.S. Patent No. 10,925,664 | pp. Appx0229-0271 |

Trials@uspto.gov
571-272-7822

Paper 70
Date: March 10, 2026

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AVANOS MEDICAL, INC.,
Petitioner,

v.

STRATUS MEDICAL, LLC,
Patent Owner.

IPR2024-01209
Patent 10,966,782 B2

Before MICHAEL J. FITZPATRICK, SUSAN L. C. MITCHELL, and ARTHUR M. PESLAK, *Administrative Patent Judges*.

MITCHELL, *Administrative Patent Judge*.

JUDGMENT
Determining All Challenged Claims Unpatentable
Dismissing the Parties' Motions to Exclude
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Petitioner, Avanos Medical, Inc., filed a Petition to institute an *inter partes* review of claims 1–27 of U.S. Patent No. 10,966,782 B2 (Ex. 1001 ("the '782 patent")) pursuant to 35 U.S.C. § 311(a). Paper 1 ("Pet."). Patent Owner, Stratus Medical, LLC, waived filing of a preliminary response pursuant to 37 C.F.R. § 42.107(b). Paper 6. We granted the Petition and instituted an *inter partes* review. Paper 8 ("Inst. Dec.").

During the review, Patent Owner filed a Patent Owner Response to the Petition (Paper 68 ("PO Resp.")[1]), Petitioner filed a Reply (Paper 31 ("Reply")), and Patent Owner filed a Sur-Reply (Paper 41 ("Sur-Reply"). Additionally, each party filed a motion to exclude. Paper 49 ("Pet. Mot. To Exclude"); Paper 47 ("PO Mot. To Exclude").

An oral hearing was held November 6, 2025. A transcript of the hearing is of record in this case. Paper 62 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6, and this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial. For the reasons discussed below, we

---

[1] The Patent Owner Response was originally filed under seal as Paper 13 and publicly with redactions as Paper 14. Those papers were later expunged and replaced with versions reflecting updates to the information considered confidential in light of the Board's November 6, 2025, Order entering a protective order and resolving several motions to seal. *See* Paper 60; Ex. 3004. Patent Owner has represented that Paper 68 is identical to the now expunged Paper 14. Ex. 3004.

determine that Petitioner has proved, by a preponderance of the evidence, that claims 1–27 of the ’782 patent are unpatentable.

### *B. Real Parties-In-Interest*

Petitioner identifies itself, Avanos Medical, Inc., as the real party-in-interest and states that “Diros Technology, Inc. of Markham, Ontario, Canada is a wholly owned subsidiary” of Petitioner. Pet. 82.

Patent Owner identifies itself, Stratus Medical, LLC, as the real party-in-interest. Paper 4, 2.

### *A. Related Matters*

Petitioner filed three related *inter partes* reviews: IPR2024-01210 (regarding U.S. Patent No. 10,733,688 B2); IPR2024-01211 (regarding U.S. Patent No. 10,733,688 B2); and IPR2024-01212 (regarding U.S. Patent No. 10,925,664 B2). In addition, Patent Owner identifies three related applications, U.S. Patent Application Nos. 17/190,224, 18/378,138, and 19/272,521, and one lawsuit, *Stratus Med., LLC v. Avanos Med., Inc.*, No. 1:25-cv-00546 (D. Del. Filed May 2, 2025). Paper 44, 2.

### *B. The ’782 Patent*

The ’782 patent is titled “Needles and Systems for Radiofrequency Neurotomy.” Ex. 1001, code (54). The ’782 patent is directed “to thermal ablation systems and methods, and more particularly to systems and methods for radio frequency (RF) neurotomy, such as spinal RF neurotomy.” *Id.* at 1:28–31. The ’782 patent provides the following background for thermal ablation, RF ablation, and RF neurotomy:

> Thermal ablation involves the creation of temperature changes sufficient to produce necrosis in a specific volume of tissue within a patient. The target volume may be, for example, a nerve or tumor. A significant challenge in ablation therapy is to provide adequate treatment to the targeted tissue while sparing the surrounding structures from injury.
>
> RF ablation uses electrical energy transmitted into a target volume through an electrode to generate heat in the area of the electrode tip. The radio waves emanate from a non-insulated distal portion of the electrode tip. The introduced radiofrequency energy causes molecular strain, or ionic agitation, in the area surrounding the electrode as the current flows from the electrode tip to ground. The resulting strain causes the temperature in the area surrounding the electrode tip to rise. RF neurotomy uses RF energy to cauterize a target nerve to disrupt the ability of the nerve to transmit pain signals to the brain.

Ex. 1001, 1:35–52.

The Specification discloses neurotomy system 100 for use in performing RF neurotomy on a patient. Ex. 1001, 6:64–65, 8:56–9:26, 9:39–56, Fig. 1. "The system 100 may include an RF generator 102 capable of generating an RF energy signal sufficient to ablate target tissue," a needle 103 capable of conducting the RF energy to the patient, and an "imaging system 105 capable of producing internal images of the patient 101 and the needle 103, for example to facilitate navigation of the needle 103 during a procedure." *Id.* at 8:63–9:6, 9:40–42.

> In some embodiments in which the needle 103 is a monopolar device, a return electrode pad 104 may be attached to the patient 101 to complete a circuit from the RF generator 102, through the needle 103, through a portion of the patient 101, through the return electrode pad 104 and back to the RF generator 102.

*Id.* at 9:6–11.

Needle 103 may include "a self-contained mechanical mechanism, in the form of deployable filaments 206a, 206b, operable to expand the volume of effective RF energy delivery as compared to known single-electrode RF probes." Ex. 1001, 10:18–21, Fig. 2A. Figure 2A is reproduced below.



FIG. 2A

Figure 2A, reproduced above, shows the needle with elongate member 203 having tip 201 and deployable filaments 206a–b. *Id*. at 9:57–60, 9:65–10:1. The filaments are deployed/retracted by a rotating actuator 216. *Id.* at 10:33–35. According to the Specification, "variation in the shape, position, and/or size of lesions . . . may be achieved by different configurations of filaments," including varying the number, length, position, and angle of the filaments. *Id.* at 25:34–43.

With reference to Figure 2B (not shown), actuator 216 may be fitted with Luer fitting 220 at the proximal end of needle 103, and configured for inserting (i) removable RF probe 401 through lumen 222 of elongate member 203, and (ii) fluid delivered through the lumen (when probe 401 is removed). Ex. 1001, 30:12–19.

Figures 3A and 3B are reproduced below.




FIG.3A




FIG.3B

Figure 3A, reproduced above left, shows a cut away view of distal end 202 of needle 103 with filaments 206a–b deployed. Ex. 1001, 7:11–12. Figure 3B, reproduced above right, shows a cut away view of distal end 202 of needle 103 with filaments retracted (and thus not visible). *Id.* at 3:13–14. Figures 3A and 3B also show tip (201) including fluid port 210 (e.g., for delivering anesthetic and/or image enhancing dye during an RF neurotomy procedure) *via* Luer fitting 220 when the probe 401 is removed, and sharpened point 301 for piercing the skin of a patient and facilitating advancement through tissue. *Id.* at 11:21–23, 12:66–13:6, 30:12–21.

According to the ’782 patent, tip 211 and tube 207 containing lumen 222 may be constructed from stainless steel, or other conductive material, such that when RF probe 401 is inserted into tube 207, the RF energy emitted by RF probe 401 may be conducted through tube 207 and into and through tip 201 and filaments 206a, 206b. *Id.* at 11:58–61, 9:49–52. “The configuration of the filaments 206a, 206b illustrated in FIGS. 2A, 3A, 3D, 5 and 6 may be operable to produce lesions that are radially offset from the central longitudinal axis 223 and distally offset from the point 301 as compared to a lesion created by the tip 201 without the filaments or a

lesion created with the needle 103 with the filaments 206a, 206b in the retracted position." *Id.* at 25:6–12.

The '782 patent's filing date is July 20, 2020. Ex. 1001, code (22). However, it claims priority back to five applications, the earliest of which was a provisional application filed on May 21, 2010. *Id*. at codes (60), (63), 1:7–22. Whether any of the challenged claims is entitled to the benefit of the filing date of any of the priority applications is not at issue. All of the asserted prior art references predate the earliest, May 21, 2010, date. *See infra* nn.3–10. Moreover, Patent Owner does not dispute that any of the asserted references is prior art to the challenged claims. *See generally* PO Resp.

*C. The Challenged Claims*

Petitioner challenges 1–27 of the '782 patent. Of the challenged claims, only claims 1 and 24 are independent. Claim 1 is illustrative and reproduced below as partitioned in the Petition with Petitioner's bracketed labels.

> 1. A system comprising:
>
> [1a] a radiofrequency probe; and
>
> [1b] a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising:
>
> [1c] a conductive portion at a distal end of the radiofrequency neurotomy needle;
>
> [1d] a tip configured to pierce tissue of a patient;
>
> [1e] an elongate member comprising a lumen configured to accept the radiofrequency probe

> therein such that the radiofrequency probe physically contacts and is electrically connected to the conductive portion, the tip being at a distal end of the elongate member;
>
> [1f] a filament electrically connected to the conductive portion and the tip due to physical contact of conductive materials at the distal end of the radiofrequency neurotomy needle such that the filament and the tip operate together as a single electrode;
>
> [1g] the filament being movable between a retracted position, in which the filament is at least partially in the elongate member, and a deployed position, in which at least a portion of the filament is out of the elongate member; and
>
> [1h] an actuator interconnected to the filament to move the filament between the retracted position and the deployed position,
>
> [1i] wherein the filament and the tip are configured to transmit radiofrequency energy from the radiofrequency probe and operate together as the single electrode in a monopolar mode when the filament is in the deployed position and the radiofrequency probe is accepted in the lumen and is in physical contact with the conductive portion at the distal end of the radiofrequency neurotomy needle.

Ex. 1001, 52:19–53; Pet. 83.

*D. The Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Ground | Claims Challenged | 35 U.S.C. § | Basis |
|---|---|---|---|
| A | 1–27 | 103(a) [2] | Racz,[3] Fitz,[4] Lee[5] |
| B | 1–27 | 103(a) | Racz, Fitz, Lee, Young ’965[6] |
| C | 1–27 | 103(a) | Racz, Fitz, Lee, Scheibe[7] |
| D | 1–27 | 103(a) | Racz, Fitz, Lee, Young ’965, Scheibe |
| E | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542[8] |
| F | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542, Young ’965 |
| G | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542, Scheibe |
| H | 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542, Young ’965, Scheibe |
| I | 13 | 103(a) | Racz, Fitz, Lee, Young ’2001[9] |

[2] The Leahy-Smith America Invents Act (“AIA”), Pub. L. No. 112-29, which was enacted September 16, 2011, made amendments to 35 U.S.C. §§ 102 and 103. AIA § 3(b)–(c). Those amendments became effective eighteen months later on March 16, 2013. *Id.* § 3(n). Because the application from which the ’782 patent issued was filed before March 16, 2013, any citations herein to 35 U.S.C. §§ 102 and 103 are to their pre-AIA versions. *Id.* § 3(n)(1).
[3] US 6,146,380, issued November 14, 2000. Ex. 1009.
[4] US 2005/0059964 A1, published March 17, 2005. Ex. 1011.
[5] US 2007/0016183 A1, published January 18, 2007. Ex. 1010.
[6] US 2006/0084965 A1, published April 20, 2006. Ex. 1012.
[7] US 2007/0260223 A1, published November 8, 2007. Ex. 1013.
[8] US 7,976,542 B1, issued July 12, 2011. Ex. 1014.
[9] US 2009/0112201, published April 30, 2009. Ex. 1016.

| Ground | Claims Challenged | 35 U.S.C. § | Basis |
|---|---|---|---|
| J | 13 | 103(a) | Racz, Fitz, Lee, Young ’201, Young ’965 |
| K | 13 | 103(a) | Racz, Fitz, Lee, Young ’201, Scheibe |
| L | 13 | 103(a) | Racz, Fitz, Lee, Young ’201, Young ’965, Scheibe |
| M | 15 | 103(a) | Racz, Fitz, Lee, Godara[10] |
| N | 15 | 103(a) | Racz, Fitz, Lee, Godara, Young ’965 |
| O | 15 | 103(a) | Racz, Fitz, Lee, Godara, Scheibe |
| P | 15 | 103(a) | Racz, Fitz, Lee Godara, Young ’965, Scheibe |

Pet. 12–13. As noted above, each of the 16 grounds presented relies on a combination of at least Racz, Fitz, and Lee. The majority of the parties’ dispute is focused on the combination of Racz, Fitz, and Lee. Therefore, analysis of the combination will be our primary focus in our discussion of the issues set forth below.

## II. ANALYSIS

### *A. Claim Construction*

The challenged claims should be read in light of the specification, as it would be interpreted by one of ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Thus, we generally give claim terms their ordinary and customary meaning. *See In re Translogic Tech.,*

---

[10] US 2007/0027449, published Feb. 1, 2007. Ex. 1015.

*Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question." (internal quotation marks omitted)); *see also* 37 C.F.R. § 42.100(b) (stating that claims are construed in IPRs according to the same standard as used in federal court).

With respect to the challenged claims, Petitioner contends that no claim term requires express construction. Pet. 12 (citing Ex. 1031 ¶106 (Dr. Robert D. Tucker's[11] testimony that "the terms in the Challenged Claims would be understood by a POSA to have their plain and ordinary meaning and do not require a special construction or definition")). In instituting the IPR, we found no need to provide an express construction of any claim term. Inst. Dec. 12. We likewise find no need to do so now, as neither party has proposed a construction for any claim term and none of the parties' arguments turns on a disputed meaning of any claim language.

*B. Obviousness Generally*

A claim is unpatentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). "Obviousness is a question of law based on underlying facts." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015). The underlying facts include (i) the scope and content of the

[11] Dr. Tucker has a Ph.D. in biophysics as well as a medical degree. Ex. 1031 ¶2.

prior art, (ii) any differences between the prior art and the claimed invention, (iii) the level of ordinary skill in the field of the invention, and (iv) any relevant objective indicia, or secondary considerations, of nonobviousness. *Id*. (citing *Graham v. John Deere of Kan. City*, 383 U.S. 1, 17–18 (1966)). Further, if all the elements of an invention are found in a combination of prior art references, then:

> a proper analysis under § 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success.

*Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006).

### *C. Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

The parties dispute the level of ordinary skill in the art, and their main dispute is the scope of the art itself, which logically is intertwined with determining the level of skill in the pertinent art at the time of the invention.

*See, e.g., Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the *pertinent prior art*." (emphasis added)). Indeed, several factors for consideration are premised on the scope of the art. *See id.* ("Factors that may be considered in determining level of skill include: type of problems encountered in art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.").

Petitioner argues that the art is "'thermal ablation systems and methods,' which includes RF neurotomy systems," as set forth in the '782 patent's express description of the "Field" of invention. Pet. 11 (quoting Ex. 1001, 1:28–31); Reply 2. Petitioner argues that a person of ordinary skill in such art:

> would have had at least (i) a bachelor's degree in biomedical engineering, or a related field, such as mechanical engineering, biomechanical engineering, or bioengineering, who also has at least 3 years of experience with thermal ablation system[s] and methods; or (ii) an advanced degree in the same areas of academic study with at least 1 year[] of experience with thermal ablation systems and methods.

*Id.* (citing Ex. 1031 ¶105).

Patent Owner argues that the art should be limited to RF neurotomy alone—to the exclusion of other types of ablation such as tumor ablation and cardiac ablation. *See, e.g.,* PO Resp. 25 ("[T]he central focus of the '782 Patent is RF neurotomy, which is one specialized field among many diverse and non-overlapping fields, like tumor ablation and cardiac ablation, within the broad class of RF ablation."). Thus, according to Patent Owner, "[b]y

failing to specifically include RF neurotomy, the petition's definition diverts attention to unrelated and inappropriate fields of RF ablation." *Id.* (citing Ex. 2001 ¶ 177; Ex. 2006 ¶¶ 47–49 (describing RF ablation encompasses many subfields "wholly unrelated to RF neurotomy"). In further support of its narrower proposal, Patent Owner quotes from the same "Field of the Invention" section of the '782 patent to which Petitioner cites. *Id.* The entirety of that section states: "The present application generally relates to thermal ablation systems and methods, and more particularly to systems and methods for radio frequency (RF) neurotomy, such as spinal RF neurotomy." Ex. 1001, 1:28–31.

Although it is true that the '782 patent relates "more particularly" to RF neurotomy and the challenged claims require a "radiofrequency neurotomy needle," the '782 patent also expressly relates to "thermal ablation" systems and methods generally. *See* Ex. 1001, 1:28–31; 52:21, 54:28. Petitioner also points to a statement in the '782 patent that indicates the described needles "may be adapted (e.g., modified or scaled) for use in other medical procedures" than neurotomy. Reply 2 (citing Ex. 1001, 48:28–32; Ex. 1054, 30 (provisional)). The Specification of the '782 patent also describes using RF needles for creating endocardial lesions, for cauterizing feeder vessels in ulcers, and for cardiac ablation generally. *See* Reply (citing Ex. 1001, 19:36–54, 48:32–47; Ex. 1046, 34:7–10, 142:9–145:8). Further, the "Detailed Description of the Invention" concludes by emphasizing that the scope of the invention encompasses "the delivery of RF energy to tissue in the anatomy . . . for a multitude of reasons," stating as follows:

> It will be appreciated that the delivery of RF energy to tissue in the anatomy can be practiced for a multitude of reasons, and embodiments of the needles described herein may be adapted (e.g., modified or scaled) for use in other medical procedures. For example, embodiments of needles described herein could be used to deliver RF energy as a means to cauterize "feeder vessels," such as in bleeding ulcers and/or in orthopedic applications. For another example, embodiments of the needles described herein could be adapted for use in procedures such as cardiac ablation, in which cardiac tissue is destroyed in an effort to restore a normal electrical rhythm in the heart. Certain such uses could further benefit from the ability of embodiments of needles described herein to deliver fluid through a lumen since, for example, emerging procedures in cardiac therapy may require the ability to deliver stem cells, vascular endothelial growth factor (VEGF), or other growth factors to cardiac tissue. The ability to steer embodiments of the needle described herein may provide significant benefit in the field of cardiovascular drug delivery.

Ex. 1001, 48:28–47; *see also id*. at 1:37–38 (target volume may be nerve or *tumor*).

In the Sur-Reply, Patent Owner reasonably concedes that "the patent mentions some non-neurotomy ablation applications." Sur-Reply 20. Patent Owner argues, however, that such non-neurotomy ablation applications are beyond the field of the invention as evidenced by the '782 patent's statement that "the invention can be 'adapted,' 'modified,' 'scaled,' or 'tailored' for [such] other RF ablation procedures," and thus, "the invention itself is not directed to those procedures." *Id.* (citing Ex. 1001: 48:28–47; Ex. 1054, 30). This argument is not persuasive as it is directly at odds with the '782 patent, which states: "it will be understood by those skilled in the art that the invention extends beyond the specifically disclosed embodiments to other

alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof." Ex. 1002, 51:64–52:1.

Further, in determining a patent's field of invention or art, it is the patent's broader description that controls.

> We determine the field of endeavor by reference to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention. The field of endeavor is not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field.

*Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1359 (Fed. Cir. 2023) (quotations marks and internal citations omitted).

In sum, the field of the invention is thermal ablation. It encompasses RF neurotomy, but it is not limited to RF neurotomy. With that settled, we turn now to the person of ordinary in the field/art (POSITA or POSA).

Patent Owner's proposal is reproduced below:

> [A] combination of (1) an interventional pain-specialist physician with significant experience performing RF neurotomy procedures and (2) an engineer with a degree in biomedical engineering or a related field and experience in the design and development of devices and methods for applying electromagnetic energy to nerves. The POSITA should have either a bachelor-level degree with three years of the design/development experience noted above or an advanced degree with one year of the design/development experience noted above. Such a POSITA could be a team of two or more people working together.

PO Resp. 30 (citing Ex. 2006 ¶ 58). Patent Owner's proposal is too narrow in two respects. First, it mandates certain education and experience in RF neurotomy specifically. This is too narrow as the description of the scope of the invention set forth in the '782 patent as described above is not limited to

RF neurotomy. Second, it requires the POSA to be both a physician who performs thermal ablation (RF neurotomy specifically) and an engineer with training and experience "in the design and development of devices and methods" for performing the same. *Id.* This is too narrow because it excludes physicians and other advanced degree holders who research and design devices and methods for performing thermal ablation but do not actually operate on patients.

We adopt the Petitioner's definition of a POSA, quoted above, as it is reflective of the level of skill in the art when viewed in light of the disclosure of the '782 patent. *Supra* (quoting Pet. 11).

### *D. The Racz, Fitz, Lee Combination Common to All Grounds of Unpatentability*

#### *1. The Asserted Prior Art*

##### *a) Racz (Ex. 1009)*

Racz is titled "Bent Tip Electrical Surgical Probe" and discloses discloses an "apparatus for pain relief that delivers electrical stimulation pulses or high-frequency signals to the vicinity of a neural structure via an electrical needle or cannula." Ex. 1009, code (54), 1:4–9.

Racz Figure 1 is reproduced below.




FIG_1

Figure 1, reproduced above, shows a schematic diagram of Racz's system comprising "radio-frequency electrode cannula 10 having a shaft 12 inserted into a portion P of a patient's body." *Id.* at 3:24–26, 38–40. "The cannula 10 can be inserted directly through the skin of the body portion P to locate the tip 14 in a target position within the body." *Id.* at 3: 42–44. RF "cannula 10 further comprises a hub 20. The hub 20 is capable of accommodating an electrical probe 22, which includes a segment that is inserted into and received by the shaft 12 of the cannula 10." *Id.* at 3:60–63. "[E]lectrical connection 24 couples the cannula 10 to an external signal generator 28 by way of the hub 20 and the probe 22. A second electrical connection 26 connects the external signal generator 28 to a reference electrode 30 in contact with the patient's body portion P." *Id.* at 4:1–5. "[S]ignal generator 28 can be a source of electrical stimulation, pulsed high-frequency stimulation signals, high frequency signals, pulsed radio-frequency output, or other electrical waveforms." *Id.* at 4:6–9.

Racz Figure 2B is reproduced below.




Figure 2B, reproduced above, shows a specific embodiment of the system diagramed in Figure 1. *Id.* at 3:27–30; 4:59–62, 5:7–51. The cannula, reference numeral 33 in this embodiment,[12] includes shaft 34 defining an internal lumen. *Id.* at 5:41–45. Shaft 34 "comprises a hollow metal tube with an insulated portion 36 illustrated by hatched lines," and exposed distal tip 38. *Id.* at 4:62–65. Distal tip 38 includes a pointed end (40), which "can be useful in penetrating tough tissue." *Id.* at 5:3–5.

---

[12] According to Petitioner, Racz uses different reference numerals for corresponding elements of its figures such that, for example, cannula 10 of Figure 1 corresponds to cannula 33 of Figures 2A–2B. Thus, Petitioner identifies multiple reference numerals for the same element such as, for example, "cannula (10/33)." Pet. 19. Patent Owner does the same thing. *See, e.g.*, PO Resp. 19 ("Racz discloses an RF neurotomy 'needle or cannula' 10/33 with a shaft 12/34 and curved tip 14/38, which enables it to go around anatomical structures 16. *See* Racz 4:44–58. A shaft 54 of a removable electrical probe 22/52 is insertable in the cannula 10/33. *See id.* 5:26–30. The probe 22/52 connects to a signal generator 28/58 at its proximate end."). We follow suit.

In operation, cannula 33 "with a stylet positioned in the shaft 34 is inserted into the patient's body portion P." *Id.* at 5:31–33. "The stylet is then removed, and probe 52 is inserted into the shaft 34." *Id.* at 5:37–38. "The probe 52 is connected to the signal generator 58" in order to generate high-frequency heating, or other electrical stimulation. *Id.* at 3:60–63, 4:18–23, 4:18–20. When the probe 52 is fully inserted into cannula 33, "physical contact" between probe 52 and the cannula's tip 38 conducts the RF energy to tip 38. *Id.* at 3:60–65, 4:18–23, 5:41–48. Racz's cannula 33 thus provides "electrical stimulation or high frequency heating of tissue near the exposed electrical tip." *Id.* at 3:60–4:23, 5:41–51, Fig. 1.

*b) Fitz (Ex. 1011)*

Fitz discloses "improved-coverage RF neurotomy instrumentation, including an introducer used to deploy a set of electrodes to an area to be treated." Ex. 1011 ¶9.

Fitz discloses that a known problem with single-tip RF neurotomy devices was "that they do not allow for adequate coverage of the target area," and produce lesions that "extend[] only a few millimeters at the diameter of the midportion of the lesion" from the exposed needle tip. *Id.* ¶4. "Although multiple lesions may be created to enhance coverage, this is more time-consuming and usually more painful for the patient." *Id.* ¶5. Moreover, "creation of multiple lesions also exposes the patient to more radiation, as fluoroscopy is used to place and replace the needles." *Id.*

To address inadequate coverage in single-tip neurotomy devices, Fitz discloses "an introducer used to deploy a set of electrodes." *Id.* ¶9. The introducer features a plurality of elongated, co-extensive cannulae, each cannula including an insulated and electrically conductive electrode. *Id.*

Each electrode has a proximal end configured for attachment to a source of energy, an exposed distal tip to deliver the energy to a localized region, and each electrode slides within its respective cannula so as to enhance the energy coverage area. *Id.* According to Fitz, "at least some of the electrodes [may be] constructed of a shape-memory material to control deployment. The cannulae are generally parallel, and may either lie in the same plane or may be arranged otherwise, including spoke-like cross-sections." *Id.* ¶10. "At least some of the electrodes may slide independently, and at least some of the electrodes may slide in unison." *Id.* ¶11.

Fitz Figure 4 is reproduced below.




Figure 4, reproduced above, shows an embodiment of Fitz's invention having a side port introducer. *Id.* ¶15. In this embodiment, "introducer 402 is curved, and a plurality of electrodes are deployed through the tip and/or multiple side ports." *Id.* ¶20.

*c) Lee (Ex. 1010)*

Lee discloses a radio frequency ablation device having a plurality of deployable electrodes or "ablation antennae." *See, e.g.*, Ex. 1010, code (57), ¶8. Lee Figure 1 is reproduced below.



Figure 1, reproduced above, shows a perspective view of the distal portion of Lee's "multiple antenna ablation device" or "ablation trocar." *Id.* ¶¶32, 91.

Ablation trocar 10 includes trocar point 14 having "forward piercing edge surface 18." *Id.* ¶91. "[T]rocar point 14 is mounted on a cannula 16[, which] may be made of . . . metal covered with a plastic insulating layer, to prevent ablative energy from leaking out of the device along the length of the cannula." *Id.* "Cannula 16 defines an internal lumen 20 which carries a plurality of stylets 22" each of which "comprises a long and straight springy wire-like member . . . . made of a springy conductive material such as springy nickel titanium alloy." *Id.* ¶92.[13] Each of stylets 22 "may be housed wholly within lumen 20 of cannula 16." *Id.* (referencing Fig. 2). But in the

[13] Petitioner reasonably refers to Lee's conductive stylets/electrodes as "filaments." *See, e.g.*, Pet. 19, 37 (citing Ex. 1031 ¶¶125–126, 162–163, repectively). Patent Owner does not dispute that Lee's stylets/electrodes are "filaments" as that term is used in the claims. *See* PO Resp. 23–25.

deployed configuration shown in Figure 1, "the ends of the wire-like stylets 22 are exposed," such that RF energy may be conducted from the tips of the stylets after they exit trocar 10 and "define an ablation volume in the target tissue." *Id.* ¶¶12, 92. "The electrodes may be used in a monopolar fashion with the ablation stylets excited with RF energy and a return electrode being applied usually in the form a conductive pad in contact with a remote surface on the patient." *Id.* ¶24.

As illustrated in Figure 1, stylets 22 are positioned around the perimeter of tip 14 and extend outwardly in a "cone" orientation around the central stylet (labeled 24*a* to indicate a sharpened piercing point), which is deployed through the center of trocar point 14. *Id.* ¶¶92, 102, 103, 128, Figs. 1–3. Lee discloses that stylets 22 "may be connected to suitable advancement and retraction mechanisms." *Id.* ¶106. During deployment, the electrically conductive stylets around tip 14 are guided by "deflection surfaces," which may comprise a plurality of channels and ramps. *Id.* ¶¶16, 18, 87 (the "electrodes are directed into the tissue at a variety of angles by a mandrel like delivery member which serves as a deflection surface"), 91, 102. The ends of the exposed stylets transmit RF energy to define an ablation volume. *Id.* ¶¶7, 12, 123, 129.

*d) Whether Lee Is Analogous Art*

Patent Owner argues that Lee is not analogous art. PO Resp. 2, 34–36. "Although § 103 does not, by its terms, define the 'art to which [the] subject matter [sought to be patented] pertains,' this determination is frequently couched in terms of whether the art is analogous or not, i.e., whether the art is 'too remote to be treated as prior art.'" *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992) (quoting *In re Sovish*, 769 F.2d 738, 741

(Fed. Cir. 1985)). "Whether a reference in the prior art is 'analogous' is a fact question." *Clay*, 966 F.2d at 658. "Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *Id.* at 658–59.

Patent Owner argues that Lee is not analogous art under the first criterion because "Lee does not relate to neurotomy at all." PO Resp. 34. However, as discussed above, the field of the invention is not limited to neurotomy. The field of the invention is thermal ablation generally, which encompasses RF neurotomy, but which is not limited to RF neurotomy. Accordingly, we are not persuaded by Patent Owner's argument.

To the contrary, we are persuaded by Petitioner's argument that Lee is analogous art, under at least the first *Clay* criterion, because it "discloses various techniques for deploying electrodes from the tip of an RF ablation device." Pet. 18.

*2. The Proposed Combination – "Racz's modified device"*

Petitioner argues that "a POSA would have been motivated to implement deployable filaments on the distal tip (14/38) of Racz's electrode cannula (10/33)," as "Fitz and Lee disclose a known technique for solving a known problem in RF ablation devices—providing deployable filaments at a distal tip to expand and control the ablation volume compared to single-tip devices with inadequate energy coverage." Pet. 22–23. The Petition repeatedly refers to the proposed combination as "Racz's modified device."

*See, e.g.*, Pet. 44, 54, 57. The Petition also provides a definition for the term in a glossary, namely "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee." *Id.* at vii. Patent Owner likewise employs the same term. *See, e.g.*, PO Resp. 23–25. We follow suit below.

Patent Owner begins by asserting that "Racz does not teach or suggest deployable filament(s)," and "neither Fitz nor Lee teaches energizing those filaments at a distal end using an insertable RF probe." PO Resp 36. Therefore, Patent Owner concludes, "[w]hat is missing from all three references are deployable filament(s) that are energized at the distal end by an insertable RF probe. That feature, which is recited in each independent claim, is beyond what the references themselves teach." *Id*. Patent Owner's argument misses the mark.

The point of an obviousness challenge is that no one reference teaches all of the limitations of a claim, but a POSA would have found it obvious to combine known teachings to arrive at the claimed invention. So, although Patent Owner's statements are true as no single reference of record includes an RF probe *and* deployable filaments that are energized at the distal end of that probe, Patent Owner's argument is not persuasive. Rather, it is a classic case of attacking references individually, which is inapposite when a prior art combination is asserted as obvious, as is the circumstance here. *Keller*, 642 F.2d 413, 426 (C.C.P.A. 1981).

Patent Owner further asserts that the proposed combination (Racz's modified device) is "[t]oo [v]ague," and thus the Petition fails to comply with 35 U.S.C. § 312 ("requiring petitions to set forth grounds 'with particularity'"), 37 C.F.R. § 42.104 ("requiring petitions to be 'precise' and

'with specificity'"[14]), and 5 U.S.C. § 554(b) ("requiring timely notice of 'the matters of fact and law asserted'"). PO Resp. 37–38.

In support of these assertions, Patent Owner lists eight criticisms purportedly demonstrating "ambiguities, omissions, and lack of clarity that frustrate Stratus's ability to meaningfully respond to the petition." *Id.* at 41; *see id*. at 37–42. As discussed below, however, none of Patent Owner's criticisms is well taken, and none demonstrates a lack of compliance by the Petition with 35 U.S.C. § 312, 37 C.F.R. § 42.104, or 5 U.S.C. § 554(b).

The first such criticism is that the Petition provides "just one partial view of Racz's modified device, from just one perspective." PO Resp. 38–39. Patent Owner reproduces an image from the Petition to illustrate the point. *See* PO Resp. 39. We reproduce this illustration below and in addition add the related text appended to the image in the Petition.

[14] Contrary to Patent Owner's argument (*see* PO Resp. 37), Rule 104 does not include the phrase "with specificity." 37 C.F.R. § 42.104.




***Dr. Tucker Declaration at ¶143 (showing one example of how a POSA would modify Racz to include Lee's filaments)***

Pet. 28; *see also* Ex. 1031 ¶143. According to Petitioner what is shown above is "one example of how a POSA would modify Racz to include Lee's filaments." Pet. 28. Dr. Tucker elaborates on that point, testifying:

> The figure shows *one example* of how a POSA (motivated by both Fitz and Lee) would have incorporated Lee's deployable filaments (22/1622) as monopolar electrodes at Racz's distal tip (14/38). This figure is not intended to be limiting or represent the only way Racz's device would have been modified, but I am providing it as a helpful illustration of how the references would be combined in one example.

Ex. 1031 ¶143.

Patent Owner does not identify any legal requirement for petitions to *illustrate* proposed combinations of prior art features. Indeed, the very statute identified by Patent Owner as "requiring petitions to set forth grounds 'with particularity'" (*see* PO Resp. 37) calls for the requisite particularity to be "in writing," not by illustration. *See* 35 U.S.C. § 312(a)(3) ("A petition filed under section 311 may be considered only if . . . (3) the petition

identifies, in writing and with particularity . . . the grounds on which the challenge to each claim is based.”). Simply put, there is no legal requirement to provide multiple illustrations of a proposed combination of prior art features (as Patent Owner implies), let alone a single illustration (as Petitioner has done).

The rest of the criticisms are that the Petition does not provide enough specific details. *See* PO Resp. 39 (“Second, no dimensions are provided.”), 40 (“Third, [regarding the filaments and their channels,] it is unclear how far proximally (left as shown [in the figures]) those channels continue (*i.e.*, where those channels begin on the proximal end) or how the filaments enter those channels.”), 40 (“Fourth, it is unknown whether the tip remains bent, as taught by Racz, or has been straightened to accommodate the filaments in Racz’s modified device.”), 41 (“Fifth, it is unknown whether Racz’s modified device includes anchors, which Lee says are necessary to prevent backward migration of the needle when Lee’s filaments are deployed.”), 41 (“Sixth, it is also unknown, for example, whether the filaments are electrically connected to an RF signal source, as taught be Lee, or not, as that may be unnecessary in view of Racz’s RF probe.”), 41 (“Seventh, it appears that no features of Fitz are incorporated into this modified device, but that is not clear.”), 41 (“Eighth, Dr. Tucker refers to two examples of Racz’s modified device, but the differences between them are not clear.”). None of these criticisms is persuasive.

With respect to the second through sixth criticisms set forth above, Patent Owner has not explained, nor is it apparent to us, that any such detail is necessary in light of the claim requirements. For example, the challenged

claims do not specify dimensions, mandate or preclude the use of anchors, or mandate or preclude a bent tip.

As for the "[s]eventh" criticism that it is not clear whether a feature from Fitz is being utilized, we are not persuaded. Lee and Fitz are somewhat duplicative or redundant of one another as both teach the use of deployable filaments at the distal end of an ablation device. *See, e.g.*, Pet. 18 ("Like Fitz, Lee discloses that a deployable-electrode technique can be used to deliver RF energy to a targeted area of tissue." (citing Ex. 1010 ¶¶32, 84, code (54)). It is true that the Petition illustrates "one example of how a POSA would modify Racz to include Lee's filaments" with no mention of Fitz. Pet. 27–28. The Petition clearly articulates, however, that "Racz's modified device" is "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee." Pet. vii. Thus, "Racz's modified device" is not limited to incorporating Lee's filaments. Further, even in the example of incorporating Lee's deployable filaments, the cited teachings of Fitz nonetheless are relevant as they provide further support for why a POSA would have been motivated to incorporate any deployable filaments into Racz. *See* Pet. 16 ("Fitz discloses that a known problem with single-tip RF neurotomy devices was 'that they do not allow for adequate coverage of the target area.'") (citing Ex. 1011 ¶4)), 17 ("To solve the problem of inadequate coverage in single-tip neurotomy devices, Fitz suggests providing a deployable 'set of electrodes' that extend outwardly from the 'exposed distal tip' of an RF neurotomy cannula." (citing Ex. 1011 ¶9, code (57), Claim 1; Ex. 1031 ¶ 120).

Patent Owner's last criticism regarding the purported vagueness of Racz's modified device is that "Dr. Tucker refers to two examples of Racz's

modified device, but the differences between them are not clear." PO Resp. 41 (citing Ex. 2006 ¶¶195–197; Ex. 2020, 112:9–113:5). What Patent Owner refers to, despite not citing to it in its brief, is Dr. Tucker's testimony offering two examples of how deployable filaments could be implemented in Racz. *See* Ex. 1031 ¶145 ("As a first example, it is my opinion that a POSA would be able to define channels (as disclosed in Lee) as an integral part of Racz's cannula and dimension the channels to accommodate Lee's filaments."), ¶147 ("As a second example, it is also my opinion that a POSA would also have been able to implement the combination of Racz and Lee using a separate tip defining channels (as disclosed in Lee)."). We are not moved by Patent Owner's criticism. Patent Owner does not cite any legal authority that would preclude a Petitioner (or its witness) from identifying multiple examples of how a POSA could have combined the prior art.[15]

---

[15] Patent Owner also states that it is not clear "if there are other (unillustrated) examples that [Dr. Tucker] or the petitioner intends to rely upon." PO Resp. 41. To the extent this is an argument, it is not persuasive. Petitioner relies on "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee." Pet. vii. That there may be additional permutations of how the prior art might be combined that Petitioner has not articulated does not undermine Petitioner's obviousness challenge. In fact, the law does not require Racz to be physically combinable with Lee or Fitz for their combination to be obvious. *See Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) ("Contrary to Allied's position, it is not necessary that [Caterpillar and Ogawa] be physically combinable to render obvious the ['489 patent]." (quotes and citation omitted); *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined but whether the

Further, as Petitioner points out, "obviousness does not require the art be 'physically combinable,' much less in the exacting detail [Patent Owner] Stratus suggests." Reply 12 (citing *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016)). Petitioner is correct. The Federal Circuit has held:

> To justify combining reference teachings in support of a rejection it is not necessary that a device shown in one reference can be physically inserted into the device shown in the other. The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.

*In re Keller*, 642 at 425 (citations omitted).

In sum, the proposed combination, which Petitioner refers to as "Racz's modified device" and defines as "Racz's cannula (10/33) modified by a POSA to include deployable filaments as disclosed in Fitz and Lee" (*see* Pet. vii.), is not "vague," as Patent Owner asserts. *See* PO Resp. 37.

*3. Reason To Combine*

Petitioner cites *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373 (Fed. Cir. 2023) as holding that, "if there's a known technique to address a known problem using prior art elements according to their established functions, then there is a motivation to combine." *Id.* at 1380; Pet. 22–23. Petitioner cites Fitz and Lee as evidence that implementing deployable

---

claimed inventions are rendered obvious by the teachings of the prior art as a whole.").

filaments on the distal tip of an RF ablation device was a known technique for expanding and controlling the ablation volume. Pet. 23 (citing Ex. 1011, ¶¶9–10, code (57); Ex. 1010 ¶¶12, 84, 123–131); *see also* Ex. 1031 ¶¶60–65, 69–72 (Dr. Tucker testifying, among other things, that deployable electrodes were well known in the art). In addition, Petitioner cites declaration testimony of Dr. Tucker that "a POSA would have been motivated to implement deployable filaments on the distal tip (14/38) of Racz's electrode cannula (10/33)" of the proposed combination, as he "would have recognized that the Fitz/Lee technique would improve the energy coverage area of Racz's single-tip device." Ex. 1031 ¶132, *cited in* Pet. 22.

Petitioner presents additional arguments and evidence to support that a POSA would have had an apparent reason to make Racz's modified device. Pet. 22–28. We need not address these additional arguments and evidentiary citations, however, as Petitioner has demonstrated by a preponderance of the evidence that implementing deployable filaments on the distal tip of an RF ablation device was a known technique for expanding and controlling the ablation volume. Thus, so long as there would have been a reasonable expectation of success in making Racz's modified device (addressed *infra*), the combination would have been obvious. *See Intel Corp.*, 61 F.4th at 1380 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."); *Medichem*, 437 F.3d at 1165 ("[A]n obviousness determination requires not only the existence of a motivation to combine elements from different prior art

references, but also that a skilled artisan would have perceived a reasonable expectation of success in making the invention via that combination.”).

Patent Owner argues that Petitioner presents an inadequate motivation to combine Racz, Fitz, and Lee. PO Resp. 57. In that regard, Patent Owner summarizes testimony of Mr. Crosby as demonstrating that “the art was generally characterized by two alternative approaches: (1) tine-less devices with removable RF probes for distal energization and (2) probe-less tined devices in which deployable tines or filaments are energized at the proximal end.” *Id.* at 57 (citing Ex. 2006 ¶¶161–167). According to Patent Owner, prior to the ’782 patent, these “two distinct approaches . . . had never before been attempted together” and “were considered mutually exclusive.” *Id.*

The legal significance of this line of argument is not clear. To the extent it is an attack on the references individually, it is not persuasive. *See In re Keller*, 642 F.2d at 426 (“But one cannot show non-obviousness by attacking references individually where, as here, the rejections are based on combinations of references.”). To the extent it is a preview of Patent Owner’s teaching away arguments, such arguments are addressed further below.

Patent Owner presents numerous additional arguments attempting to show that a POSA would not have had an adequate reason to combine the prior art as proposed by Petitioner. PO Resp. 50–56. These arguments are not persuasive, first and foremost, because they do nothing to rebut the following facts established by Petitioner: (1) it was known in the art that deployable filaments could be provided at a distal tip of an RF ablation device to expand and control the ablation volume compared to single-tip

devices, (2) a POSA would have recognized that deployable filaments similarly would improve Racz's electrode cannula in the same way.

Still, we address Patent Owner's arguments. In general, Patent Owner presents two main arguments—the asserted prior art teaches away from Racz's modified device, and a POSA would have combined the prior art in a manner outside the scope of the challenged claims. PO Resp. 51–59.

As for the teaching away argument, Patent Owner offers three explanations. First, Patent Owner argues that "Racz teaches away from the addition of filaments." PO Resp. 51. This is so, according to Patent Owner, because, "[f]or Racz's modified device to be usable as a neurotomy needle, the filaments would need to be extraordinarily thin or narrow" such that they would be unworkable. *Id.* "Assuming they could even be constructed at all, [Patent Owner continues,] such small filaments would be so flexible as to be bent by tissue in unpredictable manners as they exit the needle or possibly not even being able to pass through the tissue." *Id.* (citing Ex. 2006 ¶282).

Patent Owner argues that Racz expressly teaches away from such filaments in the following passage.

> Stimulation and high frequency electrodes having expandable and flexible curved tips are known. Examples of such electrodes are the TEW Electrode Kit and the ZHK Electrode Kit, both manufactured by Radionics. Those electrodes both have flexible, curved tips, which extend from the straight shaft of an enclosing cannula to extend off-axis in an arc. This is useful in certain neural regions such as the trigeminal ganglion or the pituitary gland, or any area where the target region is very soft or fluid filled. *Such flexible off-axis electrodes have a limitation that there [sic] tips cannot penetrate tough tissue or encounter hard bone without being damaged or diverted*.

PO Resp. 52 (quoting Ex. 1009, 2:26–37 (colored text converted to black)).

Petitioner replies that Racz does not teach away from flexible electrodes (or deployable filaments) because Racz endorses them in some situations, including some RF neurotomy procedures. Reply 14. Petitioner is correct. In fact, in the sentence immediately preceding the purported teaching away (in italics *supra*), Racz states that such flexible electrodes are "useful in certain neural regions such as the trigeminal ganglion or the pituitary gland, or any area where the target region is very soft or fluid filled." Ex. 1009, 2:35–34.

Second, Patent Owner argues that, "[b]ecause Racz teaches that a curved tip is a necessity, Racz teaches away from the petition's proposal *to the extent that Racz's modified device would have a straight tip*." PO Resp. 55 (emphasis added)[16]; *see also* Ex. 1009, code (54) ("Bent Tip Electrical Surgical Probe"), code (57) ("A medical needle or cannula for stimulation or ablation includes a rigid bent tip for simplified placement at target sites within a patient's anatomy. The curved tip or shaft is used to

---

[16] A fair reading of the Petition shows that Petitioner's challenge is based on a modification of Racz's improved electrode cannula, which has a bent tip, not a straight tip. *See* Pet. 22 (asserting that "a POSA would have been motivated to implement deployable filaments on the distal tip (14/38) of *Racz's electrode cannula (10/33)*" (emphasis added)); Ex. 1009, Figs. 1 (showing Racz's cannula 10 with a bent tip), 2A–B (showing Racz's cannula 33 with a bent tip)). However, a fair reading of the Petition further shows that Petitioner's challenge is not premised on Racz's modified device having a bent tip; rather, it is indifferent as to that feature. *See, e.g.,* Pet. 13–16 (summarizing Racz's disclosure and not noting the bent tip); *compare* Pet. 14 (annotated Racz Fig. 1 – curved tip shown), *with* Pet. 15 (annotated Racz Fig. 2B – straight tip shown).

steer the device within the patient's body and to avoid critical anatomical structures.”).

Petitioner replies that, “[a]t most, Racz suggests a preference for a bent tip in limited scenarios but never requires it.” Reply 14 (citing Ex. 1009, 2:3–25, 2:39–41; Ex. 1045, 129:15–131:2, 133:17–134:10). Petitioner is correct insofar as Racz does not require a bent tip or teach away from a straight tip in all scenarios. Rather, Racz (1) substantiates that a POSA would have known about RF ablation devices with straight tips and that such devices were suitable for some applications, and (2) teaches a bent tip as an improvement for other applications. *See, e.g.*, Ex. 1009, 1:32–35 (“Radiofrequency electrodes are commonly used; these typically have an insulated straight tubular metal shaft with an electrically exposed tip.”), 4:56–58 (“This procedure can be more effective when performed with the rigid bent tip 14 of the invention than with a traditional straight or flexible tip.”).

In sum, Petitioner’s proposal is not conditioned on Racz’s modified device having a straight tip or a bent tip.[17]

---

[17] The degree of bend or curvature of Racz’s tip can vary widely per Racz. *See* Ex. 1009, 8:58–9:1 (“Various forms and embodiments of the bent tip needle or cannula are provided herein involving various shapes, sizes, forms, and configurations of the cannula” and, within the scope of the invention, “various configurations of tip geometry, bluntness or sharpness, degree of curvature, position of fluid injection ports, and the insulation configuration may be devised.”). Dr. Tucker interpreted this to mean that it could be varied to zero, resulting in a straight tip. Ex. 2020, 48:1–3. Regardless, of whether a straight tip would be considered part of Racz’s invention, as Dr. Tucker testifies, Racz clearly shows that straight tips were known in the art.

Third, Patent Owner argues "it is unclear whether Racz's modified device would have anchors as taught by Lee," as the Petition does not address anchors. PO Resp. 56. Thus, according to Patent Owner, Lee teaches away from Racz's modified device because, "[a]ccording to Lee, such anchors are a necessity to prevent movement of the needle when Lee's [filaments] are deployed, unless the [filaments] are deployed 'one at a time.'" *Id.* (quoting Ex. 1010 ¶¶89, 104).

Petitioner replies that Lee does not teach what Patent Owner asserts it to teach. Rather, according to Petitioner, "Lee is unequivocal that its anchors are optional." Reply 14 (citing Ex. 1010 ¶¶90, 104). Petitioner is correct. *See* Ex. 1010 ¶90 ("It is also contemplated in accordance with the invention that there are circumstances where anchors might not be applied at all."), ¶104 ("[I]f desired, anchors may not be deployed.").

We are not persuaded that any of the asserted prior art teaches away from the claimed invention.

We turn now to Patent Owner's related argument that, if a POSA would have combined the prior art, the POSA would have done so exclusively in a manner outside the scope of the challenged claims. PO Resp. 58–59. Specifically, Patent Owner argues that a POSA would consider the use of deployable filaments in an ablation device, as taught by Fitz or Lee, only in lieu of, and not in addition to, a removable RF probe, as taught in Racz. *Id.* In other words, according to Patent Owner, if a POSA sought to improve Racz "to achieve the expanded-ablation-volume objective stated in the petition," the POSA "could simply replace Racz's probe 52 with Fitz's electrodes." *Id.* at 58. Thus, as Patent Owner concludes, "Racz's

modified device is far more complicated and problematic than necessary." *Id.*

This line of argument does not demonstrate that a POSA would not have combined the prior art in the manner proposed by Petitioner. It merely demonstrates that a different combination, one lacking an RF probe and thus not encompassed by the claims,[18] also may have been obvious to a POSA and ostensibly would have been considered superior to Petitioner's proposed combination. But "just because [allegedly] better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012); *see also In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."). Thus, even if Racz's modified device were inferior to the alternative combination identified by Patent Owner, such a fact would not rebut or undermine Petitioner's reason to combine the art into Racz's modified device.

In sum, we are persuaded that Petitioner has shown sufficiently that a POSA would have had an adequate reason to combine the prior art as proposed by Petitioner.

*4. Reasonable Expectation of Success*

Patent Owner disputes that there would have been a reasonable expectation of success in making the proposed combination. PO Resp. 43–

---

[18] Independent claims 1 and 24 recite "an radiofrequency probe."

49. Patent Owner argues both that Petitioner's evidence does not support a reasonable expectation of success, and that Patent Owner's evidence demonstrates a lack of it. *Id.* at 43.

As for the former point, Patent Owner argues that "[t]he sole" evidence for a reasonable expectation of success that Petitioner presents "is Dr. Tucker's bald conclusion, which is entitled to no weight." PO Resp. 43.

Dr. Tucker's testimony is not a bald conclusion. His conclusion as to a reasonable expectation of success is set forth in paragraph 148 of his declaration. Ex. 1031 ¶148. It is supported extensively with testimony regarding what the prior art teaches (*see id.* ¶¶110–117 (Racz), ¶¶118–123 (Fitz), ¶¶124–131 (Lee)) and why and how a POSA would have combined the prior art teachings (*see id.* ¶¶132–147).

Dr. Tucker's testimony clearly is entitled to weight. Since 1983, he has "been a Professor at the University of Iowa where [he] direct[s] an active research program in radiofrequency electrosurgical procedures and instrumentation." Ex. 1031 ¶3. He has a Ph.D. in biophysics, and he is also a medical doctor (albeit he is not Board certified as pointed out by Patent Owner[19]). *Id.* ¶2. He also has additional training and experience that is relevant, but which is not necessary, but further establishes that he is well qualified to offer the opinions set forth in his declaration. *Id.* ¶¶2–11.

Patent Owner argues that Dr. Tucker is not qualified to testify here because "he is not Board certified" and he is "not a pain-specialist physician and has never performed a neurotomy." PO Resp. 30. Dr. Tucker explained, however, that he is not Board certified nor does he operate on

---

[19] *See* PO Resp. 30 (citing Ex. 2020, 10:19–12:20).

patients because his work focuses on the development of instrumentation, not the use of it, explaining on cross-examination:

> I have a Ph.D. in engineering and had no intention of doing pathology on patient samples day-to-day. I wanted to combine my Ph.D. in engineering with pathology to develop instrumentation. Medical instrumentation. So I never was Board-certified. Instead of Boards, I got a Ph.D.

Ex. 2020, 11:7–13. We are persuaded that Dr. Tucker is qualified to offer testimony in this proceeding, and that his testimony adequately supports Petitioner's asserted reasonable expectation of success.

We turn now to whether there would have been a reasonable expectation of success.

It is not disputed that Racz discloses a cannula with a removable RF probe, and Lee and Fitz both disclose cannulas with deployable filaments ("electrodes" in Fitz and "stylets" in Lee). Pet. 13–21; PO Resp. 19–23. These disclosures are presumed to be enabling. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003) ("[W]e hold a presumption arises that both the claimed and unclaimed disclosures in a prior art patent are enabled."); *Apple Inc. v. Corephotonics, Ltd.*, No. 2020-1438, 2021 WL 2577597, at *4 (Fed. Cir. June 23, 2021) (nonprecedential) (holding that in the context of AIA trial proceedings, "regardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art" and that "[i]t was error for the Board to suggest otherwise"). Accordingly, it is clear that there would have been a reasonable expectation of success in making a cannula with an RF probe as well as a cannula having deployable filaments, as taught by Racz and Fitz/Lee, respectively.

The question before us is whether there would have been a reasonable expectation of success in combining the prior art features into Racz's modified device.[20] Petitioner answers that question in the affirmative, pointing to the testimony of Dr. Tucker. Pet. 28 (citing Ex. 1031 ¶148). As discussed above, Dr. Tucker's conclusion is supported extensively with testimony regarding what the prior art teaches (*see* Ex. 1031 ¶¶110–117 (Racz), ¶¶118–123 (Fitz), ¶¶124–131 (Lee)) and why and how a POSA would have combined the prior art teachings (*see id.* ¶¶132–148). For example, Dr. Tucker explains that, because Lee discloses that deployable filaments can be arranged around the inner perimeter of a cannula such that they surround and provide space for a central element, a POSA would have understood that they could be arranged to accommodate Racz's centrally located removable RF probe. Ex. 1031 ¶140. Dr. Tucker further testifies that a POSA could make the combination "using ordinary skill and routine engineering," and it "would involve nothing more than using prior art elements like the filaments (22/1622), cannula (10/33), active tip (14/38),

---

[20] Separately, Patent Owner argues that Racz's modified device is not enabled. PO Resp. 49–51. In particular, Patent Owner argues that the "references used in an obviousness challenge must collectively teach a POSITA how to make the claimed invention . . . without undue experimentation." *Id.* (citing *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *Bristol-Myers Squibb v. Ben Venue Labs, Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001); *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The cited cases, however, do not support Patent Owner's argument. To be clear, the law does not require that a combination of prior art teachings "enable" what they render obvious. Rather, Patent Owner's arguments in this regard appear to be a rehashing of its unpersuasive reasonable expectation of success arguments.

and removable probe (22/52) according to their established functions, which would have been known to a POSA." *Id.* ¶¶143–144; *see also* Pet. 6 ("This would have been a matter of routine engineering with entirely predictable results"). Consistent with this testimony, Petitioner accurately points out that the ’782 patent itself does not teach how to manufacture its claimed invention. *See* Reply 16 (Patent Owner "Stratus argues that the proposed combination would be too challenging to manufacture, leaving a POSA with no expectation of success. [PO Resp.] 43–51. But the specification belies Stratus's position—nowhere does it teach how to manufacture the disclosed system or devices."). Patent Owner does not dispute this point. Sur-reply 5–6.[21]

Patent Owner argues there would not have been a reasonable expectation of success because of the difficulty of incorporating deployable filaments into Racz while retaining its removable RF probe given the purported size constraints applicable to neurotomy. In particular, Patent Owner argues that Racz's modified device would have required that the deployable filaments longitudinally slide through channels extending within the sidewall of Racz's cannula, but such narrow channels "would be extremely challenging, if not impossible, to fabricate." PO Resp. 43

---

[21] Although Patent Owner does not dispute that the ’782 patent omits how to manufacture the claimed invention, Patent Owner argues that the omission is irrelevant because "Stratus's invention is ***different***" than Racz's modified device. Sur-reply 5–6. Patent Owner does not explain sufficiently why the alleged differences excuse the lack of manufacturing details in the ’782 patent while a lack of manufacturing details in the Petition would be fatal to Petitioner's challenge.

(quoting Ex. 2006 ¶225).[22] According to Patent Owner, "[i]f reduced to a size suitable for RF neurotomy, those channels would be so long and thin that there would be no reasonable expectation of success to make them. At its largest an RF neurotomy needle would be 16 gauge, with a 1.65-mm outer diameter and 1.19-mm inner diameter, meaning that the sidewall is 0.22 mm thick." *Id.* at 43–44 (citing Ex. 2006 ¶235; Ex. 2001 ¶¶158–160, 230–236).[23] Patent Owner's argument is not persuasive.

Petitioner replies with persuasive evidence that 16 gauge is *not* the maximum size for neurotomy. Reply 19–20. In particular, Petitioner relies on the following disclosure of Racz: "Those individuals skilled in the art

---

[22] Patent Owner raises a related argument, that Racz's modified device "would be even more difficult to fabricate if the tip is bent or curved, as emphatically taught by Racz." PO Resp. 43–44. However, Petitioner's challenge is not premised on preserving Racz's bent tip. Nor does Racz require any particular bend or curvature to the tip. Rather, Racz expressly contemplates wide variations in the geometry of the tip. *See* Ex. 1009, 8:58–9:1 ("Various forms and embodiments of the bent tip needle or cannula are provided herein involving various shapes, sizes, forms, and configurations of the cannula" and, within the scope of the invention, "various configurations of tip geometry, bluntness or sharpness, degree of curvature, position of fluid injection ports, and the insulation configuration may be devised."). Thus, if a certain tip's shape or curvature proved difficult to work with, a POSA would have known, based on this explicit disclosure, that the tip could be altered as needed. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (The obviousness analysis "can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."), 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

[23] *See* Ex. 2001 ¶99 ("Gauge refers to the inner measurement or opening of the needle, and the higher the number, the smaller the needle."); Ex. 2006 ¶228 ("The smaller the gauge number, the bigger the needle.").

will recognize that many variations of the electrode geometries depicted in FIGS. 1–3 are possible without departing from the invention. Various sized electrodes can be made, from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge)." Ex. 1009, 8:10–15, *cited in* Reply 19.

Patent Owner responds that Racz's teaching of 10-gauge electrodes is referring exclusively to non-neurotomy applications because it "does not actually say that a ***neurotomy*** needle could be as big as 10-gauge." Sur-Reply 8. Patent Owner posits that the 10-gauge teaching must be referring instead to *non*-neurotomy applications because Racz states that its "invention is not limited to use in such [previously discussed] applications, and ***other medical and surgical procedures*** would be apparent to a practitioner of ordinary skill." *Id.* (quoting Ex. 1009, 9:12–18).

We are not persuaded by Patent Owner's characterization of Racz. The teaching that Petitioner relies on from Racz is expressly applicable to "variations of the electrode geometries depicted in FIGS. 1–3 [that] are possible without departing from the invention." Ex. 1009, 8:11–13. Notably, Patent Owner concedes that the embodiments disclosed in Racz Figures 1 and 2 are for RF *neurotomy*. *See* PO Resp. 19 ("Racz discloses an RF neurotomy 'needle or cannula' 10/33 with a shaft 12/34 and curved tip 14/38, which enables it to go around anatomical structures 16." (citing Ex. 1009, 4:44–58)); *see also* Ex. 1009, Fig.1 (labeling the cannula of Figure 1 with reference numeral "10"), Fig. 2 (labeling the cannula of Figure 2 with reference numeral "33"). Thus, Racz's teaching that "[v]arious sized electrodes can be made[] from extremely small gauges (e.g., 30 gauge) to much larger sizes (e.g., 10 gauge)" applies to RF neurotomy needles and cannulas. Ex. 1009, 8:13–15.

We are cognizant that Patent Owner cites declaration testimony that supports its contrary argument that, "[a]t its largest[,] an RF neurotomy needle would be 16 gauge." PO Resp. 44 (citing Ex. 2006 ¶235; Ex. 2001 ¶¶158–160, 230–236). However, we find Racz—an issued patent—to be inherently more credible than witness testimony prepared specifically for litigation, and we give it more weight.

In sum, we are not persuaded by Patent Owner's foundational argument that Racz's modified device could not be larger than 16 gauge. According, we likewise are not persuaded by Patent Owner's conclusion that it "would be extremely challenging, if not impossible, to fabricate" Racz's modified device. PO Resp. 42. Instead, we are persuaded by Petitioner's arguments and evidence showing that there would have been a reasonable expectation of success in making the proposed combination, as the prior art features were known and could have been combined through ordinary skill in the art.

### *E. Ground 1*

Petitioner asserts that claims 1–27 of the '782 patent would have been obvious over Racz, Fitz, and Lee. Pet. 13–67. Claims 1 and 27 are independent. Claims 2 through 23 ultimately depend from independent claim 1. Claims 25–27 ultimately depend from independent claim 24. We begin our analysis with claim 1.

#### *1. Claim 1*

Petitioner relies on the disclosure of Racz to teach all of the limitations of claim 1 that do not involve a filament. *See* Pet. 29–36. Petitioner provides a detailed explanation supported with the testimony of

Dr. Tucker that Racz teaches a system comprising "a radiofrequency probe and a radiofrequency neurotomy needle operable with the radiofrequency probe" where the radiofrequency neurotomy needle comprises "a conductive portion at a distal end of the radiofrequency neurotomy needle, a tip configured to pierce tissue of a patient, [and] an elongate member comprising a lumen configured to accept the radiofrequency probe therein such that the radiofrequency probe physically contacts and is electrically connected to the conductive portion, the tip being at a distal end of the elongate member." *See id.*; Ex. 1031 ¶¶149–160. Patent Owner does not dispute that Racz teaches these limitations of claim 1. *See generally* PO Resp. After reviewing the evidence, we find that Petitioner has shown sufficiently that Racz teaches these limitations.

Each of the remaining limitations of claim 1 involves a filament, and Petitioner relies on Racz's modified device as explained by Dr. Tucker to teach these remaining limitations of claim 1. Pet. 36–47; *see* Ex. 1031 ¶¶161–180. As discussed above, *see supra* Section II.D., Patent Owner challenges whether the asserted combination of Racz, Fitz, and Lee teach or suggest Racz's modified device. *See* PO Resp. 32–60. We have addressed Patent Owner's concerns above and found them unpersuasive. We also determined above that Petitioner has shown sufficiently that a POSA would have had an adequate reason to combine the prior art as proposed by Petitioner to arrive at Racz's modified device with a reasonable expectation of success. *See supra* Section II.D. Thus, we determine that Petitioner has shown sufficiently that Racz's modified device teaches or suggests each of the remaining limitations of claim 1 involving filaments as explained by Petitioner with the support of Dr. Tucker's testimony.

*Objective Indicia*

Patent Owner argues that "the following objective indicia show nonobviousness: (1) long-felt-but unmet need; (2) copying by others; (3) industry praise; and (4) commercial success." PO Resp. 61.

Objective indicia evidence "must always be considered when present en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). However, "to be accorded substantial weight in the obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019). Patent Owner bears the burden of proving nexus. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("The burden of proof as to this connection or nexus resides with the patentee.").

Nexus can be established in one of two ways. First, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392). "That is, presuming nexus is appropriate 'when the patentee shows that the asserted objective evidence is tied to a specific product and that product

[1] 'embodies the claimed features, and [2] is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)); *see also Fox Factory, Inc. v. SRAM, LLC*, 813 F. App'x 539, 542, 2020 WL 2517105 (Fed. Cir. 2020) ("[A] product is not coextensive with a claimed invention simply because it falls within the scope of the claim.").

The second way to prove nexus is directly, by showing that the presented evidence of secondary considerations is "a direct result of the unique characteristics of the claimed invention." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *Fox Factory*, 944 F.3d at 1373–74 (In the absence of a presumption, nexus can be proved "by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention.").

Patent Owner argues that "[t]his is a case in which a nexus should be presumed." PO Resp. 74. This is so, according to Patent Owner because the "Nimbus devices embody at least challenged claim 1 and are coextensive with claim 1." PO Resp. 73 (citing Ex. 2006 ¶21; Ex. 2008).

In the cited testimony, Mr. Crosby states:

> I understand that Stratus makes and sells an RF neurotomy device called the "Nimbus® Multi-tined Expandable Electrode" (Nimbus Device). I have personally inspected the Nimbus Device and compared it to the claims of the Stratus Patents. Details of that comparison are included in Exhibit 2008, which I incorporate into this declaration as part of my testimony. It is my opinion that the Nimbus Device is covered by at least some claims of each of the Stratus Patents.

Ex. 2006 ¶21.

The term "Stratus Patents" refers to the '782 patent and the two related patents that are the subject of *inter partes* reviews No. IPR2024-01210, IPR2024-001211, and No. IPR2024-01212. Ex. 2006 ¶¶17–19. Exhibit 2008 is a claim chart purporting to map Patent Owner Stratus's products to claim 1 of each of the three Stratus Patents. However, as pointed out by Petitioner (*see* Reply 26), what the claim chart compares to claim 1 of the '782 patent (as well as claim 1 of the other Stratus Patents) is not the Nimbus Device, but rather the Nimbus Device *in combination with a second product*, either a reusable or disposable RF Probe. *See* Ex. 2008.

Both Mr. Crosby and Patent Owner expressly define the Nimbus Device to be the "Nimbus® Multitined Expandable Electrode" *without the RF probe*. *See* Ex. 2006 ¶21 ("I understand that Stratus makes and sells an RF neurotomy device called the 'Nimbus® Multi-tined Expandable Electrode' (Nimbus Device)."). PO Resp. 13 ("Stratus markets a device known as the Nimbus® Multitined Expandable Electrode ('Nimbus device') and RF probes usable therewith that are covered by the '782 Patent."). As Petitioner points out, "[i]t is undisputed that all claims require an RF probe." Reply 26.

Patent Owner—perhaps anticipating this shortcoming—vacillates between referring to the singular "Nimbus device," which Patent Owner defines as excluding an RF probe, and the plural "Nimbus devices," which Patent Owner does not define but which it implies is a combination of the Nimbus device and one of Stratus's two RF probes. There is a clear disconnect between Patent Owner's position and its evidence. For example, Patent Owner argues that "the Nimbus *devices* embody at least challenged claim 1 and are coextensive with claim 1." PO Resp. 73 (emphasis added;

citing Ex. 2006 ¶21; Ex. 2008). However, the cited testimony of Mr. Crosby refers only to the Nimbus *device* (without the RF probe).

> 21. I understand that Stratus makes and sells an RF neurotomy device called the "Nimbus® Multi-tined Expandable Electrode" (Nimbus Device). I have personally inspected the Nimbus Device and compared it to the claims of the Stratus Patents. Details of that comparison are included in Exhibit 2008, which I incorporate into this declaration as part of my testimony. It is my opinion that the Nimbus Device is covered by at least some claims of each of the Stratus Patents.

Ex. 2006 ¶21. Exhibit 2008 does not support Mr. Crosby's testimony. For limitation [1a] (i.e., "an RF probe"), the claim chart fails to map any portion of the Nimbus device. Instead, the claim chart maps limitation [1a] to one of two separate Nimbus products: "Stratus offers two types of RF probes, reusable and disposable, for use with its needle." Ex. 2008, 1.

In its Sur-reply, Patent Owner argues that, for presumption of nexus purposes, "there is no legal or logical requirement that all components of the claimed invention be sold together in one transaction." Sur-reply 26. Patent Owner does not cite any legal authority for this proposition. Under binding precedent, to be afforded a presumption of nexus, Patent Owner must show that its objective indicia evidence "is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory*, 944 F.3d at 1373 (quoting *Demaco*, 851 F.2d at 1392). Patent Owner has failed to do this.

Accordingly, Patent Owner has failed to show that its objective indicia evidence bears a nexus to the claimed invention, and we give it no weight.

*Conclusion as to Claim 1*

We determine that Petitioner has shown by a preponderance of the evidence that claim 1 would have been obvious over Racz, Fitz, and Lee.

*2. Claims 2–27*

Petitioner offers a detailed explanation as to how the combination of Racz, Fitz, and Lee also teaches each limitation of claims 2 through 27 supported by the testimony of Dr. Tucker. *See* Pet. 48–67; Ex. 1031 ¶¶181–220. Patent Owner does not challenge this showing apart from the arguments regarding Racz's modified device that we have previously addressed and found unpersuasive. *See* PO Resp. 32–59; *supra* Section II.D.

We have reviewed the Petitioner's assertion and evidence and determine that Petitioner has shown by a preponderance of the evidence that claims 2–27 would have been obvious over Racz, Fitz, and Lee.

*F. Remaining Grounds*

In each of the remaining grounds, Petitioner challenges the same claims or a subset of the claims that it challenges in Ground 1, but adds one or more additional references (i.e., Scheibe, Young '965, Cosman, Young '201, Godara). Pet. 12–13.

We have already determined, in connection with Ground 1, that Petitioner has shown by a preponderance of the evidence that claims 1–27 would have been obvious over Racz, Fitz, and Lee. Thus, for reasons explained above in connection with Ground 1, we are persuaded that claims 1–27 also would have been obvious over the various combinations presented in the remaining grounds.

## III. MOTIONS TO EXCLUDE

Each of the parties filed a motion to exclude. Paper 49 ("Pet. Mot. To Exclude"); Paper 47 ("PO Mot. To Exclude").

Petitioner's Motion seeks to exclude (1) paragraphs 16–27, 47, 54, and 55 from a declaration of Cody Jorgensen (Exhibits 2015, 2016, 2039[24], and 1037) and (2) Exhibits 2021–2026 in their entireties.

Patent Owner's Motion seeks to exclude Petitioner's Exhibit 1063 if Patent Owner's Exhibits 2044 and 2045 are excluded or otherwise not considered.[25] *See* PO Mot. To Exclude 1 ("Stratus conditionally requests that, if its Exhibits 2044 and 2045 are struck from the record or otherwise not considered by the Board, then Exhibit 1063 must be excluded under Federal Rule of Evidence ("FRE") 106 for violating the doctrine of completeness.").

The instant Decision not rely on any of the evidence either party seeks to exclude. Accordingly, both Motions are dismissed as moot.

## IV. CONCLUSION

We conclude, based on a preponderance of the evidence, that claims 18–27 are unpatentable. In summary:

---

[24] The record contains three copies of Mr. Jorgensen's declaration. Exhibit 2015 is an unredacted copy that is under seal. Exhibit 2016 is publicly filed copy with redactions of confidential information. Exhibit 2039 is a third copy of Mr. Jorgensen's declaration that Patent Owner Stratus filed, which copy "identifies the redactions that Stratus propose[d] to remove in gold highlighting and those it propose[d] to maintain in violet highlighting." Paper 27, 5.

[25] Exhibits 2044 and 2045 were filed by Patent Owner with its Sur-reply contrary to 37 C.F.R. § 42.23(b). We do not rely on either of these exhibits.

| Claims | 35 U.S.C. § | Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–27 | 103(a) | Racz, Fitz, Lee | 1–27 | |
| 1–27 | 103(a) | Racz, Fitz, Lee, Young ’965 | 1–27 | |
| 1–27 | 103(a) | Racz, Fitz, Lee, Scheibe | 1–27 | |
| 1–27 | 103(a) | Racz, Fitz, Lee, Young ’965, Scheibe | 1–27 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542 | 7–9 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542, Young ’965 | 7–9 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542, Scheibe | 7–9 | |
| 7–9 | 103(a) | Racz, Fitz, Lee, Cosman ’542, Young ’965, Scheibe | 7–9 | |
| 13 | 103(a) | Racz, Fitz, Lee, Young ’2001 | 13 | |
| 13 | 103(a) | Racz, Fitz, Lee, Young ’201, Young ’965 | 13 | |
| 13 | 103(a) | Racz, Fitz, Lee, Young ’201, Scheibe | 13 | |

| **Claims** | **35 U.S.C. §** | **Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not Shown Unpatentable** |
|---|---|---|---|---|
| 13 | 103(a) | Racz, Fitz, Lee, Young ’201, Young ’965, Scheibe | 13 | |
| 15 | 103(a) | Racz, Fitz, Lee, Godara | 15 | |
| 15 | 103(a) | Racz, Fitz, Lee, Godara, Young ’965 | 15 | |
| 15 | 103(a) | Racz, Fitz, Lee, Godara, Scheibe | 15 | |
| 15 | 103(a) | Racz, Fitz, Lee Godara, Young ’965, Scheibe | 15 | |
| **Overall Outcome** | | | 1–27 | |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–27 of U.S. Patent No. 10,966,782 B2 are proven unpatentable;

FURTHER ORDERED that both Motions to Exclude are dismissed as moot; and

FURTHER ORDERED that, because this Decision is final, a party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Christopher Kelly
Gregory Carlin
Warren Thomas
Lee Hamilton
MEUNIER CARLIN & CURFMAN LLC
ckelly@mcciplaw.com
gcarlin@mcciplaw.com
wthomas@mcciplaw.com
lhamilton@mcciplaw.com

FOR PATENT OWNER:

Daniel Higgs
Kevin Laurence
Matthew Phillips
Derek Meeker
Joseph Hawkins
LAURENCE & PHILLIPS IP LAW
dhiggs@lpiplaw.com
klaurence@lpiplaw.com
mphillips@lpiplaw.com
dmeeker@lpiplaw.com
joe@lpiplaw.com

Trials@uspto.gov
571-272-7822

Paper 68
Date: March 5, 2026

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AVANOS MEDICAL, INC.,
Petitioner,

v.

STRATUS MEDICAL, LLC,
Patent Owner.

---

IPR2024-01212
Patent 10,925,664 B2

---

Before MICHAEL J. FITZPATRICK, SUSAN L.C. MITCHELL, and ARTHUR M. PESLAK *Administrative Patent Judges*.

PESLAK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing the Parties' Motions to Exclude (Papers 47, 49)
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Avanos Medical, Inc. ("Petitioner") filed a Petition for an *inter partes* review of claims 1–29 ("the Challenged Claims") of U.S. Patent No. 10,925,664 B2 ("the '664 patent," Ex. 1003). Paper 1 ("Pet."). Petitioner filed a Declaration of Dr. Robert Tucker in support of the Petition. Ex. 1034. Stratus Medical, LLC ("Patent Owner") did not file a Preliminary Response. On February 6, 2025, we instituted this *inter partes* review as to all Challenged Claims and all grounds presented in the Petition. Paper 8 ("Dec.").

After institution, Patent Owner filed a Response to the Petition ("PO Resp."). Paper 65.[1] In support of the Patent Owner Response, Patent Owner filed a Declaration of Professor Marc Andrew Russo (Ex. 2001), a Declaration of Peter Crosby (Ex. 2006), and a Declaration of Cody Jorgenson (Ex. 2015). Petitioner filed a Reply ("Pet. Reply"). Paper 30. In support of the Reply, Petitioner filed a Reply Declaration of Dr. Robert Tucker (Ex. 1042), a Declaration of Mark A. Konno (Ex. 1043), and a Declaration of Dennis Johnson (Ex. 1044). Patent Owner filed a Sur-reply ("Sur-reply"). Paper 40. An oral hearing was held on November 6, 2025, and the transcript is entered into the record. Paper 60 ("Tr.").

[1] The Patent Owner Response was originally filed under seal as Paper 13 and publicly with redactions as Paper 14. Those papers were later expunged and replaced with versions reflecting updates to the information considered confidential in light of the Board's November 6, 2025, Order entering a protective order and resolving several motions to seal. *See* Paper 59; Ex. 3[add Trials email of Jan. 15, 2026, 1:12PM]. Patent Owner has represented that Paper 65 is identical to the now expunged Paper 13. Ex. [same exhibit, probably numbered 3004].

Patent Owner filed a Motion to Exclude Evidence. Paper 47 ("PO MTE"). Petitioner filed an Opposition. Paper 51 ("Pet. MTE Opp."). Patent Owner filed a Reply. Paper 53 ("PO MTE Reply").

Petitioner filed a Motion to Exclude Evidence. Paper 49 ("Pet. MTE"). Patent Owner filed an Opposition. Paper 50 ("PO MTE Opp."). Petitioner filed a Reply. Paper 53 ("Pet. MTE Reply").

We have jurisdiction under 35 U.S.C. § 6. This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the Challenged Claims. For the reasons discussed below, we determine Petitioner establishes by a preponderance of the evidence that all Challenged Claims are unpatentable.

A. Real Parties-in-Interest

Petitioner identifies itself, Avanos Medical, Inc., as the real party-in-interest. Pet. 79. Petitioner explains that "Diros Technology, Inc. of Markham, Ontario, Canada is a wholly owned subsidiary of Avanos Medical, Inc." *Id.*

Patent Owner identifies itself, Stratus Medical, LLC, as the real party-in-interest. Paper 4, 2.

B. Related Matters

Patent Owner identifies *Stratus Med., LLC v. Avanos Med., Inc.*, No. 1:25-cv-00546 (D. Del.) as a related matter. Paper 44, 2.

Petitioner filed four Petitions challenging claims of Stratus Medical's Patents. IPR2024-01212 involving the '664 patent at issue here; IPR2024-01210 and IPR2024-01211, both involving U.S. Patent No. 10,736,688 B2 ("the '688 patent," Ex. 1002); and IPR2024-01209, involving U.S. Patent No. 10,966,782 B2 ("the '782 patent," Ex. 1001). Paper 44, 2.

C. The ’664 Specification

The ’664 patent for “Methods for Radio Frequency Neurotomy,” is assigned on its face to Stratus Medical, LLC, and issued to Robert E. Wright and Scott A. Brandt on February 23, 2021. Ex. 1003, codes (54), (72), (73). The ’644 patent claims the benefit of Provisional Application Nos. 61/280,557 and 61/347,351, both filed on May 21, 2010. *Id.* at codes (10), (12), (60), (73).

The ’664 patent discloses systems and methods for performing thermal tissue ablation using radiofrequency [RF] energy. *See generally*, Ex. 1003, 1:24–28, 8:26–41. “RF ablation uses electrical energy transmitted into a target volume through an electrode to generate heat in the area of the electrode tip. The radio waves emanate from a non-insulated distal portion of the electrode tip” which “causes the temperature in the area surrounding the electrode tip to rise,” thereby ablating the target tissue. *Id.* at 1:31–49. The term “RF neurotomy” applies when the target tissue is a nerve, such as a spinal nerve. *See, e.g.*, *id.* at 1:50–52, 2:54–64, 4:26–41. *See also id.* at 31:6–24. (describing further applications in ablating blood vessels, cardiac tissue, and vertebral discs). Ablation (cauterization) of the target nerve disrupts the ability of the nerve to transmit pain signals to the central nervous system. *Id.* at 1:50–52, 4:36–40.

The Specification discloses an embodiment directed to a neurotomy system 100 for use in performing RF neurotomy on a patient. *See* Ex. 1003, 3:44–45, 4:42–5:6, 5:16–32, Fig. 1. “[S]ystem 100 may include an RF generator 102 capable of generating an RF energy signal sufficient to ablate target tissue,” a needle 103 capable of conducting the RF energy to the patient, and an “imaging system 105 capable of producing internal images of

the patient 101 and the needle 103 to facilitate navigation of the needle 103 during a procedure." *Id.* at 4:48–57; 5:16–21.

> Where the needle 103 is a monopolar device, a return electrode pad 104 may be attached to the patient 101 to complete a circuit from the RF generator 102, through the needle 103, through a portion of the patient 101, and back to the RF generator 102 through the return electrode pad 104.

*Id.* at 4:57–61.

As illustrated in Figure 2A, reproduced below, RF neurotomy needle 103 may include "a self-contained mechanical mechanism, in the form of deployable filaments 206a, 206b, operable to expand the volume of effective RF energy delivery as compared to known single-electrode RF probes." Ex. 1003, 5:42–45, Fig. 2A.




FIG.2A

Figure 2A shows a perspective view of an RF neurotomy needle 103 comprising elongate member 203 having a tip 201 and deployable filaments 206a-b. *Id.* at 3:33–55. Filaments 206a-b are deployed/retracted by a rotating actuator 216. *Id.* at 5:53–55, 17:17–18:40. According to the Specification, "variation in the shape, position, and/or size of lesions … may

be achieved by different configurations of filaments," including varying the number, length, position, and angle of the filaments 206a-b. *See id.* at 11:19–31, 11:65–12:42, 13:44–14:12.

With reference to Figure 2B (not shown), actuator 216 may be fitted with a Luer fitting 220 at the proximal end of the needle 103, and configured for inserting (i) a removable RF probe 401 through the lumen 222 of elongate member 203, and (ii) fluid delivered through the lumen (when the probe 401 is removed). *See* Ex. 1003, 2:15–20, 5:7–15, 5:56–67, 17:56–63; *see also id.* at 2:20–23 ("In another implementation, an RF probe may be integrated into the needle structure for communication of an RF signal to the tip and plurality of filaments.").

Figures 3A and 3B are reproduced below:




FIG.3A




FIG.3B

Figures 3A and 3B are cut-away views of the distal end 202 of needle 103 with filaments 206a-b in fully deployed and retracted configurations, respectively. Ex. 1003, 3:53–56, 6:33–34. Figures 3A and 3B also show tip (201) including a fluid port 210 (e.g., for delivering anesthetic and/or image enhancing dye during an RF neurotomy procedure) via Luer fitting 220

when probe 401 is removed, and a sharpened point 301 "for piercing the skin of a patient and facilitating advancement through tissue." *Id.* at 5:33–36, 6:33–36, 7:40–57, 17:55–62.

According to the Specification, tip 311 and tube 207 containing lumen 222 may be constructed from stainless steel, or other conductive material, such that when RF probe 401 is inserted within the tube 207, the RF energy emitted by RF probe 401 may be conducted through tube 207 and into and through tip 201 and filaments 206A, 206b. Ex. 1003, 6:45–47, 9:61–64, 10:57–63, 14:65–15:1. The "RF energy emanating from the tip and filaments may generate heat that ablates the target nerve." *Id.* at 24:35–36.

D. Challenged Claims

Petitioner challenges claims 1–29, of which claims 1 and 21 are independent. *See* Pet. 12–13, 80–84 (claims listing). Claim 1 is reproduced below with Petitioner's formatting and element annotations:

> [1pre] A method comprising:
>
> [1a] inserting a needle into a patient, the needle comprising:
>
> [1b] an elongate member;
>
> [1c] a piercing tip at a distal end of the elongate member;
>
> [1d] a lumen within the elongate member; and
>
> [1e] a filament in a retracted position in which the filament is at least partially disposed within the elongate member;
>
> [1f] moving the filament to a deployed position within the patient in which at least a distal end of the filament is out of the elongate member and disposed away from the tip;
>
> [1g] inserting a radiofrequency probe into the lumen of the needle such that the radiofrequency probe

> contacts a conductive portion of the needle at a distal end of the needle to thereby establish an electrically conductive path from the radiofrequency probe to the filament; and
>
> [1h] operating the radiofrequency probe, the tip, and the filament as a monopolar electrode, with radiofrequency energy from the radiofrequency probe being conducted to the filament through the electrically conductive path and transmitted by the filament.

Ex. 1003, 31:32–53.

E. Asserted Grounds of Unpatentability

Petitioner asserts the following twelve grounds of unpatentability (Pet. 12):

| Ground | Claims | 35 U.S.C. § | References |
|---|---|---|---|
| A | 1–10, 18–26, 28, 29 | 103(a)[2] | Racz,[3] Fitz,[4] Lee[5] |
| B | 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee, Young ’965[6] |
| C | 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee, Scheibe[7] |
| D | 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee, Young ’965, Scheibe |
| E | 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara[8] |
| F | 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara, Young ’965 |
| G | 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara, Scheibe |
| H | 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee Godara, Young ’965, Scheibe |

[2] We apply the pre-AIA version of 35 U.S.C. § 102 and 35 U.S.C. § 103 because the claims at issue have an effective filing date prior to March 16, 2013, the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”). *See* Ex. 1001, code (22).

[3] Ex. 1009, Racz et al., US 6,146,380, issued Nov. 14, 2000.
[4] Ex. 1011, Fitz, US 2005/0059964 A1, pub. March 17, 2005.
[5] Ex. 1010, Lee et al., US 2007/0016183 A1, pub. Jan. 18, 2007.
[6] Ex. 1012, Young, US 2006/0084965 A1, pub. April 20, 2006.
[7] Ex. 1013, Scheibe et al., US 2007/0260223 A1, pub. Nov. 8, 2007.
[8] Ex. 1015, Godara et al., US 2007/0027449 A1, pub. Feb. 1, 2007.

| Ground | Claims | 35 U.S.C. § | References |
|---|---|---|---|
| I | 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen[9] |
| J | 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen, Young ’965 |
| K | 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen, Scheibe |
| L | 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen, Young ’965, Scheibe |

## II. ANALYSIS

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of

[9] Ex. 1019, Cohen et al., *Randomized Placebo-controlled Study Evaluating Lateral Branch Radiofrequency Denervation for Sacroiliac Joint Pain*, 109(2) Anesthesiology, 279–288 (2008).

obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations). *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

The Supreme Court explained in *KSR International Co. v. Teleflex Inc.* that

> [o]ften, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." (alteration in original)). Further, for motivation to combine, it is enough to show that there was a known problem in the art, that a prior art reference "helped address that issue" and that combining the teachings of the references "wasn't beyond the skill of an ordinary artisan." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1381 (Fed. Cir. 2023).

"Whether an ordinarily skilled artisan would have been motivated to modify the teachings of a reference is a question of fact." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1327 (Fed. Cir. 2016). "[W]here a party argues

a skilled artisan would have been motivated to combine references, it must show the artisan 'would have had a reasonable expectation of success from doing so.'" *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1360–61 (Fed. Cir. 2017) (quoting *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012)).

Reasonable expectation of success of the proposed combination is also a question of fact. *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F. 3d 1359, 1366 (Fed. Cir. 2016). "The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention." *Id.* at 1367. In evaluating reasonable expectation of success, we must consider the appropriate scope of the "claimed invention." *Id.* (emphasis omitted).

A. Level of Ordinary Skill in the Art

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *see also Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

According to Petitioner, the relevant technical field is "'thermal ablation systems and methods,' which includes 'methods for performing Radio Frequency (RF) neurotomy.'" Pet. 11 (citing Ex. 1003, 1:24–27). Relying on the testimony of Dr. Tucker, Petitioner contends that the ordinarily skilled artisan in this field would have had at least:

> (i) a bachelor's degree in biomedical engineering, or a related field, such as mechanical engineering, biomechanical engineering, or bioengineering, who also has at least 3 years of experience with thermal ablation system and methods; or
>
> (ii) an advanced degree in the same areas of academic study with at least 1 year[] of experience with thermal ablation systems and methods.

*Id.* (citing Ex. 1034 ¶ 105).

Patent Owner argues that Petitioner's "assert[ion] that the relevant field is 'thermal ablation systems and methods'" . . . diverts attention to unrelated and inappropriate fields of RF ablation." PO Resp. 26. According to Patent Owner, "the central focus of the '664 Patent is RF neurotomy, which is one specialized field among many diverse and non-overlapping fields, like tumor ablation and cardiac ablation, within the broad class of RF ablation." *Id.* In support of this argument, Patent Owner quotes, with added emphasis, the description in the '664 patent Specification that "[t]he present invention relates to thermal ablation systems and methods and, ***more specifically, to improved systems and methods for performing Radio Frequency (RF) neurotomy***. The invention is particularly apt for spinal RF neurotomy procedures." *Id.* (quoting Ex. 1003, 1:24–27).

Patent Owner next argues that "RF ablation broadly encompasses many diverse, non-overlapping subfields involving different physicians treating different conditions in different parts of the body for different clinical purposes using different devices." PO Resp. 27 (citing Ex. 2001 ¶ 177; Ex. 2006 ¶¶ 47–49). Citing Dr. Russo's testimony, Patent Owner further argues that there are no medical practitioners who are generalists in RF ablation and likewise RF medical devices are not usable in all RF

ablation procedures. *Id.* (citing Ex. 2001 ¶ 76). According to Patent Owner, "there has historically been little to no cross-talk or cross-pollination of the various fields in which RF ablations are performed." *Id.* (quoting Ex. 2001 ¶ 76).

Patent Owner next offers various criticisms of Petitioner's proposed level of skill in the art. PO Resp. 29–30. Patent Owner then proffers the following level of ordinary skill in the art:

> [A] combination of (1) an interventional pain-specialist physician with significant experience performing RF neurotomy procedures and (2) an engineer with a degree in biomedical engineering or a related field and experience in the design and development of devices and methods for applying electromagnetic energy to nerves. The POSITA should have either a bachelor-level degree with three years of the design/development experience noted above or an advanced degree with one year of the design/development experience noted above. Such a POSITA could be a team of two or more people working together.

*Id.* at 30 (citing Ex. 2006 ¶ 58) (alteration in original).

Petitioner responds that "the patent claims are not limited to neurotomy" and directs us to Mr. Crosby's testimony confirming this. Pet. Reply 2 (citing Ex. 1003, 31:32–34:23; Ex. 1045, 257:1–22).[10] Petitioner contends that "the intrinsic evidence is unequivocal: 'the delivery of RF energy to tissue in the anatomy is practiced for a multitude of reasons and *embodiments of needles described herein may be adapted (modified or scaled)* for use in other medical procedures.'" *Id.* (quoting Ex. 1003, 31:6–

[10] Although many of the claims, including both independent claims, are not limited to neurotomy, some of the dependent claims, namely claims 10–19 and 26–29, are arguably limited to RF neurotomy.

10 (emphasis added by Petitioner); Ex. 1054, 30). Petitioner further contends that "[t]he specification describes using RF needles for 'cauterize[ing] 'feeder vessels'" in ulcers and for 'cardiac ablation' generally—*not RF neurotomy*." *Id.* (citing Ex. 1003, 31:10–22; Ex. 1046, 34:7–10, 142:9–145:8) (alterations in original). Petitioner contends that the '622 patent "expressly stat[es] the target volume can be a 'nerve or a tumor.'" *Id.* (citing Ex. 1003, 1:34–35).

Petitioner next contends that Dr. Russo "agreed that cooled-tip technology (providing 'enlarged lesions') was originally developed for cardiac and tumor RF ablation needles and then *adapted* for RF neurotomy." Pet. Reply 3 (citing Ex. 1015; Ex. 1046, 69:24–70:23, 125:10–25; Ex. 1055; Ex. 2001 ¶ 107; Ex. 2004, 3902–03, 3906). According to Petitioner, Patent Owner's "lead inventor (Wright) was working with cooled-tip neurotomy needles . . . *immediately before* the alleged invention" and "the claimed invention was developed by benchmarking a needle with cooled-tip technology adopted from cardiac/tumor ablation." *Id.* at 4 (citing Ex. 1046, 58:4–60:11, 72:12–73:19, 75:1–24, 90:3–93:10; Ex. 1051, 5, 8; Ex. 1055; Ex. 2004, 3902).

Petitioner next provides several criticisms of Patent Owner's proposed level of skill in the art. Petitioner first argues that Patent Owner "errs by requiring 'significant experience performing RF neurotomy procedures' when the patent's field is not limited to neurotomy" and "the claims are not limited to neurotomy at all." Pet. Reply 5 (citing Ex. 1003, 31:32–34:23; Ex. 1045, 211:7–213:18). Next, Petitioner argues that Patent Owner's declarants Dr. Russo and Mr. Crosby testified that "they never relied on one another for their testimony." *Id.* (emphasis omitted) (citing Ex. 1045, 21:7–

23:20, Ex. 1046, 26:2–27:11). According to Petitioner, "Crosby is not a physician but didn't need Russo to form his opinions" yet "believed himself competent to offer testimony on *all aspects* of the Stratus patents and the prior art, including operating the devices." *Id.* (citing Ex. 1045, 98:5–101:10, 105:1–107:2; Ex. 2006 ¶ 21). Lastly, Petitioner argues that Patent Owner's level of skill "requires 'experience in the design and development of devices and methods for applying electromagnetic energy to nerves" but this would encompass an ordinarily skilled artisan with "experience only with stimulating nerves—*but no experience in RF ablation*." *Id.* at 6 (citing Ex. 1045, 30:1–5).

In the Sur-reply, Patent Owner argues that "RF neurotomy is the almost exclusive focus of the patent." Sur-reply 20. Patent Owner concedes that the '664 "patent mentions some non-neurotomy ablation applications, it merely says the invention can be 'adapted,' 'modified,' 'scaled,' or 'tailored' for other RF ablation procedures," but argues these descriptions mean "the invention itself is not directed to those procedures." *Id.*

We first address the field of the invention and then the parties' respective contentions concerning the level of ordinary skill in the art.

In determining a patent's field of invention, we are guided by the following Federal Circuit precedent:

> We determine the field of endeavor by reference to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention. The field of endeavor is not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field.

*Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1359 (Fed. Cir. 2023) (quotations marks and internal citations omitted).

The ’664 patent describes the invention as “relat[ing] to thermal ablation systems and methods and more specifically to improved systems for performing Radio Frequency (RF) neurotomy” and “is particularly apt for spinal RF neurotomy procedures.” Ex. 1003, 1:24–28. The ’664 patent next describes that “[t]he target volume” for a thermal ablation procedure “may be, for example, *a nerve or tumor*.” *Id.* at 1:32–35 (emphasis added). The ’664 patent further describes that

> It will be appreciated that the delivery of RF energy to tissue in the anatomy is practiced for a multitude of reasons and embodiments of needles described herein may be adapted (modified or scaled) for use in other medical procedures. For example, embodiments of needles described herein could be used to deliver RF energy as a means to cauterize “feeder vessels,’ such as in bleeding ulcers and/or orthopedic applications. Further, embodiments of needles described herein could also be adapted to procedures such as cardiac ablation, in which cardiac tissue is destroyed in an effort to restore electrical rhythm in the hart [sic].

*Id.* at 31:6–16.

Of the Challenged Claims, only dependent claims 10–19 and 26–29 are arguably limited to RF neurotomy. Independent claims 1 and 21 are not so limited.

Based on the foregoing, we find that the field of invention is “thermal ablation systems” and is not limited to RF neurotomy as Patent Owner argues. This accords with the Specification which states under the heading “Field of Invention” that “[t]he present invention relates to thermal ablation systems and methods.” Ex. 1003, 1:24–25. The fact that the Specification describes that the needles “may be adapted (modified or scaled) for use in in other medical procedures” does not, as Patent Owner asserts, mean that the field of the claimed invention is limited to RF neurotomy. The import of

this statement is that it would be within the knowledge of a person of ordinary skill in the art to determine how to modify the disclosed embodiments to accommodate "other medical procedures" in order to practice the invention recited in claims 1 and 21 for example. In sum, Patent Owner asks us, in essence, to find that the field of the invention is "limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field" in contravention of the Federal Circuit's holding in *Netflix*. We do not so find.

We now turn to the level of ordinary skill in the art.

Patent Owner's proposal set forth above suffers from two defects. First, it mandates certain education and experience in RF neurotomy specifically. This is too narrow as neither the field of the invention nor independent claims 1 and 21 are limited to RF neurotomy. Second, it requires the ordinarily skilled artisan to be both a physician who performs RF ablation (neurotomy specifically) and an engineer with training and experience "in the design and development of devices and methods" for performing the same. *Id.* This is also too narrow because it excludes physicians and other advanced degree holders that research and design devices and methods for performing RF ablation, but do not actually operate on patients. For these reasons, we do not adopt Patent Owner's proffered level of skill in the art.

We apply Petitioner's proffered level of skill in the art set forth on page 11 of the Petition and set forth above because it is consistent with the problems addressed in the '664 patent and the prior art.

B. Claim Construction

Petitioner contends that no claim term requires express construction. Pet. 11 (citing Ex. 1034 ¶ 106 (Dr. Tucker's testimony that "the terms in the Challenged Claims would be understood by a POSA to have their plain and ordinary meaning and do not require a special construction or definition")).

Patent Owner does not address claim construction in the Patent Owner Response. *See generally* PO Resp.

After review of the parties' evidence and arguments, we determine that we need not expressly construe any claim terms to resolve the controversy before us. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

C. Overview of Asserted References for Ground A

Petitioner relies on Racz, Fitz, and Lee for Ground A. Pet. 12.

1. Overview of Racz (Ex. 1009)

Racz discloses a "Bent Tip Electrical Surgical Probe" comprising a "medical needle or canula for stimulation or ablation." Ex. 1009, Abstract.

> The device is partially insulated and has a tip that is at least partially electrically exposed; a connection to an external signal generator provides electrical stimulation or high-frequency heating of the patient's tissue proximal to the exposed tip. The device includes a longitudinal passage to facilitate the injection of fluids or the insertion of instruments through the cannula or needle.

*Id.*

Racz's Figure 1 is reproduced below:




FIG_1

Figure 1 is a schematic diagram of Racz's system comprising "a radio-frequency electrode cannula 10 having a shaft 12 inserted into a portion P of a patient's body." Ex. 1009, 3:24–26, 3:38–40.

"The cannula 10 can be inserted directly through the skin of the body portion P to locate the tip 14 in a target position within the body." Ex. 1009, 3:42–44. RF "cannula 10 further comprises a hub 20. Hub 20 is capable of accommodating an electrical probe 22, which includes a segment that is inserted into and received by the shaft 12 of the cannula 10." *Id.* at 3:60–63. "[E]lectrical connection 24 couples the cannula 10 to an external signal generator 28 by way of the hub 20 and the probe 22. A second electrical connection 26 connects the external signal generator 28 to a reference electrode 30 in contact with the patient's body portion P." *Id.* at 4:1–5. "[S]ignal generator 28 can be a source of electrical stimulation, pulsed high-frequency stimulation signals, high frequency signals, pulsed radio-frequency output, or other electrical waveforms." *Id.* at 4:6–9.

Racz's Figure 2B, reproduced below, shows a specific embodiment of the system illustrated in Figure 1:




Fig. 2B is a "schematic side elevation and orthogonal view of" Racz's device. Ex. 1009, 3:27–30.

The cannula, 33 in this embodiment,[11] includes a shaft 34 defining an internal lumen. Ex. 1009, 5:41–45. Shaft 34 "comprises a hollow metal tube with an insulated portion 36 illustrated by hatched lines," and an exposed distal tip 38. *Id.* at 4:62–65. The distal tip 38 includes a pointed end (40), which "can be useful in penetrating tough tissue." *Id.* at 5:3–5.

In operation, cannula 33, "with a stylet positioned in the shaft 34, is inserted into the patient's body portion P." Ex. 1009, 5:31–33. "The stylet is

[11] According to Petitioner, Racz uses a different numbering system for the corresponding elements of its figures such that, for example, cannula 10 of Figure 1 corresponds to cannula 33 of Figures 2A. In discussing the specific embodiment of Figure 2b, Petitioner references both sets of numbers, as, e.g., "cannula (10/33)." *See, e.g.*, Pet. 13. Petitioner applies the same convention to Lee, e.g., referencing "filaments (22/1622)," to indicate that a corresponding structure is differently labeled 22 in Figure 1 and 1622 in Figure 48 of that reference. *See id.* at 24–27. Patent Owner does not dispute this approach by Petitioner. *See generally* PO Resp.

then removed, and the probe 52 is inserted into the shaft 34." *Id.* at 5:37–38. "The probe 52 is connected to the signal generator 58" in order to generate high-frequency heating, or other electrical stimulation. *Id.* at 3:60–63, 4:18–23, 4:18–20. Electrical probe 52 includes probe shaft 54 having probe tip 56, which may include a temperature sensor. *Id.* at 5:26–30, Fig. 2B. When probe 52 is fully inserted into the cannula 33, "physical contact" between probe 52 and cannula's tip 38 conducts the RF energy to tip 38. *Id.* at 3:60–65, 4:18–23, 5:41–48. Racz's cannula 33, thus, provides "electrical stimulation or high frequency heating of tissue near the exposed electrical tip 14." *Id.* at 3:60–4:23, 5:41–51, Fig. 1.

2. Overview of Fitz (Ex. 1011)

Fitz is directed to "[i]mproved-coverage RF neurotomy instrumentation" comprising a multiplicity of electrically conductive electrodes. Ex. 1011, Abstract; claim 1.

Fitz discloses that a known problem with single-tip RF neurotomy devices was "that they do not allow for adequate coverage of the target area," and produce lesions that "extend[] only a few millimeters at the diameter of the midportion of the lesion" from the exposed needle tip. Ex. 1011 ¶ 4. "Although multiple lesions may be created in order to enhance coverage, this is more time-consuming and usually more painful to the patient." *Id.* ¶ 5. Moreover, "creation of multiple lesions also exposes the patient to more radiation, as fluoroscopy is used to place and replace the needles." *Id.*

To address inadequate coverage in single-tip neurotomy devices, Fitz discloses "an introducer used to deploy a set of electrodes." Ex. 1011, Abstract. Fitz's

> introducer features a plurality of elongated, co-extensive cannula, each including an insulated, electrically conductive electrode. Each electrode has a proximal end configured for attachment to a source of energy, and an exposed distal tip to deliver the energy to a localized region, and each electrode slides within its respective cannula so as to enhance the energy coverage area.

*Id.* ¶ 9. According to Fitz, at least some of the "electrodes [may be] constructed of a shape-memory material to control deployment. The cannula are generally parallel, and may either lie in the same plane or may be arranged otherwise, including spoke-like cross-sections." *Id.* ¶ 10. "At least some of the electrodes may slide independently, and at least some of the electrodes may slide in unison." *Id.* ¶ 11.

Fitz's Figure 4 is reproduced below:




Fig - 4

Figure 4 represents an embodiment of Fitz's invention having a side port inducer. Ex. 1011 ¶ 15. In this embodiment, "introducer 402 is curved, and a plurality of electrodes are deployed through the tip and/or multiple side ports." *Id.* ¶ 20.

Fitz's Figure 5 is reproduced below:



Fig - 5

Figure 5 shows an embodiment of Fitz's invention "in the form of a radial array." Ex. 1011 ¶ 16. In this embodiment the "inducer ha[s] a tip and sufficient side ports to form an array of electrodes once deployed. Although the side electrodes are shown as emanating from more or less the same distance from the tip, this is not necessary, in that a helix or spiral of apertures may alternative[ly] be used." *Id.* ¶ 21

3. Overview of Lee (Ex. 1010)

Lee discloses a radio frequency ablation device having a plurality of deployable electrodes or "ablation antennae." *See, e.g.*, Ex. 1010, Abstract, ¶ 8. Figure 1 of Lee is reproduced below:




Figure 1 is a perspective view of the distal portion of Lee's "multiple antenna ablation device" or "ablation trocar." *Id.* ¶¶ 32, 91.

Ablation trocar 10 includes trocar point 14 having "a forward piercing edge surface 18." Ex. 1010 ¶ 91. "[T]rocar point 14 is mounted on a cannula 16[, which] . . . may be made of . . . metal covered with a plastic insulating layer, to prevent ablative energy from leaking out of the device along the length of the cannula." *Id.* "Cannula 16 defines an internal lumen 20 which carries a plurality of stylets 22" each of which "comprises a long and straight springy wire-like member" and is "made of a springy conductive material such as a springy nickel titanium alloy." *Id.* ¶ 92.[12] "[S]tylets 22 . . . may be housed wholly within lumen 20 of cannula 16." *Id.* (referencing Fig. 2). But in the deployed configuration shown in Figure 1,

---

[12] Petitioner refers to Lee's conductive stylets/electrodes as "filaments." *See, e.g.*, Pet. 19, 37 (citing Ex. 1034 ¶¶ 125–126, 162–163). Patent Owner does not dispute this characterization. *See generally* PO Resp.

"the ends of the wire-like stylets 22 are exposed," such that RF energy may be conducted from the tips of the stylets after they exit trocar 10 and "define an ablation volume in the target tissue." *Id.* ¶¶ 12, 92, 93, 99, 102. "The electrodes may be used in a monopolar fashion with the ablation stylets excited with RF energy and a return electrode being applied usually in the form of a conductive pad in contact with a remote surface on the patient." *Id.* ¶ 24.

As illustrated in Figure 1, stylets 22 are positioned around the perimeter of tip 14 and extend outwardly in a "cone" orientation around the central stylet (labeled 24*a* to indicate a sharpened piercing point), which is deployed through the center of trocar point 14. Ex. 1010 ¶¶ 92, 102, 103, 128, Figs. 1–3. Lee discloses that stylets 22 "may be connected to suitable advancement and retraction mechanisms." *Id.* ¶ 106. During deployment, the electrically conductive stylets around tip 14 are guided by "deflection surfaces," which may comprise a plurality of channels and ramps. *Id.* ¶¶ 16, 18, 87 (the "electrodes are directed into the tissue at a variety of angles by a mandrel like delivery member which serves as a deflection surface"), 91, 102, Abstract, claims 8, 10. The ends of the exposed stylets transmit RF energy to define an ablation volume. *See, e.g.*, *id.* ¶¶ 7, 12, 123, 129, claims 1, 2.

### D. Ground A: Obviousness in view of Racz, Fitz, and Lee

For Ground A, Petitioner challenges claims 1–10, 18–26, 28, and 29 as obvious in view of Racz, Fitz, and Lee. Pet. 13–62.

Patent Owner contends that Lee is not analogous art, none of the references teach a deployable filament energized at the distal end by an insertable RF probe, Petitioner's proposed modification of Racz's device is

too vague, Petitioner has not established reasonable expectation of success, Petitioner's proposed modification of Racz's device "is not enabled," the references teach away from Racz's modified device, Petitioner fails to establish motivation to combine, and the teachings of the prior art would not have a led an ordinarily skilled artisan to Racz's modified device. PO Resp. 34–59. Further, Patent Owner submits that objective indicia of non-obviousness support the patentability of the challenged claims. *Id.* at 61–74.

1. Claim 1

a) Petitioner's Contentions

Petitioner provides limitation-by-limitation contentions for claim 1 detailing how the combination of Racz, Fitz, and Lee teaches each of the elements of claim 1. Pet. 28–47. Supported by the testimony of Dr. Tucker, Petitioner contends that an ordinarily skill artisan would have been motivated to combine the teachings of Racz, Fitz, and Lee with a reasonable expectation of success of arriving at the claimed invention. *Id.* at 1–6, 21–27; Ex. 1034 ¶¶ 132–149.

We begin with motivation to combine and reasonable expectation of success and then address Petitioner's mapping of the prior art to the claim limitations.

i. Motivation to Combine/Reasonable Expectation of Success

Petitioner contends that "[c]onsidering Racz, Fitz, and Lee together, a [person of ordinary skill in the art] would have been motivated to implement deployable filaments on the distal tip (14/38) of Racz's electrode cannula (10/33)." Pet. 21. According to Petitioner, "Fitz and Lee disclose a known technique for solving a known problem in RF ablation devices—providing

deployable filaments at a distal tip to expand and control the ablation volume compared to single-tip devices with inadequate energy coverage" leading an ordinarily skilled artisan to "recognize[] that the Fitz/Lee technique would improve the energy coverage area of Racz's single-tip device." *Id.* at 22 (citing Ex. 1010 ¶¶ 84, 123–131; Ex. 1011 ¶¶ 9–10, Abstract; Ex. 1034 ¶¶ 60–65, 69–72, 132).

Petitioner next contends that because Fitz discloses a known problem with single-tip RF neurotomy devices, an ordinarily skilled artisan would have understood that Racz's single-tip device would also suffer from inadequate coverage of the target area. Pet. 22 (citing Ex. 1011 ¶¶ 4, 12, 17; Ex. 1034 ¶¶ 133–135; *see also id.* at 23 (reproducing a side-by-side comparison of Racz's Figure 2B and Fitz's Figure 1). Petitioner further contends that Fitz would have motivated the ordinarily skilled artisan "to provide deployable electrodes on Racz's exposed tip" in order to "[t]o solve the limited energy coverage problem in Racz's device." *Id.* at 23 (citing Ex. 1011 ¶ 9, Abstract; Ex. 1034 ¶ 136). In support of this contention, Petitioner points to Fitz's disclosure that its "electrodes may be made from a 'shape-memory alloy' and be deployed outwardly from the distal tip 'to an area to be treated.'" *Id.* (citing Ex. 1011 ¶¶ 9–10, 18–21, Abstract, Figs. 4, 5).

Petitioner next contends that Fitz's deployable electrodes implemented in Racz's distal tip would have numerous benefits including "reducing instances where a target nerve 'is not lesioned at all,'" "reducing the need to create multiple lesions," "providing greater flexibility in lesion size/placement as 'anatomy differs from patient to patient,'" and "expanding the energy coverage area without compromising the device's ability to be

'readily deployable through muscle tissue.'" Pet. 24 (citing Ex. 1011 ¶¶ 4–8). According to Petitioner, for these reasons, "Fitz would have motivated a [person of ordinary skill in the art] to add deployable electrodes to the distal tip (14/38) of Racz's cannula (10/33)" and the deployment of Fitz's electrodes in Racz's tip "could be easily implemented." *Id.* (citing Ex. 1034 ¶ 137).

Petitioner next contends that Lee "disclose[s] a further refinement of the deployable-electrode technique." Pet. 24. Petitioner argues that Lee's "filaments (22/1622) 'define an ablation volume in the target tissue' as 'the destruction of target tissue [occurs] at the site where the electrodes are located" allowing "variations in ablation volume" to "be achieved by controlling the number of filaments (22/1622) used as well as their length, direction, and arrangement." *Id.* (citing Ex. 1010 ¶¶ 12, 84, 123–131). According to Petitioner, Lee would have motivated an ordinarily skilled artisan "to add deployable filaments to the distal tip (14/38) of Racz's cannula (10/33) to not just expand—*but also to control*—the ablation volume generated by Racz's device." *Id.* at 25 (citing Ex. 1034 ¶ 138).

Petitioner next contends that Lee discloses that its "deployable filaments (22/1622) can be arranged around the inner perimeter of a cannula such that they surround and provide space for a central element." Pet. 25 (citing Ex. 1010 ¶¶ 94, 99, 125, Figs 1, 23, 49). According to Petitioner, Lee's disclosure "would have confirmed to a [person of ordinary skill in the art] that Lee's deployable filaments (22/1622) would be easily arranged to accommodate Racz's centrally located removable probe" and would "be a matter of routine engineering, well within the level of ordinary skill in the

art, and executable with a reasonable expectation of success." *Id.* at 25, 27 (citing Ex. 1034 ¶¶ 139–140, 148–149).

Patent Owner interposes numerous arguments that are relevant to Petitioner's contentions on motivation to combine which we address below and determine are unavailing.

We now set forth our findings and legal conclusions in light of the legal principles underlying motivation to combine.

We start with the premise that, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 550 U.S. at 417. In this case, we must determine whether one of ordinary skill in the art would recognize that applying the teachings of Fitz and Lee of deploying multiple filaments to increase and control the ablation volume to Racz's distal tip would improve Racz's device in the same way. For us to resolve this question in Petitioner's favor, Petitioner must provide "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* at 418 (citing *In re Kahn*, 441 F.3d at 988). However, bodily incorporation, i.e., "an actual physical substitution of" Lee's filaments into Racz is not required. *See In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements."); *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the *teachings* of references does not involve an ability to combine their specific structures.").

The Federal Circuit holds that that

> motivation to combine may be found explicitly or implicitly in market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill.

*Zup, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018); *see also Intel*, 61 F.4th at 1381 (explaining that it is sufficient for motivation to combine "that there was a known problem . . . in the art, that Bauman[] . . . helped address that issue, and that combining the teachings of Kabemoto and Bauman wasn't beyond the skill of an ordinary artisan. Nothing more is required to show a motivation to combine under *KSR*").

Fitz is directed to RF neurotomy. Ex. 1011 ¶ 2. Fitz explains that the then current designs consisted of "a straight needle . . . used to cover a small nerve on a rounded bony surface." *Id.* ¶ 4. Fitz describes that a problem with those designs "is that they do not allow for adequate coverage of the target area." *Id.* This may require "multiple lesions . . . to enhance coverage" but "this is more time-consuming and usually more painful to the patient." *Id.* ¶ 5. Fitz's purported invention is an "improved coverage RF neurotomy instrumentation, including an introducer used to deploy a set of electrodes to an area to be treated. *Id.* ¶ 9. Figure 2 of Fitz shows an embodiment deploying a plurality of electrodes 206. *Id.* ¶ 17, Fig. 2.

Lee discloses "utilizing radio frequency heating of tissues for ablation or shrinkage by the application of the energy to the tissues through specialized delivery devices." Ex. 1010 ¶ 83. Lee discloses deploying a plurality of stylets (electrodes) 22 through its distal tip. *Id.* ¶ 92, Fig. 1. Lee discloses that extending the electrodes in different directions and in differing

lengths defines and controls the shape and volume of ablation. *See id.* ¶¶ 123–130.

These and other disclosures in Fitz and Lee support Dr. Tucker's testimony that a person of ordinary skill in the art would have been motivated to combine the teachings of Racz, Fitz, and Lee. In particular, Dr. Tucker testifies that an ordinarily skilled artisan:

> would have been motivated to implement deployable filaments on the distal tip (14/38) of Racz's electrode cannula (10/33). . . . Fitz and Lee disclose a technique for solving the problem of inadequate coverage in single-tip RF ablation devices: providing deployable filaments at a distal tip to expand and control the ablation volume compared to single-tip devices with inadequate energy coverage. Ex-1011, ¶ 0009-10, Abstract; Ex-1010, ¶ 0012, 0084, 0123-131. Thus, a [person of ordinary skill in the art] would have recognized that the Fitz/Lee technique would improve the energy coverage area of Racz's single tip device.

Ex. 1034 ¶ 132.

> Fitz discloses that a known problem with single-tip RF neurotomy devices was "that they do not allow for adequate coverage of the target area" and produce lesions extending "only a few millimeters" from the exposed tip. Ex-1011, ¶ 0004-0005. . . . Fitz therefore teaches a [person of ordinary skill in the art] that this limited coverage problem would be present in Racz's device due to its single-tip configuration . . . Ex.-1011, ¶ 0004, 0012, 0017.

*Id.* ¶ 134.

> Fitz also teaches a solution to this problem: providing a deployable set of electrodes on the exposed distal tip. Ex-1011, ¶ 9, Abstract. The deployable electrodes may be made from a "shape-memory alloy" and can be configured to be deployed outwardly from the distal tip of a cannula "to an area to be treated." Ex-1011, ¶ 0009-0010, 0018-0021, Abstract.

*Id.* ¶ 135.

> Fitz would have accordingly motivated a [person of ordinary skill in the art] to solve the limited energy coverage problem in Racz's device by providing deployable electrodes on Racz's exposed tip (14/38). Ex. 1011, ¶ 0009.

*Id.* ¶ 136.

> A POSA would have understood from Fitz that implementing deployable electrodes at Racz's distal tip (14/38) has numerous benefits: (i) reducing instances where a target nerve "is not lesioned at all" (Ex-1011, ¶0004); (ii) reducing the need to create multiple lesions, which is "time-consuming and usually more painful to the patient" (Ex-1011, ¶0005); providing greater flexibility in lesion size/placement as "anatomy differs from patient to patient" (Ex-1011, ¶0004); and (iv) expanding the energy coverage area without compromising the device's ability to be "readily deployable through muscle tissue"(Ex-1011, ¶0006-0008).

*Id.* ¶ 137.

> Lee disclosed a further refinement of the deployable-electrode technique that would have provided additional motivation and guidance to a POSA to combine the references. For example, Lee discloses that its filaments (22/1622) "define an ablation volume in the target tissue" as "the destruction of target tissue [occurs] at the site where the electrodes are located." Ex-1010, ¶0012, 0084. As a result, "variations in ablation volume" may be achieved by controlling the number of filaments (22/1622) used as well as their length, direction, and arrangement. Ex-1010, ¶0123-0131, 0084. Indeed, the "arrangement of [filaments] may … form any desired pattern" (Ex1010, ¶0103) and the precision and control offered by the filaments (22/1622) allows "the operator [to] deliver the [radiofrequency] treatment safely and effectively" (Ex-1010, ¶0084). Thus, a POSA would understand from Lee the relationship between the configuration of the filaments and the shape/size lesion created. From this relationship a POSA would be motivated to use filaments in radiofrequency ablation devices to control the shape and/or size of the lesions created by the device.

*Id.* ¶ 138.

> Lee would have confirmed to a POSA that providing deployable filaments (e.g., stylets (22/1622)) at the distal tip of an ablation device

> can be used to not only to expand the ablation volume but to precisely control the size and shape of the ablation volume. For at least these reasons, a POSA would have been further motivated by Lee to add deployable filaments to the distal tip (14/38) of Racz's cannula (10/33) to not just expand—*but also control*—the ablation volume generated by Racz's device.

*Id.* ¶ 139.

We accord substantial weight to this testimony of Dr. Tucker because it is supported by the cited disclosure from Racz, Fitz, and Lee.

Based on the foregoing disclosures in Racz, Fitz, and Lee and the testimony of Dr. Tucker, we find that Petitioner has shown that Racz's single tip electrode suffered from a known problem of inadequate energy coverage and that Fitz and Lee addressed that problem by deploying multiple electrodes to increase and control the ablation volume. Consequently, an ordinarily skilled artisan would have been motivated to combine Racz with the interrelated teachings of Fitz and Lee. *Intel*, 61 F.4th at 1381; *Zup*, 896 F.3d at1371.

We address the question of reasonable expectation of success in connection with our analysis of Patent Owner's contentions set forth below.

ii. Petitioner's Claim Limitation Contentions

[1pre][13] "A method comprising:"

Petitioner contends that Racz discloses that it is "directed to a system and *method* for . . . pain relief." Pet. 28 (underlining omitted) (citing Ex. 1009, 2:46–47; Ex. 1034 ¶ 150).

Patent Owner does not address the preamble. *See generally* PO Resp.

[13] We use Petitioner's claim limitation annotations for ease of reference.

We have reviewed Petitioner's contentions and evidence and find that Racz discloses the subject matter of the preamble. Moreover, the preamble here clearly is not limiting.

> [1a] "inserting a needle into a patient, the needle comprising:"

Petitioner contends that Racz discloses a "curved tip needle electrode" or cannula, that may be "inserted directly through the skin." Pet. 28 (citing Ex. 1009, 2:46–48, 3:24–45, 8:45–57, 9:49–51; Ex. 1034 ¶ 151).

Patent Owner does not address this limitation. *See generally* PO Resp.

We have reviewed Petitioner's contentions and evidence and find that Racz discloses this limitation.

> [1b] "an elongate member;"; [1d] "a lumen within the elongate member; and"

In support of its contentions for limitations [1b] and [1d], Petitioner provides the following annotated version of Racz's Figure 2B:




*Racz – Fig. 2B (annotated to show [1b]-[1d])*

Pet. 29. Figure 2B is a "schematic side elevation and orthogonal view" of Racz's device. Ex. 1009, 3:27–28. Petitioner annotates Figure 2B with green highlighting of element 54, a green circle around element number 52 and green text "Removable RF probe"; orange highlighting of element number 34 and element 34 and orange text "'elongate member' defining a 'lumen'"; red highlighting of element numbers 38 and 40 and element 38 with red text "a piercing tip at distal end of elongate member"; and a red circle around element number 33 with red text "RF Neurotomy Needle (Cannula)." Pet. 29.

For limitations [1b] and [1d], Petitioner contends that Racz discloses an "electrode cannula (10/33) compris[ing] 'an elongated shaft' (12/34) defining 'an internal lumen.'" Pet. 28–29 (citing Ex. 1009, 1:33–36, 2:48–51, 5:41–48, claims 1, 8, 11). Petitioner further contends that the "shaft's lumen accepts the radiofrequency probe (22/52) via the hub (20/42/70), which is 'mounted at a proximal end of the shaft.'" *Id.* at 29 (citing Ex. 1009, 3:38–42, 3:60–65, 5:26–28, 5:37–51, 9:44–48, Fig. 2B (annotated); Ex. 1034 ¶¶ 152–153).

Patent Owner does not address these limitations. *See generally* PO Resp.

We have reviewed Petitioner's contentions and evidence and find that Racz discloses these limitations.

> [1c] "a piercing tip at a distal end of the elongate member;"

With reference to its annotated reproduction of Racz's Figure 2B, Petitioner contends that "exposed electrical tip (14/38) . . . positioned at a distal end of the shaft (12/34) . . . defines a 'self-penetrating point' (18/40),"

which "allows the cannula (10/33) to be 'inserted directly through the skin.'" Pet. 29–30 (underlining omitted) (citing Ex. 1009, 3:42–45, 3:47–51, 1:28–30, 5:3–5, 8:45–57, 9:49–51, claim 3; Ex. 1034 ¶ 154).

Patent Owner does not address this limitation. *See generally* PO Resp.

We have reviewed Petitioner's contentions and evidence and find that Racz discloses this limitation.

> [1e] "a filament in a retracted position in which the filament is at least partially disposed within the elongate member"; [1f] "moving the filament to a deployed position within the patient in which at least a distal end of the filament is out of the elongate member and disposed away from the tip"

Petitioner contends that Lee's deployable stylets/electrodes (22/1622) correspond to the recited "filament" and that Lee's stylets/electrodes "are each 'a long and straight springy wire-like member' and may be 'made of a springy conductive material such as a springy nickel titanium alloy' (i.e., Nitinol)." Pet. 30–31 (citing Ex. 1010 ¶¶ 87, 92; Ex. 1034 ¶¶ 156–157).

Relying on its contentions for motivation to combine discussed above, Petitioner contends that one of ordinary skill in the art would have been motivated to implement Lee's perimeter filaments "on the distal tip (14/38) of Racz's cannula (10/33) for the purpose of expanding and controlling the energy coverage area of Racz's device." Pet. 30, 33 ("a [person of ordinary skill in the art would have been motivated to implement Lee's perimeter filaments (22/1622) around Racz's tip (14/38) to provide a desired ablation volume (e.g., in a full or partial cone shape) and omit Lee's central filament." (citing Ex. 1034 ¶¶ 73–75, 79–83. 159)). According to Petitioner, a person of ordinary skill in the art would have been further motivated to

omit Lee's central filament as unnecessary because "Racz's exposed distal tip (14/38) is already active," and omitting the central filament would have the benefit of not obstructing Racz's cannula (10/33). *Id.* at 33, 35 (citing Ex. 1009, 3:60–63, 4:18–23; Ex. 1034 ¶¶ 159, 161).

Petitioner next contends that an ordinarily skilled artisan seeking to implement Lee's perimeter filaments (22/1622) on Racz's distal tip (14/38)

> would have found it obvious to modify Racz's tip (14/38) to include internal deflection surfaces (12/1612) (e.g., channels and ramps as disclosed in Lee) to guide the perimeter filaments (22/1622) outwardly around Racz's tip (14/38). Ex-1010, ¶0016, 0018, 0092, 0102, Claim 8, Claim 10; Ex-1034, ¶160. It would have been further obvious to provide openings in Racz's distal tip (14/38) (e.g., in communication with the internal deflection surfaces as disclosed in Lee) such that Lee's perimeter filaments (22/1622) can—when deployed—exit Racz's distal tip (14/38). Ex-1010, ¶0092, 0102; Ex-1034, ¶160.

Pet. 34–35; *see also id.* at 35–38 (citing Ex. 1034 ¶¶ 162–165 (summarizing Dr. Tucker's testimony regarding an example of how one of ordinary skill in the art would have implemented Lee's filaments and deflection surfaces to guide them as they are deployed and retracted from Racz's cannula)).

Petitioner contends that limitations [1e] and [1f] would have been obvious in light of Lee's disclosure that "perimeter filaments (22/1622) are configured to be adjusted between deployed and withdrawn positions," and thus, extend beyond the tip of the device when in the deployed position "to define the ablation volume." Pet. 38–39 (citing Ex. 1010 ¶¶ 92, 98–99, 106–107, Figs. 1–3; Ex. 1034 ¶¶ 166–168). In support of this contention, Petitioner argues that Lee teaches "variations in ablation volume may be achieved by varying the extent to which stylets are extended from the distal

end of the trocar and the direction in which stylets extend." *Id.* at 39 (emphasis omitted) (citing Ex. 1010 ¶ 129, Figs. 1, 48, 49; Ex. 1034 ¶ 167).

Petitioner further contends one of ordinary skill in the art "would have been motivated (and found it obvious) to connect Lee's perimeter filaments (22/1622) to an actuator that would not obstruct Racz's central lumen for the purpose of preserving the functionality of Racz's electrical probe (22/52) (e.g., a rotating actuator configured to rotate around Racz's central lumen)." Pet. 41 (citing Ex. 1034 ¶¶ 77–78, 170–172). In support of this contention, Petitioner references Lee's disclosure that "perimeter filaments (22/1622) 'may be connected to suitable advancement and retraction mechanisms' (i.e., an actuator) for adjusting the filaments (22/1622) between the deployed position and the withdrawn position'" and that "[s]uch mechanisms may be of a conventional design." *Id.* at 40 (emphasis omitted, alteration in original) (citing Ex. 1010 ¶ 106). Petitioner similarly relies on Fitz's disclosure of "filaments . . . 'deployed' from the introducer by a 'slid[ing] movement," and its reference to a prior art deployable electrical lead that "may be actuated with various mechanisms." *Id.* (citing Ex. 1011 ¶¶ 7, 9) (second alteration in original).

Patent Owner does not address these limitations. *See generally* PO Resp.

We have reviewed Petitioner's contentions and evidence and find that the combination of Racz, Fitz, and Lee teaches these limitations.

> [1g] "inserting a radiofrequency probe into the lumen of the needle such that the radiofrequency probe contacts a conductive portion of the needle at a distal end of the needle to thereby establish an electrically conductive path from the radiofrequency probe to the filament; and"

Petitioner contends that Racz's electrode cannula (10/33) comprises a "metal tubular shaft" defining an internal lumen that "accepts the radiofrequency probe (22/52) . . . to conduct RF energy to the tip (14/38)." Pet. 41 (citing Ex. 1009, 1:33–36, 2:48–51, 3;38–42, 3:60–65, 5:26–28, 5:37–51, claims 1, 11). With reference to its annotated reproduction of Racz's Figure 2B (*id.* at 42), Petitioner reasons that,

> [w]hen the probe is "inserted into and received by the shaft 12 of the cannula 10," the "*physical relationship* between the probe 22 and the shaft 12 facilitates *electrical contact* between the two elements." Ex-1009, 3:60-65. Thus, "electrical signals from the signal generator 58 are communicated to the exposed distal tip 38 by way of *contact between* the probe shaft 54 and [the] internal lumen defined by the electrode shaft 34." Ex-1009, 5:41-48, 4:18-23.

*Id.* (citing Ex. 1034 ¶ 174) (second alteration in original). With respect to the conduction of RF energy to the filament(s), Petitioner asserts that because Racz's electrical probe (52)/ distal tip (14/38) and Lee's filaments (22/1622) "are all constructed from conductive materials, . . . the (modified) tip's deflection surfaces will physically contact the filaments [such that] . . . energy would be transmitted from the probe (52) to the tip (14/38) and to the perimeter filaments (22/1622) by physical contact." *Id.* at 45 (citing Ex. 1034 ¶¶ 178–179).

Patent Owner concedes that "Racz teaches an insertable RF probe to energize a needle at its distal tip" but argues that Racz does not teach or

suggest a deployable filament." PO Resp. 36. Patent Owner further argues that "[a]lthough Fitz and Lee each teach deployable filaments, neither Fitz nor Lee teaches energizing those filaments at a distal end using an insertable RF probe" and "[w]hat is missing from all three references is a deployable filament that is energized at the distal end by an insertable RF probe." *Id.* This contention is unavailing because it attacks the references individually while Petitioner relies on the combination of the teachings of Racz, Fitz, and Lee for this limitation. *See Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1050 (Fed. Cir. 2019) ("A finding of obviousness . . . cannot be overcome 'by attacking references individually where the rejection is based upon the teachings of a combination of references.'" (quoting *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986)); *In re Mouttet*, 686 F.3d at 1333 (Fed. Cir. 2012) (holding that the test for obviousness is "what the combined teachings of the references would have suggested to those having ordinary skill in the art").

We have reviewed Petitioner's contentions and evidence in light of Patent Owner's contention and find that the combination of Racz, Fitz, and Lee teaches this limitation.

> [1h] "operating the radiofrequency probe, the tip, and the filament as a monopolar electrode, with radiofrequency energy from the radiofrequency probe being conducted to the filament through the electrically conductive path and transmitted by the filament."

Petitioner contends that Racz's "tip (14/38) is configured to operate in a conventional monopolar mode by providing a 'reference electrode 30' that is electrically connected to a signal generator (28) and 'in contact with the patient's body portion P.'" Pet. 46 (citing Ex. 1009, 4:3–23, Fig. 1;

Ex. 1034 ¶ 181). As such, Petitioner argues, "implementing Lee's perimeter filaments (22/1622) at Racz's tip (14/38)—and electrically connecting the monopolar tip (14/38) and perimeter filaments (22/1622) by physical contact using internal deflection surfaces discussed above—would naturally result in the active tip (14/38) and perimeter filaments (22/1622) functioning together as a single monopolar electrode" for transmitting RF energy suitable for RF ablation procedures. *Id.* at 46–47 (citing Ex. 1009, 4:3–23, Fig 1; Ex. 1010 ¶ 24; Ex. 1034 ¶¶ 84–88, 182). Relying on the testimony of Dr. Tucker, Petitioner contends that the ordinarily skilled artisan "would have had no reason to deviate from Racz's monopolar configuration and would have been motivated to electrically connect Lee's filaments (22/1622) to function as a single monopolar electrode with Racz's tip (14/38)." *Id.* at 47 (citing Ex. 1034 ¶¶ 183–184). Petitioner further contends that an ordinarily skilled artisan "would have had a reasonable expectation of success in implementing this configuration as both Racz and Lee disclose that a monopolar configuration is suitable for RF ablation procedures." *Id.* (citing Ex. 1009, 4:3–23, Fig. 1; Ex. 1010 ¶ 24; Ex. 1034 ¶ 183).

For all the foregoing reasons, Petitioner has shown that the combination of Racz, Fitz, and Lee teaches all the limitations of claim 1.

2. Claim 2

Claim 2 depends from claim 1 and recites "wherein said moving the filament to a deployed position within the patient takes place prior to said inserting the radiofrequency probe into the lumen of the needle." Ex. 1003, 31:54–57.

Petitioner first contends that "Lee teaches it 'is important for the physician operator to carefully place the ablation [filaments] (for example

radiofrequency electrodes in the correct positions . . . *prior to* applying ablative energy'" and "that '*after* the [filaments] 22 have been successfully deployed in the tumor mass to be ablated, *RF energy … is applied* to the [filaments].'" Pet. 48 (citing Ex. 1010 ¶¶ 85, 87, 99, 107) (alterations in original). Petitioner next contends that "Racz also discloses that the RF probe (22/52) can be inserted into the cannula (10/33) *after* the cannula (10/33) has been inserted into the patient" and "*after* the RF probe is inserted, its tip (14/38) is activated with RF energy to ablate targeted tissue." *Id.* (citing Ex. 1009, 1:43–52, 2:53–56, 4:18–23, 5:29–51). Based on the cited disclosure of Lee and Racz, Petitioner contends it would have been obvious to an ordinarily skilled artisan "to insert Racz's modified cannula (10/33) into a patient, then insert Racz's RF probe (22/52) into the cannula, then deploy Lee's filaments (22/1622) from the tip (14/38), and then activate the filaments (22/1622) and tip (14/38) with RF energy to ablate a targeted volume of tissue." *Id.* at 48–49 (citing Ex. 1034 ¶¶ 185–187).

Petitioner's contentions are not persuasive. Claim 2 requires inserting deploying the filaments prior to inserting the radiofrequency probe. Petitioner's contentions are the opposite, i.e., the radiofrequency probe is first inserted and then the filaments are deployed. Consequently, Petitioner fails to show that that the combination of Racz, Fitz, and Lee teaches the limitations of claim 2.

3. Claims 3, 4, 5

Claim 3 depends from claim 1 and recites "wherein the needle further comprises a fitting in fluid communication with the lumen, the method further comprising: connecting a fluid source to the fitting; transporting fluid

through the lumen of the needle to a target volume within the patient; and disconnecting the fluid source from the fitting." Ex. 1003, 31:58–64.

Claim 4 depends from claim 3 and recites "wherein said inserting the radiofrequency probe into the lumen is achieved by passing the radiofrequency probe through the fitting." Ex. 1003, 31:65–67.

Claim 5 depends from claim 3 and recites "wherein said inserting the radiofrequency probe into the lumen takes place after said disconnecting the fluid source from the fitting." Ex. 1003, 32:1–3.

Petitioner contends that Racz's proximal hub (20/42/70) "may be a standard hypodermic needle or luer type hub capable of connection to stylets, electrical probes, syringes, or injection tubes" and its "tip (14/38) includes 'an opening 46 that is capable . . . of dispensing diagnostic or therapeutic liquids' that are injected *via the hub* (20/42/70) and through the lumen of the shaft (12/34)." Pet. 49 (citing Ex. 1009, 1:29–33, 5:14–18, 5:66–6:8, 6:9–12, 8:54–57). In addition to receiving fluid, "Racz's proximal hub (20/42/70) is also configured to receive the probe (22/52) (for transmitting RF energy during ablation)." *Id.* (citing Ex. 1009, 3:59–65, 5:66–6:12, 9:30–39; 10:8–10). According to Petitioner, "the fluid source can necessarily be disconnected from the hub (20/42/20) to allow for insertion of the RF probe (22/52) through the hub/fitting," and therefore discloses the limitations of claims 3 and 4. *Id.* at 49–50 (citing Ex. 1034 ¶¶ 188–189).

For claim 5, Petitioner contends that Racz "teaches that 'injection of a local anesthetic' through the hub 'can be used to confirm the exact *position* of a target' which 'may be a *precursor* to other options such as stimulation [and] radio frequency heating.'" Pet. 50 (citing Ex. 1009, 1:55–63, 5:66–

6:7; Ex. 1022, 5:46–57) (alteration in original). Petitioner further contends that this disclosure renders the subject matter of claim 5 obvious to a person of ordinary skill in the art. *Id.* (citing Ex. 1034 ¶¶ 190–191).

Patent Owner does not dispute Petitioner's contentions for claims 3–5. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find the combination of Racz, Fitz, and Lee teaches the limitations of claims 3, 4, and 5.

4. Claims 6 and 7

Claim 6 depends from claim 1 and recites "wherein said moving the filament to the deployed position comprises positioning the distal end of the filament distally beyond the tip of the needle." Ex. 1003, 32:4–7.

Claim 7 depends from claim 1 and recites "wherein said moving the filament to the deployed position places the distal end of the filament at a position that is spaced from a central longitudinal axis of the needle by a distance greater than a radius of the elongate member." Ex. 1003, 32:8–12.

Petitioner contends that "Lee teaches that 'variations in ablation volume may be achieved by varying *the extent to which stylets are extended from the distal end* of the trocar and the direction in which stylets extend" and "illustrates its filaments (22/1622) extending beyond the tip of its device." Pet. 51 (citing Ex. 1010 ¶ 129, Figs. 1, 48, 49; Ex. 1034 ¶ 192). Petitioner further contends that "in the proposed combination, configuring the filaments (22/1622) to extend beyond the distal tip would be an obvious way to expand the device's achievable ablation volume (in comparison to Racz unmodified), which is the problem Fitz identifies as being present in Racz." *Id.* at 52. According to Petitioner, it would have been obvious to an

ordinarily skilled artisan to operate Racz's modified device to position "the distal end of the filament distally beyond the tip of the needle" which corresponds to the limitations of claim 6. *Id.* at 53 (citing Ex. 1034 ¶ 194).

Petitioner next contends that, "in each of Lee's figures, the filament tips extend well outside of the cannula, which means the filament tips are spaced from the cannula's central longitudinal axis by a distance greater than the cannula's radius." Pet. 53 (citing Ex. 1010, Figs. 1, 5, 48, 49; Ex. 1034 ¶ 195). Petitioner further contends that "Lee emphasizes that 'variations in ablation volume may be achieved by varying *the extent to which stylets are extended from the distal end* of the trocar and the direction in which stylets extend." *Id.* (citing Ex. 1010 ¶ 129). According to Petitioner, this disclosure teaches the limitations of claim 7 because one of ordinary skill in the art would understand the filaments (22/1622) would be extended "to any position necessary to produce a desired ablation volume (including where 'the distal end of the filament [is] at a position that is spaced from a central longitudinal axis of the needle by a distance greater than a radius of the elongate member.')." *Id.* (alteration in original).

Patent Owner does not dispute Petitioner's contentions for claims 6 and 7. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claims 6 and 7.

5. Claim 8

Claim 8 depends from claim 1 and recites "further comprising attaching a return electrode pad to the patient prior to said operating the

radiofrequency probe, the tip, and the filament as the monopolar electrode." Ex. 1003, 32:14–17.

Petitioner first refers to it contentions for limitation 1[g] that "Racz's modified device operates with its tip (14/38) and filaments (22/1622) functioning as a monopolar electrode." Pet. 54. Petitioner contends that "Lee teaches its filaments (22/1622) 'may be used in a monopolar fashion with . . . a return electrode being applied usually in the form a conductive pad in contact with a remote surface on the patient." *Id.* (citing Ex. 1010 ¶ 24) (alteration in original). According to Petitioner, based on this disclosure, an ordinarily skilled artisan would have found it obvious "to attach a return electrode pad to the patient" as required by claim 8. *Id.* (citing Ex. 1034 ¶ 197).

Patent Owner does not dispute Petitioner's contentions for claim 8. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claim 8.

6. Claims 9 and 20

Claim 9 depends from claim 1 and recites

> wherein the conductive portion comprises a conductive material in the tip, and wherein said inserting the radiofrequency probe into the lumen of the needle such that the radiofrequency probe contacts the conductive portion of the needle comprises contacting a distal end of the radiofrequency probe to the conductive material of the tip.

Ex. 1003, 32:18–24.

Claim 20 depends from claim1 and recites "wherein the probe directly contacts the tip during said operating the radiofrequency probe, the tip, and the filament as the monopolar electrode." Ex. 1003, 32:55–57.

Referring to its contentions for limitations [1e], [1g], and [1h], Petitioner contends that "Racz's distal tip (14/38), and Lee's filaments (22/1622) are all constructed from conductive materials and direct physical contact between them allows the device to operate to transmits the RF energy" and when "RF probe (22/52) is inserted, a distal end of the probe's conductive shaft (54) physically contacts the conductive tip (14/38)." Pet. 54–55 (citing Ex. 1034 ¶ 198). Petitioner further contends that this disclosure corresponds to the limitations of claim 9 that the needle "comprises a conductive material in the tip" and inserting the RF probe results in "contacting a distal end of the probe to the conductive material" in the tip. *Id.* at 55 (citing Ex. 1034 ¶¶ 199–200). Petitioner further contends that this disclosure corresponds to the limitation of claim 20 that "the probe directly contacts the tip during said operating the radiofrequency probe, the tip, and the filament as the monopolar electrode." *Id.*

Patent Owner does not dispute Petitioner's contentions for claims 9 and 20. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claims 9 and 20.

7. Claim 10

Claim 10 depends from claim 1 and recites "after said inserting the needle into the patient, moving the needle to a target volume within the patient that includes a nerve; and ablating the nerve to relieve pain of the patient." Ex. 1003, 32:25–29.

Petitioner contends that "Racz expressly teaches its device is used for nerve ablation to relieve pain, and to do so necessarily involves inserting the

needle into the patient, moving the device proximate to a target nerve, and ablating the nerve to relieve pain." Pet. 55–56 (citing Ex. 1009, 1:4–10, 3:42–45, 4:49–58, 7:43–50; Ex. 1011 ¶ 7; Ex. 1034 ¶ 201).

Patent Owner does not dispute Petitioner's contentions for claim 10. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claim 10.

8. Claim 21

For independent claim 21, Petitioner relies on its contentions and evidence for corresponding elements of claim 1. Pet. 56–57.

Patent Owner does not dispute Petitioner's contentions for claim 21. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claim 21.

9. Claims 18, 19, 28, and 29

Claim 18 depends from claim 10 and recites "wherein said ablating comprises forming a lesion that includes the nerve and has a maximum cross dimension that is 10 millimeters or larger." Ex. 1003, 32:49–51. Claim 28 depends from claim 21 and recites the same limitations. *Id.* at 34:18–20.

Claim 19 depends from claim 10 and recites "wherein said ablating comprises forming a lesion that includes the nerve and has a volume of about 500 $mm^3$." Ex. 1003, 32:52–54. Claim 29 depends from claim 21 and recites the same limitations. *Id.* at 34:30–32.

Petitioner contends that the combination of Racz, Fitz, and Lee teaches the limitations of claims 18, 19, 28, and 29. Pet. 62. Specifically, Petitioner argues that Fitz "disclose[s] an 'improved-coverage RF

neurotomy' device using multiple electrodes (i.e., filaments)" to solve "a 'problem' with single-tip neurotomy devices," such as Racz, which "did not allow for adequate coverage of the target area." *Id.* at 59 (citing Ex. 1011 ¶¶ 4–5, 9). Petitioner next argues that Lee discloses "varying the number, pattern, direction, size, and/or length of the filaments (22/1622)" in order to "define the shapes of [] various ablation volumes." *Id.* at 60 (citing Ex. 1010 ¶¶ 12, 84, 106, 123–131) (alteration in original). Petitioner further argues that the '664 patent follows the teachings of the prior art "and employs ordinary skill to achieve the claimed lesion sizes." *Id.* at 61 (citing Ex. 1034 ¶ 207). According to Petitioner, "by dictating the[] characteristics of the filaments (22/1622)—and the size and/or shape of Racz's tip (14/38)––a [person of ordinary skill in the art] would be capable of configuring Racz' modified device to produce lesion of any desired volume" including those recited in claims 18, 19, 28, and 29. *Id.* at 61–62 (citing Ex. 1015 ¶ 133; Ex. 1019, 282; Ex. 1034 ¶ 208).

Patent Owner does not dispute Petitioner's contentions for claims 18, 19, 28, and 29. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claims 18, 19, 28, and 29.

10. Claims 22–26

For claims 22–26, which depend from claim 21, Petitioner relies on its contentions for substantially similar limitations from claims 1, 2, 3, and 10. Pet. 56–59.

Patent Owner does not dispute Petitioner's contentions for claims 22–26. *See generally* PO Resp.

We have reviewed Petitioner's evidence and contentions and find that the combination of Racz, Fitz, and Lee teaches the limitations of claims 22–26.

b) Patent Owner's Contentions

i. Adequacy of Motivation to Combine

Patent Owner argues that "the art was generally characterized by two alternative approaches: (1) tine-less devices with removable RF probes for distal energization and (2) probe-less tined devices in which deployable tines or filaments are energized at the proximal end." PO Resp. 57 (citing Ex. 2006 ¶¶ 161–167). Patent Owner further argues that, "[i]n the RF neurotomy field specifically, the two approaches were considered mutually exclusive because of the very limited space available at the tip of a small RF neurotomy needle." *Id.* (citing Ex. 2006 ¶ 164). According to Patent Owner, the Petition is flawed because it incorrectly treats the two approaches "as complementary rather than alternatives." *Id.*

For the following reasons, this argument is unavailing.

Patent Owner is arguing that an ordinarily skilled artisan would not have combined Racz's "tine-less device" with "probe-less tined devices" such as Fitz and Lee, because of size limitations at the tip of Racz's device. In other words, Patent Owner is arguing that a device with deployable filaments such as Lee could not be bodily incorporated into Racz's device because of the limited size of Racz's tip. This argument is, thus, unavailing. *In re Mouttet*, 686 F.3d at 1332. Further, the argument does not directly address Petitioner's evidence and reasons for combining the teachings of Racz, Fitz, and Lee, which as discussed above, we find to be persuasive.

ii. Dr. Tucker

Patent Owner asserts that Petitioner's declarant, Dr. Tucker, does not satisfy its definition of a person of ordinary skill in the art. PO Resp. 30. Based on this, Patent Owner argues that we should give little weight to his testimony.

For the following reasons, we disagree with Patent Owner's assertion.

First, the argument is unavailing because we do not adopt Patent Owner's definition of the level of ordinary skill in the art. Contrary to Patent Owner's argument, Dr. Tucker's testimony clearly is entitled to weight.

Since 1983, he has "been a Professor at the University of Iowa where [he] direct[s] an active research program in radiofrequency electrosurgical procedures and instrumentation." Ex. 1034 ¶ 3. He has a Ph.D. in biophysics, and he is also a medical doctor (albeit he is not Board certified as pointed out by Patent Owner[14]). *Id.* ¶ 2. He also has additional training and experience that is relevant but which is unnecessary to establish that he is qualified to offer the opinions set forth in his declaration. *Id.* ¶¶ 2–11.

Patent Owner argues that Dr. Tucker is not qualified to testify here because "he is not Board certified," and he is "not a pain-specialist physician and has never performed a neurotomy." PO Resp. 30–31. Dr. Tucker explained, however, that he is not Board certified nor does he operate on patients because his work focuses on the development of instrumentation, not the use of it, explaining on cross-examination:

> I have a Ph.D. in engineering and had no intention of doing pathology on patient samples day-to-day. I wanted to combine

[14] *See* PO Resp. 31 (citing Ex. 2020, 10:19–12:20).

> my Ph.D. in engineering with pathology to develop instrumentation. Medical instrumentation. So I never was Board-certified. Instead of Boards, I got a Ph.D.

Ex. 2020, 11:7–13. We are persuaded that Dr. Tucker is qualified to offer testimony in this proceeding and, as explained elsewhere in this Decision, his testimony adequately supports motivation to combine and a reasonable expectation of success.

iii. Lee is not Analogous Art

Patent Owner contends that Lee is not analogous art. PO Resp. 34. According to Patent Owner, "the pertinent field must include RF neurotomy." Patent Owner argues that "Lee does not relate to neurotomy at all" and would qualify as prior art only if "reasonably pertinent" to the problem with which the inventors of the '664 patent were concerned. *Id.* at 34–35.

Patent Owner next contends that Lee is not reasonably pertinent because it "pertains to a different non-overlapping field of RF ablation involving much larger structures, different target tissue, different physician users, different devices, different scale of devices" and sought to solve a problem of "sufficiently ablating uterine fibroid tumors, several orders of magnitude larger than nerves." PO Resp. 35 (citing Ex. 2001 ¶¶ 172–181; Ex. 2006 ¶¶ 153, 222). According to Patent Owner, "[t]he sufficiency-of-ablation problem in Lee is not reasonably pertinent to the miss-the-nerve problem solved by the" '664 patent. *Id.*

Petitioner responds that "Lee is within the patent's field of 'thermal ablation systems and methods" because "Lee discloses an RF ablation needle" and its "needle shares a similar structure and function to the ['664]

patent's needle." Pet. Reply 8–9 (citing Pet. 17–21, 36–41; PO Resp. 22; Ex. 1003, 1:32–62, 5:33–6:22, 24:35–38; Ex. 2006 ¶ 34).

Petitioner alternately argues that Lee is "'reasonably pertinent' to the inventors' problem: expanding the needle's ablation volume." Pet. Reply 9 (citing Pet. 2, 7; PO Resp. 5; Ex. 1003, 5:42–45, 6:11–22; Ex. 2001 ¶¶ 121–122; Ex. 2006 ¶ 91). According to Petitioner, Patent Owner "conflates the field of endeavor and reasonable pertinence inquiries, 'effectively exclude[ing] consideration of any references outside [the patent's] field." *Id.* (citing *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1360 (Fed. Cir. 2020)) (alterations in original).

For the following reasons, we find that Lee qualifies as analogous art.

For a prior-art reference to qualify as analogous art, the reference must either be in the field of the applicant's endeavor or reasonably pertinent to the problem with which the inventor was concerned. *In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir. 1992). References are selected as being reasonably pertinent to the problem based on the judgment of a person having ordinary skill in the art. *Id.* ("[I]t is necessary to consider 'the reality of the circumstances,' —in other words, common sense—in deciding in which fields a person of ordinary skill would reasonably be expected to look for a solution to the problem facing the inventor." (quoting *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979))). Furthermore, the scope of analogous art for the reasonably pertinent prong is to be construed broadly. *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) ("The Supreme Court's decision in *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), directs us to construe the scope of analogous art broadly, stating that '*familiar items may have obvious uses beyond their primary purposes*, and a

person of ordinary skill often will be able to fit the teachings of multiple patents together like pieces of a puzzle.' *Id.* at 402 (emphasis added).").

As discussed above, we find that the field of invention is thermal ablation systems or methods and is not limited to RF neurotomy systems or methods. Lee discloses methods that "utilize radio frequency heating of tissues for ablation or shrinkage by the application of energy to the tissues through specialized delivery devices" that "have electrodes or antenna that are placed into, or onto, the tissue to be treated." Ex. 1010 ¶ 83. Lee further discloses that "energy delivery devices are provided which are adapted to the destruction of target tissue at the site where the electrodes are located." *Id.* ¶ 84. Based on this disclosure in Lee, we find that Lee is in the field of RF thermal ablation systems and qualifies as analogous art.

Further, even if the field of the invention were to be limited strictly to RF neurotomy as Patent Owner asserts, Lee would qualify as reasonably pertinent art. Similar to the challenged patent, Lee teaches using RF current to shrink tissue, i.e, "a uterine fibroid" rather than nerve tissue. Ex. 1010 ¶ 84. In accordance with the Federal Circuit's direction in *Wyers* to construe the scope of analogous art broadly, Lee is reasonably pertinent to the problem facing the inventors of the '664 patent.

iv. Reasonable Expectation of Success

Patent Owner contends that an ordinarily skilled artisan would not have had a reasonable expectation of success. PO Resp. 43. Patent Owner argues that Petitioner's "sole support" for reasonable expectation of success "is Dr. Tucker's bald conclusion which is entitled to no weight." *Id.* Patent Owner offers Mr. Crosby's testimony that details alleged "impediments a [person of ordinary skill in the art] would encounter trying

to ***make*** Racz's modified device." *Id.* (citing Ex. 2006 ¶¶ 273, 221–260). According to Patent Owner, "Racz's modified device "would be either impossible to fabricate or doing so would require undue experimentation and have no reasonable expectation of success." *Id.* (citing Ex. 2006 ¶ 221; Ex. 2020, 112:5, 123:6).

Patent Owner first argues that "the channels for the filaments 'would be extremely challenging, if not impossible to fabricate. That is true even assuming the tip in Racz's modified device is straight; it would be even more difficult . . . if the tip is bent or curved, as emphatically taught by Racz." PO Resp. 43–44 (citing Ex. 2006 ¶ 225). Based on the testimony of Dr. Russo and Mr. Crosby, Patent Owner argues that "[a]t its largest an RF neurotomy needle would be 16 gauge with a 1.65-mm outer diameter and 1.19-mm inner diameter, meaning the sidewall is 0.22 mm thick." *Id.* at 45 (citing Ex. 2001 ¶¶ 158–160, 230–236; Ex. 2006 ¶ 235). According to Patent Owner, "[t]he channels must be notably smaller in diameter, and the filaments must be smaller still in diameter" and an ordinarily skilled artisan "would not reasonably expect to be able to successfully make such narrow channels of any appreciable length, as would be required to make Racz's modified device in any form." *Id.*

Patent Owner next contends that Mr. Crosby considered every way that an ordinarily skilled artisan might reasonably consider to form the channels in Racz's modified device "and concluded that a [person of ordinary skill in the art] would have no reasonable expectation of success that any such way would succeed." PO Resp. 44 (citing Ex. 2006 ¶¶ 235–245). According to Patent Owner, Mr. Crosby testifies that "drilling, including laser drilling", "casting or sintering", "injection molding",

"extrusion", or "3D printing" would all present a "challenge that would be too great for a [person of ordinary skill in the art]" to have a reasonable expectation of success." *Id.* at 44–45 (citing Ex. 2006 ¶¶ 246, 248–252); *id.* at 45 (arguing that Mr. Crosby testifies that the alleged challenges would be "considerably more difficult for a curved tip, as required by Racz" (citing Ex. 2006 ¶¶ 244, 247)); *id.* at 46 (arguing that Mr. Crosby "considers the possibility that Racz's modified device is made of conductive plastic rather than metal" and reaches a similar conclusion (citing Ex. 2006 ¶ 254)).

Patent Owner next argues that filaments for use with a 16-gauge needle for neurotomy "would be so fragile that the risk of bending unpredictably, permanently deforming, or possibly breaking within the patient's body would defeat any reasonable expectation of success." PO Resp. 48 (citing Ex. 2006 ¶¶ 277–282). Patent Owner also points to testimony by Dr. Russo that filaments "within the sidewall of a 16-to-22 gauge needle . . . present significant risks of being damaged or deflected." *Id.* (citing Ex. 2001 ¶ 215).

Petitioner, in turn argues that the '664 patent "describes an elongate cannula, RF probe, deployable filaments, actuator, and a filament-guiding tip (separately attached or formed as a 'single unitary structure' with the cannula)." Pet. Reply 16 (citing Ex. 1003, 5:33–6:22, 8:46–53). According to Petitioner, "[t]he patent is *silent* on how to make these components . . . demonstrat[ing] that the 'purported novelty' was not in *manufacturing* the claimed invention—that was within the level of ordinary skill." *Id.* (case citations omitted). Petitioner further contends that Mr. Crosby "testified that a [person of ordinary skill in the art] would have been able to make the disclosed RF needles in the '688 patent (which shares the '664 patent's

specification)" and that "the prior art is silent on manufacturing techniques, further reflecting that making RF needles is within the level of ordinary skill." *Id.* (citing Ex. 1045, 272:9–279:15, 280:6–12, 284:8–285:17, 295:7–22).

Petitioner next contends that "Lee provides a blueprint for how to implement deployable filaments." Pet. Reply 17 (citing Pet. 31–38). According to Petitioner, "Lee illustrates how the filaments can be arranged around the cannula's inner perimeter and deployed around the tip" which "is an ideal configuration to preserve the functionality of Racz's probe." *Id.* (citing Ex. 1034 ¶¶ 125–131, 140–148, 161). Petitioner further contends that an ordinarily skilled artisan "would have known that Lee's device would produce an ablation volume having a nearly identical shape to the claimed invention." *Id.* at 18 (citing Ex. 1045, 161:15–162:19, 175:19–176:5; Ex. 1051, 1, Ex. 2006 ¶¶ 230–232; Ex. 2010, 21–22).

Petitioner next contends that Patent Owner's "reasonable expectation of success arguments depend on its experts' unsupported—and false—testimony that neurotomy needles cannot be larger than 16–gauge." Pet. Reply 19 (citing PO Resp. 4, 43–44, 48, 50; Ex. 2001 ¶¶ 47, 155–169, 210–215; Ex. 2006 ¶¶ 158, 228–253, 267). Petitioner contends that Patent Owner "agree[s] that Racz discloses an RF neurotomy needle" and "Racz expressly teaches that its needle comes in 'many variations,' including from *10- to 30-gauge*." *Id.* (citing PO Resp. 19; Ex. 1009, 8:10–15). Petitioner argues that "[t]here are other examples of RF neurotomy needles larger than 16-gauge too." *Id.* (citing Ex. 1015 ¶ 40; Ex. 1056, 160). Petitioner further argues that Patent Owner's "only 'evidence' of its assertion are its expert declarations . . . neither Crosby nor Russo point to *any evidence* that

neurotomy needles must be 16-gauge or smaller." *Id.* (citing Ex. 1003, 8:10–15).

Petitioner also takes issue with Patent Owner's argument that "0.2 mm nitinol filaments don't work." Pet. Reply 20 (citing Ex. 2006 ¶¶ 276–282). According to Petitioner, "the patents say [0.2 mm filaments] do" work. *Id.* (citing Ex. 1001, 21:49–52, 22:37–49; Ex. 1003, 9:62–64).

In the Sur-reply, Patent Owner argues that Petitioner's reliance on the failure of the Specification to address how to manufacture the disclosed invention should be discounted because Patent Owner's "invention is ***different*** from RMD and does ***not*** have the unique enablement flaws that RMD has." Sur-reply 5–6. According to Patent Owner, "[t]hose flaws relate to having ***long narrow channels in the sidewall of a needle***" and the "evidence establishes that the those long narrow channels in the sidewall of a needle cannot be made." *Id.* at 6 (citing PO Resp. 43–46).

Patent Owner next argues that "Lee's filaments extend down the ***internal lumen*** of a cannula 1615 and then through short grooves in an external surface of a tip 1614" but "Lee does not teach how to implement his deployable filaments in impossible-to-make long narrow channels fully ***within the sidewall*** of that cannula (let alone a smaller cannula)." Sur-reply 6.

With respect to Racz's disclosure of a needle larger than 16-gauge, Patent Owner argues that the passage relied on by Petitioner (Ex. 1009, 8:10–15) is "vague" and "does not actually say that a ***neurotomy*** needle could be as big as 10-gauge." Sur-reply 9. According to Patent Owner, the passage "suggests that a larger (or smaller) needle may be associated with one of 'many variations" but "Racz explains that those 'many variations'

include 'other medical and surgical procedures' apart from neurotomy." *Id.* (citing Ex. 1009, 9:12–18).

Patent Owner next argues that Dr. Russo "is a peer-recognized worldwide leader in the field of RF neurotomy" and performs RF neurotomy procedures "a dozen times per day." Sur-reply 9. Patent Owner further argues that Dr. Russo "cogently explained why neurotomy needles are between 16- and 22- gauge." *Id.* (citing Ex. 2001 ¶¶ 157–169).

Patent Owner does not dispute that its patents disclose ranges for filament sizes that encompass filaments with a diameter of 0.2 mm. Sur-reply 15 (citing Pet. Reply 20). Patent Owner argues, however, that its "commercial embodiments have considerably thicker filaments." *Id.*

Analysis

"[A] conclusion of obviousness requires a reasonable expectation of success." *Intelligent Bio-Sys.*, 821 F.3d at 1365 (citing *KSR*, 550 U.S. at 421) (alteration in original). "The reasonable expectation of success requirement refers to the likelihood of success in combining references *to meet the limitations of the claimed invention*." *Id.* at 1367 (emphasis added). In evaluating reasonable expectation of success, we must consider the appropriate scope of the "claimed invention." *Id.* (emphasis omitted). "Obviousness does not require absolute predictability of success . . . all that is required is a reasonable expectation of success." *In re O'Farrell*, 853 F.2d 894, 903–04 (Fed. Cir. 1988) (citations omitted). With these principles in mind, we evaluate the parties' respective contentions.

We start by determining the appropriate scope of the claimed invention so that we can evaluate the parties' respective contentions.

Independent claims 1 and 21 recite a "method" for "inserting" or "introducing a needle" into a patient. Ex. 1003, 31:32–53, 32:58–33:10. Neither claim 1 nor claim 11 contains any limitations concerning RF neurotomy or requiring ablation of any tissue at all let alone nerve tissue. *See id.* Further, neither claim 1 nor claim 11 nor any claim depending from either claim recites any limitation concerning needle size or filament size. *See id.* at 31:32–34:29. Claims 10–19 and 26–29 recite limitations relating to thermal ablation of nerve tissue but do not recite any limitation concerning needle size or filament size. *Id.* at 32:25–54, 34:8–23. Consequently, the issues raised by Patent Owner relating to needle size and filament size appear to be inapposite because no claim of the '664 patent requires a particular needle or filament size.

The Specification of the '664 patent provides the following relevant disclosure:

> The filaments 206a, 206b may be at least partially disposed within the elongate member 203 and may be operable to emerge through a side wall of the needle 103 proximate to the distal end of the needle 103.

Ex. 1003, 5:46–49; Fig. 2A.

> The elongate member 203 may be of any appropriate size and internal configuration to allow insertion into the patient 101 and to house componentry therein. In an exemplary embodiment, the elongate member may, for example, be a 16 gauge round tube or smaller. For example, the elongate member 203 may be 18 or 20 gauge. For example, the elongate member may have a maximum cross dimension of at most 1.7 mm. In another example, the elongate member may have a maximum cross dimension of at most 1 mm.

*Id.* at 8:10–19.

> The filaments 206a, 206b may be constructed from a material operable to conduct RF energy, e.g., a metal such as stainless steel, Nitinol or shape memory alloy.

*Id.* at 10:62–64.

> *The filaments discussed herein may be encased within lumens sized to help prevent buckling or bending of the filaments within the elongate member 203. Such lumens may be part of the elongate members (e.g., tubes within the elongate member).* Such lumens may be formed by an inner member (not shown) within the elongate member where the inner member includes channels along its periphery in which the filaments may lie with the elongate member forming a portion of the lumens.

*Id.* at 16:53–63 (emphasis added).

In its related '782 patent,[15] Patent Owner discloses filament diameters in the range of between approximately 0.06mm and about 1mm. Ex. 1001, 22:28–31; Tr. 69:8–16. Patent Owner does not dispute that this range is disclosed but argues, based on the testimony of Dr. Russo and Mr. Crosby, that filaments within at least part of this range would be inappropriate for use in RF neurotomy procedures. PO Resp. 48 (citing Ex. 2001 ¶¶ 215, 217, 218, 220; Ex. 2006 277–282); Tr. 69:7–11 ("the lower end [of the range in the patents] would not be suitable").[16] Given the disclosure in the related '782 patent of a range of filament sizes with no indication that the entire range is not suitable for RF neurotomy, the testimony of Dr. Russo and Mr. Crosby concerning reasonable expectation of success of the "claimed

[15] The application for the '782 patent was filed on the same day as the application for the '664 patent and claims priority to the same prior applications as does the application for the '664 patent. Ex. 1001, codes (22), (63); Ex. 1003, codes (22), (63).

[16] Young '965 discloses filaments "in the range from 0.05 mm to 0.3 mm, preferably from 0.1 mm to 0.2 mm. Ex. 1012 ¶ 30; *see also* Pet. 65 (arguing that "Young '965 would have confirmed to a [person of ordinary skill in the art] that Lee's filaments (22/1622) would be implemented in sizes as small as 0.2 mm wide and easily implemented into Racz's cannula (10/33)").

invention" based on filament size for RF neurotomy is entitled to little weight because it does not align with the disclosure of '664 patent and/or the '782 patent.

Patent Owner does not direct us to any part of the '664 patent Specification describing a technique for forming the lumens with channels in the sidewalls of the elongate member described in the Specification. Our review of the Specification of the '664 patent does not reveal any such description. This lack of description of how to form internal lumens in both Lee and the '664 patent supports a finding that one of ordinary skill in the art would have had a reasonable expectation of success in modifying Racz as proposed by Petitioner because the techniques for making lumens either in the tip or along the length of the elongate member in the proposed combination would have been within the knowledge of an ordinarily skilled artisan.

We now turn to the relevance of RF neurotomy needle size and filament size to reasonable expectation of success. Claims 1–9 and 20–26 are not limited to ablating nerve tissue, do not recite any filament size, and do not recite any needle size. Consequently, even if we accept Patent Owner's position that RF neurotomy needles can be no larger than 16 gauge, the question of needle size and filament size is irrelevant to reasonable expectation of success for claims 1–9 and 20–26.

Claims 10–19 and 27–29, are directed to ablating nerve tissue, but do not recite any needle size or filament size. For the reasons discussed below, we determine that Patent Owner's arguments are unavailing for these claims as well.

We reproduce below an example offered by Petitioner of the proposed combination of Racz and Lee:




***Dr. Tucker Declaration at ¶143 (showing one example of how a POSA would modify Racz to include Lee's filaments)***

Pet. 27. The above drawing shows Racz's active tip (14/38) in red, Racz's RF probe (22/52) in green, and Lee's filaments (22/1622) guided by deflection surfaces (12/612) in blue near the left end of Racz's active tip. Ex. 1034 ¶¶ 143–144.

Patent Owner interposes a series of arguments based on Mr. Crosby's testimony that "the channels for the filaments 'would be extremely challenging, if not impossible to fabricate." PO Resp. 43–47. These arguments are premised on a needle no larger than 16 gauge for RF neurotomy procedures. *Id.* at 44. Based on a 16-gauge needle, Patent Owner provides calculations of wall thickness of the tip and filament size for Petitioner's example. *Id.*; Sur-reply 16 (providing drawing illustrating wall thicknesses based on Mr. Crosby's calculations). These arguments are unavailing for several reasons.

Racz discloses a needle size as large as 10 gauge. Ex. 1009, 8:10–15. The parties, however, dispute whether or not Racz's disclosure of needles larger than 16 gauge could be used for RF neurotomy or whether it refers to other type of tissue ablation procedures. Pet. Reply 19; Sur-reply 8–9. As discussed above, the '664 patent discloses example embodiments that are 16 gauge or smaller but does not describe that 16 gauge is the maximum diameter for use in RF neurotomy. *See* Ex. 1003, 8:8–19.

Patent Owner does not ask us to construe these claims as limited to needles of 16-gauge and smaller. *See generally* PO Resp. Nor do we view the examples of needle size in the Specification as either lexicographical definitions or disclaimer of claim scope. Patent Owner's reasonable expectation of success arguments, therefore, are premised on an inappropriate incorporation of an exemplary embodiment in the Specification of a maximum 16-gauge needle into the claims and some undefined minimum filament size. Consequently, Patent Owner's arguments are unavailing and do not undercut Petitioner's showing.

Petitioner provides several arguments in support of motivation to combine including that "implementing Lee's deployable filaments (26/1622) while preserving the functionality of Racz's cannula (10/33), active tip (14/38), and removable probe (22/52)" "would involve nothing more than using prior art elements according to their established functions and combining them in a way that would achieve an expected improvement." Pet. 26 (citing Ex. 1034 ¶¶ 144–147). As discussed above, we agree with Petitioner and find that an ordinarily skilled artisan would have been motivated to combine Racz, Fitz, and Lee. In a case such as this, where motivation to combine arguments are intertwined with reasonable

expectation of success, a finding of motivation to combine also implicates, and therefore, supports a finding of reasonable expectation of success. *See Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1376 (Fed. Cir. 2023).

After considering the parties' respective contentions and all of the evidence of record, given our finding that the proposed combination is a simple substitution of known components performing known functions to achieve an expected result, we find that Petitioner has shown that a person of ordinary skill in the art would have had a reasonable expectation of success in the proposed combination.

v. Vagueness of the Proposed Combination

Patent Owner next contends that the Petition fails to satisfy the "particularity' requirement of 35 U.S.C. § 312 because the Petition's description of Racz, as modified by Fitz and Lee, suffers from "numerous omissions, ambiguities, and confusing aspects." PO Resp. 38 (citing Ex. 2001 ¶¶ 182–201).

Patent Owner provides the following criticisms of the Petition:

1) "[T]he petition and Dr. Tucker present just one partial view of Racz's modified device, from just one perspective." PO Resp. 38. Patent Owner argues that no side views, perspective/isometric views are presented, the Petition does not depict or describe the structure in the proximal direction, or how many filaments are included and where the filaments are located. *Id.* at 39 (citing Ex. 2006 ¶¶ 182, 184).
2) No dimensions are provided on the drawing. *Id.* at 39 (citing Ex. 2006 ¶ 190).

3) "[T]here is uncertainty regarding the filaments and their channels." *Id.* at 40 (citing Ex. 2006 ¶ 187). Patent Owner argues that "there is no description of how those channels are made." *Id.*
4) "[I]t is unknown whether the tip remains bent, as taught by Racz, or has been straightened to accommodate the filaments in Racz's modified device." *Id.* (citing Ex. 2006 ¶ 191).
5) "[I]t is unknown whether Racz's modified device includes anchors, which Lee says are necessary to prevent backward migration of the needle when Lee's filaments are deployed." *Id.* at 41 (citing Ex. 2006 ¶ 184).
6) "[I]t is also unknown . . . whether the filaments are electrically connected to an RF signal source, as taught by Lee, or not as that may be unnecessary in view of Racz's RF probe." *Id.* (citing Ex. 2006 ¶ 188).
7) "[I]t appears that no features of Fitz are incorporated into this modified device, but that it not clear." *Id.* (citing Ex. 2006 ¶ 193).
8) "Dr. Tucker refers to two examples of Racz's modified device, but the differences between them are not clear" it is not "clear from the petition or Tucker's declaration if there are other (unillustrated) examples that he or the petitioner intends to rely upon." *Id.* (citing Ex. 2006 ¶¶ 195–197; Ex. 2020, 112:9–113:5).

Petitioner, in turn, argues that "obviousness does not require the art be 'physically combinable,' must less in the exacting detail" that Patent Owner suggests. Pet. Reply 12. Petitioner further argues that "there is evidence of a known problem, known solution, and that combining the art was within the skill of a [person of ordinary skill in the art]—'nothing more is required to

show motivation to combine." *Id.* According to Petitioner, "[t]he detail in the Petition and Dr. Tucker's declaration, which provided "Racz's modified device' as a helpful example, went beyond what is required." *Id.* (citing Pet. 23–27, 35–45; Ex. 1034 ¶¶ 143–148, 157–179).

For the following reasons, Patent Owner's arguments are unavailing.

We first note that Patent Owner is not "disputing the presence of any particular claim limitation in the prior art collectively." Tr. 61:12–18. Consequently, these allegedly "numerous omissions, ambiguities, and confusing aspects" in the Petition have no relevance to whether the Petition has established that the combination of Racz, Fitz, and Lee teaches each and every limitation of the Challenged Claims.

Patent Owner's arguments that Petitioner must provide multiple detailed views of the entire exemplary device from distal to proximal end with dimensions is far beyond what is required to show motivation to combine or reasonable expectation of success. *See Intel*, 61 F.4th at 1381. Further, Patent Owner does not tie these allegedly missing items to the claimed invention, but rather they are directed to unclaimed structural elements such as filament size, number of filaments, size of the needle, whether the probe is curved or straight at its tip, and whether Lee's anchors and RF signal source are included or not.

Petitioner is required to show a motivation to combine the *teachings* of Racz, Fitz, and Lee, not show that the structures of Fitz and/or Lee can be bodily incorporated into Racz. *In re Mouttet*, 686 F.3d at 1332. As discussed above, Petitioner has shown that the combination teaches each and every claim limitation and that an ordinarily skilled artisan would have been

motivated to combine Racz. Fitz, and Lee with a reasonable expectation of success.

vi. Modified Device not Enabled

Patent Owner next repackages its lack of reasonable expectation of success argument as a failure by Petitioner to satisfy the "enablement requirement." PO Resp. 49–51. According to Patent Owner, "[t]he references in an obviousness challenge must collectively teach a [person of ordinary skill in the art] how to make the claimed invention" and that "Racz, Fitz, and Lee do not, collectively, enable a [person of ordinary skill in the art] to make Racz's modified device." *Id.* at 49. Patent Owner then directs us to Mr. Crosby's testimony, referenced above in connection with reasonable expectation of success, that "it is not possible to construct Racz's modified device without undue experimentation, if at all." *Id.* (citing Ex. 2006 ¶¶ 261–271).

Patent Owner's arguments are inapposite. The law does not impose an "enablement" requirement in regards to a *combination* of references in an obviousness challenge.

Patent Owner cites to several cases, none of which support its arguments. First, it cites to *Beckman Instruments, Inc. v. LKB Produktor AB*, 892 F.2d 1547 (Fed. Cir. 1989). *Beckman* involved anticipation and the Federal Circuit merely explained that "[e]ven if a reference discloses an inoperative device, it is prior art for all that it teaches." *Id.* at 1551. Second, it cites to *Bristol-Myers Squibb v. Ben Venue Labs, Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001). This case also involved anticipation and the Federal Circuit explained that "[t]o anticipate, the reference must also enable

one of skill in the art to make and use the claimed invention." *Id.* at 1374. Neither case supports Patent Owner's position.

Patent Owner next cites to *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988). *Wands* is an appeal from our predecessor, the Board of Patent Appeals and Interferences, in which the Board affirmed an examiner's rejection of a patent application as failing to satisfy the enablement requirement set forth in 35 U.S.C. § 112, first paragraph. *Id.* at 733. This case does not support Patent Owner's position.

For the foregoing reasons, Patent Owner's enablement argument is unsupported and unavailing.

vii. Teaching Away

Patent Owner contends that in Petitioner's proposed combination, "the filaments would need to be extraordinarily thin or narrow" and "so flexible as to be bent by tissue in unpredictable manners as they exit the needle or possibly not even be able to pass through the tissue." PO Resp. 51 (citing Ex. 2001 ¶¶ 217–218; Ex. 2006 ¶ 282). According to Patent Owner, "Racz expressly teaches away from deploying a flexible electrode from a cannula in the context of neurotomy for these exact reasons." *Id.* at 52. Patent Owner cites to Racz's disclosure that "flexible off-axis electrodes have a limitation that their tips cannot penetrate tough tissue or encounter hard bone without being damaged or diverted." *Id.* (citing Ex. 1009, 2:26–37) (emphasis omitted).

Patent Owner argues that Racz teaches away from using a straight tip. PO Resp. 53. Patent Owner argues that "Racz repeatedly and clearly says the tip 14 should be curved to go around anatomical obstacles, such as the structure 16 illustrated in Figure 1." *Id.* at 53–54 (reproducing Ex. 1009,

Fig. 1). Patent Owner contends that "Racz is emphatic in teaching a curved tip" and identifies straight needles as problematic." *Id.* at 54 (citing Ex. 1009, 1:63–2:15, 2:30–42, 2:57–3:17, 4:49–5, 9:40, 10:31, 10:42). According to Patent Owner, an ordinarily skilled artisan "would interpret Racz as teaching that a curved or bent tip is an ***essential*** feature of Racz's probe" and "Racz's devices, and any variations thereof, require a permanently bent tip." *Id.* (citing Ex. 2001 ¶ 151; Ex. 2006 ¶ 203).

Patent Owner next contends that Lee's "anchors are a necessity to prevent movement of the needle when Lee's stylets are deployed unless, the stylets are deployed 'one at a time.'" PO Resp. 56 (citing Ex. 1010 ¶¶ 89, 110). According to Patent Owner, "[i]t is unclear how the filaments (Lee's stylets) are deployed in Racz's modified device, but neither the petition nor Dr. Tucker has indicated that they would be deployed one at a time," and Lee would teach away from Racz's modified device if "the filaments in Racz's modified device are deployed all at once and Racz's modified device does not have anchors." *Id.* (citing Ex. 2006 ¶ 289).

Petitioner, in turn, replies "Racz indicated that 90's-era electrodes having flexible curved tips . . . were effective 'in certain neural regions such as the trigeminal ganglion or the pituitary gland." Pet. Reply 13 (citing Ex. 1009, 2:26–35). Petitioner argues that "Racz suggests a preference for a bent tip in limited scenarios but never requires it." *Id.* at 14 (citing Ex. 1045, 129:15–131:2, 133:17–134:10). Petitioner further argues that "Lee is unequivocal that its anchors are optional." *Id.* (citing Ex. 1010 ¶¶ 90, 114).

Petitioner next argues that "the curved-tip electrodes Racz mentions bear no resemblance to the deployable filament in Fitz/Lee." Pet. Reply 13 (citing Ex. 1010, Fig. 48; Ex. 1058). Petitioner contends that "Lee teaches

'straight electrodes . . . have superior mechanical advantages over curved,' allowing them to 'push[] into and through . . . 'tough fibroid tumor[s].'" *Id.* at 13–14 (citing Ex. 1010 ¶ 87) (alterations in original). Based on this disclosure, a person of ordinary skill in the art "would not be dissuaded from using Lee's filaments to expand Racz's ablation volume." *Id.* at 14.

With respect to Patent Owner's reliance on Racz's requirement of a curved or bent tip and Lee's requirements for anchors, Petitioner argues "[t]he claims do not require a straight (or bent) tip or anchors" and its "arguments do not turn on them either." Pet. Reply 14 (citing Ex. 1003, 31:32–34:23; Ex. 2020, 46:16–48:3, 68:17–69:13).

For the following reasons, we are not persuaded by Patent Owner's teaching away arguments.

A reference must be considered for all it discloses, both disclosure that teaches away from the invention at issue as well as disclosure that points toward and teaches the invention. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 (Fed. Cir. 1985). A reference does not teach away "if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009). "The degree of teaching away will of course depend on the particular facts; in general a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

We initially note that Patent Owner frames its teaching away arguments as "teaching away from Racz's modified device." PO Resp. 51.

However, the pertinent question is whether Racz and/or Lee teach away from the claimed invention.

With respect to Racz, as discussed above, none of the challenged claims recites any particular filament size. Further, none of the challenged claims requires that the tip of the recited needle be straight or bent. For example, claim 1 merely recites "a piecing tip at a distal end of the elongate member." Ex. 1003, 31:35. Consequently, the scope of claim 1 is broad enough to encompass both a curved piercing tip or a straight piercing tip.

There is no dispute that Racz is directed to RF neurotomy. Ex. 1009, 1:55–2:15; *see* Pet. 5. We agree with Petitioner that Racz describes flexible electrodes as useful in RF neurotomy procedures. Pet. Reply 13. Racz discloses that flexible electrodes with curved tips are "useful in certain neural regions such as the trigeminal ganglion or the pituitary gland, or any area where the target region is very soft or fluid filled." Ex. 1009, 2:32–35. Because the claimed invention does not require any filament size or a straight tip, we do not perceive how Racz can be said to teach away from the invention as claimed. Rather, it discloses a device used to ablate nerves including a piercing tip at its distal end, albeit a curved tip. These disclosures suggest the claimed invention. Consequently, we find that Racz, when considered in its entirety, does not teach away from the claimed invention.

Lee discloses that "[i]t is also contemplated in accordance with the invention that there are circumstances where anchors might not be applied at all." Ex. 1010 ¶ 90. Further, Lee discloses that "if desired, anchors may not be deployed. An implementation of a use of the inventive trocar 10 without anchors would be promoted by advancing the ends of stylets 22 one at a

time." *Id.* ¶ 104. Lee clearly contemplates circumstances where anchors may not be used and gives an example of a circumstance where anchors are not required. Based on this, we find that Lee does not teach away from using anchors or not using anchors. While Lee can be interpreted as stating a preference for using anchors, Lee does not discourage a person of ordinary skill in the art from using or not using anchors. More pertinently, none of Challenged Claims recites the use of anchors or preclude the use of anchors so Lee does not teach away from any aspect of the claimed invention.[17]

viii. There is a simpler way to combine the references

Patent Owner contends that, "[s]etting aside whether a [person of ordinary skill in the art] would have had sufficient motivation to do so, the teachings of Racz and Fitz could be combined in a much simpler way to achieve the expanded-ablation-volume objective stated in the petition." PO Resp. 58 (citing Ex. 2006 ¶¶ 168–175). The fact that there may be a better way to combine the references is not determinative of whether or not Petitioner has shown a motivation to combine. *In re Mouttet*, 686 F.3d at 1334 ("This court has further explained that just because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes."). Consequently, Patent Owner's contention is unavailing.

[17] With respect to Patent Owner's argument that Lee's anchors are needed to prevent needle movement "when Lee's stylets are deployed, unless the stylets are deployed 'one at a time'" (PO Resp. 56), claim 1 requires only one stylet to be deployed. Ex. 1003, 31:37–40.

ix. Objective Indicia of Non-Obviousness

Patent Owner argues that "the following objective indicia show nonobviousness: (1) long-felt-but unmet need; (2) copying by others; (3) industry praise; and (4) commercial success." PO Resp. 61.

Objective indicia evidence "must always be considered, when present, en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). However, "to be accorded substantial weight in the obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019). Patent Owner bears the burden of proving nexus. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("The burden of proof as to this connection or nexus resides with the patentee.").

Nexus can be established in one of two ways. First, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392). "That is, presuming nexus is appropriate 'when the patentee shows that the asserted objective evidence is tied to a specific product and that product

[1] 'embodies the claimed features, and [2] is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)); *see also Fox Factory, Inc. v. SRAM, LLC*, 813 F. App'x 539, 542 (Fed. Cir. 2020) ("[A] product is not coextensive with a claimed invention simply because it falls within the scope of the claim.").

The second way to prove nexus is directly, by showing that the presented evidence of secondary considerations is "a direct result of the unique characteristics of the claimed invention." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *Fox Factory*, 944 F.3d at 1373–74 (In the absence of a presumption, nexus can be proved "by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention.").

Patent Owner argues that "[t]his is a case in which a nexus should be presumed." PO Resp. 74. According to Patent Owner, this is because the "Nimbus devices embody at least challenged claim 1 and are coextensive with claim 1." *Id.* at 73 (citing Ex. 2006 ¶21; Ex. 2008).

In the cited testimony, Mr. Crosby states:

> I understand that Stratus makes and sells an RF neurotomy device called the "Nimbus® Multi-tined Expandable Electrode" (Nimbus Device). I have personally inspected the Nimbus Device and compared it to the claims of the Stratus Patents. Details of that comparison are included in Exhibit 2008, which I incorporate into this declaration as part of my testimony. It is my opinion that the Nimbus Device is covered by at least some claims of each of the Stratus Patents.

Ex. 2006 ¶ 21.

The term "Stratus Patents" refers to the '664 patent and the two related patents that are the subject of *inter partes* reviews No. IPR2024-

01209, No. IPR2024-01210, and No. IPR2024-01211. Ex. 2006 ¶¶ 17–19. Exhibit 2008 is a claim chart purporting to map Patent Owner Stratus's products to claim 1 of each of the three Stratus Patents. However, what the claim chart compares to claim 1 of the '664 patent (as well as claim 1 of the other Stratus Patents) is not the Nimbus Device, but rather the Nimbus Device *in combination with a second product*, either a reusable or disposable RF Probe. Ex. 2008.

Patent Owner describes the "Nimbus device" as "includ[ing] all components recited in the claim and little else." PO Resp. 73. The "little else" apparently refers to the recited "radiofrequency probe." *Id.* at 14 ("Stratus *additionally* sells both reusable and disposable varieties of RF probes") (emphasis added). Thus, there is a clear disconnect between Patent Owner's position that "the Nimbus *devices* embody at least challenged claim 1 and are coextensive with claim 1" (PO Resp. 72) and its evidence. The testimony of Mr. Crosby cited by Patent Owner refers only to the Nimbus *device* (without the RF probe).

In Mr. Crosby's testimony quoted above, he relies on Exhibit 2008. Ex. 2006 ¶21. Exhibit 2008, however, does not support his testimony. For limitation 1[g] (i.e., "a radio frequency probe"), the claim chart fails to map limitation 1[g] to any portion of the Nimbus device. Instead, the claim chart maps limitation [1g] to one of two additional Nimbus products: "Stratus offers two types of RF probes, reusable and disposable, for use with its needle." Ex. 2008, 9. As Petitioner correctly points out, "[i]t is undisputed that all claims require an RF probe." Pet. Reply 25 (citing Ex. 1003, claim 1; Ex. 1045, 95:22–96:9).

In its Sur-reply, Patent Owner argues that, for presumption of nexus, "there is no legal or logical requirement that all components of the claimed invention be sold together in one transaction." Sur-reply 25–26. Patent Owner does not cite any legal authority for this proposition. Under binding precedent, to be afforded a presumption of nexus, Patent Owner must show that its objective indicia evidence "is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco*, 851 F.2d at 1392). Patent Owner failed to do this.

Thus, Patent Owner has failed to show that its objective indicia evidence bears a nexus to the claimed invention and its evidence is entitled to little, if any, weight.

11. Balancing the *Graham* Factors

After weighing all the evidence submitted by the parties in light of the *Graham* factors, we determine Petitioner has demonstrated by a preponderance of the evidence that the claims 1, 3–10, 18–26, 28, and 29 would have been obvious over Racz, Fitz, and Lee. As discussed above, Petitioner's evidence establishes that the combination of Racz, Fitz, and Lee teaches every limitation of claims 1, 3–10, 18–26, 28, and 29 and that an ordinarily skilled artisan would have been motivated to combine Racz, Fitz, and Lee with a reasonable expectation of success. Further, as discussed above, Patent Owner's evidence of secondary considerations is entitled to little, if any, weight because Patent Owner fails to establish nexus. Consequently, after considering all the evidence in the record both for and against patentability, we determine that Petitioner has shown by a

preponderance of the evidence that claims 1, 3–10, 18–26, 28, and 29 would have been obvious over Racz, Fitz, and Lee.

### E. Ground B: Obviousness in view of Racz, Fitz, Lee and Young ’965

Petitioner contends that claims 1–10, 18–26, and 28–29 are also obvious over Racz, Fitz, Lee, and Young ’965. Pet. 62–67.

Patent Owner argues that Young ’965 does not cure the alleged deficiencies in Ground 1, is directed to tumor ablation not neurotomy, would require a substantial redesign of Racz’s modified device, and there is no motivation to combine. PO Resp. 59–60.

We start with a brief overview of Young ’965 and address the parties’ respective contentions.

#### 1. Overview of Young ’965 (Ex. 1012)

Young ’965 is directed “to radio frequency (RF) electrosurgical probes for the treatment of tissue, and more particularly, to electrosurgical probes having multiple tissue-penetrating electrodes that are deployed in an array.” Ex. 1012 ¶ 1. An ablation device disclosed in Young ’965 “includes a cannula having a distal end and a lumen, an array of electrodes deployable from within the lumen, each of the electrodes having a first configuration when inside the lumen, and a second configuration when outside the lumen.” *Id.* ¶ 8.

Figure 2 of Young ’365 is reproduced below:




FIG. 2

Figure 2 is a perspective view of Young ’965’s ablation probe with the electrode array retracted. Ex. 1012 ¶ 16.

The probe illustrated in Figure 2 “includes an elongate cannula 12, a shaft 20 slidably disposed within the cannula 12, and an array 30 of electrodes 26 carried by the shaft 20.” Ex. 1012 ¶ 23. Cannula 12 “has a distal end 14, a proximal end 16, and a central lumen 18 extending through the cannula 12 between the distal end 14 and the proximal end 16.” *Id.*

“[E]ach electrode takes the form of an electrode tine, which resembles the shape of a needle or wire” and “is in the form of a small diameter metal element, which can penetrate into tissue as it is advanced from a target site within the target region.” Ex. 1012 ¶ 25. The electrodes will have “a thickness (in the radial direction) in the range of 0.05 mm to 0.3 mm, and preferably from 0.1 mm to 0.2 mm.” *Id.* ¶ 30.

2. Claim 1

Petitioner contends that "Young '965's electrode tip (92) is configured 'for delivering ablation energy in a monopolar configuration,' where a dispersive electrode is attached to the patient." Pet. 64 (citing Ex. 1012 ¶ 33). Petitioner further contends that Young '965's "array 30 of electrodes 26 and the operative electrode 92 are monopolar electrodes, and current will pass from the electrodes 26 and the electrode 92 to the dispersive electrode to thereby deliver ablation energy in a monopolar configuration." *Id.* Petitioner argues that an ordinarily skilled artisan would have been further motivated "by Young '965 to modify Racz's device and thereby perform the step" recited in limitation [1.h] "of operating the radio frequency probe, the tip [14/38], and the filament [22/1622] as a monopolar electrode . . ." *Id.* (citing Ex. 1034 ¶ 215) (emphasis omitted).

Petitioner next contends that "Young '965's filaments (26) are interconnected to an actuator shaft (20) and handle assembly (27) to retract and deploy the filaments (26)." Pet. 65 (citing Ex. 1012 ¶¶ 23–24, 34–35, 37–38). According to Petitioner, an ordinarily skilled artisan "would have recognized that Young '965's shaft (20) could be adapted to deploy and retract Lee's filaments (22/1622) from Racz's device" and would have been further motivated "to modify Racz's device to perform that step of '<u>moving</u>' a retracted filament in the device to a '<u>deployed position within the patient</u>'" as recited in limitation [1.f]. *Id.* (citing Ex. 1034 ¶ 216).

Petitioner next contends that "Young '965's filaments (26) are as small as 0.2mm (wide) and 0.05mm (thick)." Pet. 65 (citing Ex. 1012 ¶ 30). According to Petitioner, "Young '965 would have confirmed to a [person of ordinary skill in the art that Lee's filaments (22/1622) would be

implemented in sizes as small as 0.2mm wide and easily implemented into Racz's cannula (10/33)." *Id.* (citing Ex. 1034 ¶ 217).

Petitioner, thus, argues that claim 1–10, 18–26, and 28–29 are obvious in view of Racz, Fitz, Lee, and Young '965). Pet. 66 (citing Ex. 1034 ¶ 218). Below, we address the subset of these claims for which Petitioner provides separate and additional contentions.

3. Claim 2

Petitioner provides separate and additional contentions for claim 2. Pet. 66. Petitioner contends that Young '965 discloses that "[a]fter the cannula 12 is properly placed the electrode array 30 is deployed out of the lumen 18 of the cannula 12" and "[n]ext, the RF generator 6 is then connected to the probe assembly 4 via the electrical connectors." *Id.* (citing Ex. 1012 ¶¶ 40–41). Referring to its contentions from Ground 1, Petitioner notes that "the filaments in the modified Racz are energized by a removable RF probe" and contentions that an ordinarily skilled artisan "would understand that, when operating modified Racz," the step recited in claims 2 of "moving the filament to a deployed position within the patient takes place prior to inserting the radiofrequency probe into the lumen of the needle." *Id.* (citing Ex. 1034 ¶ 219) (emphasis omitted).

Patent Owner does not dispute Petitioner's contentions for claim 2 beyond those already discussed in Ground A. *See generally* PO Resp.

We find that the combination of Racz, Fitz, Lee, and Young '965[18] teaches the limitations of claim 2.

---

[18] This cited disclosure in Young '965 cures the deficiency in Petitioner's Ground A challenge to claim 2 discussed above.

4. Claims 8, 9, 20, and 23

Petitioner provides separate contentions for claims 8, 9, 20, and 23. Pet. 66–67. According to Petitioner, "[t]he teachings in Young '965 identified above for claim 1 also renders the limitations in certain dependent claims further obvious in combination with Racz, Fitz, and Lee." *Id.*

5. Patent Owner's Contentions

Patent Owner contends that "Young '965 does not cure the deficiencies in Racz's modified device and introduces further complications." PO Resp. 59.

Patent Owner first argues that "Young '965 is generally directed to tumor ablation and not neurotomy" and "lacks relevance to Racz and Fitz in many of the same ways as Lee." PO Resp. 59 (citing Ex. 2001 ¶¶ 182–184; Ex. 2006 ¶ 295).

Patent Owner next argues that "the petition's proposal to adapt Young '965's shaft 20 to deploy and retract Lee's filaments would require a substantial redesign of Racz's modified device, yet the petition provides no details of how this redesign could be implemented." PO Resp. 59–60 (citing Ex. 2006 ¶ 296). According to Patent Owner "shaft 20 could not possibly function in its original form within Racz's modified device because there is no clear way to attach the proximal ends of Lee's filaments to the distal end of the shaft (20)." *Id.* at 60 (citing Ex. 2006 ¶ 297).

Patent Owner next argues that an ordinarily skilled artisan would not have found it obvious to incorporate Racz's RF probe 52 into a hollowed-out shaft 20 for two reasons. PO Resp. 60. Petitioner argues that "(1) the petitioner has identified no motivation to do so and (2) this would position

the RF probe's temperature sensor away from the ablation zone, thus comprising its performance." *Id.* (citing Ex. 2001 ¶¶ 186–189).

6. Petitioner's Reply

Petitioner argues that Patent Owner "vaguely suggests that Young '965 'lacks relevance' but does not assert that it is non-analogous art" and that a non-analogous art argument is waived. Pet. Reply 10 (citing PO Resp. 59–60; Paper 9, 10). Notwithstanding the waiver argument, Petitioner contends that "Young '965 is directed to an RF ablation needle with deployable filaments (Pet. 62–65) and is analogous art for the same reasons discussed above for Lee." *Id.*

7. Analysis

First, as discussed above in Ground A, we determine, after considering Patent Owner's arguments that there are no deficiencies in Racz's modified device as proposed by Petitioner, except for claim 2. Consequently, this ground would succeed even if there are issues with Young '965.

Regardless of whether Patent Owner waived arguing that Young '965 is non-analogous art, the parties rely on substantially the same arguments as they did in Ground A regarding whether Lee is non-analogous art. PO Resp. 59. Consequently, for the same reasons discussed above for Lee, we find that Young '965 qualifies as analogous art.

Patent Owner's last two arguments, that adding Young '965 would require a substantial redesign of Racz's tip and would result in positioning the temperature sensor away from the ablation zone, are bodily incorporation arguments and, consequently, unavailing.

8. Conclusion

For the foregoing reasons and after considering all the evidence in the record both for and against patentability, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–10, 18–26, 28, and 29 would have been obvious over Racz, Fitz, Lee, and Young ’965.

F. Grounds C and D: Obviousness in view of Racz, Fitz, Lee, and Scheibe with or without Young ’365

Petitioner contends that claims 1–10, 18–26, and 28–29 are also obvious over Racz, Fitz, Lee, and Scheibe with or without Young ’965. Pet. 67–72.

Patent Owner argues that Scheibe does not cure the alleged deficiencies in Ground 1, is directed to a deflectable catheter assembly, and is not analogous art. PO Resp. 60–61.

We start with a brief overview of Scheibe and address the parties’ respective contentions.

1. Overview of Scheibe (Ex. 1013)

Scheibe is directed to “a deflectable catheter that allows for more ease positioning of the distal end of the deflectable catheter.” Ex. 1013 ¶ 3. Figure 1 of Scheibe is reproduced below:




*FIG. 1*

Figure 1 is a perspective view of Scheibe's deflectable catheter 100. *Id.* ¶ 4.

Figure 2 of Scheibe is reproduced below:




*FIG. 2*

Figure 2 is a cross-sectional view of a proximal portion of a deflectable catheter. Ex. 1013 ¶ 5.

Deflectable catheter 100 comprises deflectable body 120, housing 140 and pullwire 130. Ex. 1013 ¶ 16. As shown in Figure 2 of Scheibe, pullwire 130 is coupled with catheter body 120 and is disposed through a lumen in deflectable body 120. *Id.* ¶¶ 17–18. Deflectable body 120 further comprises handle assembly 140 which allows displacement of pullwire 130 relative to deflectable body 120 by rotating knob 142. *Id.* ¶ 19; *id.* ¶ 35 ("sliding member 146 is fixed to an inner tube 164 and moves axially when the knob

is rotated . . . causing the pullwire to translate longitudinally along the deflectable body 120.").

2. Claims 1 and 21

Petitioner contends that an ordinarily skilled artisan "would have been motivated to provide Scheibe's rotatable actuator (142) and sliding member (146) in Racz's device for the purpose of '<u>moving</u>' Lee's filaments (22/1622) between their retracted and deployed positions without compromising the functionality of Racz's probe (22/52)." Pet. 69 (citing Ex. 1034 ¶ 224). Petitioner further contends that an ordinarily skilled artisan would understand "that proximal ends of Lee's filaments (22/16[]2) are securable to the sliding member (146)" in a similar manner to how Scheibe's pullwire 130 is secured to sliding member 146. *Id.* (citing Ex. 1013 ¶¶ 18–19, 35; Ex. 1034 ¶ 224). Petitioner also contends that an ordinarily skilled artisan would understand "that the rotatable actuator (142) would retract and deploy Lee's filaments (22/162) through Racz's shaft (12/34)" by rotating Scheibe's actuator (142). *Id.* (citing Ex. 1034 ¶ 224).

Petitioner next contends that Scheibe may be optionally considered in combination with Young '965, which discloses that rotational actuators "can be used to retract and deploy filaments." Pet. 71 (citing Ex. 1012 ¶ 38; Ex. 1034 ¶ 228). According to Petitioner, an ordinarily skilled artisan "would be further motivated to select a suitable rotational actuator (such as Scheibe's) for deploying Lee's filaments (22/1622) from Racz's device." *Id.* (citng Ex. 1034 ¶ 239).

Patent Owner argues that Scheibe's "deflectable catheter assembly is not in the same field as RF neurotomy needles" and "[n]o amount of reliance by the petitioner and Dr. Tucker on a clearly erroneous statement in Scheibe

that mischaracterizes 'deflectable catheter assemblies' as implantable leads for cardiac stimulation systems can render Scheibe analogous to RF neurotomy devices." PO Resp. 60–61 (citing Ex. 2001 ¶¶ 191–193).

Patent Owner further argues that Scheibe is not reasonably pertinent. PO Resp. 61. Patent Owner quotes Dr. Russo's declaration that Scheibe's "pullwire" is not reasonably pertinent "to the objective of pushing tines out of a distal end of a stiff cannula." *Id.* (citing Ex. 2001 ¶ 194) (emphasis omitted).

Petitioner, in turn, contends Scheibe qualifies as analogous art under the reasonably pertinent prong. Pet. Reply 10–11. Petitioner argues that Patent Owner "conflates the patent's field with the reasonable pertinence inquiry, improperly excluding all non-neurotomy art." *Id.* (citing PO Resp. 61–62). Petitioner points to disclosure in the Specification of the '664 patent of "an actuator to deploy/retract filaments" and further describes a rotatable Luer fitting that results in linear motion of an advancing hub. *Id.* (citing Ex. 1003, 5:53–55, 17:34–35, 17:45–55). Petitioner argues that Scheibe's disclosure of a luer fitting and a rotatable actuator causing linear movement addresses the same problems as the '664 patent. *Id.* (citing Ex. 1013 ¶¶ 24–25, 29–37).

Petitioner has shown that Scheibe is analogous art under the reasonably pertinent test because it addresses the same problems as did the inventors of the '664 patent of moving a filament from a retracted to a deployed position as recited in claim elements [1e], [1f], [21d], and [21e]. Consequently, Petitioner has shown by a preponderance of the evidence that claims 1–10, 18–26, and 28–29 would have been obvious over the combination of Racz, Fitz, Lee, Scheibe, and Young '965.

### G. Grounds E–H: Obviousness over Godara in Combination with Racz, Fitz, Lee, Young ’965, and Scheibe

Petitioner contends that claims 11–17, 19, 27, and 29 are obvious over Godara in various combinations with Racz, Fitz, Lee, Young ’965, and/or Scheibe. Pet. 72–76. Patent Owner does not address these grounds. *See generally* PO Response.

We begin with a brief overview of Godara and then address Petitioner’s contentions.

#### 1. Overview of Godara (Ex. 1015)

Godara is directed to electrosurgical devices and methods of treatment of pain. Ex. 1015 ¶ 2. Godara explains that “[e]lectrosurgical procedures typically rely on the application of high frequency, for example radiofrequency (RF) energy to treat, cut, ablate or coagulate tissue structures such as, for example neural tissue.” *Id.* ¶ 3.

Godara discloses that

> Embodiments of the method aspect of the present invention may be useful for creating a lesion having a desired shape, size, and/or location with various tissues of a human or animal. More specifically, some embodiments of the present invention may comprise treatment procedures for treating one or more target tissue sites associated with a patient’s vertebral column. For example, treatment procedures may be performed at various locations external to the vertebrae, including, but not limited to target sites at the cervical, thoracic, lumbar and sacral regions of the spine. In addition, treatment procedures may be performed at target sites within the vertebrae themselves, referred to as an intraosseous procedure. Furthermore, treatment procedures may be performed at target sites within one or more intervertebral discs.

*Id.* ¶ 114.

2. Claims 12, 14–17, and 29

Petitioner contends that "[t]hese [dependent] claims merely recite specific types and locations of a target 'nerve' to be ablated." Pet. 73 (citing Ex. 1001, claims 12, 14–17, and 27). Petitioner further contends that "Fitz teaches that RF neurotomy 'can be used on *any area* of the spine, be it cervical, thoracic, or lumbar . . . so there is nothing inventive about the specific locations recited in these claims." *Id.* (citing Ex. 1011 ¶ 2; Ex. 1034 ¶¶ 231–232). Petitioner next contends that Godara "teaches treatment by ablation 'at various locations,' including 'target sites at the cervical, thoracic, lumbar and sacral regions of the spine,' 'sites within the vertebrae themselves,['] [and] 'sites within one or more intervertebral discs.'" *Id.* (citing Ex. 1015 ¶ 114). Petitioner also contends that Godara teaches use in the areas recited in these claims. *Id.* at 73–74 (citing Ex. 1015 ¶¶ 119–120, 124–125, 128–130, 134, claims 36–38). According to Petitioner, "Godara would have motivated a [person of ordinary skill in the art] to use the modified Racz anywhere Godara's device was appropriate such that claims 12, 14–17, and 27 are obvious." *Id.* at 74 (citing Ex. 1015 ¶2 119; Ex. 1034 ¶¶ 232–233).

We have reviewed Petitioner's undisputed contentions and evidence regarding Godara and find that the combination of Racz, Fitz, Lee, and Godara with or without Young '965 and/or Scheibe teaches the limitation of claims 12, 14–17, and 29.

3. Claims 11 and 13

Claims 11 and 13 both recite "inserting the needle within 30 degrees of perpendicular to a surface of the patient." Ex. 1003, 32:31–33, 32:37–39. Petitioner contends that "Godara teaches, 'the probe may be inserted and

positioned *substantially perpendicular* or generally upstanding to the surface, including 'between about 60° and 120°.'" Pet. 75 (citing Ex. 1015 ¶¶ 6, 94, 126). According to Petitioner, an ordinarily skilled artisan "would have found it obvious to perform the step of **Claims 11 and 13** (which Godara confirms is a known technique) using Racz's modified device." *Id.* (citing Ex. 1034 ¶¶ 234–235).

We have reviewed Petitioner's undisputed contentions and evidence regarding Godara and find that the combination of Racz, Fitz, Lee, and Godara with or without Young '965 and/or Scheibe teaches the limitation of claims 11 and 13.

4. Claims 19 and 29

Claims 19 and 29 both recite "forming a lesion that includes the nerve and has a volume of about 500 $mm^3$." Ex. 1003, 32:52–54, 34:21–23.

Petitioner contends that "Godara's device is configured for generating lesions at a target tissue site, 'for example a nerve' (or 'neural tissue')." Pet. 75 (citing Ex. 1015 ¶¶ 3, 96, 98–100). Petitioner further contends that Godara discloses forming lesions at target sites "including 'between about 150 $mm^3$ and about 500 $mm^3$,' which 'may be particularly useful for lesioning of [spinal] nerves.'" *Id.* at 76 (citing Ex. 1015 ¶ 133). According to Petitioner, "considered in combination with Lee's disclosure that its filaments can be adjusted to provide any desired ablation volume . . . Godara would have further motivated a [person of ordinary skill in the art] to configure Racz's modified device" to form a lesion with the volume recited in claims 19 and 29. *Id.*

We have reviewed Petitioner's undisputed contentions and evidence regarding Godara and find that the combination of Racz, Fitz, Lee, and

Godara with or without Young ’965 and/or Scheibe teaches the limitation of claims 19 and 29.

For the foregoing reasons, Petitioner has shown by a preponderance of the evidence that claims 11–17, 19, 27, and 29 would have been obvious over the combination of Racz, Fitz, Lee, and Godara with or without Young ’965 and/or Scheibe.

### H. Grounds I–L: Obviousness over Cohen in Combination with Racz, Fitz, Lee, Young ’965, and Scheibe

Petitioner contends that claims 18 and 28 are obvious over Cohen in various combinations with Racz, Fitz, Lee, Young ’965, and/or Scheibe. Pet. 76–79. Patent Owner does not address these grounds. *See generally* PO Resp.

We begin with a brief overview of Cohen and then address Petitioner’s contentions.

#### 1. Overview of Cohen (Ex. 1019)

Cohen is a scientific paper published by the American Society of Anesthesiologists. Ex. 1019, 279.[19] The title of the paper is “Randomized Placebo-controlled Study Evaluating Lateral Branch Radiofrequency Denervation for Sacroiliac Joint Pain.” *Id.*

#### 2. Claims 18 and 28

Claims 18 and 28 each recite “forming a lesion that includes the nerve and has a maximum cross dimension that is 10 millimeters or larger.” Ex. 1003, 32:49–51, 34:18–20.

Petitioner contends that “Cohen discusses techniques for RF neurotomy” and “expressly describes creating a ‘lesion diameter ranging

---

[19] For Exhibit 1019, we refer to the original page numbers in the document.

between 8 and 10 mm' in procedures for denervation of the sacroiliac joint." Pet. 77 (citing Ex. 1019, 282, Fig. 3; Ex. 1034 ¶¶ 240–241). Petitioner further contends that when "[c]onsidered in combination with Lee's disclosure that its filaments can be adjusted to provide any desired ablation volume", an ordinarily skilled artisan would have been motivated "to configure and/or use Racz's device modified to include Lee's filaments (22/1622) . . . to form lesions of various sizes specifically including lesions with maximum cross dimension that is 10 millimeters or larger." *Id.* (citing Ex. 1034 ¶ 241).

We have reviewed Petitioner's undisputed contentions and evidence regarding Cohen and find that the combination of Racz, Fitz, Lee, and Cohen with or without Young '965 and/or Scheibe teaches the limitation of claims 18 and 28.

I. Motions to Exclude Evidence

Each of the parties filed a motion to exclude. Papers 47, 49.

Petitioner's Motion seeks to exclude (1) paragraphs 16–27, and 47 from a declaration of Cody Jorgensen (Exhibits 2015, 2016, 2039, and 1037[20]) and (2) Exhibits 2021–2026 in their entireties. Pet. MTE, 1.

Patent Owner's Motion seeks to exclude Petitioner's Exhibit 1063 if Patent Owner's Exhibits 2044 and 2045 are excluded or otherwise not

[20] The record contains three copies of Mr. Jorgensen's declaration. Exhibit 2015 is an unredacted copy that is under seal. Exhibit 2016 is publicly filed copy with redactions of confidential information. Exhibit 2039 is a third copy of Mr. Jorgensen's declaration that Patent Owner Stratus filed, which copy "identifies the redactions that Stratus propose[d] to remove in gold highlighting and those it propose[d] to maintain in violet highlighting." Paper 27, 5.

considered.[21] *See* PO MTE, 1 ("Stratus conditionally requests that, if its Exhibits 2044 and 2045 are struck from the record or otherwise not considered by the Board, then Exhibit 1063 must be excluded under Federal Rule of Evidence ("FRE") 106 for violating the doctrine of completeness.").

We do not rely on any of the evidence either party seeks to exclude. Accordingly, both Motions are dismissed as moot.

[21] Exhibits 2044 and 2045 were filed by Patent Owner with its Sur-reply contrary to 37 C.F.R. § 42.23(b). *See* Papers 49, 52. We do not rely on either of these exhibits.

## III. CONCLUSION[22]

In summary:

| Claim(s) | 35 U.SC. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee | 1, 3–10, 18–26, 28, 29 | 2 |
| 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee, Young ’965 | 1–10, 18–26, 28, 29 | |
| 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee, Scheibe | 1–10, 18–26, 28, 29 | |
| 1–10, 18–26, 28, 29 | 103(a) | Racz, Fitz, Lee, Scheibe, Young 965’ | 1–10, 18–26, 28, 29 | |
| 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara | 11–17, 19, 27, 29 | |
| 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara, Young ’965 | 11–17, 19, 27, 29 | |
| 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara, Scheibe | 11–17, 19, 27, 29 | |
| 11–17, 19, 27, 29 | 103(a) | Racz, Fitz, Lee, Godara, | 11–17, 19, 27, 29 | |

[22] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| **Claim(s)** | **35 U.SC. §** | **Reference(s)/ Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not Shown Unpatentable** |
|---|---|---|---|---|
| | | Young'965, Scheibe, | | |
| 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen | 18, 28 | |
| 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen, Young '965 | 18, 28 | |
| 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen, Scheibe | 18, 28 | |
| 18, 28 | 103(a) | Racz, Fitz, Lee, Cohen, Young '965, Scheibe | 18, 28 | |
| **Overall Outcome** | | | 1–29 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–29 of the '664 patent have been shown by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that the parties Motions to Exclude Evidence, Papers 47 and 49 are dismissed as moot; and

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Christopher Kelly
Gregory Carlin
Warren Thomas
Lee Hamilton
MEUNIER CARLIN & CURFMAN LLC
ckelly@mcciplaw.com
gcarlin@mcciplaw.com
wthomas@mcciplaw.com
lhamilton@mcciplaw.com

PATENT OWNER:

Daniel Higgs
MED VENTURE MANAGEMENT, LLC
dhiggs@medventureholdings.com

Kevin Laurence
Matthew Phillips
Derek Meeker
Joseph Hawkins
LAURENCE & PHILLIPS IP LAW
klaurence@lpiplaw.com
mphillips@lpiplaw.com
dmeeker@lpiplaw.com
joe@hawkins-ip.com

US010966782B2

(12) **United States Patent**
**Wright et al.**

(10) **Patent No.: US 10,966,782 B2**
(45) **Date of Patent: *Apr. 6, 2021**

(54) **NEEDLES AND SYSTEMS FOR RADIOFREQUENCY NEUROTOMY**

(71) Applicant: **Stratus Medical, LLC**, Magnolia, TX (US)

(72) Inventors: **Robert E. Wright**, Clayton (AU); **Scott A. Brandt**, Denver, CO (US)

(73) Assignee: **Stratus Medical, LLC**, Magnolia, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/933,811**

(22) Filed: **Jul. 20, 2020**

(65) **Prior Publication Data**

US 2020/0345411 A1 Nov. 5, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/092,945, filed on Apr. 7, 2016, now Pat. No. 10,716,618, which is a

(Continued)

(51) **Int. Cl.**

***A61B 18/14*** (2006.01)
*A61B 18/00* (2006.01)
*A61B 18/12* (2006.01)

(52) **U.S. Cl.**

CPC ...... ***A61B 18/1477*** (2013.01); *A61B 18/1206* (2013.01); *A61B 2018/0044* (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .. A61B 2018/1427; A61B 2018/00577; A61B 2018/0044; A61B 2018/1475;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,011,872 A 3/1977 Kamiya
4,206,761 A 6/1980 Cosman

(Continued)

FOREIGN PATENT DOCUMENTS

AU 2017203754 6/2017
CN 1211171 A 3/1999

(Continued)

OTHER PUBLICATIONS

Biomerics LLC, Statement of Claim, *Biomerics LLC* v *Diros Technology Inc & M Medical Pty Ltd*, NSD438/2019, Federal Court of Australia, Mar. 22, 2019, 10 pages.

(Continued)

*Primary Examiner* — Eun Hwa Kim
*Assistant Examiner* — Christine A Dedoulis
(74) *Attorney, Agent, or Firm* — Med Venture Management, LLC; Daniel C. Higgs

(57) **ABSTRACT**

Apparatus for radiofrequency neurotomy are disclosed. Needles with deployable filaments capable of producing lesions at target volumes, which include a target nerve, and systems including such needles are disclosed. Ablation of at least a portion of the target nerve may inhibit the ability of the nerve to transmit signals, such as pain signals, to the central nervous system. The lesion may facilitate procedures by directing energy towards the target nerve and away from collateral structures. Example anatomical structures include lumbar, thoracic, and cervical medial branch nerves and rami and the sacroiliac joint.

**29 Claims, 41 Drawing Sheets**




Petitioner's Exhibit 1001
Avanos v. Stratus

**Related U.S. Application Data**

continuation of application No. 13/101,009, filed on May 4, 2011, now abandoned.

(60) Provisional application No. 61/357,894, filed on Jun. 23, 2010, provisional application No. 61/357,886, filed on Jun. 23, 2010, provisional application No. 61/347,351, filed on May 21, 2010.

(52) **U.S. Cl.**
CPC .............. *A61B 2018/00577* (2013.01); *A61B 2018/1253* (2013.01); *A61B 2018/143* (2013.01); *A61B 2018/1427* (2013.01); *A61B 2018/1475* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61B 2018/143; A61B 2018/1253; A61B 18/1477; A61B 18/1206
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,206,762 | A | 6/1980 | Cosman |
| 4,281,667 | A | 8/1981 | Cosman |
| 4,353,371 | A | 10/1982 | Cosman |
| 4,375,220 | A | 3/1983 | Matvias |
| 4,378,809 | A | 4/1983 | Cosman |
| 4,385,636 | A | 5/1983 | Cosman |
| 4,411,266 | A | 10/1983 | Cosman |
| 4,565,200 | A | 1/1986 | Cosman |
| 4,573,980 | A | 3/1986 | Karrasch et al. |
| 4,583,538 | A | 4/1986 | Onik et al. |
| 4,593,703 | A | 6/1986 | Cosman |
| 4,618,978 | A | 10/1986 | Cosman |
| 4,646,752 | A | 3/1987 | Swann et al. |
| 4,653,508 | A | 3/1987 | Cosman |
| 4,660,568 | A | 4/1987 | Cosman |
| 4,676,255 | A | 6/1987 | Cosman |
| 4,698,207 | A | 10/1987 | Bringham et al. |
| 4,787,886 | A | 11/1988 | Cosman |
| 4,796,615 | A | 1/1989 | Bullock et al. |
| 4,827,927 | A | 5/1989 | Newton |
| 4,838,265 | A | 6/1989 | Cosman et al. |
| 4,886,506 | A | 12/1989 | Lovgren et al. |
| 4,907,589 | A | 3/1990 | Cosman |
| 4,966,597 | A | 10/1990 | Cosman |
| 5,010,897 | A | 4/1991 | Leveen |
| 5,160,337 | A | 11/1992 | Cosman |
| 5,217,457 | A | 6/1993 | Delahuerga et al. |
| 5,230,623 | A | 7/1993 | Guthrie et al. |
| 5,233,515 | A | 8/1993 | Cosman |
| 5,244,462 | A | 9/1993 | Delahuerga et al. |
| 5,257,630 | A | 11/1993 | Braitman et al. |
| 5,291,896 | A | 3/1994 | Fonger et al. |
| 5,304,114 | A | 4/1994 | Cosman et al. |
| 5,304,115 | A | 4/1994 | Pflueger et al. |
| 5,312,329 | A | 5/1994 | Beaty et al. |
| 5,312,391 | A | 5/1994 | Wilk |
| 5,318,013 | A | 6/1994 | Wilk |
| 5,324,255 | A | 6/1994 | Passafaro et al. |
| 5,334,183 | A | 8/1994 | Wuchinich |
| 5,342,292 | A | 8/1994 | Nita et al. |
| 5,370,645 | A | 12/1994 | Klicek et al. |
| 5,370,675 | A | 12/1994 | Edwards et al. |
| 5,372,596 | A | 12/1994 | Klicek et al. |
| 5,377,685 | A | 1/1995 | Kazi et al. |
| 5,383,917 | A | 1/1995 | Desai et al. |
| 5,397,301 | A | 3/1995 | Pflueger et al. |
| 5,401,272 | A | 3/1995 | Perkins |
| 5,421,923 | A | 6/1995 | Clarke et al. |
| 5,422,567 | A | 6/1995 | Matsunaga |
| 5,423,809 | A | 6/1995 | Klicek |
| 5,433,739 | A | 7/1995 | Sluijter et al. |
| 5,447,417 | A | 9/1995 | Kuhl et al. |
| 5,458,597 | A | 10/1995 | Edwards et al. |
| 5,472,441 | A | 12/1995 | Edwards et al. |
| 5,472,442 | A | 12/1995 | Klicek |
| 5,474,057 | A | 12/1995 | Makower et al. |
| 5,484,398 | A | 1/1996 | Stoddard |
| 5,486,161 | A | 1/1996 | Lax et al. |
| 5,496,312 | A | 3/1996 | Klicek |
| 5,507,743 | A | 4/1996 | Edwards et al. |
| 5,507,802 | A | 4/1996 | Imran |
| 5,511,564 | A | 4/1996 | Wilk |
| 5,514,129 | A | 5/1996 | Smith |
| D372,086 | S | 7/1996 | Grasso et al. |
| 5,536,267 | A | 7/1996 | Edwards et al. |
| 5,541,376 | A | 7/1996 | Ladtkow et al. |
| 5,560,358 | A | 10/1996 | Arnold et al. |
| 5,562,703 | A | 10/1996 | Desai |
| 5,571,147 | A | 11/1996 | Sluijter et al. |
| 5,580,665 | A | 12/1996 | Taguchi et al. |
| 5,599,345 | A | 2/1997 | Edwards et al. |
| 5,599,346 | A | 2/1997 | Edwards et al. |
| 5,611,709 | A | 3/1997 | McAnulty |
| 5,613,966 | A | 3/1997 | Makower et al. |
| 5,628,743 | A | 5/1997 | Cimino |
| 5,662,111 | A | 9/1997 | Cosman |
| 5,662,620 | A | 9/1997 | Lieber et al. |
| 5,662,680 | A | 9/1997 | Desai |
| 5,667,488 | A | 9/1997 | Lundquist et al. |
| 5,669,904 | A | 9/1997 | Platt, Jr. et al. |
| 5,672,173 | A | 9/1997 | Gough et al. |
| 5,672,174 | A | 9/1997 | Gough et al. |
| 5,683,349 | A | 11/1997 | Makower et al. |
| 5,683,384 | A | 11/1997 | Gough et al. |
| 5,701,575 | A | 12/1997 | Taguchi et al. |
| 5,720,744 | A | 2/1998 | Eggleston et al. |
| 5,728,143 | A | 3/1998 | Gough et al. |
| 5,735,847 | A | 4/1998 | Gough et al. |
| 5,738,648 | A | 4/1998 | Lands et al. |
| 5,748,703 | A | 5/1998 | Cosman |
| 5,749,689 | A | 5/1998 | Konig |
| 5,749,846 | A | 5/1998 | Edwards et al. |
| 5,755,754 | A | 5/1998 | Rudie et al. |
| 5,768,679 | A | 6/1998 | Taguchi et al. |
| 5,772,659 | A | 6/1998 | Becker et al. |
| 5,778,043 | A | 7/1998 | Cosman |
| 5,782,827 | A | 7/1998 | Gough et al. |
| 5,792,146 | A | 8/1998 | Cosman |
| 5,797,906 | A | 8/1998 | Rhum et al. |
| 5,800,484 | A | 9/1998 | Gough et al. |
| 5,807,309 | A | 9/1998 | Lundquist et al. |
| 5,810,804 | A | 9/1998 | Gough et al. |
| 5,827,271 | A | 10/1998 | Buysse et al. |
| 5,827,276 | A | 10/1998 | LeVeen et al. |
| 5,848,967 | A | 12/1998 | Cosman |
| 5,855,576 | A | 1/1999 | LeVeen et al. |
| 5,863,290 | A | 1/1999 | Gough et al. |
| 5,868,740 | A | 2/1999 | LeVeen et al. |
| 5,893,847 | A | 4/1999 | Kordis |
| 5,911,739 | A | 6/1999 | Kordis et al. |
| 5,913,855 | A | 6/1999 | Gough et al. |
| 5,921,992 | A | 7/1999 | Costales et al. |
| 5,925,042 | A | 7/1999 | Gough et al. |
| 5,928,229 | A | 7/1999 | Gough et al. |
| 5,935,123 | A | 8/1999 | Edwards et al. |
| 5,951,547 | A | 9/1999 | Gough et al. |
| 5,968,040 | A | 10/1999 | Swanson et al. |
| 5,980,517 | A | 11/1999 | Gough |
| 5,983,141 | A | 11/1999 | Sluijter et al. |
| 6,006,126 | A | 12/1999 | Cosman |
| 6,013,076 | A | 1/2000 | Goble et al. |
| 6,014,590 | A | 1/2000 | Whayne et al. |
| 6,015,406 | A | 1/2000 | Goble et al. |
| 6,016,452 | A | 1/2000 | Kasevich |
| 6,039,733 | A | 3/2000 | Buysse et al. |
| 6,041,260 | A | 3/2000 | Stern et al. |
| 6,044,846 | A | 4/2000 | Edwards |
| 6,045,532 | A | 4/2000 | Eggers et al. |
| 6,050,992 | A | 4/2000 | Nichols |
| 6,053,937 | A | 4/2000 | Edwards et al. |
| 6,059,780 | A | 5/2000 | Gough et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,068,627 A 5/2000 Orszulak et al.
6,071,280 A 6/2000 Edwards et al.
6,080,150 A 6/2000 Gough
6,090,105 A 7/2000 Zepeda et al.
6,105,581 A 8/2000 Eggers et al.
6,106,521 A 8/2000 Blewett et al.
6,117,134 A 9/2000 Cunningham et al.
6,122,341 A 9/2000 Butler et al.
6,129,726 A 10/2000 Edwards et al.
6,132,425 A 10/2000 Gough
6,139,519 A 10/2000 Blythe
6,139,547 A 10/2000 Lontine et al.
6,143,003 A 11/2000 Cosman
6,146,380 A 11/2000 Racz et al.
6,161,048 A 12/2000 Sluijter et al.
6,165,169 A 12/2000 Panescu et al.
6,167,295 A 12/2000 Cosman
6,179,834 B1 1/2001 Buysse et al.
6,210,403 B1 4/2001 Klicek
6,210,406 B1 4/2001 Webster
6,213,999 B1 4/2001 Platt, Jr. et al.
6,216,043 B1 4/2001 Swanson et al.
6,217,554 B1 4/2001 Green
6,221,071 B1 4/2001 Sherry et al.
6,228,080 B1 5/2001 Gines
6,228,083 B1 5/2001 Lands et al.
6,231,570 B1 5/2001 Tu et al.
6,234,178 B1 5/2001 Goble et al.
6,235,023 B1 5/2001 Lee et al.
6,241,725 B1 6/2001 Cosman
6,241,726 B1 6/2001 Chia et al.
6,246,912 B1 6/2001 Sluijter et al.
6,251,106 B1 6/2001 Becker et al.
6,259,952 B1 7/2001 Sluijter et al.
6,268,200 B1 7/2001 Tucker et al.
6,275,725 B1 8/2001 Cosman
6,277,117 B1 8/2001 Tetzlaff et al.
6,280,441 B1 8/2001 Ryan
6,287,304 B1 9/2001 Eggers et al.
6,312,426 B1 11/2001 Goldberg et al.
6,330,478 B1 12/2001 Lee et al.
6,331,180 B1 12/2001 Cosman et al.
6,334,861 B1 1/2002 Chandler et al.
6,352,536 B1 3/2002 Buysse et al.
6,402,743 B1 6/2002 Orszulak et al.
6,402,747 B1 6/2002 Lindermann et al.
6,405,072 B1 6/2002 Cosman
6,416,520 B1 7/2002 Kynast et al.
6,419,653 B2 7/2002 Edwards et al.
6,419,680 B1 7/2002 Cosman et al.
6,419,798 B1 7/2002 Topolkaraev et al.
6,425,887 B1 7/2002 McGuckin et al.
6,440,127 B2 8/2002 McGovern et al.
6,447,477 B2 9/2002 Burney et al.
6,447,505 B2 9/2002 McGovern et al.
6,451,018 B1 9/2002 Lands et al.
6,454,765 B1 9/2002 Leveen et al.
6,458,130 B1 10/2002 Frazier et al.
6,459,769 B1 10/2002 Cosman
6,461,314 B1 10/2002 Pant et al.
6,464,704 B2 10/2002 Schmaltz et al.
6,468,273 B1 10/2002 Leveen et al.
6,471,695 B1 10/2002 Behl
6,471,698 B1 10/2002 Edwards et al.
6,478,793 B1 11/2002 Cosman et al.
6,500,175 B1 12/2002 Gough et al.
6,506,189 B1 1/2003 Rittman, III et al.
6,517,534 B1 2/2003 McGovern et al.
6,530,922 B2 3/2003 Cosman et al.
6,533,987 B2 3/2003 Topolkaraev et al.
6,551,311 B2 4/2003 Lee et al.
6,562,033 B2 5/2003 Shah et al.
6,565,562 B1 5/2003 Shah et al.
6,569,159 B1 5/2003 Edwards et al.
6,575,967 B1 6/2003 Leveen et al.
6,575,969 B1 6/2003 Rittman, III et al.
6,585,735 B1 7/2003 Frazier et al.
6,602,249 B1 8/2003 Stoddard et al.
6,605,085 B1 8/2003 Edwards
6,610,054 B1 8/2003 Edwards et al.
6,622,731 B2 9/2003 Daniel et al.
6,623,481 B1 9/2003 Garbagnati et al.
6,632,221 B1 10/2003 Edwards et al.
6,632,222 B1 10/2003 Edwards et al.
6,638,275 B1 10/2003 McGaffigan et al.
6,641,580 B1 11/2003 Edwards et al.
6,645,201 B1 11/2003 Utley et al.
6,652,515 B1 11/2003 Maguire et al.
6,652,516 B1 11/2003 Gough
6,660,002 B1 12/2003 Edwards et al.
6,660,362 B1 12/2003 Lindsay et al.
6,663,624 B2 12/2003 Edwards et al.
6,669,693 B2 12/2003 Friedman
6,682,526 B1 1/2004 Jones et al.
6,682,528 B2 1/2004 Frazier et al.
6,685,701 B2 2/2004 Orszulak et al.
6,689,127 B1 2/2004 Gough et al.
6,690,210 B2 2/2004 Hadjizada et al.
6,692,490 B1 2/2004 Edwards
6,699,242 B2 3/2004 Heggeness
6,706,152 B2 3/2004 Burazin et al.
6,723,092 B2 4/2004 Brown et al.
6,740,080 B2 5/2004 Jain et al.
6,743,226 B2 6/2004 Cosman et al.
6,743,229 B2 6/2004 Buysse et al.
6,746,570 B2 6/2004 Burazin et al.
6,749,719 B2 6/2004 Burazin et al.
6,752,804 B2 6/2004 Simpson et al.
6,770,070 B1 8/2004 Balbierz
6,780,180 B1 8/2004 Goble et al.
6,803,549 B2 10/2004 Yu
6,814,712 B1 11/2004 Edwards et al.
6,837,956 B2 1/2005 Cowell et al.
6,846,448 B2 1/2005 Rymer et al.
6,847,848 B2 1/2005 Sterzer et al.
6,852,091 B2 2/2005 Edwards et al.
6,866,663 B2 3/2005 Edwards et al.
6,881,214 B2 4/2005 Cosman et al.
6,889,089 B2 5/2005 Behl et al.
6,896,675 B2 5/2005 Leung et al.
6,932,810 B2 8/2005 Ryan
6,958,062 B1 10/2005 Gough et al.
6,958,064 B2 10/2005 Rioux et al.
6,961,602 B2 11/2005 Fuimaono et al.
6,962,587 B2 11/2005 Johshon et al.
6,964,660 B2 11/2005 Maguire et al.
6,966,908 B2 11/2005 Maguire et al.
6,974,455 B2 12/2005 Garabedian et al.
6,989,004 B2 1/2006 Hinchliffe et al.
6,997,925 B2 2/2006 Maguire et al.
7,025,767 B2 4/2006 Schaefer et al.
7,033,353 B2 4/2006 Stoddard et al.
7,044,949 B2 5/2006 Orszulak et al.
7,048,733 B2 5/2006 Hartley et al.
7,056,320 B2 6/2006 Utley et al.
7,074,484 B2 7/2006 Topolkaraev et al.
7,076,399 B2 7/2006 Godara
7,087,051 B2 8/2006 Bourne et al.
7,099,712 B2 8/2006 Fuimaono et al.
7,108,696 B2 9/2006 Daniel et al.
7,112,197 B2 9/2006 Hartley et al.
7,115,124 B1 10/2006 Xiao
7,138,088 B2 11/2006 Wariar et al.
7,150,743 B2 12/2006 Zvuloni et al.
7,150,744 B2 12/2006 Edwards et al.
7,160,296 B2 1/2007 Pearson et al.
7,163,536 B2 1/2007 Godara
7,179,256 B2 2/2007 Mest
7,179,258 B2 2/2007 Buysse et al.
7,207,990 B2 4/2007 Lands et al.
7,229,438 B2 6/2007 Young
7,258,688 B1 8/2007 Shah et al.
7,266,414 B2 9/2007 Cornelius et al.
7,270,660 B2 9/2007 Ryan

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,270,661 B2 9/2007 Dahla et al.
7,270,662 B2 9/2007 Visram et al.
7,276,064 B2 10/2007 Paul et al.
7,281,666 B2 10/2007 Smith
7,294,127 B2 11/2007 Leung et al.
7,306,596 B2 12/2007 Hillier et al.
7,311,702 B2 12/2007 Tallarida et al.
7,318,822 B2 1/2008 Darmos et al.
7,340,307 B2 3/2008 Maguire et al.
7,344,533 B2 3/2008 Pearson et al.
RE40,279 E 4/2008 Sluijter et al.
7,354,436 B2 4/2008 Rioux et al.
7,357,798 B2 4/2008 Sharps et al.
7,371,234 B2 5/2008 Young
RE40,388 E 6/2008 Gines
7,387,626 B2 6/2008 Edwards et al.
7,387,630 B2 6/2008 Mest
7,393,351 B2 7/2008 Woloszko et al.
7,399,299 B2 7/2008 Daniel et al.
7,416,549 B2 8/2008 Young et al.
7,419,487 B2 9/2008 Johnson et al.
7,449,020 B2 11/2008 Edwards et al.
7,458,971 B2 12/2008 Zerfas et al.
7,468,062 B2 12/2008 Oral et al.
7,480,533 B2 1/2009 Cosman et al.
7,517,346 B2 4/2009 Sloan et al.
7,524,318 B2 4/2009 Young et al.
7,533,002 B2 5/2009 Godara
7,549,986 B2 6/2009 Rioux et al.
7,561,907 B2 7/2009 Fuimaono et al.
7,593,778 B2 9/2009 Chandran et al.
7,596,469 B2 9/2009 Godara
7,615,050 B2 11/2009 Cross et al.
7,670,336 B2 3/2010 Young et al.
7,670,337 B2 3/2010 Young
7,678,106 B2 3/2010 Lee
7,678,107 B2 3/2010 Young
7,699,844 B2 4/2010 Utley et al.
7,704,248 B2 4/2010 Dicarlo
7,771,420 B2 8/2010 Butty et al.
7,794,458 B2 9/2010 McIntyre et al.
7,794,459 B2 9/2010 Faure
7,797,049 B2 9/2010 Christopherson et al.
7,799,021 B2 9/2010 Leung et al.
7,815,571 B2 10/2010 Deckman et al.
7,819,869 B2 10/2010 Godara et al.
7,819,871 B2 10/2010 Paul et al.
7,824,404 B2 11/2010 Godara et al.
7,828,796 B2 11/2010 Wong et al.
7,846,157 B2 12/2010 Kozel
7,874,986 B2 1/2011 Deckman et al.
7,875,025 B2 1/2011 Cockburn et al.
7,892,231 B2 2/2011 Elliott
7,896,871 B2 3/2011 Bhushan et al.
7,896,874 B2 3/2011 Young et al.
7,918,852 B2 * 4/2011 Tullis ................. A61B 18/1477
606/41
8,262,574 B2 9/2012 Placek et al.
8,512,330 B2 8/2013 Epstein et al.
8,518,037 B2 8/2013 Young
8,753,335 B2 6/2014 Moshe et al.
9,402,560 B2 8/2016 Organ et al.
9,675,406 B2 6/2017 Moss et al.
10,716,618 B2 7/2020 Wright et al.
10,736,688 B2 8/2020 Wright et al.
2001/0012956 A1 8/2001 Behl et al.
2002/0022864 A1 2/2002 Mahvi et al.
2002/0026185 A1 2/2002 Gough
2002/0029037 A1 3/2002 Kim
2002/0133148 A1 9/2002 Daniel et al.
2002/0143302 A1 * 10/2002 Hinchliffe ............. A61B 18/00
604/272
2002/0188275 A1 12/2002 McGuckin, Jr.
2003/0018332 A1 1/2003 Schmaltz et al.
2003/0078595 A1 4/2003 Cosman
2003/0199862 A1 10/2003 Simpson et al.
2004/0006336 A1 1/2004 Swanson
2004/0015176 A1 1/2004 Cosman
2004/0015218 A1 1/2004 Finch et al.
2004/0059328 A1 3/2004 Daniel et al.
2004/0064137 A1 4/2004 Pellegrino et al.
2004/0100376 A1 5/2004 Lye et al.
2004/0122482 A1 6/2004 Tung et al.
2004/0143262 A1 7/2004 Visram et al.
2004/0158239 A1 8/2004 Behl et al.
2004/0176759 A1 9/2004 Krishnamurthy et al.
2004/0199179 A1 10/2004 Elliott
2004/0230187 A1 11/2004 Lee et al.
2004/0260282 A1 * 12/2004 Gough ..................... A61N 1/06
606/41
2005/0033279 A1 2/2005 Edwards et al.
2005/0059964 A1 3/2005 Fitz
2005/0085804 A1 4/2005 McGaffigan
2005/0101944 A1 5/2005 Williams
2005/0101950 A1 5/2005 Gough et al.
2005/0165391 A1 7/2005 Maguire et al.
2005/0171522 A1 8/2005 Christopherson
2005/0177209 A1 8/2005 Leung et al.
2005/0177211 A1 8/2005 Leung et al.
2005/0203503 A1 9/2005 Edwards et al.
2005/0234445 A1 10/2005 Conquergood et al.
2005/0240174 A1 10/2005 Pearson et al.
2005/0267552 A1 12/2005 Conquergood et al.
2005/0277918 A1 12/2005 Shah et al.
2006/0015161 A1 1/2006 Longo et al.
2006/0084965 A1 * 4/2006 Young ................. A61B 18/148
606/41
2006/0089635 A1 4/2006 Young et al.
2006/0095029 A1 * 5/2006 Young ................. A61B 18/148
606/41
2006/0095115 A1 5/2006 Bladillah et al.
2006/0111702 A1 5/2006 Oral et al.
2006/0122686 A1 6/2006 Gilad et al.
2006/0122692 A1 6/2006 Gilad et al.
2006/0142756 A1 6/2006 Davies et al.
2006/0173359 A1 8/2006 Lin et al.
2006/0189972 A1 8/2006 Grossman
2006/0200121 A1 9/2006 Mowery
2006/0206111 A1 9/2006 Young
2006/0206127 A1 9/2006 Conquergood et al.
2006/0206128 A1 9/2006 Conquergood et al.
2006/0206129 A1 9/2006 Conquergood et al.
2006/0206130 A1 9/2006 Conquergood et al.
2006/0206131 A1 9/2006 Conquergood et al.
2006/0206132 A1 9/2006 Conquergood et al.
2006/0206133 A1 9/2006 Conquergood et al.
2006/0206134 A1 9/2006 Conquergood et al.
2006/0217705 A1 9/2006 Godara et al.
2006/0229645 A1 10/2006 Bonnette
2006/0247616 A1 11/2006 Edwards et al.
2006/0259026 A1 11/2006 Godara et al.
2006/0259027 A1 11/2006 Kwan et al.
2006/0271036 A1 11/2006 Garabedian et al.
2007/0006215 A1 1/2007 Epstein et al.
2007/0010809 A1 1/2007 Hovda et al.
2007/0016183 A1 1/2007 Lee et al.
2007/0027449 A1 2/2007 Godara et al.
2007/0060921 A1 3/2007 Janssen et al.
2007/0112340 A1 5/2007 Thomas et al.
2007/0112342 A1 5/2007 Pearson et al.
2007/0118191 A1 5/2007 Godara
2007/0123964 A1 5/2007 Davies et al.
2007/0156136 A1 7/2007 Godara et al.
2007/0161905 A1 7/2007 Munrow
2007/0167943 A1 7/2007 Janssen et al.
2007/0179380 A1 8/2007 Grossman
2007/0179491 A1 8/2007 Kratoska et al.
2007/0185522 A1 8/2007 Davies et al.
2007/0203402 A1 8/2007 Godara et al.
2007/0203486 A1 8/2007 Young
2007/0213703 A1 9/2007 Naam et al.
2007/0260234 A1 11/2007 Mccullagh et al.
2007/0282321 A1 12/2007 Shah et al.
2007/0287996 A1 12/2007 Rioux

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0015569 | A1 | 1/2008 | Saadat et al. |
| 2008/0033493 | A1 | 2/2008 | Deckman et al. |
| 2008/0045939 | A1 | 2/2008 | Lee |
| 2008/0045940 | A1 | 2/2008 | Lee |
| 2008/0048786 | A1 | 2/2008 | Feldkamp et al. |
| 2008/0065062 | A1 | 3/2008 | Leung et al. |
| 2008/0154259 | A1 | 6/2008 | Gough et al. |
| 2008/0161804 | A1 | 7/2008 | Rioux et al. |
| 2008/0167646 | A1 | 7/2008 | Godara et al. |
| 2008/0167649 | A1 | 7/2008 | Edwards et al. |
| 2008/0208121 | A1 | 8/2008 | Youssef et al. |
| 2008/0228180 | A1 | 9/2008 | Epstein |
| 2008/0228181 | A1 | 9/2008 | Godara et al. |
| 2008/0249392 | A1 | 10/2008 | Mest |
| 2008/0249523 | A1 | 10/2008 | McPherson et al. |
| 2008/0269558 | A1 | 10/2008 | Yahagi et al. |
| 2008/0269739 | A1 | 10/2008 | Young et al. |
| 2008/0275443 | A1 | 11/2008 | Oral et al. |
| 2009/0024124 | A1 | 1/2009 | Lefler et al. |
| 2009/0054962 | A1 | 2/2009 | Lefler et al. |
| 2009/0099544 | A1 | 4/2009 | Munrow et al. |
| 2009/0131790 | A1 | 5/2009 | Munrow et al. |
| 2009/0138011 | A1 | 5/2009 | Epstein |
| 2009/0187177 | A1 | 7/2009 | Epstein |
| 2009/0187182 | A1 | 7/2009 | Epstein et al. |
| 2009/0187183 | A1 | 7/2009 | Epstein |
| 2009/0198232 | A1 | 8/2009 | Young et al. |
| 2009/0221998 | A1 | 9/2009 | Epstein et al. |
| 2009/0228001 | A1 | 9/2009 | Pacey |
| 2009/0287081 | A1 | 11/2009 | Grossman et al. |
| 2009/0292259 | A1 | 11/2009 | Delano et al. |
| 2009/0299358 | A1 | 12/2009 | Lafontaine |
| 2009/0306604 | A1 | 12/2009 | Darmos et al. |
| 2010/0004651 | A1 | 1/2010 | Biyani |
| 2010/0042098 | A1 | 2/2010 | Cross et al. |
| 2010/0049192 | A1 | 2/2010 | Holtz et al. |
| 2010/0056926 | A1 | 3/2010 | Deckman et al. |
| 2010/0076303 | A1 | 3/2010 | McKinley |
| 2010/0099980 | A1 | 4/2010 | Godara et al. |
| 2010/0114095 | A1 | 5/2010 | Janssen et al. |
| 2010/0130974 | A1 | 5/2010 | Young et al. |
| 2010/0185082 | A1 | 7/2010 | Chandran et al. |
| 2010/0222677 | A1 | 9/2010 | Placek et al. |
| 2011/0184403 | A1 | 7/2011 | Brannan |
| 2011/0213356 | A1 | 9/2011 | Wright et al. |
| 2013/0096549 | A1 | 4/2013 | Organ et al. |
| 2017/0065335 | A1 | 3/2017 | Wright et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 2418844 | 2/2001 |
| CN | 1338909 A | 3/2002 |
| DE | 2124684 | 11/1972 |
| EP | 1059067 B1 | 4/2005 |
| EP | 1645235 B1 | 11/2010 |
| EP | 2571439 B1 | 6/2020 |
| GB | 2423024 | 8/2006 |
| JP | 2000-507844 | 6/2000 |
| JP | 2001-527428 | 12/2001 |
| JP | 2003-527888 | 9/2003 |
| JP | 2004-267759 | 9/2004 |
| JP | 2008-516667 | 5/2008 |
| JP | 2009-504201 | 2/2009 |
| JP | 4290894 B2 | 4/2009 |
| JP | 2013-509966 | 3/2013 |
| WO | 96/04860 | 2/1996 |
| WO | 96/16606 | 6/1996 |
| WO | WO 96/29946 | 10/1996 |
| WO | 97/06740 | 2/1997 |
| WO | 97/06855 | 2/1997 |
| WO | 97/06857 | 2/1997 |
| WO | WO 97/06739 | 2/1997 |
| WO | 97/29702 | 8/1997 |
| WO | 99/25260 | 5/1999 |
| WO | 00/06046 | 2/2000 |
| WO | 01/28446 | 4/2001 |
| WO | 01/57655 | 8/2001 |
| WO | 02/22032 | 3/2002 |
| WO | 02/54941 | 7/2002 |
| WO | 2006/044105 | 4/2006 |
| WO | 2006/104682 | 10/2006 |
| WO | 2007/005830 | 1/2007 |
| WO | 2008/083044 | 7/2008 |
| WO | WO 2011/057157 | 5/2011 |
| WO | 2011/113943 | 9/2011 |
| WO | 2011/146243 | 11/2011 |

OTHER PUBLICATIONS

Diros Technology Inc, Statement of Cross Claim, *Biomerics LLC* v *Diros Technology Inc & M Medical Pty Ltd*, NSD438/2019, Federal Court of Australia, May 13, 2019, 5 pages.

Diros Technology Inc., RF Trident Cannulae, Last Accessed Aug. 20, 2019, available at https://dirostech.com/product-details/rf-tridenttrident-hybrid-cannulae/, 7 pages.

Diros Technology Inc., RF Trident Hybrid Cannulae, Last Accessed Aug. 20, 2019, available at https://dirostech.com/product-details/rf-trident-hybrid-cannulae/, 10 pages.

Food and Drug Administration, 510(k) Summary for Diros OWL Sterile Single Use Trident R.F. Insulated Cannulae Models DTR and DTRH, Jul. 30, 2015, 11 pages.

Ahmed et al., Principles of and Advances in Percutaneous Ablation, Radiology, Feb. 2011, pp. 351-369, vol. 258, No. 2.

Chen et al., Optimizing Electrode Placement Using Finite-Element Models in Radiofrequency Ablation Treatment Planning, IEEE Transactions on Biomedical Engineering, Feb. 2009, pp. 237-245, vol. 56, No. 2.

Haemmerich et al., Hepatic Bipolar Radio-Frequency Ablation Between Separated Multiprong Electrodes, IEEE Transactions on Biomedical Engineering, Oct. 2001, pp. 1145-1152, vol. 48, No. 10.

Haemmerich et al., Large-Volume Radiofrequency Ablation of ex Vivo Bovine Liver with Multiple Cooled Cluster Electrodes, Radiology, Feb. 2005, pp. 563-568, vol. 234, No. 2.

Laeseke et al., Multiple-Electrode RF Ablation Creates Confluent Areas of Necrosis: Results in in vivo Porcine Liver, Radiology, Oct. 2006, pp. 116-124.

Quaranta et al., FEM Analysis of RF Breast Ablation: Multiprobe versus Cool-tip Electrode, Anticancer Research, 2007, pp. 775-784.

Scharf et al., Ablation of Persistent Atrial Fibrillation Using Multielectrode Catheters and Duty-Cycled Radiofrequency Energy, Journal of the American College of Cardiology, Oct. 6, 2009, pp. 1450-1456, vol. 54, No. 15.

Shirato et al., Small Hepatocellular Carcinoma: Therapeutic Effectiveness of Percutaneous Radio Frequency Ablation Therapy With a LeVeen Needle Electrode, American Institute of Ultrasound in Medicine, 2002, pp. 67-76.

IP Australia, Patent Examination Report No. 2, Australian Patent Application No. 2014200132, dated Apr. 8, 2015, 3 pages.

IP Australia, Examination Report No. 1 for standard patent application, Australian Patent Application No. 2015261694, dated Sep. 27, 2017, 3 pages.

Brazilian National Institute of Industrial Property, Search Report, Brazilian Patent Application No. BR112012010199-4, dated Jul. 23, 2019, 6 pages.

Canadian Intellectual Property Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,778,997, dated Jun. 9, 2017, 7 pages.

Canadian Intellectual Property Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,778,997, dated May 23, 2019, 5 pages.

Intellectual Property India, Examination Report, Indian Patent Application No. 3638/DELNP/2012, dated Mar. 13, 2019, 5 pages.

Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2012-538056, dated Feb. 2, 2015, 7 pages.

Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2015-215570, dated Oct. 24, 2016, 15 pages.

IP Australia, Patent Examination Report No. 1, Australian Patent Application No. 2014200126, dated May 27, 2016, 6 pages.

(56) **References Cited**

OTHER PUBLICATIONS

Canadian Intellectual Proprety Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,799,505, dated Mar. 17, 2017, 5 pages.
Canadian Intellectual Proprety Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,799,505, dated Apr. 15, 2019, 10 pages.
CNIPA, National Intellectual Property Administration, PRC, Office Action, Chinese Patent Application No. 201510151627.1, dated Feb. 22, 2017, 8 pages.
CNIPA, National Intellectual Property Administration, PRC, Office Action, Chinese Patent Application No. 201510148998.4, dated Mar. 2, 2017, 10 pages.
European Patent Office, Communication Pursuant to Article 94(3) EPC, European Patent Application No. 11 783 944.9-1124, dated Feb. 28, 2018, 4 pages.
Israel Patent Office, Office Action, Israeli Patent Application No. 222965, dated May 14, 2015, 3 pages.
Intellectual Property India, Examination Report, Indian Patent Application No. 9943/DELNP/2012, dated Jul. 30, 2019, 6 pages.
Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2013-511205, dated Feb. 9, 2015, 5 pages.
Japan Patent Office, Decision of Rejection, Japanese Patent Application No. 2013-511205, dated Aug. 10, 2015, 4 pages.
Japan Patent Office, Appeal No. 2015-21839, Notice of Reasons for Rejection, Japanese Patent Application No. 2013-511205, dated Oct. 3, 2016, 8 pages.
Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2015-240011, dated Jan. 4, 2017, 12 pages.
Korean Intellectual Property Office, Notice to Submit Response, Korean Patent Application No. 10-2012-7033363, dated May 4, 2015, 14 pages.
Korean Intellectual Property Office, Notice to Submit Response, Korean Patent Application No. 10-2015-7004378, dated Sep. 25, 2017, 13 pages.
Mexican Institute of Industrial Property, Requirement 1, Mexican Patent Application No. MX/a/2012/013280, Feb. 17, 2015, 4 pages.
Mexican Institute of Industrial Property, Requirement 2, Mexican Patent Application No. MX/a/2012/013280, May 27, 2015, 8 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 12/940,974, dated Mar. 16, 2015, 32 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 15/098,673, dated Sep. 11, 2018, 6 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 15/098,673, dated Jun. 18, 2019, 15 pages.
United States Patent and Trademark Office, Applicant-Initiated Interview Summary, U.S. Appl. No. 15/098,673, dated Jul. 16, 2019, 4 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 15/098,673, dated Sep. 3, 2019, 17 pages.
United States Patent and Trademark Office, Applicant-Initiated Interview Summary, U.S. Appl. No. 15/098,673, dated Sep. 18, 2019, 4 pages.
Office Action issued in Japanese Application No. 2012-538056, dated Feb. 2, 2015.
U.S. Appl. No. 12/940,974, filed Nov. 5, 2010, Methods and Systems for Spinal Radio Frequency Neurotomy.
U.S. Appl. No. 15/098,673, filed Apr. 14, 2016, Methods and Systems for Spinal Radio Frequency Neurotomy.
U.S. Appl. No. 16/933,995, filed Jul. 20, 2020, Methods for Radio Frequency Neurotomy.
U.S. Appl. No. 13/101,009, filed May 4, 2011, Systems and Methods for Tissue Ablation.
U.S. Appl. No. 15/092,945, filed Apr. 7, 2016, Systems and Methods for Tissue Ablation.
Barauskas et al., Investigation of radiofrequency ablation process in liver tissue by finite element modeling and experiment, *Medicine* (*Kaunas*), vol. 43(4), pp. 310-325, 2007.
Berjano, Theoretical modeling for radiofrequency ablation: state-of-the-art and challenges for the future, *BioMedical Engineering OnLine*, vol. 5(24), 17 pages, Apr. 18, 2006.
Burdio et al., Bipolar Saline-enhanced Electrode for Radiofrequency Ablation: Results of Experimental Study of in Vivo Porcine Liver, *Radiology*, vol. 229(2), pp. 447-456, Nov. 2003.
Choi et al., Overlapping Ablation Using a Coaxial Radiofrequency Electrode and Multiple Cannulae System: Experimental Study in ex-Vivo Bovine Liver, *Korean Journal of Radiology*, vol. 4(2), pp. 117-123, Jun. 2003.
Chua, Clinical Anatomy of the Thoracic Dorsal Rami, Thesis at the University of Newcastle, New South Wales, Australia, 220 pages, 1994.
Derby et al., The Efficacy of a Two Needle Electrode Technique in Percutaneous Radiofrequency Rhizotomy: An Investigational Laboratory Study in an Animal Model, *Pain Physician*, vol. 9, pp. 207-214, 2006.
Govind et al., Radiofrequency neurotomy for the treatment of third occipital headache, *Journal of Neurology, Neurosurgery & Psychiatry*, vol. 74(1), pp. 88-93, Jan. 2003.
Liu et al., Abstract, Computer modeling of factors that affect the minimum safety distance required for radiofrequency ablation near adjacent nontarget structures, *Journal of Vascular and Interventional Radiology*, vol. 19(7), pp. 1079-1086, Jul. 2008, Epub. May 27, 2008.
Lord et al., Percutaneous Radio-Frequency Neurotomy for Chronic Cervical Zygapophyseal-Joint Pain, *New England Journal of Medicine*, vol. 335(23), pp. 1721-1726, Dec. 5, 2006.
Mulier et al., Electrodes and multiple electrode systems for radiofrequency ablation: a proposal for updated terminology, *European Radiology*, vol. 15, pp. 798-808, 2005, Epub Feb. 12, 2005.
O'Rourke et al., Current status of liver tumor ablation devices, *Expert Rev. Med. Devices*, vol. 4(4), pp. 523-537, 2007.
AngioDynamics® Incorporated, Rita® StarBurst® Model 75; StarBurst® SOE Electrosurgical Device, StarBurst® XL Electrosurgical Device, MRI Compatible StarBurst® XL Device, MRI Compatible StarBurst® Semi-Flex Electrosurgical Device; Instructions for Use, (no date) in 5 pages.
AngioDynamics®, StarBurst® XL RFA Device; StarBurst® Semi-Flex RFA Device, http://www.angiodynamics.com/products/starburst-semiflex, 2011, in 2 pages.
Baylis Medical Company, Inc., Pain Management; SInergy™ System, Apr. 2008, in 6 pages.
Baylis Medical Company, Inc., Pain Management; RF Generator V3 Platform, May 2008, in 6 pages.
Baylis Medical Company, Inc., For Thoracic Medial Branch Neurotomy; ThoraCool™ Pain Management System, 2009, in 3 pages.
Boston Scientific, LeVeen® Needle Electrodes; The Choice for Open, Laparoscopic or Percutaneous Radiofrequency Ablation, 2006, in 2 pages.
Boston Scientific, LeVeen® CoAccess™ Electrode System; Coaxial Radiofrequency Ablation Device, 2006, in 2 pages.
Diros Technology Inc., OWL Pain Management Sets, http://www.dirostech.com/22.php, (no date), in 3 pages.
Diros Technology Inc., OWL Sterile Single Use (Disposable) RF Probes, http://www.dirostech.com/productdetail.php?a=16&b+3, 2007, in 1 page.
Diros Technology Inc., OWL Re-Usable RF Probes, http://www.dirostech.com/productdetail.php?a=17&b=3, 2007, in 1 page.
FDA, Design Control Guidance for Medical Device Manufacturers, Mar. 11, 1997, in 53 pages.
Leibinger®, Electrodes for Neurosurgical Applications, pp. 4-10, 12 (no date).
Leibinger®, Accessories for RF-Electrosurgery; Bipolar and Monoplar Electrodes; Active and Inactive Cannulas; User Manual, Feb. 2000, in 24 pages.
NeuroTherm®, http://www.neurotherm.com/interventional_pain_prod_electrodes.htm, 2007, in 2 pages.
NeuroTherm®, One System, Multiple Applications, Mar. 2007, in 2 pages.
NeuroTherm®, RF for Pain Management; Disposable RF Electrode, (no date) in 2 pages.

(56) **References Cited**

OTHER PUBLICATIONS

NeuroTherm®, RF for Pain Management; Simplicity, (no date) in 2 pages.
Rex Medical, Quadra-Fuse; Multi-pronged Injection Needle, http://www.rexmedical.com/quadra-fuse.html, 2010, in 2 pages.
Smith & Nephew Endoscopy, Electrothermal 20S Spine System, http://endo.smith-nephew.com/fr/node.asp?NodeId=3592, (no date) in 2 pages.
Stryker Instruments, "MultiGen™ One Machine; Four Lesions; Multiple Options," Jul. 2008, in 8 pages.
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2010/055744, dated Mar. 1, 2011, in 34 pages.
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2011/035253 dated Aug. 18, 2011.
International Preliminary Report on Patentability issued in PCT/US2011/035253, dated Nov. 27, 2012.
Patent Examination Report issued in Australian Application No. 2011256709, dated Mar. 22, 2013.
Patent Examination Report issued in Australian Application No. 2010314930, dated Jul. 26, 2013.
Notice of Acceptance issued in Australian Application No. 2010314930, dated Oct. 14, 2013.
Notice of Acceptance issued in Australian Application No. 2011256709, dated Oct. 10, 2013.
Office Action issued in U.S. Appl. No. 12/940,974, dated Feb. 28, 2014.
Office Action issued in Japanese Application No. 2012-538056, dated May 19, 2014.
Office Action issued in U.S. Appl. No. 12/940,974, dated Jul. 7, 2014.
Office Action issued in Japanese Application No. 2013-511205, dated Aug. 4, 2014.
Office Action issued in Chinese Application No. 201180035655.7, dated Aug. 25, 2014.
Office Action issued in U.S. Appl. No. 12/940,974, dated Nov. 13, 2014.
Office Action issued in Korean Application No. 10-2012-7033363, dated Dec. 23, 2014.
Patent Examination Report issued in Australian Application No. 2014200132, dated Dec. 1, 2014.
Supplemental European Search Report and Search Opinion issued in EP Application No. 10829203.8, dated May 9, 2014.
Supplemental European Search Report and Search Opinion issued in EP Application No. 11783944, dated Jun. 23, 2014.
Leslie W. Organ, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jul. 5, 2020, 19 pages.
William Samuel Hunter, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jul. 20, 2020, 32 pages.
Marc Andrew Russo, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jul. 20, 2020, 70 pages.
Peter Darmos, Amended Statement of Cross Claim Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jun. 5, 2020, 7 pages.
United States Patent and Trademark Office, Notice of Allowance in U.S. Appl. No. 16/933,995, dated Oct. 15, 2020, 12 pages.
Peter Darmos, Further Amended Statement of cross claim, as proposed for submission in Federal Court of Australia Case No. NSD 438 of 2019, dated Oct. 2020, 7 pages.
David Lawson Morris, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Oct. 21, 2020, 37 pages.
United States Patent and Trademark Office, Office Action in U.S. Appl. No. 16/933,995, dated Oct. 15, 2020, 49 pages.
European Patent Office, Communication Under Rule 71(3) EPC for European Patent Application No. EP 11783944.9, dated Dec. 18, 2019, 125 pages.
Instituto Nacional Da Propriedade Industrial, Search Report for Brazilian Patent Application No. BR112012029263-3, dated Dec. 6, 2019, 8 pages.
United States Patent and Trademark Office, Applicant-Initiated Interview Summary for U.S. Appl. No. 15/098,673, dated Feb. 14, 2020, 3 pages.
United States Patent and Trademark Office, Form PTO/AIA/25, Terminal Disclaimer to Obviate a Provisional Double Patenting Rejection over a Pending "Reference" Application for U.S. Appl. No. 15/098,673, Feb. 20, 2020, 2 pages.
United States Patent and Trademark Office, Office Action in U.S. Appl. No. 15/098,673, dated Mar. 19, 2020, 37 pages.
Canadian Intellectual Property Office, Office Action for Canadian Patent Application No. 2,799,505, dated Apr. 8, 2020, 4 pages.
European Patent Office, Decision to Grant a European Patent Pursuant to Article 97(1) EPC for European Patent Application No. 11783944.9, dated May 28, 2020, 2 pages.
David Lawson Morris, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 17, 2020, 29 pages.
Susanne Monica Hantos, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 21, 2020, 765 pages.
Peter Darmos, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 21, 2020, 716 pages.
William Samual Hunter, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 6, 2020, 158 pages.
Daniel Christopher Higgs, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 6, 2020, 26 pages.
IP Australia, Examination Report No. 1 for Standard Patent Application for Australian Patent Application No. 2019200358, dated Apr. 20, 2020, 3 pages.
Canadian Intellectual Property Office, Office Action for Canadian Patent Application No. 2,778,997, dated May 15, 2020, 3 pages.
United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 15/098,673, dated Apr. 9, 2020, 95 pages.
European Patent Office, European Search Report and EPO Form 1703 01.91 TRI for European Patent Application No. EP 18215729.7, dated Sep. 6, 2019, 5 pages.

* cited by examiner




FIG. 1

Petitioner's Exhibit 1001
Avanos v. Stratus


103
206b
223
201
207
301
206a
203
202
224
225
215
205
204
217
216
220

FIG. 2A




FIG. 2B

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 2C




FIG. 2D




FIG. 2E




FIG. 3A




FIG. 3B

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 3C




FIG. 3D




FIG. 3E




FIG. 3F

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 3G



319a
320
316
319b
312
330
313
332b
314
309
321
332a
318a
330
318b
315
310
317


FIG. 3H




FIG. 3I

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 9

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 10




FIG. 11A




FIG. 11B




FIG. 11C

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 12

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 13

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 14




FIG. 15




FIG. 16A




FIG. 16B

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 16C

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 16D




FIG. 16E




FIG. 16F




FIG. 16G




FIG. 17A


1710
220
1715
1724
1722
1714
1720
1735
1711
1734
205
1721
1713
1730
1731
206
17E
17E

FIG. 17B




FIG. 17C




FIG. 17D

Petitioner's Exhibit 1001
Avanos v. Stratus




FIG. 17E

Petitioner's Exhibit 1001
Avanos v. Stratus



FIG. 18A



FIG. 18B

# NEEDLES AND SYSTEMS FOR RADIOFREQUENCY NEUROTOMY

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/092,945, filed Apr. 7, 2016, titled SYSTEMS AND METHODS FOR TISSUE ABLATION, which is a continuation of U.S. patent application Ser. No. 13/101,009, filed May 4, 2011, titled SYSTEMS AND METHODS FOR TISSUE ABLATION, which claims priority benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 61/347,351, filed May 21, 2010, titled METHODS AND SYSTEMS FOR SPINAL RADIO FREQUENCY NEUROTOMY, U.S. Provisional Patent Application No. 61/357,886, filed Jun. 23, 2010, titled INTERVERTEBRAL DISC HEATING, and U.S. Provisional Patent Application No. 61/357,894, filed Jun. 23, 2010, titled LARGE FIELD DIRECTIONAL RADIOFREQUENCY NEUROABLATION, each of which is incorporated herein by reference in its entirety.

## BACKGROUND

### Field

The present application generally relates to thermal ablation systems and methods, and more particularly to systems and methods for radio frequency (RF) neurotomy, such as spinal RF neurotomy.

### Description of the Related Art

Thermal ablation involves the creation of temperature changes sufficient to produce necrosis in a specific volume of tissue within a patient. The target volume may be, for example, a nerve or a tumor. A significant challenge in ablation therapy is to provide adequate treatment to the targeted tissue while sparing the surrounding structures from injury.

RF ablation uses electrical energy transmitted into a target volume through an electrode to generate heat in the area of the electrode tip. The radio waves emanate from a non-insulated distal portion of the electrode tip. The introduced radiofrequency energy causes molecular strain, or ionic agitation, in the area surrounding the electrode as the current flows from the electrode tip to ground. The resulting strain causes the temperature in the area surrounding the electrode tip to rise. RF neurotomy uses RF energy to cauterize a target nerve to disrupt the ability of the nerve to transmit pain signals to the brain.

## SUMMARY

This application describes example embodiments of devices and methods for tissue ablation, such as spinal radio frequency neurotomy. Systems include needles with deployable filaments capable of producing asymmetrical offset lesions at target volumes, which may include a target nerve. Ablation of at least a portion of the target nerve may inhibit the ability of the nerve to transmit signals, such as pain signals, to the central nervous system. The offset lesion may facilitate procedures by directing energy towards the target nerve and away from collateral structures. Example anatomical structures include lumbar, thoracic, and cervical medial branch nerves and rami and the sacroiliac joint.

In some embodiments, a needle comprises an elongate member having a distal end, a tip coupled to the distal end of the elongate member, and a plurality of filaments. The tip comprises a bevel to a point. The plurality of filaments is movable between a first position at least partially in the elongate member and a second position at least partially out of the elongate member. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode.

In some embodiments, a needle comprises an elongate member having a distal end, a tip coupled to the distal end of the elongate member, and a plurality of filaments. The tip comprises a bevel portion comprising a point on a side of the elongate member. The plurality of filaments is movable between a first position at least partially in the elongate member and a second position at least partially out of and proximate to the side of the elongate member. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode.

In some embodiments, a needle comprises an elongate member having a proximal end and a distal end, a tip coupled to the distal end of the elongate member, a plurality of filaments, and a filament deployment mechanism coupled to the proximal end of the elongate member. The tip comprises a bevel portion comprising a point. The plurality of filaments is movable between a first position at least partially in the elongate member and a second position at least partially out of the elongate member. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode. The filament deployment mechanism comprises an advancing hub, a spin collar, and a main hub. The advancing hub includes a stem coupled to the plurality of filaments. The spin collar includes a helical track. The stem of the advancing hub is at least partially inside the spin collar. The main hub comprises a stem comprising a helical thread configured to cooperate with the helical track. The stem of the main hub is at least partially inside the spin collar. The stem of the advancing hub is at least partially inside the main hub. Upon rotation of the spin collar, the filaments are configured to move between the first position and the second position.

In some embodiments, a needle comprises an elongate member having a distal end, a tip coupled to the distal end of the elongate member, and a plurality of filaments. The tip comprises a point. The plurality of filaments is movable between a first position at least partially in the elongate member and a second position at least partially out of the elongate member. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode. A single wire comprises the plurality of filaments.

In some embodiments, a needle comprises an elongate member having a distal end, a tip coupled to the distal end of the elongate member, and a plurality of filaments. The tip comprises a bevel to a point. The plurality of filaments is movable between a first position at least partially in the elongate member and a second position at least partially out of the elongate member. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode. The tip comprises a stem at least partially in the elongate member. The stem includes a first filament lumen, a second filament lumen, and a third lumen. The bevel portion comprises a fluid port in fluid communication with the third lumen.

In some embodiments, a needle comprises an elongate member having a proximal end and a distal end, a tip coupled to the distal end of the elongate member, a plurality of filaments, and a rotational deployment mechanism coupled to the proximal end of the elongate member. The tip comprises a bevel to a point. The plurality of filaments is movable between a plurality of positions between at least partially in the elongate member and at least partially out of the elongate member. The deployment mechanism comprises indicia of fractional deployment of the plurality of filaments relative to the tip. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode.

In some embodiments, a needle comprises an elongate member having a distal end, a tip, and a plurality of filaments. The tip comprises a first body portion and a second body portion. The first body portion includes a tapered portion and a point. The tapered portion includes a plurality of filament ports. The second body portion is coupled to the distal end of the tip. The second body portion is at an angle with respect to the first body portion. The plurality of filaments is movable between a first position at least partially in at least one of the tip and the elongate member and a second position at least partially out of the filament ports. The plurality of filaments and the tip are configured to transmit radio frequency energy from a probe to operate as a monopolar electrode.

In some embodiments, a method of heating a vertebral disc comprises: positioning a distal end of a needle in a posterior annulus; deploying a filament out of the needle; traversing the posterior annulus from lateral to medial; applying radio frequency energy to the tip and to the filament; and ablating pain fibers in the posterior annulus.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member, an actuator interconnected to the plurality of filaments, and a lumen in the elongate member. The tip is shaped to pierce tissue of the patient. Movement of the actuator relative to the hub moves the plurality of filaments relative to the tip. The lumen and the tip are configured to accept an RF probe such that an electrode of an inserted RF probe, the tip, and the first and second filaments are operable to form a single monopolar RF electrode.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a fully deployed position. In the fully deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the fully deployed position. Each point is distal to the distal end of the needle. The average of all the points is offset from a central longitudinal axis of the elongate member.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of



filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a deployed position. In the deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the deployed position. Each point is distal to the distal end of the needle. Each point is on a common side of a plane that contains a central longitudinal axis of the elongate member.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of filaments. The plurality of filaments consists of a first filament and a second filament, and the needle contains no filaments other than the first and second filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a deployed position. In the deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the deployed position. Each point is distal to the distal end of the needle. In the deployed position, a midpoint between the distal end of the first filament and the distal end of the second filament is offset from a central longitudinal axis of the needle.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of filaments. The plurality of filaments consists of a first filament and a second filament, and the needle contains no filaments other than the first and second filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a deployed position. In the deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the deployed position. Each point is distal to the distal end of the needle. In their respective deployed positions, each distal end defines a vertex of a polygon. A centroid of the polygon is offset from a central longitudinal axis of the needle.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of filaments. The plurality of filaments consists of a first filament and a second filament, and the needle contains no filaments other than the first and second filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a deployed position. In the deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the deployed position. Each point is distal to the distal end of the needle. In their respective deployed positions, each of the plurality of filaments points in an at least partially distal direction.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elon-

gate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of filaments. The plurality of filaments consists of a first filament and a second filament, and the needle contains no filaments other than the first and second filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a deployed position. In the deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the deployed position. Each point is distal to the distal end of the needle. When the plurality of filaments are in the deployed position, portions of each filament extend outwardly away from the tip. Each portion of each filament extending outwardly away from the tip is straight.

In some embodiments, a needle for insertion into a patient during an RF ablation procedure comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end of the needle, a plurality of filaments in at least a portion of the elongate member in a retracted position, and an actuator interconnected to the plurality of filaments. The plurality of filaments consists of a first filament and a second filament, and the needle contains no filaments other than the first and second filaments. The actuator is operable to move the plurality of filaments relative to the hub, the elongate member, and the tip between the retracted position and a deployed position. In the deployed position, the plurality of filaments extends outwardly and away from the tip. Each filament comprises a distal end that defines a point in the deployed position. Each point is distal to the distal end of the needle. When the plurality of filaments is in the deployed position, the tip comprises an angle of at least 200 about the central longitudinal axis of the elongate member that is free of filaments.

In some embodiments, a method of performing spinal RF neurotomy in a patient comprises moving a tip of a needle to a first position proximate to a target nerve along the spine of the patient, after achieving the first position, advancing a plurality of filaments relative to the tip to a deployed position, and after the advancing step, applying RF energy to the tip and plurality of filaments, wherein said applying generates heat that ablates a portion of the target nerve.

In some embodiments, a method of performing lumbar RF neurotomy on a medial branch nerve in a patient comprises: moving a tip of a needle to a first position between the transverse and superior articular processes of a lumbar vertebra such that an end point of the tip is proximate to a surface of the vertebra; after achieving the first position, advancing a plurality of filaments relative to the tip to a deployed position; and after advancing the plurality of filaments, applying RF energy to the tip and the plurality of filaments. Said applying generates heat that ablates a portion of the medial branch nerve.

In some embodiments, a method of performing sacroiliac joint RF neurotomy in a patient comprises: a. moving a tip of a needle to a first position proximate to a sacrum of the patient; b. advancing a plurality of filaments relative to the tip to a first deployed position; c. applying RF energy to the tip and plurality of filaments, wherein the applying generates heat that ablates a first volume; d. retracting the plurality of filaments; e. with the tip in the first position, rotating the needle about a central longitudinal axis of the needle to re-orient the plurality of filaments; f. re-advancing the plurality of filaments relative to the tip; and g. re-applying RF energy to the tip and plurality of filaments, wherein the re-applying comprises ablating a second volume proximate to the tip, wherein a center of the first volume is offset from a center of the second volume.

In some embodiments, a method of performing thoracic RF neurotomy on a medial branch nerve in a patient comprises: moving a tip of a needle to a first position proximate a superior surface of a transverse process of a thoracic vertebra such that an end point of the tip is proximate to the superior surface; after achieving the first position, advancing a plurality of filaments relative to the tip toward a vertebra immediately superior to the thoracic vertebra to a deployed position; and after advancing the plurality of filaments, applying RF energy to the tip and the plurality of filaments, wherein said applying generates heat that ablates a portion of the medial branch nerve between the thoracic vertebra and the vertebra immediately superior to the thoracic vertebra.

In some embodiments, a method of performing cervical medial branch RF neurotomy on a third occipital nerve of a patient comprises: a. positioning the patient in a prone position; b. targeting a side of the C2/3 Z-joint; c. rotating the head of the patient away from the targeted side; d. locating the lateral aspect of the C2/3 Z-joint; e. moving, after steps a, b, c and d, a tip of a needle over the most lateral aspect of bone of the articular pillar at the juncture of the C2/3 z-joint to a first position contacting bone proximate to the most posterior and lateral aspect of the z-joint complex; f. retracting, after step e, the tip of the needle a predetermined distance from the first position; g. extending, after step f, a plurality of filaments outwardly from the tip and towards the lateral aspect of the C2/3 z-joint such that the plurality of filaments are positioned straddling the lateral joint lucency and posterior to the C2/3 neural foramen; h. verifying, after step g, the position of the tip and filaments by imaging the tip and a surrounding volume; and i. applying, after step h, RF energy to the tip and the plurality of filaments, wherein the applying generates heat that ablates a portion of the third occipital nerve.

For purposes of summarizing the invention and the advantages achieved over the prior art, certain objects and advantages of the invention are described herein. Of course, it is to be understood that not necessarily all such objects or advantages need to be achieved in accordance with any particular embodiment. Thus, for example, those skilled in the art will recognize that the invention may be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught or suggested herein without necessarily achieving other objects or advantages as may be taught or suggested herein.

All of these embodiments are intended to be within the scope of the invention herein disclosed. These and other embodiments will become readily apparent to those skilled in the art from the following detailed description having reference to the attached figures, the invention not being limited to any particular disclosed embodiment(s).

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present disclosure are described with reference to the drawings of certain embodiments, which are intended to illustrate certain embodiments and not to limit the invention.

FIG. **1** is a schematic diagram of an RF neurotomy system being used to perform RF neurotomy on a patient.

FIG. **2**A is a perspective view of an example embodiment of a needle that may be used in an RF neurotomy procedure.

FIG. **2**B is a cut away perspective view of a portion of the needle of FIG. **2**A.

FIG. **2**C is a partial cut away and partial cross-sectional view of a portion of another example embodiment of a needle that may be used in an RF neurotomy procedure.

FIG. **2**D is a perspective view of another example embodiment of a needle that may be used in an RF neurotomy procedure.

FIG. **2**E is a perspective view of an example embodiment of filaments formed from a single wire.

FIG. **3**A is a detailed view of an example embodiment of a needle tip with filaments in a fully deployed position.

FIG. **3**B is a detailed view of the needle tip of FIG. **3**A with filaments in a retracted position.

FIG. **3**C is a detailed view of another example embodiment of a needle tip with filaments in a deployed position.

FIG. **3**D is a detailed view of another example embodiment of a needle tip with filaments in a fully deployed position.

FIG. **3**E is a detailed view of the needle tip of FIG. **3**D with filaments in a retracted position.

FIG. **3**F is a cross-sectional view of the needle tip of FIG. **3**D with filaments in a retracted position.

FIG. **3**G is a detailed view of yet another example embodiment of a needle tip with filaments in a deployed position.

FIGS. **3**H and **3**I are detailed views of still other example embodiments of a needle tip with filaments in a deployed position.

FIG. **4** is a schematic diagram of an example embodiment of an RF probe assembly.

FIG. **5** is a proximal-facing end view of an example embodiment of a needle tip.

FIG. **6** is a side view of an example embodiment of a needle tip.

FIG. **7** is a proximal-facing end view of another example embodiment of a needle tip.

FIG. **8** is a proximal-facing end view of yet another example embodiment of a needle tip.

FIG. **9** is a proximal-facing end view of still another example embodiment of a needle tip.

FIG. **10** is a side view of another example embodiment of a needle tip.

FIG. **11**A is an illustration of an example set of isotherms that may be created with the needle of FIG. **2**A.

FIG. **11**B is an illustration of an example lesion that may be created with the needle of FIG. **2**A.

FIG. **11**C is an illustration of an example lesion that may be created with a single-filament needle.

FIG. **12** is a perspective view of the needle of FIG. **2**A positioned relative to a lumbar vertebra for performing RF neurotomy.

FIG. **13** is an illustration of a sacrum including target lesion volumes for performing Sacroiliac Joint (SIJ) RF neurotomy.

FIG. **14** is a perspective view of the needle of FIG. **2**A positioned relative to a thoracic vertebra for performing RF neurotomy.

FIG. **15** is a perspective view of the needle of FIG. **2**A positioned relative to the C2/3 cervical zygapophyseal joint (z-joint) for performing cervical medial branch RF neurotomy on the third occipital nerve.

FIG. **16**A is a perspective view of an example embodiment of a needle tip.

FIG. **16**B is a back elevational view of the needle tip of FIG. **16**A.

FIG. **16**C is a front elevational view of the needle tip of FIG. **16**A.

FIG. **16**D is a perspective view of an example embodiment of an elongate member.

FIG. **16**E is a perspective view of the needle tip of FIG. **16**A and the elongate member of FIG. **16**D.

FIG. **16**F is a cross-sectional view of the needle tip and elongate member of FIG. **16**E along the line **16**F-**16**F of FIG. **16**E and example embodiments of a filament and an RF probe.

FIG. **16**G is a cross-sectional view of another example embodiment of a needle tip and elongate member and example embodiments of a filament and an RF probe.

FIG. **17**A is an exploded view of components of the deployment mechanism of FIG. **2**D.

FIG. **17**B is a cross-sectional view of components of the deployment mechanism of FIG. **2**D.

FIG. **17**C is a perspective view of an example embodiment of an advancing hub and the wire of FIG. **2**E.

FIG. **17**D is a cross-sectional view of an example embodiment of a spin collar.

FIG. **17**E is a cross-sectional view of an example embodiment of a main hub, taken along the line **17**E-**17**E of FIG. **17**B, in exploded view with an example embodiment of an elongate member.

FIG. **18**A is an axial view of posterior oblique needle entry.

FIG. **18**B is a saggital view of posterior oblique needle entry.

## DETAILED DESCRIPTION

Although certain embodiments and examples are described below, those of skill in the art will appreciate that the invention extends beyond the specifically disclosed embodiments and/or uses and obvious modifications and equivalents thereof. Thus, it is intended that the scope of the invention herein disclosed should not be limited by any particular embodiments described below.

In the following description, the invention is set forth in the context of apparatuses and methods for performing RF ablation. More particularly, the systems and methods may be used to perform RF neurotomy to ablate portions of target nerves. Even more particularly, the systems and methods may be used to perform spinal RF neurotomy to ablate portions of target nerves along the spine of a patient to relieve pain. For example, embodiments of methods and apparatuses described herein relate to lumbar RF neurotomy to denervate a facet joint between the L4 and L5 lumbar vertebrae. Denervation may be achieved by application of RF energy to a portion of a medial branch nerve to ablate or cauterize a portion of the nerve, thus interrupting the ability of the nerve to transmit signals to the central nervous system. In another example, embodiments described herein relate to sacroiliac joint RF neurotomy.

FIG. **1** illustrates an example embodiment of a system **100** for performing RF neurotomy on a patient **101**. The patient **101** may be positioned face down on a table or surface **109** to allow access along the spine of the patient **101**. Other patient orientations are also possible depending on the procedure. The table **109** may comprise radiolucent materials substantially transparent to x-rays, such as carbon fiber.

The system **100** may include an RF generator **102** capable of generating an RF energy signal sufficient to ablate target tissue (e.g.: cause lesions in targeted volumes; cauterize targeted portions of target nerves). The RF generator **102** may, for example, be capable of delivering RF energy

between about 1 W and about 200 W and between about 460,000 Hz and about 500,000 Hz. A needle **103** capable of conducting (e.g., transmitting or directing) RF energy may be interconnected to the RF generator **102** and may be used to deliver an RF energy signal to a specific site within the patient **101**. In some embodiments in which the needle **103** is a monopolar device, a return electrode pad **104** may be attached to the patient **101** to complete a circuit from the RF generator **102**, through the needle **103**, through a portion of the patient **101**, through the return electrode pad **104**, and back to the RF generator **102**. In some embodiments comprising a bipolar arrangement, the needle **103** may comprise at least one supply electrode and at least one return electrode to define the circuit.

The RF generator **102** may be operable to control the RF energy emanating from the needle **103** in a closed-loop fashion. For example, the needle **103** and/or an RF probe in the needle **103** may include a temperature measurement device, such as a thermocouple, configured to measure temperature at the target tissue. Data may also be available from the RF generator **102**, such as power level and/or impedance, which may also be used for closed-loop control of the needle **103**. For example, upon detection of a temperature, a parameter (e.g., frequency, wattage, application duration) of the RF generator **102** may be automatically adjusted.

FIG. **4** illustrates an example RF probe assembly **400** compatible with the needle **103**. The RF probe assembly **400** includes an RF probe **401** that may be inserted into a patient (e.g., through the needle **103**) and may direct RF energy to the target tissue. In some embodiments, the RF probe **401** may be in electrical communication with the needle **103** to direct RF energy to the target tissue, but is not inserted into the patient. The RF probe **401** may include a thermocouple operable to measure temperature at a distal end **402** of the RF probe **401**. The RF probe assembly **400** may include a connector **403** and a cable **404** configured to connect the RF probe **401** to an RF generator (e.g., the RF generator **102**).

Returning to FIG. **1**, the system **100** optionally includes an imaging system **105** capable of producing internal images of the patient **101** and the needle **103**, for example to facilitate navigation of the needle **103** during a procedure. The system **100** may further include a display device for displaying the generated images to a user performing the procedure. In some embodiments, the imaging system **105** comprises a fluoroscope capable of generating real-time two dimensional images of the needle **103** and internal structures of the patient **101**. In certain such embodiments, the imaging system includes an X-ray source **106**, an X-ray detector **107**, and a controller **108** in electrical communication with the X-ray source **106** and/or the X-ray detector **107**. The X-ray source **106** and X-ray detector **107** may be mounted on a movable structure (e.g., a C-arm), to facilitate capturing a variety of images of the patient **101** (e.g., at various angles or projection views). Other imaging systems **105** are also possible (e.g., a computed tomography (CT) scanner).

FIG. **2**A illustrates an example embodiment of a needle **103** that may be used in the system **100** for performing RF neurotomy. The needle **103** includes a tip **201** that tapers to a point **301** capable of piercing the skin of a patient. In some embodiments, the tip point tapers to a point substantially at the center of the tip **201** (e.g., a "pencil-point" tip). In some embodiments, the tip point tapers to a point substantially at one side of the tip **201** (e.g., a "cutting" or "beveled" or "lancet" or "Quincke" tip). The needle **103** further includes an elongate member **203** connected to the tip **201** at a distal end **202** of the needle **103** and connected to a hub **204** at a proximal end **205** of the needle **103**. The needle **103** includes a longitudinal axis **223** along the center of the elongate member **203**.

FIG. **2**D illustrates another example embodiment of a needle **103** that may be used in the system **100** for performing RF neurotomy. The needle **103** includes a tip **211** that tapers to a point **301** capable of piercing the skin of a patient. In some embodiments, the tip point tapers to a point substantially at the center of the tip **211** (e.g., a "pencil-point" tip). In some embodiments, the tip point tapers to a point substantially at one side of the tip **211** (e.g., a "cutting" or "beveled" or "lancet" or "Quincke" tip). The needle **103** further includes an elongate member **203** connected to the tip **211** at a distal end **202** of the needle **103** and connected to a hub **204** at a proximal end **205** of the needle **103**. The needle **103** includes a longitudinal axis **223** along the center of the elongate member **203**.

The needle **103** may include a self-contained mechanical mechanism, in the form of deployable filaments **206***a*, **206***b*, operable to expand the volume of effective RF energy delivery as compared to known single-electrode RF probes. The filaments **206***a*, **206***b* may be at least partially in the elongate member **203** and may be operable to emerge through one or more apertures of the needle **103** proximate to the distal end **202** of the needle **103**. In some embodiments, the needle **103** includes a single filament or three or more filaments. The filaments **206***a*, **206***b* allow contraction/expansion, offsetting, and/or contouring of the effective RF energy delivery over a selected area of anatomy to adjust lesion geometry produced using the needle **103** to match a desired target volume (e.g., spherical, hemispherical, planar, spheroid, kidney-shaped, catcher's mitt-shaped, oblong, snowman-shaped, etc.). The filaments **206***a*, **206***b* may be deployable and/or retractable by moving (e.g., rotating) an actuator **216** relative to the hub **204**.

As will be further described, the needle **103** may further include a tube **207** that includes a lumen **222** therethrough. The lumen **222** may be used to transport fluids to and/or from the target volume. The lumen **222** may also accept the RF probe **401** for delivery of RF energy to the target volume. The lumen **222** may also accept a dummy or temporary probe, for example to occlude the fluid port **210** during insertion. In some embodiments, the RF probe **401** is integrated with the needle **103**. In certain such embodiments, the tube **207** need not be present for RF energy delivery, although it may be included to facilitate fluid delivery. In some embodiments, the filaments **206***a*, **206***b* include lumens therethrough for the transportation of fluid to and/or from the target volume. In some embodiments, the filaments **206***a*, **206***b* do not include lumens therethrough (e.g., being solid). The filaments **206***a*, **206***b* may function as thermocouples.

As RF energy penetrates biological tissue, protein and water molecules oscillate in response to the RF current and the tissue adjacent to the RF electrode is heated. As the tissue heats and coagulates, the biophysical properties of the tissue change. These tissue changes limit penetration of the RF energy beyond a leading edge defined by the shape and size of an active needle tip. Accordingly, the size of a radiofrequency lesion using conventional single needle technology is practically limited after achievement of a certain temperature delivered for a certain time.

A needle **103** with deployable filaments **206***a*, **206***b* can overcome this obstacle and expand the effective area of RF energy delivery by providing multiple locations (e.g., the tip **201**, **211** the filament **206***a*, and/or the filament **206***b*) from which the RF energy emanates. The use of multiple fila-

ments **206***a*, **206***b* provides additional conduits for RF energy, creating a multiple electrode RF field effect. The size, shape, and location of a lesion created with the needle **103** may be at least partially determined by, for example, the quantity, angle, length, location, and/or orientation of the filaments and RF energy parameters such as wattage, frequency, and/or application duration, one or all of which may be beneficially modified to suit a specific anatomical application by changing various aspects of the filaments as discussed below.

Where it is desired to create a lesion offset from the central longitudinal axis **223**, the lesion may be offset in a desired direction from the central longitudinal axis **223** by rotationally orienting the needle **103**. The needle **103** may be used to create a lesion offset from the central longitudinal axis **223** in a first direction. The filaments **206***a*, **206***b* may be retracted (e.g., after creating a first lesion), the needle **103** rotated, and the filaments **206***a*, **206***b* re-deployed to create a lesion offset from the central longitudinal axis **223** in a second direction (e.g., to create a second lesion).

FIGS. **3**A and **3**B are detailed views of an example embodiment of a distal end **202** of a needle **103** that includes a tip **201**. The tip **201** may include a sharpened point **301** (e.g., tapering to a point substantially at the center of the tip **201**, a pencil-point tip) for piercing the skin of a patient and facilitating advancement through tissue. The tip **201** may include a tapered portion **302** that transitions the tip **201** from the point **301** to a body portion **303**. The body portion **303** is the portion of the tip **201** that is proximal to the tapered portion **302**. The body portion **303** may be cylindrical as illustrated, or may be other appropriate shapes. The body portion **303** may have a cross-section that coincides with (e.g., is coaxial with) the cross section of the elongate member **203**.

FIGS. **3**D and **3**E are detailed views of another example embodiment of a distal end **202** of a needle **103** that includes a tip **211**. The tip **211** may include a sharpened point **301** (e.g., tapering to a point substantially at one side of the tip **201**, a cutting or beveled or lancet or Quincke tip) for piercing the skin of a patient and facilitating advancement through tissue. The tip **211** may include a tapered portion **302** that transitions the tip **211** from the point **301** to a body portion **303**. The body portion **303** is the portion of the tip **201** that is proximal to the tapered portion **302**. The body portion **303** may be cylindrical as illustrated, or may be other appropriate shapes (e.g., as illustrated in FIG. **16**A). The body portion **303** may have a cross-section that coincides with (e.g., is coaxial with) the cross section of the elongate member **203**. In some embodiments, the tip **211** has a bevel angle between about 10° and about 45°, between about 15° and about 35°, between about 20° and about 300 (e.g., about 25°), combinations thereof, and the like. Other bevel angles are also possible. In some embodiments, the point **301** has an angle between about 40° and about 120°, between about 70° and about 90°, between about 75° and about 85° (e.g., about 79°), combinations thereof, and the like. Other angles are also possible.

The tip **201**, **211**, or a non-insulated portion thereof, may act as an RF energy delivery element. The tip **201**, **211** may comprise (e.g., be made from) a conductive material such as, for example, stainless steel (e.g., 300 Series Stainless Steel). The tip **201**, **211** may be at least partially coated (e.g., with an insulator). The material of the tip **201**, **211** and the material of the optional coating may be selected, for example, to act as an insulator, improve radiopacity, improve and/or alter RF energy conduction, improve lubricity, and/or reduce tissue adhesion.



The tip **201**, **211** includes a first filament port or slot **304***a* (not visible in the views of FIGS. **3**A, **3**B, **3**D, and **3**E) and a second filament port or slot **304***b*. The geometry of the filament slots **304***a*, **304***b* may be selected to allow filaments **206***a*, **206***b* to be adequately retracted (e.g., such that the filaments **206***a*, **206***b* are in a cross-sectional envelope of the body portion **303** of the tip **201**, **211**, as shown in FIG. **3**F) while the needle **103** is inserted into the body, so that the filaments **206***a*, **206***b* do not cause any unintended damage to the patient. Such positioning of the filament slots **304***a*, **304***b* avoids having filament exit features on the tapered portion **302** and thus avoids potential coring that could be caused by such positioning.

The internal geometry of the filament slots **304***a*, **304***b* may be designed such that the filaments **206***a*, **206***b* may be easily retracted and advanced. For example, the internal geometry of the filament slots **304***a*, **304***b* may include a transition region **305** that meets the outer surface of the body portion **303** at an angle of about 30°. The transition region **305** may, for example, be curved and/or planar. Advancement of filaments **206***a*, **206***b* without a pre-set bias (e.g., substantially straight) relative to the filament slots **304***a*, **304***b* can causes the filaments **206***a*, **206***b* to be deflected outwardly as the filaments **206***a*, **206***b* move distally along the transition region **305**. Depending on the positioning of the transition region **305** relative to where the filaments **206***a*, **206***b* are confined (e.g., in the needle **103** of FIG. **3**A, the filaments **206***a*, **206***b* are confined to only longitudinal movement where they enter into the elongate member **203**) and on the mechanical properties of the filaments **206***a*, **206***b*, various deployment angles of the filaments **206***a*, **206***b* relative to the central longitudinal axis **223** may be achieved. Generally, the portions of the filaments **206***a*, **206***b* that extend outwardly away from the filament slots **304***a*, **304***b* may be unrestrained and thus may take any appropriate form. For example, where there is no pre-set bias, the portions of the filaments that extend outwardly away from the filament slots **304***a*, **304***b* (and therefore from the tip) may be substantially straight, such as shown in FIGS. **2**A, **3**A, **3**C, **3**D, **6**, **11**A-**11**C, and **14**. For another example, when there is a pre-set bias, the portions of the filaments that extend outwardly away from the filament slots may take any appropriate shape, such as, for example, curved as shown in FIG. **10**.

The radial orientation of the filament slots **304***a*, **304***b* may be selected such that a center point between the filament slots **304***a*, **304***b* does not coincide (e.g., is not coaxial with) with the central longitudinal axis **223**. For example, as shown in FIGS. **2**A, **3**A, **3**B, **3**D, and **3**E, the filament slots **304***a*, **304***b* may be positioned such that they are about 120° apart about the circumference of the tip **201**, **211**. Other filament slot configurations may be configured to achieve the filament placements discussed below. For example, the filament slots **304***a*, **304***b* may be between about 45 and about 180° apart about the circumference of the tip **201**, **211**, between about 90° and about 180° apart about the circumference of the tip **201**, **211**, between about 90° and about 150° apart about the circumference of the tip **201**, **211**, combinations thereof, and the like. Other angles are also possible. These configurations may be achieved by varying, for example, the quantity of filament slots, the placement of filament slots about the circumference of the tip **201**, **211**, and/or the placement of filament slots along the center longitudinal axis **223** to achieve the filament placements discussed below.

As noted herein, and illustrated in FIGS. **3**A and **3**B, the needle **103** may comprise a tube **207** that includes a lumen

**222** therethrough. The lumen **222** may be employed to accept the RF probe **401** for delivery of RF energy, for the transport of fluids, and/or for occluding a fluid port **210**. The tip **201**, **211** may include a fluid port **210** that may be in fluid communication with the lumen **222** via a channel through the tip **201**, **211**. In certain embodiments, the lumen **222** is a dual-purpose lumen that can allow injection of fluids and that can receive the distal end **402** of the RF probe **401** to deliver RF energy to the tip **201**, **211**, the filament **206***a*, and/or the filament **206***b*. In some embodiments, the fluid port **210** is longitudinally spaced from the tip **301** (e.g., by between about 1 mm and about 3 mm). The fluid port **210** may be centrally located (e.g., as illustrated in FIG. **3**D) or it may be located offset from the center longitudinal axis **223** (e.g., as shown in FIGS. **2**A and **3**A). The fluid port **210** may be used to transfer fluid between the region of the tip **201**, **211** and the proximal end **205** of the needle **103**. For example, during an RF neurotomy procedure, an anesthetic and/or an image enhancing dye may be introduced into the region of tissue around the tip **201**, **211** through the fluid port **210**. In some embodiments, the fluid port **210** is located along the tapered portion **302** of the tip **201**, **211** (e.g., as illustrated in FIGS. **3**A and **3**D). In some embodiments, the fluid port **210** is located along the body portion **303** of the tip **201**, **211**.

FIG. **16**A is a perspective view of an example embodiment of the needle tip **211**. In some embodiments, the needle **103** does not comprise a tube **207**, but the elongate member **203** comprises a lumen **308** therethrough and the tip **211** comprises a lumen **306***c* therethrough. The lumen **308** and the lumen **306***c* may be employed to accept the RF probe **401** for delivery of RF energy, for the transport of fluids, and or for occluding the fluid port **210**. In certain embodiments, the lumen **308** and the lumen **306***c* are dual-purpose lumens that can allow injection of fluids and that can receive the distal end **402** of the RF probe **401** to deliver RF energy to the tip **211**, the filament **206***a*, and/or the filament **206***b*. The filament lumens **306***a*, **306***b* may also allow liquid transfer from a proximal end of the needle to the filament ports **304***a*, **304***b*.

In some embodiments, the filament lumens **306***a*, **306***b* are sized to inhibit buckling and/or bending of the filaments in the tip **211**. In some embodiments, the elongate member **203** may also include filament lumens (e.g., comprising tubes in the elongate member **203**). In some embodiments, filament lumens in the elongate member **203** may be formed by an inner member (not shown) extending at least part of the length of the elongate member **203**. For example, a transverse cross-section of the inner member may have the same cross-section as the portion of the tip **211** illustrated in FIG. **3**F, including channels in which the filaments may lie and a lumen for passing fluid, an RF probe **401**, and/or a dummy probe.

FIG. **16**B is a back elevational view of the needle tip **211** of FIG. **16**A. FIG. **16**C is a front elevational view of the needle tip **211** of FIG. **16**A. The needle tip **211** comprises a filament lumen **306***a* in fluid communication with and terminating at the filament slot **304***a*, a filament lumen **306***b* in fluid communication with and terminating at the filament slot **304***b*, and the lumen **306***c*. In some embodiments, the lumens **306***a*, **306***b* are spaced by about 120° along the circumference of the tip **211**. Other angles are also possible. In some embodiments, the lumen **306***c* is spaced from each of the lumens **306***a*, **306***b* by about 120° along the circumference of the tip **211**. Other angles are also possible. Referring again to FIG. **3**F, the filament **206***a* may be in the filament lumen **306***a* and the filament **206***b* may be in the filament lumen **306***b*. The lumen **306***c* is in fluid communication with the fluid port **210**. In some embodiments, the proximal end of the tip **211** includes a tapered surface, as shown in FIG. **16**A. When filaments **206***a*, **206***b* are in the filament lumens **306***a*, **306***b*, the tapered surface may help to guide insertion of an RF probe **401** into the lumen **306***c*. In some embodiments, the tapered surface has an angle normal to the tip **211** between about 15° and about 75°, between about 30° and about 60°, between about 40° and about 50° (e.g., about 45°), combinations thereof, and the like. Other angles are also possible.

FIG. **16**D is a perspective view of an example embodiment of an elongate member **203**. The elongate member **203** includes the lumen **308**, the filament slot **304***a*, and the filament slot **304***b*. In some embodiments, the filament slots **304***a*, **304***b* are spaced by about 120° along the circumference of the elongate member **203**. FIG. **16**E is a perspective view of the needle tip **211** of FIG. **16**A and the elongate member **203** of FIG. **16**D. As described herein, the elongate member **203** may be coupled to the tip **211** by adhering with conductive epoxy, welding, soldering, combinations thereof, and the like. A proximal portion of the tip **211** can be inserted into the lumen **308** of the elongate member **203**. The filament slot **304***b* of the elongate member **203** is substantially aligned with the lumen **306***b* of the tip **211**, allowing the filament **206***b* to be deployed out of the lumen **306***b*. Although not illustrated, the filament slot **304***a* of the elongate member **203** is substantially aligned with the lumen **306***a* of the tip **211**, allowing the filament **206***a* to be deployed out of the lumen **306***a*. In some embodiments, each of the filament slots **304***a*, **304***b* has a length between about 0.025 inches and about 0.2 inches (approx. between about 0.6 mm and about 3 mm), between about 0.05 inches and about 0.15 inches (approx. between about 1.3 mm and about 3.8 mm), between about 0.075 inches and about 0.125 inches (approx. between about 1.9 mm and about 3.2 mm) (e.g., about 0.105 inches (approx. about 2.7 mm)), combinations thereof, and the like. Other lengths are also possible. In some embodiments, each of the filament slots **304***a*, **304***b* has a width between about 0.01 inches and about 0.4 inches (approx. between about 0.25 mm and about 10 mm), between about 0.02 inches and about 0.03 inches (approx. between about 0.5 mm and about 0.76 mm), between about 0.015 inches and about 0.025 inches (approx. between about 0.38 mm and about 0.64 mm) (e.g., about 0.02 inches (approx. about 0.5 mm)), combinations thereof, and the like. Other widths are also possible. In some embodiments, the each of the transition regions **305** has a length between about 0.02 inches and about 0.2 inches (approx. between about 0.5 mm and about 5 mm), between about 0.05 inches and about 0.15 inches (approx. between about 1.3 mm and about 3.8 mm), between about 0.075 inches and about 0.125 inches (approx. between about 1.9 mm and about 3.2 mm) (e.g., about 0.104 inches (approx. about 2.6 mm)), combinations thereof, and the like. Other lengths are also possible. In some embodiments in which the transition regions include curved surfaces, the each of the transition regions **305** has a radius of curvature between about 0.01 inches and about 0.4 inches (approx. between about 0.25 mm and about 10 mm), between about 0.15 inches and about 0.35 inches (approx. between about 3.8 mm and about 8.9 mm), between about 0.2 inches and about 0.3 inches (approx. between about 5 mm and about 7.6 mm) (e.g., about 0.25 inches (approx. about 6.4 mm)), combinations thereof, and the like. Other radii of curvature are also possible. Certain combinations of dimensions of the transition regions **305** and filaments slots

**304***a*, **304***b* described herein may cause deployment of the filaments **206***a*, **206***b* at desired angles (e.g., about 30°).

The lumen **308** is not visible in FIG. **16**E because the elongate member **203** covers the lumen **308**. Covering the lumen **308** causes fluid inserted into the lumen **308** to exit the fluid port **210**, and possibly the filament slots **304***a*, **304***b*. In some embodiments, for example as illustrated in FIGS. **3**A and **3**B, the elongate member **203** may also include a slot proximate to the tube **207**. In certain such embodiments, the tube **207** may extend distal to the slot and substantially all fluid inserted into the lumen **222** exits the fluid port **210**.

In the embodiment illustrated in FIG. **16**E, the body portion **303** of the tip **211** and the elongate member **203**, excluding the sleeve **307**, have substantially equal diameters, for example to provide a smooth transition between the tip **211** and the elongate member **203**. In some embodiments, the elongate member **203** has an inner diameter between about 0.01 inches and about 0.04 inches (approx. between about 0.25 mm and about 1 mm), between about 0.015 inches and about 0.035 inches (approx. between about 0.38 mm and about 0.89 mm), between about 0.02 inches and about 0.03 inches (approx. between about 0.5 mm and about 0.76 mm) (e.g., about 0.025 inches (approx. about 0.64 mm)), combinations thereof, and the like. Other diameters are also possible. In some embodiments, the elongate member **203** has an outer diameter between about 0.01 inches and about 0.05 inches (approx. between about 0.25 mm and about 1.3 mm), between about 0.02 inches and about 0.04 inches (approx. between about 0.5 mm and about 1 mm), between about 0.025 inches and about 0.035 inches (approx. between about 0.64 mm and about 0.89 mm) (e.g., about 0.029 inches (approx. about 0.74 mm)), combinations thereof, and the like. Other diameters are also possible. In some embodiments, the proximal portion of the tip has an outer diameter between about 0.01 inches and about 0.04 inches (approx. between about 0.25 mm and about 1 mm), between about 0.015 inches and about 0.035 inches (approx. between about 0.38 mm and about 0.89 mm), between about 0.02 inches and about 0.03 inches (approx. between about 0.5 mm and about 0.76 mm) (e.g., about 0.025 inches (approx. about 0.64 mm)), combinations thereof, and the like. Other diameters are also possible. In some embodiments, the tip **211** has an outer diameter between about 0.01 inches and about 0.05 inches (approx. between about 0.25 mm and about 1.3 mm), between about 0.02 inches and about 0.04 inches (approx. between about 0.5 mm and about 1 mm), between about 0.025 inches and about 0.035 inches (approx. between about 0.64 mm and about 0.89 mm) (e.g., about 0.029 inches (approx. about 0.74 mm)), combinations thereof, and the like. Other diameters are also possible.

FIG. **16**F is a cross-sectional view of the needle tip **211** and the elongate member **203** along the line **16**F-**16**F of FIG. **16**E. FIG. **16**F also illustrates an example embodiment of a filament **206***a* in the lumen **308** and the lumen **306***a*, then exiting via the filament slot **304***a*, and an RF probe **401** in the lumen **308**. In some embodiments, the elongate member **203** and the tip each **211** comprise (e.g., are each made from) a conductive material (e.g., 300 Series Stainless Steel), and can conduct electrical signals from the RF probe **401** to the tip **211** and the filaments **206***a*, **206***b* (e.g., due to physical contact of conductive components) to form a monopolar electrode. In some embodiments, the RF probe **401**, the filaments **206***a*, **206***b*, the tip **211**, and/or the elongate member **203** may include features configured to increase physical contact between the components. The cross-sectional view shows the lumen **308** in fluid communication with the lumen **306***c* and the fluid port **210**.

FIG. **16**G is another cross-sectional view of an example embodiment of a needle tip **211** and the elongate member **203** along a line similar to the line **16**F-**16**F in FIG. **16**E. The tip **211** in FIG. **16**G does not include a fluid port **210**, but fluid can permeate out of the filament slots **304***a*, **304***b* because the filament slots are in fluid communication with the lumen **308**. In some embodiments, the tip **211** includes a lumen **306***c*, for example to assure placement of or contact with the probe **401** (e.g., as illustrated in FIG. **16**G). In some embodiments, the tip **211** does not include a lumen **306***c*, for example to reduce manufacturing costs if the lumen **306***c* is cut from a solid tip stem.

As may be appreciated, the channel through the tip **201**, **211** may be sized to accommodate a tip of the RF probe **401** that may be inserted into the needle **103**. The channel may be sized such that RF energy from the inserted RF probe **401** is satisfactorily communicated from the RF probe **401** to the tip **201**, **211**, the filament **206***a*, and/or the filament **206***b*.

FIGS. **3**C and **3**G are each a detailed view of the distal end **310** of a needle **309** that is an alternate embodiment of the needle **103**. The distal end **310** includes a tip **311**, **321** that may include a sharpened point **312** for piercing the skin of a patient and facilitating advancement through tissue. The tip **311**, **321** may include a tapered portion **313** that transitions the tip **311**, **321** from the point **312** to a first body portion **314**. The first body portion **314** may be connected to a second body portion **315** at an angle **316**. In some embodiments, the angle **316** is about 15°. Other angles **316** are also possible. For example, the angle **316** may be between about 5° and about 90°, between about 10° and about 60°, between about 10° and about 45°, between about 10° and about 20°, combinations thereof, and the like. Other angles are also possible. The second body portion **315** may be aligned with an elongate member **317**. The elongate member **317** may be similarly configured as the elongate member **203** of FIGS. **3**A, **3**B, **3**C, and **3**D. The angle **316** between the first body portion **314** and the second body portion **315** may aid the user in navigating the needle **309** to a desired position. For example, by rotating the needle **309** such that the first body portion **314** is pointing in a desired direction, subsequent advancement of the needle **309** may result in the needle **309** following a non-straight path biased toward the desired direction.

The first and second body portions **314**, **315** may be cylindrical as illustrated, or they may be of any other appropriate shape. The first and second body portions **314**, **315** may have cross-sections that coincide with (e.g., is coaxial with) the cross section of the elongate member **317**.

The tip **311**, **321**, or a non-insulated portion thereof, may act as an RF energy delivery element. The tip **311**, **321** may comprise (e.g., be made from) a conductive material such as, for example, stainless steel (e.g., 300 Series Stainless Steel). The tip **311**, **321** may be coated (e.g., with an insulator). The material of the tip **311**, **321** and the material of the optional coating may be selected, for example, to act as an insulator, improve radiopacity, improve and/or alter RF energy conduction, improve lubricity, and/or reduce tissue adhesion.

The filaments **319***a*, **319***b* may also act as RF energy delivery elements. The filaments **319***a*, **319***b* may be constructed in a manner similar to as described with respect to the filaments **206***a*, **206***b*.

The tip **311** of FIG. **3**C includes a filament slot **318***a* and a filament slot **318***b*. The geometry of the filament slots **318***a*, **318***b* may be selected to allow filaments **319***a*, **319***b* to be adequately retracted (e.g., such that they are in a

cross-sectional envelope of the second body portion **315**) while the needle **309** is inserted into the body, so that the filaments **319***a*, **319***b* do not cause any unintended damage to the patient (e.g., by being along the second body portion **315**). Such positioning of the filament slots **318***a*, **318***b* may avoid having filament exit features on the tapered portion **313** and on the first body portion **314**, which may avoid potential coring. The internal geometry of the filament slots **318***a*, **318***b* may include a transition region that meets the outer surface of the second body portion **315** at an angle, and advancement of filaments **319***a*, **319***b* without a pre-set bias (e.g., substantially straight) relative to the filament slots **318***a*, **318***b* can causes the filaments **319***a*, **319***b* to be deflected outwardly as the filaments **319***a*, **319***b* move distally along the transition region.

The configuration and orientation of the filament slots **318***a*, **318***b* may be selected such that deployed filaments **319***a*, **319***b* may achieve the positioning illustrated in FIG. **3**C. In FIG. **3**C, the filaments **319***a*, **319***b* are generally positioned in a plane that is perpendicular to a plane that includes the angle **316** between the first and second body portions **314**, **315**. As illustrated, the filaments **319***a*, **319***b* may be positioned such that they extend at an angle (e.g., about 15°, between about 10° and about 90°, between about 10° and about 60°, between about 10° and about 45°, between about 10° and about 20°, combinations thereof, and the like) relative to the plane that includes the angle **316**. Other angles are also possible. Other filament slot **318***a*, **318***b* configurations may be configured to achieve other desired filament **319***a*, **319***b* placements. These configurations may be achieved, for example, by varying the quantity of filament slots and filaments, the placement of filament slots about the circumference of the tip **311**, the angle at which the filaments extend away from the first and second body portions **314**, **315**, and/or the placement of filament slots along the first and second body portions **314**, **315**.

FIG. **3**G illustrates an example embodiment of a tip **321** that includes a filament slot **318***a* and a filament slot **318***b* along the first body portion **314**. The geometry of the filament slots **318***a*, **318***b* may be selected to allow filaments **319***a*, **319***b* to be adequately retracted (e.g., such that they are in a cross-sectional envelope of the second body portion **315**) while the needle **309** is inserted into the body, so that the filaments **319***a*, **319***b* do not cause any unintended damage to the patient. Positioning of the filament slots **318***a*, **318***b* along the first body portion **314** may potentially cause coring, so the filaments **319***a*, **319***b* may be configured to substantially occlude the filament slots **318***a*, **318***b*, which may avoid potential coring. The internal geometry of the filament slots **318***a*, **319***b* may lack a transition region and, due to being positioned on the first body portion **314**, advancement of the filaments **319***a*, **319***b* without a pre-set bias (e.g., substantially straight) can cause the filaments **319***a*, **319***b* to continue to advance substantially straight (e.g., along the longitudinal axis of the elongate member **317** and/or the second body portion **315**) as the filaments move distally out of the filament slots **318***a*, **318***b*. Although not illustrated, placement of filament slots along the tapered portion **313** is also possible (e.g., the filaments continuing to advance along the longitudinal axis of the first body portion **314**). Although not illustrated, the embodiments depicted in FIGS. **3**A and **3**D may be adapted so the filaments **206***a*, **206***b* exit along the tapered portion **302**.

The needle **309** may comprise a tube that includes a lumen therethrough, for example as described herein with respect to FIGS. **3**A, **3**B, **3**D, and **3**E. The lumen may be employed to accept an RF probe for delivery of RF energy and/or for



the transport of fluids. In this regard, the tip **311** may further include a fluid port **320** that may be in fluid communication via a channel through the tip **311** with the lumen. The fluid port **320** may be used to transfer fluid between the region of the tip **311** and a proximal end of the needle **309**.

In the deployed position as shown in FIG. **3**C, the distal ends of the filaments **319***a*, **319***b* are disposed away from the point **312**. In the deployed position as shown in FIG. **3**G, the distal ends of the filaments **319***a*, **319***b* are disposed away from the point **312**. In a retracted position (not shown, but similar to as shown in FIGS. **3**B and **3**E), the distal ends of the filaments **319***a*, **319***b* are entirely within an outer perimeter (e.g., circumference where the second body portion **315** of the tip **311**, **321** is round) of the tip **311**, **321**. In the deployed position, the filaments **319***a*, **319***b* act as broadcast antennae for an RF probe inserted into the needle **309**. The tip **311** or **321**, the filament **319***a*, and/or the filament **319***b* may form a monopolar electrode for application of RF energy to the target volume. The filaments **319***a*, **319***b* may allow the RF energy from the RF probe to be dispersed over a larger volume than would be possible with the tip **311**, **321** alone.

In general, any or all of the herein variables may be incorporated into a particular embodiment of a needle to yield a needle capable of producing a lesion with a particular size, position and shape relative to the tip of the needle. Such custom sizes, positions and shapes may be designed for specific procedures. For example, a particular lesion size, position and shape may be selected to enable a user to navigate the needle to a particular landmark (e.g., proximate to or touching a bone visible using fluoroscopy) and then orient the needle such that deployed filaments will be operable to produce a lesion at a particular location relative to the landmark. By navigating to a particular internal landmark, as opposed to attempting to visualize a relative position of a needle offset from a landmark, a more accurate and/or consistent positioning of the needle may be achieved. In this regard, the skill level required to accurately position the needle for a particular procedure may be reduced.

The lesion shapes achievable through selection of the herein variables may include, for example, generally spherical, oblong, conical, and pyramidal shapes. The orientation relative to, and the amount of offset from, the tip of such shapes may be selectable. In an embodiment, the tips of the deployed filaments may be positioned distally relative to the point of the tip to provide for a facile positioning of the lesion relative to the tip. Such capability may allow for the needle to be inserted directly toward a target volume. In other embodiments, the tips of the deployed filaments may be positioned at the same axial position along the central longitudinal axis as the point of the tip or the tips of the deployed filaments may be positioned proximally relative to the point of the tip. In other embodiments, some filament endpoints may be located distal to the point of the tip while others are proximal to the point of the tip.

The elongate member **203** may be in the form of a hollow tube (e.g., sheath, cannula) interconnecting the tip **201**, **211** with the hub **204**. The elongate member **203** may be configured with adequate strength to allow the needle **103** to pierce a patient's skin and advance to a target area through various tissue types, including, for example, fat and muscle tissue. The elongate member **203** may also be capable of resisting kinking as it is advanced. In some embodiments, the elongate member **203** comprises a rod with a plurality of lumens along its length to accommodate the filaments **206***a*, **206***b*, the RF probe **401**, and/or a fluid passage.

The elongate member **203** houses portions of the filaments **206***a*, **206***b* and the tube **207**, and allows for relative movement of the filaments **206***a*, **206***b*. The elongate member **203** may be of any appropriate size and internal configuration to allow insertion into a patient and to house componentry therein. In some embodiments, the elongate member **203** is a 16 gauge round tube or smaller. For example, the elongate member **203** may be 18 gauge or 20 gauge. In some embodiments, the elongate member **203** has a maximum cross-sectional dimension of about 1.7 mm. In some embodiments, the elongate member **203** has a maximum cross-sectional dimension of about 1 mm. The elongate member **203** may have a length selected for performing a specific spinal RF neurotomy procedure on a particular patient. In some embodiments, the elongate member **203** has a length of about 10 cm.

In certain embodiments, the elongate member **203** comprises (e.g., is constructed from) an insulative material to reduce (e.g., eliminate) the amount of RF energy emitted along the length of the elongate member **203** when the RF probe **401** is disposed therein. For example, the elongate member **203** may comprise (e.g., be constructed from) polymeric, ceramic, and/or other insulative material. In certain embodiments, the elongate member **203** includes an insulating coating or sleeve **307** (FIGS. **2**D and **16**D). In some embodiments, the elongate member is insulated (e.g., constructed from insulative material and/or having an insulating coating **307**) except for a distal part having a length between about 5 mm and about 10 mm. FIG. **3**H illustrates an example embodiment of a needle **309** comprising an insulating coating **330** covering a proximal portion of the tip **321** and coatings **332***a*, **332***b* covering a proximal portion of the filaments **319***a*, **319***b*. The coating **330** insulates, inter alia, the bent area between the first body portion **314** and the second body portion **315** of the tip **321**.

In some embodiments, the elongate member is insulated (e.g., constructed from insulative material and/or having an insulating coating) except for a proximal part. FIG. **3**I illustrates an example embodiment of a needle **309** comprising an insulating coating **330** covering a distal portion of the tip **321** and coatings **332***a*, **332***b* covering a distal portion of the filaments **319***a*, **319***b*. In some embodiments in which the distal portion of the tip **321** is, the needle **309** may create a kidney or catcher's mitt shaped lesion, which may be useful, for example, for ablating tissue where the active tip is pressed against the wall of a structure with the device staying in the lumen of a structure. For example, when ablating endocardial lesions in which the device accesses the target through a cardiac chamber, insulating the distal portion of the tip **321**, which stays in the chamber, can make the biophysics of the lesion (e.g., impedance, power, heat) more precise because the insulated distal portion of the tip **321** that is surrounded by blood in the chamber will not be part of the field.

FIGS. **3**H and **3**I illustrate example embodiments of insulation of parts of the tip **321** and the filaments **319***a*, **319***b* illustrated in FIG. **3**G. Parts of components of the distal ends of other needle tips described herein may also be insulated (e.g., those illustrated in FIGS. **3**A, **3**C, and **3**D). In some embodiments, only parts of the tip **321**, and not parts of the filaments **319***a*, **319***b*, are insulated. In some embodiments, only parts of the filaments **319***a*, **319***b*, and not parts of the tip **321**, are insulated. In some embodiments, a distal portion of the tip **321** is insulated (e.g., as illustrated in FIG. **3**) and proximal portions of the filaments **319***a*, **319***b* are insulated (e.g., as illustrated in FIG. **3**H). In some embodiments, a distal portion of the filaments **319***a*, **319***b* are insulated (e.g., as illustrated in FIG. **3**I) and a proximal portion of the tip **321** is insulated (e.g., as illustrated in FIG. **3**H). In some embodiments, the insulative coating or sleeve **330**, **332***a*, **332***b* may be adjustable. For example, one or all of the sleeves **330**, **332***a*, **332***b* may be advanced or retracted relative to the tip **321**, the filament **319***a*, and the filament **319***b*, respectively, to increase or decrease the amount of exposed conductive area.

The elongate member **203** may include a coating that may improve radiopacity to aid in visualization of the position of the needle **103** using fluoroscopy. The elongate member **203** may include a lubricious coating to improve its ability to be inserted and positioned in the patient and/or to reduce tissue adhesion. The elongate member **203** may include markers **224** along its length to assist in determining the depth to which the needle **103** has entered into the anatomy. The markers **224** may be radiopaque so that they may be viewed under fluoroscopy. A collar (not shown) may be disposed about the elongate member **203** to assist in placement of the tip **201**, **211** of the needle **103**. For example, the tip **201**, **211** may be positioned in a first position, the collar may then be placed against the patient's skin, and then the needle **103** may be advanced and/or withdrawn a certain distance. Such a distance may be indicated, for example, by the distance between the collar and a patient's skin or other anatomy.

The elongate member **203** may be fixedly interconnected to the tip **201**, **211** and the hub **204** in any appropriate manner. For example, the tip **201**, **211** may be press fit into the elongate member **203** and the elongate member **203** may be press fit into the hub **204**. Other example methods of attachment include adhesive bonding and welding. In some embodiments, the elongate member **203** and the tip **201**, **211** are a single unitary structure. The elongate member **203** may be steerable and incorporate controlling mechanisms allowing the elongate member **203** to be deflected or steered after insertion into the anatomy.

The tube **207** containing the lumen **222** may comprise (e.g., be constructed from) any appropriate material. For example, the tube **207** comprise a conductive material, such as stainless steel (e.g., 300 Series Stainless Steel), such that when the RF probe **401** is inserted in the tube **207**, the RF energy emitted by the RF probe **401** may be conducted through the tube **207** and into and through the tip **201**, **211**, the filament **206***a*, and/or the filament **206***b*. The tube **207** may be interconnected to the tip **201**, **211** such that the lumen **222** is in sealed, fluid communication with the channel through the tip **201**, **211**. This may be accomplished by a press fit, weld, or any other appropriate method.

As noted, the lumen **222** may be in fluid communication with the tip **201**, **211** at the distal end **202**. A proximal end of the lumen **222** may be disposed at the proximal end **205** of the needle **103**. In this regard, the lumen **222** may extend from the distal end **202** to the proximal end **205**, with the only access being at the distal and proximal ends **202**, **205**. In some embodiments, the lumen **222** is the only lumen of the needle **103** disposed along the elongate member **203**.

The RF probe **401** inserted into the lumen **222** may be positioned such that an end of the RF probe **401** is proximate to the tip **201**, **211**. For example, the RF probe **401** may be positioned such that the distal end **402** of the RF probe **401** is in the lumen **222** near the tip **201**, **211** or in the channel through the tip **201**, **211**. RF energy transmitted through the RF probe **401** may then be conducted by the tip **201**, **211**, the filament **206***a*, and/or the filament **206***b*. The size of the lumen **222** may be selected to accommodate a particular size of RF probe **401**. For example, the lumen **222** may be configured to accommodate at least a 22 gauge RF probe

**401**, at least a 21 gauge RF probe **401**, or a larger or smaller RF probe **401**. For another example, the lumen **222** may have a maximum cross-sectional dimension of less than about 0.85 mm.

The proximal end of the tube **207** may be operable to receive the RF probe **401**. The proximal end of the tube **207** and the actuator **216** may be configured to accept a connector, such as a Luer fitting, such that a fluid source may be connected to the tube **207** (e.g., to deliver fluid through the lumen **222** and out the fluid port **210**).

The needle **103** includes two filaments **206***a*, **206***b* in and along elongate member **203**. Distal ends of the filaments **206***a*, **206***b* are proximate to the tip **201**, **211**, and proximal ends of the filaments **206***a*, **206***b* are fixed to a filament hub **221** discussed below. The filaments **206***a*, **206***b* are movable along the central longitudinal axis **223** between a fully deployed position as illustrated in FIGS. **3**A, **3**C, **3**D, and **3**F and a retracted position illustrated in FIGS. **3**B and **3**E. Moving the filaments **206***a*, **206***b* distally from the retracted position moves the filaments **206***a*, **206***b* toward the fully deployed position, while moving the filaments **206***a*, **206***b* proximally from the deployed position moves the filaments **206***a*, **206***b* toward the retracted position. The filaments **206***a*, **206***b* may be deployed in intermediate positions between the fully deployed positions and the retracted positions. For example, a mechanism for advancement and/or retraction of the filaments **206***a*, **206***b* may include detents indicating partial deployment and/or retraction and a stop indicating full deployment and/or retraction.

In the fully deployed position, the distal ends of the filaments **206***a*, **206***b*, **319***a*, **319***b* are disposed away from the tip **201**, **211**, **311**, **321**. In the retracted position, the distal ends of the filaments **206***a*, **206***b*, **319***a*, **319***b* are entirely within an outer perimeter (e.g., circumference where the body portion **303** of the tip **201**, **211**, **311**, **321** is round) of the tip **201**, **211**, **311**, **321**. In the deployed position, the filaments **206***a*, **206***b*, **319***a*, **319***b* can act as broadcast antennae for the RF probe **401** (e.g., RF energy passes from the RF probe **401** to the tip **201**, **211**, **311**, **321** and to the filaments **206***a*, **206***b*, **319***a*, **319***b*, and into a target volume within a patient). In this regard, together, the RF probe **401** inserted into the lumen **222**, the tip **201**, **211**, **311**, **321**, and the filaments **206***a*, **206***b*, **319***a*, **319***b*, may form a monopolar electrode for application of RF energy to the target volume. The filaments **206***a*, **206***b*, **319***a*, **319***b* allow the RF energy from the RF probe **401** to be dispersed over a larger volume than would be possible with the tip **201**, **211**, **311**, **321** alone.

The filaments **206***a*, **206***b*, **319***a*, **319***b* may be constructed from a material operable to conduct RF energy, e.g., a metal such as stainless steel (e.g., 303 Stainless Steel), Nitinol, or shape memory alloy. The filaments **206***a*, **206***b* may be coated, for example to enhance and/or inhibit their ability to conduct RF energy. The filaments **206***a*, **206***b* may include a lubricious coating to aid in insertion and/or reduce tissue adhesion.

FIG. **2**E illustrates an embodiment in which the filaments **206***a*, **206***b* are formed from a single wire **206** that is bent at the proximal end. The distal ends of the filaments **206***a*, **206***b* are shown as bent, which can be the result of deflection upon exit from a tip **201**, **211**, shape memory, combinations thereof, and the like. Forming the filaments **206***a*, **206***b* from a single wire **206** may provide advantages such as, for example, coherent activation of the filaments **206***a*, **206***b*, simultaneous deployment of the filaments **206***a*, **206***b*, and/or simultaneous retraction of the filaments **206***a*, **206***b*. It will be appreciated that the wire **206** may be a single wire or a plurality of wire segments joined together (e.g., via adhering with conductive epoxy, welding, soldering, combinations thereof, and the like). Other filaments described herein may also be coupled or bent at the proximal end. The filaments **206***a*, **206***b* illustrated in FIG. **2**E are substantially parallel, and taper outwards before being bent at the proximal end. In some embodiments, the filaments **206***a*, **206***b* are substantially parallel and do not taper out before being bent at the proximal end. In certain such embodiments, the proximal end of the wire **206** is a semi-circle, for example having a radius between about 0.03 inches and about 0.07 inches (approx. between about 0.76 mm and about 1.8 mm), between about 0.04 inches and about 0.06 inches (approx. between about 1 mm and about 1.5 mm), between about 0.05 inches and about 0.055 inches (approx. between about 1.3 mm and about 1.4 mm) (e.g., about 0.052 inches (approx. about 1.32 mm)), combinations thereof, and the like. In some embodiments, the filaments **206***a*, **206***b* are parallel and spaced by a distance between about 0.025 inches and about 0.125 inches (approx. between about 0.64 mm and about 3.2 mm), between about 0.05 inches and about 0.1 inches (approx. between about 1.3 mm and about 2.5 mm) (e.g., about 0.075 inches (approx. about 1.9 mm)), combinations thereof, and the like. In some embodiments, the filaments **206***a*, **206***b* in the elongate member **203** may be braided, wrapped, or twisted together. Such embodiments may increase column strength, providing resistance to buckling and/or bending in the elongate member **203**. In some embodiments, the wire **206** has a diameter between about 0.0025 inches and about 0.04 inches (approx. between about 0.06 mm and about 1 mm), between about 0.005 inches and about 0.025 inches (approx. between about 0.13 mm and about 0.64 mm), between about 0.01 inches and about 0.02 inches (approx. between about 0.25 mm and about 0.5 mm) (e.g., about 0.014 inches (approx. about 0.36 mm)), combinations thereof, and the like. Other diameters are also possible. In some embodiments, the filaments **206***a*, **206***b* each have a diameter between about 0.0025 inches and about 0.04 inches (approx. between about 0.06 mm and about 1 mm), between about 0.005 inches and about 0.025 inches (approx. between about 0.13 mm and about 0.64 mm), between about 0.01 inches and about 0.02 inches (approx. between about 0.25 mm and about 0.5 mm) (e.g., about 0.014 inches (approx. about 0.36 mm)), combinations thereof, and the like. Other diameters are also possible. In some embodiments, the filaments **206***a*, **206** have different diameters (e.g., by being formed from different wires, by being formed from portions of wires with different diameters that are coupled to form the wire **206**, etc.).

The distal ends of the filaments may be shaped (e.g., pointed) to improve their ability to move through tissue. For example, the tips of the filaments **206***a*, **206***b* in FIG. **3**A have an outward-facing bevel. In some embodiments, the bevel is at an angle between about 15° and about 45°, between about 20° and about 40°, between about 25° and about 35° (e.g., about 30°), combinations thereof, and the like. In embodiments in which the filaments **206***a*, **206***b* each have a diameter of about 0.014 inches (approx. about 0.36 mm) and a bevel of about 30°, the length of the bevel is about 0.024 inches (approx. about 0.61 mm). The tips of the filaments **206***a*, **206***b* may have the same shape (e.g., beveled) or different shapes. For another example, the tips of the filaments **206***a*, **206***b* in FIG. **3**D have an inward-facing bevel. In certain embodiments, bevels (e.g., inward-facing bevels) can help to induce splay between the tips of the filaments **206***a*, **206***b* (e.g., splay of between about 15° and about 20°) by tracking to one side (e.g., away from the

beveled side) upon deployment, which can improve placement of the filaments **206***a*, **206***b*. For yet another example, the tips of the filaments **319***a*, **319***b* in FIG. **3**G have a pencil-point. In certain embodiments, a pencil-point tip can help to reduce splay between the tips of the filaments **206***a*, **206***b* by substantially straight tracking deployment, which can improve placement of the filaments **206***a*, **206***b*. In some embodiments, the filaments **206***a*, **206***b* comprise materials with different tensile strength and/or rigidity, and the filaments **206***a*, **206***b*, which can affect their ability to flex due to contact with tissue and thus the amount of splay, if any. In certain embodiments in which the filaments **206***a*, **206***b* comprise a shape memory material, the deflection to an unconfined state may work with or against the shapes of the tips. In some embodiments, certain filament tips may help to occlude filaments slots, improve interaction with a transition region, etc. Although certain combinations of filament tips are illustrated with respect to certain embodiments herein, the various shapes of the filament tips described herein and otherwise may be selected for any of these embodiments (e.g., the filaments **206***a*, **206***b* of FIG. **3**A may have inwardly-facing bevels or pencil-point tips, the filaments **206***a*, **206***b* of FIG. **3**D may have outwardly-facing bevels or pencil-point tips, the filaments **319***a*, **319***b* of FIG. **3**C may have inwardly-facing bevels or pencil-point tips, the filaments **319***a*, **319***b* of FIG. **3**G may have inwardly-facing bevels or outwardly-facing bevels, etc.).

The positioning of the filaments **206***a*, **206***b* of the embodiments illustrated in FIGS. **3**A and **3**D will now be described in relation to FIG. **5**. FIG. **5** is an end view of the tip **201** and deployed filaments **206***a*, **206***b* of the embodiment illustrated in FIGS. **2**A and **3**A. The filaments **206***a*, **206***b* are positioned at a filament angle **503** of about 120° apart from each other about the central longitudinal axis **223**. This coincides with the positions of the filament slots **304***a*, **304***b* discussed herein since the filaments **206***a*, **206***b* emerge from the filament slots **304***a*, **304***b*. Other filament angles **503** are also possible. For example, the filament angle **503** may be between about 90° and about 180°, between about 90° and about 150°, between about 100° and about 140°, between about 110° and about 130°, combinations thereof, and the like. A filament-free angle **504** of about 240° is defined as the largest angle about the circumference of the tip **201**, **211** that is free of filaments. In an embodiment consisting of two filaments **206***a*, **206***b*, the filament angle **503** may be less than 180° and the filament-free angle **504** may be correspondingly greater than 180° (e.g., greater than 200° or greater than 240°).

In FIG. **5**, the central longitudinal axis **223** is perpendicular to the plane of the illustration. A midpoint **502** is defined between distal ends **501***a*, **501***b* of the filaments **206***a*, **206***b*, respectively. The midpoint **502** is offset from the central longitudinal axis **223**. For example, in some embodiments, the midpoint **502** is offset from the central longitudinal axis **223** by about 2 mm. Other offset values are also possible. For example, the offset may be between about 0.5 mm and about 5 mm, between about 1 mm and about 4 mm, between about 1 mm and about 3 mm, greater than about 0.5 mm, less than about 5 mm, combinations thereof, and the like. When RF energy is transmitted from the tip **201** and both of the filaments **206***a*, **206***b*, the RF energy will be transmitted asymmetrically with respect to the central longitudinal axis **223** the cause the RF energy will be emitted from the tip **201** and the filaments **206***a*, **206***b*. As oriented in FIG. **5**, the energy will be biased in an upward direction in the direction from the point **301** toward the midpoint **502**. Thus, when RF energy is transmitted during an RF neurotomy procedure, a lesion will be created that is correspondingly offset from the central longitudinal axis **223** in the direction from the point **301** toward the midpoint **502**.

Referring again to the asymmetric nature of the lesion, the lesion may be substantially a three-dimensional polygon (e.g., with rounded edges) of known dimensions and volume that is offset from the central cannula in a known and predictable way. Different embodiments may have different three-dimensional polygonal structures adapted to the intended ablation target. By contrast, needles without deployable filaments may be used to create asymmetric planar lesions by varying needle insertion during the ablation procedure, and may require substantial ablation volume overlap.

FIG. **6** is a side view of the tip **201** and the filaments **206***a*, **206***b*, oriented such that the deployed filament **206***b* is entirely within the plane of the figure. The filaments **206***a*, **206***b* extend from the tip **201** at a common distance, or location, along the central longitudinal axis **223**. In some embodiments, the filaments **206***a*, **206***b* may extend different distances. The filament **206***b* is deflected radially outwardly from the central longitudinal axis **223**. The filament **206***b* emerges from the tip **201** at an angle **601** of about 30° from the central longitudinal axis **223**, which is parallel to the longitudinal axis of the elongate member **203**. The angle **601** may vary, for example, based at least partially on positioning of a transition region **305**, mechanical properties of the filament **206***b* (e.g., shape-memory properties or lack thereof), and the like. In some embodiments, the angle **601** is between about 5° and about 85°, between about 10° and about 60°, between about 20° and about 40°, greater than about 5°, less than about 85°, combinations thereof, and the like. In some embodiments, the angle **601** is related to the angle **503**. For example, the angle **601** may be a fraction of the angle **503**, such as about ¼. In some embodiments, the angle **601** is unrelated to the angle **503**, for example both being independently chosen to produce a certain lesion size or shape. In some embodiments, the distal tips **501***a*, **501***b* are positioned distally beyond the point **301** by a distance **602**, are disposed at a distance **603** from the central longitudinal axis **223**, and/or are disposed at a distance **604** from each other. In some embodiments, the distance **602** is about 3.5 mm, the distance **603** is about 3 mm, and/or the distance **604** is about 4.5 mm. Other distances are also possible. For example, in some embodiments, the distance **602** is between about 0.5 mm and about 6 mm, between about 1 mm and about 5 mm, between about 3 mm and about 4 mm, combinations thereof, and the like. Other distances are also possible. For another example, in some embodiments, the distance **603** is between about 0.5 mm and about 6 mm, between about 1 mm and about 5 mm, between about 2 mm and about 4 mm, combinations thereof, and the like. Other distances are also possible. For yet another example, in some embodiments, the distance **604** is between about 2 mm and about 7 mm, between about 3 mm and about 6 mm, between about 4 mm and about 5 mm, combinations thereof, and the like. Other distances are also possible.

The angles described herein (e.g., the angles **503**, **601**) may be measured with respect to a needle **103** in a deployed state outside of a patient's body, and that the angles may when the needle is inside a patient's body, for example based at least in part on splay of filaments due to beveling.

The tip **211** and deployed filaments **206***a*, **206***b* of the embodiment illustrated in FIG. **3**D may also have a filament angle **503**, a filament-free angle **504**, a midpoint **502**, an angle **601**, distances **602**, **603**, **604**, and other features described herein, for example with respect to FIGS. **5** and **6**.

In some embodiments, the portion of the lesion based at least partially on RF energy emitted by the tip **211**, and thus the shape of the lesion, may vary based on the position of the point **301** (e.g., in FIG. **3***d*, the point **301** is on the side of the tip **211** that comprises the filaments **206***a*, **206***b*).

The configuration of the filaments **206***a*, **206***b* illustrated in FIGS. **2**A, **3**A, **3**D, **5**, and **6** may be operable to produce lesions that are radially offset from the central longitudinal axis **223** and distally offset from the point **301** as compared to a lesion created by the tip **201**, **211** without the filaments or a lesion created with the needle **103** with the filaments **206***a*, **206***b* in the retracted position.

Variations in the relative shapes, positions, and sizes of lesions created with the needle may be achieved by repositioning the filaments. For example, as noted herein, the lesion produced by the needle will be in different positions depending on whether the filaments are in the deployed or retracted positions. Lesions having intermediate shapes, positions, and/or sizes may be achieved by positioning the filaments in intermediate positions between the fully deployed (e.g., as illustrated in FIGS. **3**A, **3**C, **3**D, and **3**G) and fully retracted positions (e.g., as illustrated in FIGS. **3**B and **3**E). As noted herein, the needle with deployed filaments is operable to produce larger lesion volumes than the needle with retracted filaments. For example, the needle with fully deployed filaments may be operable to produce lesion volumes of about 500 $mm^3$. Other lesion volumes are also possible. For example, the needle with fully deployed filaments may be operable to produce lesion volumes between about 100 $mm^3$ and about 2,000 $mm^3$, between about 200 $mm^3$ and about 1,000 $mm^3$, between about 250 $mm^3$ and about 750 $mm^3$, between about 400 $mm^3$ and about 600 $mm^3$, combinations thereof, and the like.

Further variation in the shape, position, and/or size of lesions created by needles with deployable filaments may be achieved by different configurations of filaments. Variations may include, for example, variations in materials, the number of filaments, the radial positioning of the filaments, the axial positioning of the filaments, the length of the filaments, the angle at which the filaments exit the tip, the shape of the filaments, etc. By varying these parameters, the needle may be configured to produce lesions of various sizes and shapes that are positioned at various locations relative to the tip. Such variations may be specifically tailored to be used in specific procedures, such as RF neurotomy procedures of particular nerves adjacent to particular vertebrae.

Variations of the materials used for the tip and/or the filaments may be selected to achieve particular lesion sizes, positions, and/or shapes. For example, the tip may comprise (e.g., be made form) a material that does not conduct RF energy, in which case RF energy from the RF probe **401** may be conducted by substantially only the deployed filaments. In certain such embodiments, emitting RF energy from the filaments may provide for a lesion with a larger offset from the central longitudinal axis **223** than would be produced if the tip conducts RF energy and acts as an electrode along with the filaments.

Another material-related variation that may affect lesion shape, size, and/or position is the addition and placement of insulation over the tip and/or over the filaments. For example, by placing a layer of insulation over a proximal part of the portions of the filaments that extend from the tip when in the deployed position, the shape of the lesion may be altered since RF energy may primarily emanate from the distal, non-insulated part of the filaments. For another example, by placing a layer of insulation over a proximal part of the tip, the shape of the lesion may be altered since RF energy may primarily emanate from the distal, non-insulated part of the tip. Other parts of the filaments and/or tip may also be covered by an insulating material, for example a distal part of the filaments and/or tip, an intermediate part of the filaments and/or tip, combinations thereof, and the like, for example as described with respect to FIGS. **3**H and **3**I.

Moreover, the materials used in making the filaments and tip may be selected based on RF conductivity. For example, by using a material for the tip that is less conductive of RF energy, the proportion of RF energy emanating from the tip as compared to that emanating from the filaments may be altered resulting in a corresponding change in lesion size, position and/or shape.

The RF needles and RF probes discussed herein may be constructed from materials that are Magnetic Resonance Imaging (MRI) compatible (e.g., titanium, aluminum, copper, platinum, non-magnetic 300 Series Stainless Steel, etc.). In certain such embodiments, MRI equipment may be used to verify the positioning of the needles and/or portions thereof and/or monitor the progress of an ablation procedure (e.g., RF neurotomy).

Variations of the number of filaments used for needle may be selected to achieve particular lesion sizes, positions and/or shapes. For example, as illustrated in FIG. **7**, a third filament **701** may extend from the tip **201'** (or other tips described herein such as the tip **211**) in a position between filaments **206***a*, **206***b*. The tips **501***a*, **501***b* of the filaments **206***a*, **206***b* and a tip **702** of filament **701** may form a polygon **703** that has a centroid **704**. The centroid **704** is offset from the central longitudinal axis **223**. Such an arrangement may produce a lesion that is offset from the central longitudinal axis **223** to a different degree than, and shaped differently than, a lesion created by the needle of FIG. **5**. In general, where a centroid of a polygon formed by the tips of filaments (or, in the case where there are two filaments, the midpoint between them) is offset from the central longitudinal axis **223**, a lesion created by such a configuration will be correspondingly offset from the central longitudinal axis **223**. The filaments **206***a*, **206***b*, **702** are positioned at the same filament angle **503** of about 120° as in the embodiment of FIG. **5**. Other filament angles **503**, in either FIG. **5** or FIG. **7**, are also possible. The embodiment illustrated in FIG. **7** has a filament-free angle **504** of about 240°, also the same as in the embodiment of FIG. **5**. Other filament-free angles **504**, in either FIG. **5** or FIG. **7**, are also possible. In general, in embodiments in which the filaments are positioned in a filament angle **503** that is less than about 180°, resultant lesions will be offset from the central longitudinal axis **223** in the direction of the filaments. In embodiments in which the filaments are positioned in a filament angle **503** that is less than about 180°, the filament-free angle is correspondingly greater than about 180° (e.g., greater than about 200° or greater than about 240°).

For another example, as illustrated in FIG. **8**, four filaments **801***a*-**801***d* are positioned about a tip **201"** (or other tips described herein such as the tip **211**). The tips of the filaments **801***a*-**801***d* may form a polygon **802** that has a centroid **803**. The centroid **803** is offset from the central longitudinal axis **223**. Such an arrangement may produce a lesion that is offset from the central longitudinal axis **223** in the direction of the centroid **803**. The filaments **801***a*-**801***d* are positioned at a filament angle **804** of about 200°. Other filament angles **804** are also possible. The embodiment illustrated in FIG. **8** has a filament-free angle **805** of about 160°. Other filament-free angles **805** are also possible. FIG. **8** illustrates an embodiment in which the filament-free angle

**805** is less than about 180°, but which is capable of producing a lesion offset from the central longitudinal axis **223**.

In the herein-described embodiment of FIGS. **2**A, **3**A, **3**B, **5**, and **6** with two filaments, a midpoint **502** between the filaments was discussed. In embodiments with more than two filaments, a centroid of a polygon formed by the distal ends of the filaments was discussed. Both the midpoints and the centroids may be considered to be "average" points of the filaments for their particular configurations. In such embodiments, the midpoint between filaments in two-filament embodiments and the centroid of the polygon in embodiments with more than two filaments may be offset from the central longitudinal axis of the elongate member. For example, the midpoint or centroid may be offset from the central longitudinal axis by 1 mm or more. In embodiments, the polygon may lie in a plane perpendicular to the central longitudinal axis.

As illustrated in, for example, FIGS. **2**A, **2**D, **3**A, **3**C, **3**D, **3**G-**3**I, **5**, **7**, **8**, **9**, and **10**, the distal ends of the filaments when fully deployed may be in a common plane. In some embodiments, the common plane is perpendicular or transverse to the central longitudinal axis. In some embodiments, the common plane is distal to the point **301**, **312**.

As illustrated in, for example, FIGS. **2**A, **2**D, **3**A, **3**C, **3**D, **3**G-**3**I, **5**, **7**, and **10**, the filaments of the needle may all be deployed on a common side of a central plane of the needle (where the central longitudinal axis is entirely within the central plane). In certain such embodiments, the distal ends of the filaments are all on a common side of the central plane. Such a configuration may enable the needle to be used to create a lesion that is offset from the tip of the needle to the same side of the central plane as the deployed filament ends.

As illustrated, for example, in FIGS. **2**A, **2**D, **3**A, **3**C, **3**D, **3**G-**3**I, and **10**, the filaments when fully deployed may point in an at least partially distal direction. In this regard, a vector extending longitudinally from the distal end of a filament and coinciding with a central axis of the portion of the filament out of the tip **211** has at least some distal component. The fully deployed filaments in the embodiments illustrated in FIGS. **2**A, **2**D, **3**A, **3**C, **3**D, **3**G-**3**I, and **10** all point in an at least partially distal direction.

FIG. **9** illustrates an embodiment in which the filaments are uniformly distributed about the circumference of the tip **201""**. The needle of FIG. **9** includes three filaments **901***a*, **901***b*, **901***c* distributed substantially equally about the circumference of the tip **201""**, the angles **902***a*, **902***b*, **902***c* between the filaments **901***a*, **901***b*, **901***c* each being about 120°. Such a needle may be operable to produce a lesion that is generally centered along the central longitudinal axis **223**. However, the position of the produced lesion longitudinally along the central longitudinal axis **223** may be determined by the configuration (e.g., length, deployment angle, etc.) of the filaments. For example, relatively longer filaments may be operable to produce lesions that are positioned distal to lesions produced by configurations with relatively shorter filaments. For another example, in an embodiment in which the filament **901***b* is longer than the filaments **901***a*, **901***c*, the needle may be operable to create a lesion that is offset from the tip of the needle towards the filament **901***b*. For yet another example, in an embodiment in which the filaments **901***a*, **901***b* are longer than the filament **901***c*, the needle may be operable to create a lesion that is offset from the tip of the needle towards the filaments **901***a*, **901***b*.

Referring again to FIG. **7**, if the filament **701** was distal to the filaments **206***a*, **206***b*, the resultant lesion may be longer along the central longitudinal axis **223** than lesions resulting from an embodiment in which the filaments **206***a*, **206***b*, **701** are each positioned along substantially the same plane perpendicular or transverse to the central longitudinal axis **223**. In another variation, as deployed, two or more filaments may be at the same radial position and at different axial positions. Such embodiments may include multiple rows of filaments.

Referring again to FIGS. **5** and **6**, if the lengths of the deployed portions of the filaments **206***a*, **206***b* were increased, the needle may be capable of producing lesions that are more distally positioned than lesions created by the embodiment as shown in FIGS. **5** and **6**. The effects of lengthening or shortening the deployed length of the filaments may be similar to those discussed herein with respect to partially deploying filaments.

In some embodiments, the needle includes filaments having deployed portions with different lengths. In certain embodiments in which all of the filaments are deployed and/or retracted by a common actuator and/or are part of the same wire, variations in filament lengths may be achieved by varying the overall length of the filaments. For example, the distal end of a shorter filament may be retracted further into the tip or elongate member than the distal end of a longer filament. The effects of lengthening or shortening the length of the deployed portions of the filaments may be similar to those discussed herein with respect to variations in the axial positioning of filaments emergence from the tip of the needle and/or with respect to partially deploying filaments.

The angle at which a filament exits a tip (e.g., the angle **601** of FIG. **6**) may be varied to achieve particular lesion sizes, positions, and/or shapes. For example, if the angle **601** in FIG. **6** was about 60°, the needle may be operable to produce a lesion that has a larger maximum cross-sectional dimension in a plane perpendicular to the central longitudinal axis **223** than if the angle **601** was about 30°, for example because the filaments can emanate RF energy at a distance further away from the central longitudinal axis. In some embodiments, the filaments can be deployed at different angles **601** relative to the central longitudinal axis **223**.

Referring again to FIG. **10**, the deployed portions of the filaments **1001***a*, **1001***b* may be curved. As described herein, the term "curved" may mean a continuous curve, a curve in combination with a straight section, a plurality of curves in different directions, combinations thereof, and the like. Such curvatures may be achieved, for example, by filaments **1001***a*, **1001***b* comprising shape memory material (e.g., Nitinol) or spring material. When the filaments **1001***a*, **1001***b* are retracted, the shape of the tip **201** and/or the elongate member **203** may cause the filaments **1001***a*, **1001***b* to be in constrained straightened configurations. As the filaments **1001***a*, **1001***b* are advanced toward the fully deployed position, they become unconstrained and return to their curved shapes as shown in FIG. **10**. The deployed shape of the filaments **1001***a*, **1001***b* may be predetermined, or the filaments **1001***a*, **1001***b* may comprise (e.g., be made from) a material that may be shaped by a user prior to insertion. The filaments of other embodiments described herein (e.g., FIGS. **3**A, **3**C, **3**D, and **3**G-**3**I) may also be curved. In some embodiments, one filament is curved and one filament is straight.

The curved filaments **1001***a*, **1001***b* of FIG. **10** are positioned in planes that include the central longitudinal axis **223**. In other embodiments, the filaments **1001***a*, **1001***b* may be curved in other directions, such as in a corkscrew arrangement. This may be beneficial to assist the filaments in remaining anchored to the tissue during delivery of RF

energy. The curved filaments **1001***a*, **1001***b* of FIG. **10** may be operable to produce a lesion that is flatter in a plane perpendicular to the central longitudinal axis **223** than, for example, the straight filaments **206***a*, **206***b* of FIG. **6**.

In the embodiment illustrated in FIGS. **2**A and **2**B, the filaments **206***a*, **206***b* are illustrated as running the entire length of the elongate member **203** from the filament hub **221** to the tip **201**. In some embodiments, a single member may run along at least part of the elongate member **203** and the filaments **206***a*, **206***b* may be interconnected to the single member at a point proximal to the tip **201**.

The illustrated embodiments show all of the filaments of a given embodiment as commonly deployed or retracted. In some embodiments, one or more filaments may be individually deployed and/or retracted. In some embodiments, a plurality of filaments may exit from the tip at a common location and form a fan-like arrangement as they are deployed.

Deployment of filaments discussed herein has been described as movement of the filaments relative to a stationary tip. In some embodiments, the filaments may be deployed by pulling the tip back relative to the filaments (e.g., movement of the tip relative to stationary filaments). Movement of the tip rather than the filaments may be advantageous, for example, in embodiments in which the needle is initially advanced until in contact with bone to ensure proper positioning relative to target tissue, and then the tip may be retracted, leaving the filaments (e.g., curved shape memory filaments) in a precise, known position. In some embodiments, the filaments may be deployed by advancing the filaments and retracting the tip.

Referring again to FIGS. **2**A and **2**B, the hub **204** may be fixedly attached to the elongate member **203**. The hub **204** may be the primary portion of the needle **103** gripped by the user during insertion and manipulation of the needle **103**. The hub **204** may include an asymmetric feature, such as an indicator **225**, that is in a known orientation relative to the asymmetry of the tip **201**. In this regard, the indicator **225** may be used to communicate to the user the orientation of the tip **201** within a patient. For example, in the embodiment illustrated in FIG. **2**A, the indicator **225** is fixed at an orientation circumferentially opposite to the filament slots **304***a*, **304***b*. Internally, the hub **204** may include a cavity **213** sized to house a longitudinal protrusion **218** of the actuator **216**. The hub **204** may include a hole through which a projection **215** may project into the interior of the cavity **213** to control the motion of the actuator **216** relative to the hub **204** and to secure the actuator **216** to the hub **204**. The hub **204** may comprise (e.g., be made from) any appropriate material (e.g., a thermoset plastic, Makrolon® 2548, available from Bayer).

The actuator **216** may be used to control the motion to deploy and/or retract the filaments **206***a*, **206***b*. The actuator **216** is operable to move relative to the hub **204**, the elongate member **203**, and the tip **201** (e.g., parallel to the central longitudinal axis **223**). The actuator **216** includes the longitudinal protrusion **218** extending into the cavity **213** of the hub **204**. The outer surface of the longitudinal protrusion **218** includes a helical track **219** sized to accommodate the projection **215**. In this regard, as the actuator is rotated relative to the hub **204** (e.g., by a user to deploy the filaments **206***a*, **206***b*), the helical track **219** and the projection **215** combine to cause the actuator **216** to move longitudinally (e.g., parallel to the central longitudinal axis **223**). The actuator **216** comprises an interface portion **217** that may be gripped by a user when rotating the actuator **216**. The interface portion **217** may be knurled or otherwise textured to enhance the user's ability to rotate the actuator **216**. The hub **204** may also include a textured or shaped feature (e.g., the indicator **225**) configured to enhance the user's ability to rotate the actuator **216** relative to the hub **204**. The longitudinal protrusion **218** of the actuator **216** may include an inner cavity **226** sized to accept a filament hub **221** and to allow the filament hub **221** to rotate freely relative to the actuator **216**. In this regard, the linear motion of the actuator **216** may be transmitted to the filament hub **221** while the rotational motion of the actuator **216** may not be transmitted to the filament hub **221**.

The actuator **216** may include a Luer fitting **220** or any other appropriate fitting type on a proximal end thereof. The Luer fitting **220** may be in fluid communication with the lumen **222** and provide a connection such that fluid may be delivered into the lumen **222** and to the fluid port **210** of the tip **201**, **211**. The Luer fitting **220** may also be configured to allow for the insertion of the RF probe **401** into the lumen **222**. The actuator **216** may comprise any appropriate material (e.g., Pro-fax 6523 polypropylene homopolymer, available from LyondellBasell Industries).

The filaments **206***a*, **206***b* may be fixedly interconnected to the filament hub **221**. In this regard, the longitudinal movement of the filament hub **221** due to the actuator **216** may be communicated to the filaments **206***a*, **206***b* to deploy and retract the filaments **206***a*, **206***b* upon rotation of the actuator **216**. The filament hub **221** may comprise any appropriate material (e.g., Pro-fax 6523 polypropylene homopolymer, available from LyondellBasell Industries).

The user can deploy or retract the filaments **206***a*, **206***b* by twisting or rotating the actuator **216**. For example, as illustrated, a counterclockwise (as seen from the viewpoint of FIG. **5**) rotation of the actuator **216** relative to the hub **204** will result in the deployment (extension) of the filaments **206***a*, **206***b*, while a clockwise rotation of the actuator **216** relative to the hub **204** will result in the retraction of the filaments **206***a*, **206***b*.

The filaments **206***a*, **206***b* may be partially deployed or retracted by partially rotating the actuator **216** relative to the hub **204**. The actuator **216** and/or the hub **204** may include markings to indicate the position of the filaments **206***a*, **206***b* (e.g., the depth or extent of deployment). The actuator **216** and/or the hub **204** may include detents to provide audible and/or tactile feedback of the position of the filaments **206***a*, **206***b*.

In some embodiments, the filaments may be deployed at the user's discretion to a deployed position proximal to, at, or distal to a plane perpendicular or transverse to the central longitudinal axis **223** at the point **301**, **312**. For example, in some embodiments, full (e.g., 3/3) rotation of the actuator **216** may deploy the filaments in a fully deployed position that is distal to a plane perpendicular or transverse to the central longitudinal axis **223** at the point **301**, **312**, partial (e.g., 2/3) rotation of the actuator **216** may deploy the filaments in a partially deployed position that is at a plane perpendicular or transverse to the central longitudinal axis **223** at the point **301**, **312**, and partial (e.g., 1/3) rotation of the actuator **216** may deploy the filaments in a partially deployed position that is proximal to a plane perpendicular or transverse to the central longitudinal axis **223** at the point **301**, **312**. The actuator **216** and/or the hub **204** may include features such as stops or detents to provide audible and/or tactile feedback regarding the extent of deployment (e.g., at 0/3, 1/3, 2/3, and 3/3) and/or the position of the filaments **206***a*, **206***b* (e.g., fully retracted, 1/3 deployed, 2/3 deployed, and fully deployed). Other fractions are also possible, including fractions at uneven intervals (e.g., a combination

of ⅓, ½, and ⅘). In certain embodiments, selectable controlled partial deployment allows for controlled adaptation of the lesion to any particular shape and/or conformance of the filaments to a specific anatomy (e.g., boney anatomy).

FIGS. **17**A-**17**E illustrate components of the mechanism at the proximal end **205** of the needle **103** of FIG. **2**D. The mechanism may also be used, for example, with the needle **103** of FIG. **2**A and other needles described herein. The components described with respect to FIGS. **17**A-**17**E may include features described herein with respect to FIGS. **2**B and **2**C, and the components described herein, for example with respect to FIGS. **2**B and **2**C may include features described herein with respect to FIGS. **17**A-**17**E. Combinations of components are also possible.

FIG. **17**A is an exploded view of components of the deployment mechanism of FIG. **2**D. The mechanism comprises an advancing hub or slide member **1710**, a spin collar or actuator **1720**, and a main hub **1730**. FIG. **17**B is a cross-sectional view of the advancing hub **1710**, the spin collar **1720**, and the main hub **1730** assembled together, as well as half of the wire **206** illustrated in FIG. **2**E. The advancing hub **1710** includes a stem or longitudinal protrusion **1712**. The spin collar **1720** includes a lumen **1721** extending from the proximal end to the distal end. The main hub **1730** includes a lumen **1731** extending from the proximal end to the distal end. When assembled, the stem **1712** of the advancing hub **1710** is in the lumen **1721** of the spin collar **1720** and in the lumen **1731** of the main hub **1730**. The advancing hub **1710** may include an annular protrusion **1714** that may interact with an annular protrusion of the spin collar **1720** (e.g., the annular protrusion **1714** having a larger diameter than the annular protrusion **1724**) to inhibit the stem **1712** from exiting the proximal end of the lumen **1721**. In some embodiments, the annular protrusions **1714**, **1724** include tapered surfaces that may interact to allow insertion of the stem **1712** and the annular protrusion **1714** into the lumen **1721** and perpendicular surfaces to inhibit the annular protrusion **1714** and the stem **1712** from exiting the proximal end of the lumen **1721**. The main hub **1730** includes a stem or longitudinal protrusion **1734**. When assembled, the stem **1734** of the main hub **1730** is in the lumen **1721** of the spin collar **1720**. Other interactions between the advancing hub **1710**, the spin collar **1720**, and the main hub **1730** are described herein, for example with respect to FIGS. **17**C-**17**E.

FIG. **17**C is a perspective view of an example embodiment of the advancing hub **1710** and the wire **206** of FIG. **2**E. The stem **1712** of the advancing hub **1710** comprises a U-shaped recess **1713** configured to interact with the bent proximal portion of the wire **206**. Other shapes of the recess **1713** are also possible (e.g., V-shaped). The recess **1713** may complement the shape of the proximal end of the wire **206**. In some embodiments, the width of the recess **1713** is slightly smaller (e.g., about 0.001 inches (approx. about 0.025 mm) smaller) than the diameter of the wire **206** such that after being press-fit, the wire **206** is fixedly interconnected to the advancing hub **1710**.

In some embodiments, the stem **1712** is shaped as illustrated in FIG. **17**C, including a perpendicular or transverse cross-section that includes flat surfaces (e.g., the surface comprising the top of the recess **1713**) and arcuate surfaces, for example an ellipse with squared ends. The lumen **1731** of the main hub **1730** may comprise complementary surfaces, for example in a wider proximal portion, such that when the stem **1712** is in the lumen **1731**, the advancing hub **1710** is in a fixed rotational position relative to the main hub **1710**. Other shapes and rotational fixation configurations are also possible.

The proximal end of the advancing hub **1710** comprises a fitting **220** (e.g., a Luer fitting or any other appropriate fitting). When assembled, the fitting **220** is proximal to the spin collar **1720**. The advancing hub **1710** comprises a lumen **1711** extending from the proximal end to the distal end. A fluid delivery device such as a syringe may be attached to the fitting **220** to deliver fluid through the lumen **1711** and then through the lumen **1731** of the main hub, the lumen **308** of the elongate member **203**, the lumen **306***c* of the tip **211**, and out the fluid port **210** of the tip **211**. The RF probe **401** may be inserted into the lumen **1711**, then into the lumen **1731** of the main hub, then into the lumen **308** of the elongate member **203**, then into the lumen **306***c* of the tip **211**. The RF probe **401** may include a fitting configured to interact with the fitting **220**. The lumen **1711** may include a wide diameter portion in the area of the fitting **220** and a narrow diameter portion in the area of the stem **1712**, and a tapered surface **1715** transitioning from the wide diameter portion to the narrow diameter portion. The tapered surface **1715** may help direct fluid and/or an RF probe **401** into the narrow diameter portion. In some embodiments, the narrow diameter portion of the lumen **1711** has a diameter between about 0.005 inches and about 0.05 inches (approx. between about 0.13 mm and about 1.3 mm), between about 0.01 inches and about 0.03 inches (approx. between about 0.25 mm and about 0.76 mm), between about 0.015 inches and about 0.025 inches (approx. between about 0.38 mm and about 0.64 mm) (e.g., about 0.02 inches (approx. about 0.5 mm)), combinations thereof, and the like. In some embodiments, the narrow diameter portion of the lumen **1711** has a diameter that is no larger than the diameter of any other lumen of the needle **103** such that fluid pressure will default to the distal end of the needle **103**. For example, the narrow diameter portion of the lumen **1711** may have a diameter of about 0.02 inches (approx. about 0.5 mm), the narrow diameter portion of the lumen **1731** may have a diameter of about 0.05 inches (approx. about 1.3 mm), the lumen **308** of the elongate member **203** may have a diameter of about 0.05 inches (approx. about 1.3 mm), and the lumen **306***c* may have a width of about 0.02 inches (approx. about 0.5 mm). In some embodiments, the lumen **306***c* may be slightly smaller than the narrow diameter portion of the lumen **1711** and have the same effect, for example due to small losses of fluid through the lumens **306***a*, **306***b* and out the filament ports **304***a*, **304***b*, which may be acceptable because anesthesia and dye, for example, may permeate through fluid and proximate to the filament ports **304***a*, **304***b* even if substantially only dispensed from the fluid port **210**. In some embodiments, the advancing hub **1710** comprises a polymer (e.g., Pro-fax 6523 polypropylene homopolymer, available from LyondellBasell Industries).

FIG. **17**D is a cross-sectional view of an example embodiment of a spin collar **1720**. The cross-section is along the same line as in FIG. **17**B, but further features are visible because not blocked by the advancing hub **1710** or the main hub **1730**. As illustrated in FIG. **17**B, the lumen **1721** is configured to at least partially contain the stem **1712** and the stem **1734**, and not to contact fluid or an RF probe **401**. The lumen **1721** comprises a helical track **1722** sized to interact with a corresponding helical thread **1735** (FIG. **17**A) on the stem **1734** of the main hub **1730**. As the spin collar **1720** is rotated relative to the main hub **1730** (e.g., by a user stabilizing the needle and gripping the main hub **1730** with the non-dominant hand and manipulating the spin collar

**1720** with the dominant hand), for example, to deploy the filaments **206***a*, **206***b*, the helical track **1722** and the helical thread **1735** interact to cause the spin collar **1720** and the advancing hub **1710** to move longitudinally parallel to the central longitudinal axis **223**. In this regard, a linear motion of the advancing hub **1710** relative to the main hub **1730** may be created while the rotational motion of the spin collar **1720** may not be transmitted to the advancing hub **1710** and the main hub **1730**. In some embodiments, between about 1.25 turns and about 1.5 turns of the spin collar **1720** fully deploys the filaments **206***a*, **206***b*. In some embodiments, between about 0.75 turns and about 1.25 turns (e.g., one 360° rotation) of the spin collar **1720** fully deploys the filaments **206***a*, **206***b*. The configuration of the helical track **1722** and the helical thread **1735** may be adjusted to provide varying levels of filament deployment with varying levels of rotation of the spin collar **1720**. An outer surface of the spin collar **1720** may be textured or include features **1723** to assist the user in gripping and twisting or rotating the spin collar **1720** relative to the main hub **1730**. In some embodiments, the spin collar comprises the helical thread **1735** and the main hub **1730** comprises the helical track **1722**. In some embodiments, the spin collar **1720** comprises a polymer (e.g., Pro-fax 6523 polypropylene homopolymer, available from LyondellBasell Industries).

FIG. **17**E is a cross-sectional view of an example embodiment of the main hub **1730**, taken along the line **17**E-**17**E of FIG. **17**B, in exploded view with an example embodiment of an elongate member **203**. The proximal end of the elongate member **203**, to the right in FIG. **17**E, includes a partial circumferential portion **1736**. The distal end lumen **1731** of the main hub **1730** includes a complementary partial circumferential portion **1737**. The partial circumferential portions **1736**, **1737** can cause the elongate member **203** to be in a fixed and known rotational orientation with the main hub **1730**, for example after assembly because the relative position of the indicator **1733** and the partial circumferential portion **1737** is known. For example, the distal end of the elongate member **203**, to the left in FIG. **17**E, includes the filament ports **304***a*, **304***b* on the same side as the partial circumferential portion **1736**. Other partial circumferential portions and other complementary shapes are also possible. For example, the partial circumferential portions may comprise interlocking teeth. In some embodiments, the thickness of the partial circumferential portion **1737** is substantially the same as the thickness of the walls of the elongate member **1736** to provide a smooth transition between the lumen **1731** and the lumen **308**. In some embodiments, the main hub **1730** comprises clear polycarbonate (e.g., thermoset plastic such as Makrolon® 2548, available from Bayer). In some embodiments, the elongate member comprises a hypotube (e.g., comprising 300 Series Stainless Steel) with features such as the filament ports **304***a*, **304***b* and the partial circumferential portion **1736** cut out (e.g., by laser, mechanical, chemical, or other cutting methods).

Other types of mechanisms may be used to control deployment and retraction of the filaments. For example, in some embodiments, the mechanism includes a spring configured to bias the filaments **206***a*, **206***b* toward a predetermined position (e.g., fully deployed, fully retracted), analogous to a spring loaded mechanism used in retractable ballpoint pens. For another example, the mechanism may include a roller wheel, for example incorporated into the hub **204**, that would advance or retract the filaments **206***a*, **206***b* upon rotation, for example with a user's thumb. For yet another example, the hub **204** and the actuator **216** may interact via complimentary threaded features. As the actuator **216** is threaded into the hub **204**, the filaments **206***a*, **206***b* would advance, and as the actuator **216** is threaded out of the hub **204**, the filaments **206***a*, **206***b* would retract. For still another example, a Touhy-Borst type mechanism could be incorporated to control the deployment and retraction of the filaments **206***a*, **206***b*. Any other appropriate mechanism for controlling linear motion of the filaments **206***a*, **206***b* may be incorporated into the needle **103**. Any of the mechanisms described herein may be used for controlling deployment and retraction of the filaments of any of the embodiments described herein. For example, the mechanisms illustrated in FIGS. **2**A-**2**D and **17**A-**17**E may be used to deploy and retract the filaments in FIGS. **3**A, **3**C, **3**D, **3**G-**3**I, and **5**-**10**.

FIG. **2**C is a partial cut away and partial cross-sectional view of a portion of an alternate embodiment of a mechanism **230** comprising a hub **231** and actuator **232** that may be part of a needle **103** used in an RF neurotomy procedure. The hub **231** may be fixedly attached to the elongate member **203**. The hub **231** may be the primary portion of the needle **103** gripped by the user during insertion and manipulation of the needle **103**. The hub **231** may include an asymmetric feature, such as an indicator **233**, that is in an known orientation relative to the asymmetry of the tip **201**. In this regard, the indicator **233** may be used to communicate to the user the orientation of the tip **201** within a patient. Internally, the hub **231** may include a cavity **234** sized to house a longitudinal protrusion **235** of a slide member **236**. The longitudinal protrusion **235** may include a keyway or key slot **237** that may run along a longitudinal direction of the longitudinal protrusion **235**. The internal surface of the hub **231** through which the longitudinal protrusion **235** moves may include a mating key (not shown) configured to fit and slide in the key slot **237**. Together, the key slot **237** and mating key of the hub **231** may limit the slide member **236** to a linear motion parallel to the central longitudinal axis **223**.

The filaments **206***a*, **206***b* may be fixedly connected to the longitudinal protrusion **235** of the slide member **236** for longitudinal movement therewith. In this regard, distal movement (e.g., movement to the right as shown in FIG. **2**C) of the longitudinal protrusion **235** relative to the hub **231** may cause extension of the filaments **206***a*, **206***b* relative to the hub **231**, the elongate member **203**, and the tip **201**. For example, distal movement of the longitudinal protrusion **235** may move the filaments **206***a*, **206***b* from a retracted position to a deployed position. For another example, proximal movement (e.g., movement to the left as shown in FIG. **2**C) of the longitudinal protrusion **235** relative to the hub **231** may result in retraction of the filaments **206***a*, **206***b* relative to the hub **231**, the elongate member **203**, and the tip **201**.

The hub **231** may be made from any appropriate material (e.g., a thermoset plastic, Makrolon® 2548, available from Bayer). The hub **231** may be at least partially transparent such that the position of the longitudinal protrusion **235** and/or other components of the hub **231** may be observable by a user. The hub **231** may further include demarcations (e.g., molded or printed marks) such that the amount of extension of the filaments **206***a*, **206***b* may be determined from the position of the longitudinal protrusion **235** and/or other components relative to the demarcations.

An actuator **232** may be used to control the motion to deploy and/or retract the filaments **206***a*, **206***b* fixedly connected to the longitudinal protrusion **235**. The actuator **232** may be generally tubular such that it fits around a longitudinal hub projection **238** projecting from the proximal end of the hub **231**. At least a portion of the cavity **234** may be in

the longitudinal hub projection **238**. The actuator **232** may also include an annular feature **239** configured to fit in an annular slot **240** in the slide member **236**. The annular feature **239** may be sized relative to the annular slot **240** such that the actuator **232** may rotate relative to the slide member **236** about the central longitudinal axis **223** or an axis parallel thereto while the position of the actuator **232** relative to the slide member **236** along the central longitudinal axis **223** remains fixed. In this regard, the actuator **232** and the slide member **236** may be configured to move in tandem relation along the central longitudinal axis **223**. The annular feature **239** and annular slot **240** may be configured such that, during assembly, the actuator **232** may be pressed onto the slide member **236** and the annular feature **239** may snap into the annular slot **240**.

The inner surface of the actuator **232** may include a helical track **241** sized to accommodate a corresponding mating helical thread **242** on the longitudinal hub projection **238**. In this regard, as the actuator **232** is rotated relative to the slide member **236** and the hub **231** (e.g., by a user to deploy the filaments **206***a*, **206***b*), the helical track **241** and the helical thread **242** interact to cause the actuator **232** and the slide member **236** to move longitudinally along the central longitudinal axis **223**. In this regard, a linear motion of the slide member **236** relative to the hub **231** may be created while the rotational motion of the actuator **232** may not be transmitted to the slide member **236** and the hub **231**. An outer surface of the actuator **232** may be textured or include features to assist the user in gripping and twisting or rotating the actuator **232** relative to the hub **231**. In some embodiments, the longitudinal hub projection **238** comprises the helical track **241** and the inner surface of the actuator **232** comprises the helical thread **242**.

The proximal end of the slide member **236** may include a Luer fitting **243** or any other appropriate fitting type. The Luer fitting **243** may be in fluid communication with a lumen passing through the slide member **236** and may provide a connection such that fluid may be delivered through the Luer fitting **243** and into the lumen of the slide member **236**. In turn, the lumen of the slide member **236** may be in fluid communication with the cavity **234** of the hub **231**, which may in turn be in fluid communication with a lumen in the elongate member **223** (e.g., the lumen **222**). The lumen in the elongate member **223** may be in fluid communication with the tip **201** (e.g., the fluid port **210**). In this regard, fluid may flow into the Luer fitting **243**, into and through the lumen in the slide member **236**, into and through the cavity **234** of the hub **231**, into and through the elongate member **223**, and out from fluid portion **210** of the tip **201**. The Luer fitting **243**, the lumen in the slide member **236**, the cavity **234** of the hub **231**, and the lumen of the elongate member **223** may all also be configured to allow for the insertion of the RF probe **401** therethrough. The protrusion **235** and the cavity **234** of the longitudinal hub projection **238** may be sized and/or configured to form a fluid seal therebetween, allowing fluid delivered under pressure through the Luer fitting **220** to flow through the cavity **238** and into the elongate member **203** substantially without leaking past the interface between the protrusion **235** and the cavity **234** of the longitudinal hub projection **238**.

As described herein, the filaments **206***a*, **206***b* may be fixedly interconnected to the slide member **236**. Axial movement of the slide member **236** due to the actuator **232** may be thereby communicated to the filaments **206***a*, **206***b* to deploy and retract the filaments **206***a*, **206***b* upon rotation of the actuator **232**. The slide member **236** may be made from any appropriate material (e.g., Pro-fax 6523 polypropylene



homopolymer, available from LyondellBasell Industries). The actuator **232** may be made from any appropriate material (e.g., Pro-fax 6523 polypropylene homopolymer, available from LyondellBasell Industries).

The user can deploy or retract the filaments **206***a*, **206***b* by twisting or rotating the actuator **232**. By partially rotating the actuator **232** relative to the hub **231**, the filaments **206***a*, **206***b* may be partially deployed or retracted. The actuator **232** and/or hub **231** may include detents to provide audible and/or tactile feedback of the position of the filaments **206***a*, **206***b*. The detents may be configured such that audible and/or tactile feedback associated with engagement of a detent coincides with a predetermined amount of deployment or retraction of the filaments **206***a*, **206***b*, as described herein. In this regard, such audible and/or tactile feedback may be used in determining filament position.

In some embodiments, the needle **103** is a multipolar (e.g., bipolar) device in contrast to the monopolar devices described herein. In certain such embodiments, the filaments are isolated from each other and/or from the tip to enable bipolar operation (e.g., the filaments having one polarity and the tip having a second polarity, one filament having one polarity and one filament and the tip having a second polarity, one filament having one polarity and one filament having a second polarity, etc.). In embodiments in which the needle **103** comprises more than two filaments, elements may be included to allow for selection of the polarity of the certain filaments to aid in lesion shape, size, and/or position control. In some embodiments, the needle **103** may be used in either a monopolar mode or in a bipolar mode as selected by the user. For example, RF probes **401** may include shapes, insulating features, etc. configured to produce monopolarity or bipolarity.

The herein-described embodiments of needles may be used in spinal RF neurotomy procedures, which will now be described. In general, for an RF neurotomy procedure, the patient may lie face down on a table so that the spine of the patient is accessible to the user. At any appropriate time before, during, and/or after the procedure, the user may use imaging equipment, such a fluoroscope, to visualize the patient's anatomy and/or to visualize the positioning of equipment (e.g., the needle relative to a target volume).

The patient may be administered sedatives and/or intravenous fluids as appropriate. The skin of the patient surrounding the procedure location may be prepared and maintained using an appropriate sterile technique. In embodiments in which the needle is monopolar, a return electrode pad **104** may be attached to the patient. A local anesthetic may be injected subcutaneously where the needle will be inserted or along the approximate path of the needle, for example through the needle itself or through a different needle.

With the filaments in the retracted position, the needle may be introduced into the patient and moved to a target position relative to a target portion of a target nerve or to a target position relative to a target volume in which the target nerve is likely situated (all of which are generally referred to herein as the target nerve or portion of the target nerve). The target nerve may be an afferent nociceptive nerve such as, for example, a medial branch nerve proximate a lumbar facet joint. Introduction of the needle into the patient may include percutaneously using the tip of the needle to pierce the skin of the patient. The moving of the needle may include navigating toward the target position using fluoroscopic guidance. Furthermore, the moving of the needle may include advancing the needle to an intermediate position and then repositioning the needle to the target position. For

example, the needle may be advanced until it contacts a bone or other structure to achieve the intermediate position. This may be followed by retracting the needle a predetermined distance to achieve the target position. Such a procedure may be facilitated by the markers **224** or collar discussed herein.

During the moving of the needle or after the target position has been achieved, the needle may be used to inject an anesthetic and/or a dye proximate to the target nerve. The dye may increase contrast in fluoroscopic images to assist in visualizing the patient's anatomy, which may aid the user in guiding and/or verifying the position of the needle.

The needle may be rotated about the central longitudinal axis of the elongate member of the needle to achieve a desired orientation relative to the target nerve. For example, the needle may be rotated such that a lesion created with the needle with the filaments deployed will be offset from the central longitudinal axis toward the target nerve. Such rotation of the needle may be performed prior to insertion of the needle into the patient and/or after insertion into the patient. For example, the user may rotate the needle prior to insertion such that the needle is generally in the desired rotational orientation. Then, after achieving the target position, the user may fine tune the rotational orientation of the needle by rotating the needle to a more precise orientation. As described herein, the hub or another portion of the needle outside the patient's body may indicate the rotational orientation of the needle.

Once the target position and desired rotational orientation have been achieved, the next step may be to advance one or more filaments of the needle relative to the tip of the needle. The particular needle used for a procedure may have been selected to enable the creation of a particular sized and shaped lesion at a particular position relative to the needle. The particular needle used may be of any appropriate configuration discussed herein (e.g., any appropriate number of filaments, any appropriate filament positioning, monopolar or bipolar, any appropriate deployment and retraction mechanism, etc.).

In embodiments in which the needle is configured as illustrated in FIGS. **5** and **6** (e.g., about 120° apart), the advancement of filaments may include advancing the filaments such that when the filaments are in their respective deployed positions, a midpoint between a distal end of the first filament and a distal end of the second filament is offset from the central longitudinal axis of the needle, and the filament endpoints are distal to the tip of the needle. Such deployment may enable the needle to be used to create a lesion that is offset from the tip of the needle toward the midpoint between the deployed filament ends. The lesion created may also be positioned at least partially distal to the tip of the needle.

FIG. **11**A is an illustration of an example set of isotherms **1010***a*-**1010***c* that may be created with the needle **103** of FIG. **2**A. As illustrated by the set of isotherms **1010***a*-**1010***c*, RF energy emanating from the tip **201** and from the filaments **206***a*, **206***b*, may produce a region of elevated temperature about the tip **201** and the filaments **206***a*, **206***b*. The isotherms **1010***a*-**1010***c* may be offset from the central longitudinal axis **223** such that a centroid of the isotherms as viewed in FIG. **11**A is offset from the central longitudinal axis **223** in the direction of the filaments **206***a*, **206***b*. The centroid of the isotherms **1010***a*-**1010***c* as viewed in FIG. **11**A may also be distal relative to the tip **201** and between the tip **201** and the distal ends of the deployed filaments **206***a*, **206***b*. The isotherms **1010***a*-**1010***c* may also be shaped such that, as viewed in FIG. **11**A, the isotherms **1010***a*-**1010***c* have a maximum cross-sectional dimension along the central longitudinal axis **223** that is greater than a maximum cross dimension in the plane of FIG. **11**A perpendicular to the central longitudinal axis **223**. As visible in the illustrated orientation of FIG. **11**B, the isotherms **1010***a*-**1010***c* may have a maximum cross-sectional dimension along the central longitudinal axis **223** that is greater than a maximum cross-sectional dimension perpendicular to the plane of FIG. **11**A and perpendicular to the central longitudinal axis **223**.

The offset of the centroid of the isotherms **1010***a*-**1010***c* from the central longitudinal axis **223** may result in greater lesion width in a plane perpendicular to the central longitudinal axis **223**, as compared to a similarly-sized straight needle with no filaments. The offset of the centroid of the isotherms **1010***a*-**1010***c* may also allow for projection of the centroid of a corresponding lesion volume in a direction away from the central longitudinal axis **223**. By way of example, such offsets may advantageously enable the execution of the example procedures described herein. Such offsets may advantageously enable the creation of lesion volumes distal (relative to the needle **103**) to potentially interfering structures (e.g., an ossified process). Such offsets may advantageously enable the needle **103** to be inserted into a patient at a more desirable angle (e.g., closer to perpendicular to the surface of the patient such as within 30° of perpendicular to the surface of the patient), at a more desirable piercing location, and/or through more desirable tissue than may be attempted using a needle without offset lesion capabilities.

FIG. **11**B is an illustration of an example lesion **1011** that may be created with the needle **103** of FIG. **2**A. In FIG. **11**B, the needle **103** has been placed perpendicular to a surface **1012**. The surface **1012** may, for example, be the surface of a bone, such as a lumbar vertebra. As illustrated, the filaments **206***a*, **206***b* are deployed such they are proximate to the surface **1012**. In some embodiments, contact with the surface **1012** might undesirably deform the filaments **206***a*, **206***b*, but such contact may be avoided, for example by the needle advancement and retraction procedures described herein. The lesion **1011** has a width along the surface **1012** that is wider than would be created by the needle **103** if the filaments **206***a*, **206***b* were not deployed. Such capabilities may, for example, be advantageous where a target structure (e.g., a nerve) is known to be positioned along the surface **1012**, but its exact position is unknown. In such a case, the needle **103** may be positioned generally perpendicular to the surface **1012** to achieve the illustrated lesion width along the surface **1012**, whereas achieve the same lesion width along the surface **1012** using a the needle **103** without the filaments **206***a*, **206***b* deployed would require either multiple repositioning steps or placement of the needle **103** generally parallel to the surface **1012**.

FIG. **11**C is an illustration of an example lesion **1022** that may be created with a single-filament needle **1020**. The single-filament needle **1020** may be similar to the needle **103**, although the single-filament needle **1020** includes only a single filament **1021**. The filament **1021** may be configured similarly to the filaments **206***a*, **206***b*. The single-filament needle **1020** with the filament **1021** deployed may be operable to produce a lesion **1022** that is a flattened version (e.g., thinner in a direction perpendicular to the central longitudinal axis **223**, which is the left to right direction as illustrated in FIG. **11**C) of a lesion that may be produced by the needle **103** with two filaments **206***a*, **206***b* deployed. The capability to produce such a lesion shape may be beneficial when it is desirable to have a relatively large lesion in a particular direction (e.g., to compensate for the variability of

location of a target nerve) and a relatively small lesion width in another direction (e.g., to avoid a structure such as viscera or a patient's skin). As described herein, certain embodiments of the needle **103** may allow differential or selective deployment and/or activation of the filaments **206***a*, **206***b* such that the needle **103** may imitate the single-filament needle **1020**.

In embodiments in which the needle is configured such that all of the filaments of the needle are deployed on a common side of a central plane of the needle (in which the central longitudinal axis is entirely within the central plane), the advancement of filaments may include advancing the filaments such that when the filaments are in their respective deployed positions, the distal ends of all of the filaments are on a common side of the central plane. Such deployment may enable the needle to be used to create a lesion that is offset from the tip of the needle to the same side of the central plane as the deployed filament ends. The lesion created may also be positioned at least partially distal to the tip of the needle.

In embodiments in which the needle is configured as illustrated in FIG. **7** or **8**, the advancement of filaments may include advancing the filaments such that when the filaments are in their respective deployed positions, each filament distal end defines a vertex of a polygon whose centroid is offset from a central longitudinal axis of the needle. Such deployment may enable the needle to be used to create a lesion that is offset from the tip of the needle toward the centroid. The lesion created may also be positioned at least partially distal to the tip of the needle.

The advancement of the filaments may be achieved using any of the mechanisms discussed herein. For example, in the embodiment of FIG. **2**A, rotating the actuator **216** relative to the hub **204** may cause the filaments to advance to the deployed position. The advancement of the filaments may be performed such that each of the plurality of filaments passes through a surface of the needle that is parallel to the central longitudinal axis of the needle. In some embodiments, the filaments of the needle may be advanced to a position that is an intermediate position between the retracted position and the fully deployed position. The degree of deployment may be based on the desired lesion size and/or the accuracy of the placement of needle. For example, the same needle may be used in two different procedures where the variability of the location of a target nerve is greater in the first procedure than it is in the second procedure. In such situation, the greater deployment of the filaments may be used in the first procedure, whereas in the second procedure, a smaller degree of deployment may be used since a smaller lesion may suffice to ensure that the target nerve has been ablated. For another example, after placement of the needle during a procedure, the position of the needle may be determined to be slightly offset from a target position. In such a case, the filaments may be deployed to a greater degree than would have been required if the needle were placed exactly on target. In such a case, the greater degree of deployment may be used to compensate for the needle positioning inaccuracy. In such a case, needle repositioning and possible associated trauma may be avoided.

During and/or after advancing the filaments to the deployed position, their positions may be confirmed using an imaging system (e.g., using a fluoroscope). Proper filament positioning may also be verified by using the needle to stimulate the target nerve. For example, an electrical signal (e.g., up to about 2 volts applied at about 2 Hz) may be applied to the needle and the user may observe any related patient movement (e.g., muscle fasciculation in the territory supplied by the nerve). For another example, an electrical signal (e.g., up to about 1 volt applied at about 50 Hz) may be applied to the needle and the patient may indicate if they feel any associated sensations and their locations to assist in verifying correct needle positioning. Such stimulation (user-observed and/or patient reported) may be used to stimulate a targeted nerve to determine if the deployed position is adequate to achieve denervation of the targeted nerve. In this regard, it is desirable for the stimulation to affect the targeted nerve. Upon determination that the target nerve is stimulated, increased energy may be applied to ablate a volume comprising the target nerve.

Such stimulation may also be used to attempt to stimulate a nerve that is not targeted for denervation (e.g., a nerve where no denervation is desired) to determine the position of the needle relative to such a non-targeted nerve. In this regard, if the stimulation signal does not stimulate the non-targeted nerve, the user may determine that the position of the needle relative to the non-targeted nerve is such that the application of ablation energy to the needle will not result in significant damage to (e.g., ablation of) the non-targeted nerve. If the stimulation stimulates the non-targeted nerve (e.g., as determined by user observation and/or patient reporting), the needle may be repositioned to avoid damaging the non-targeted nerve. In this regard, it is desirable for the stimulation not to affect the non-targeted nerve.

After correct needle positioning has been verified (e.g., by imaging and/or stimulation), an anesthetic may be injected through the needle, for example out of at least one of the fluid port **210**, **320**, the filament ports **304***a*, **304***b*, **318***a*, **318***b*, the lumen **306***c*, etc.

After the filaments have been advanced to the desired position, the next step may be to apply RF energy to the needle using the interconnected RF generator. In embodiments that use a separate RF probe to deliver RF energy, the RF probe may be inserted into a lumen of the needle prior to application of the RF energy. When using such a configuration, the application of RF energy may include applying RF energy to the RF probe and conducting the RF energy away from the probe by the tip and/or filaments.

The resultant RF energy emanating from the tip and/or the filaments may generate heat that ablates the target nerve. Such ablation may be achieved by creating a lesion volume that includes the target nerve. It is desired that the target nerve be completely ablated to prevent incomplete neurotomy which may result in dysesthesia and/or patient discomfort. For example, a lesion with a maximum cross-sectional dimension between about 8 mm and about 10 mm may be created. Larger or smaller lesions may be created by varying filament characteristics (e.g., filament advancement distance) and/or RF energy levels. The created lesion may be offset from the central longitudinal axis of the needle. The center of the lesion may be distal to the tip of the needle. Of note, since the RF energy is emanating from the tip and filaments, a particularly sized lesion may be created with a lower peak temperature (the maximum temperature experienced in the patient) than would be possible if a needle without filaments or without deployed filaments were to be used to create the same-sized lesion. For example, a particular lesion may be achieved with the needle with deployed filaments where the peak temperature is between about 55° C. and about 60° C. or less than about 70° C., whereas creation of the same lesion using a needle without filaments or without deployed filaments could require a peak temperature of about 80° C. Such lower temperature lesions achievable by a needle with deployed filaments may result in greater patient safety and/or procedure tolerance.

Before, during, and/or after the application of RF energy, a temperature sensor (e.g., thermocouple) at or near the tip of the needle may be used to monitor the temperature at or near the tip. Such readings may be used as control signals (e.g., a feedback loop) to control the application of RF energy to the needle. For example, control signals and/or temperature data may be used for closed-loop control of the needle **103** by automatic adjustment of a parameter (e.g., frequency, wattage, and/or application duration of the RF energy, and/or filament deployment length, needle position, etc.) upon detection of a temperature. Feedback loops involving the user are also possible. If it is desired to ablate additional target nerves or to ablate an additional volume to ensure ablation of the original target nerve, the spinal RF neurotomy procedure may continue. In some embodiments, the distal end **402** of the RF probe **401** is a dual-purpose wire that can deliver RF energy to the tip and/or the filaments and that can act as a thermocouple (e.g., having thermosensing properties).

In embodiments in which the needle is configured to create lesions offset from the central longitudinal axis, and an additional target nerve or target volume is within a volume that may be ablated using the needle in its current position but in a different rotational orientation, the procedure may continue as follows. First, after the initial RF energy application, the filaments may be retracted into the needle. Once retracted, the needle may be rotated, and the filaments redeployed. The redeployment may have the same characteristics (e.g., length of the deployed portions of the filaments) as the original deployment or different characteristics. Next, the reoriented needle may be used to at least partially ablate the additional target nerve or target volume. Such retargeting of ablation volumes without repositioning (e.g., without withdrawing the needle from the patient and reinserting), may result in reduced patient trauma as compared to known spinal RF neurotomy procedures, which may require removal and reinsertion of a needle to achieve lesioning of the second target volume. Moreover, such retargeting of ablation volumes without repositioning (e.g., with only rotation of the needle, without additional tissue piercing) may result in the ability to create uniquely shaped lesions from a single insertion position. Such shaped lesions may include, for example, lesions that are in the shape of two or more intersecting spheres or oblong spheroids. The steps of retracting the filaments, rotating the needle, redeploying the filaments, and applying RF energy may be repeated a plurality of times. In some embodiments, an second ablation volume may be defined without rotating the needle, but by different deployment characteristics (e.g., lengths, RF energy parameters, etc.) of the filaments.

In embodiments in which the additional target nerve or target volume is not within a volume that may be ablated by rotating the needle, the needle may be repositioned. Such repositioning may include partially or fully removing the needle from the patient and then repositioning the needle and repeating the herein-described steps. In some embodiments, the second ablation is performed using a different needle (e.g., a needle with different properties (e.g., longer filaments)) than the original needle.

When no additional ablation is desired, the filaments of the needle may be retracted, and the needle may be removed from the patient. After removal of the needle, a sterile bandage may be placed over the needle insertion site or sites. The patient may then be held for observation and recovery from the effects of any sedative that may have been administered.

Examples of specific spinal RF neurotomy procedures will now be described. Generally, steps unique to each procedure will be discussed while steps common to any spinal RF neurotomy procedure (e.g., site preparation such as infiltrating the skin and subcutaneous tissues with 1.5% lidocaine to achieve skin anesthesia, nicking the skin to facilitate needle insertion, insertion monitoring with fluoroscopy, stimulation, etc., filament deployment mechanics, needle removal, and the like) will not be further discussed. Each of the procedures is described as being performed with a needle comprising two filaments offset from the central longitudinal axis, for example as described herein. It will be appreciated that the variations in needle configuration discussed herein may be used in these procedures. For example, to increase the offset of the created lesion relative to the central longitudinal axis, curved filaments (e.g., as illustrated in FIG. **10**) and/or partially insulated filaments (e.g., as illustrated in FIGS. **3**H and **3**I) may be used to create a lesion different properties (e.g., greater offset from the central longitudinal axis).

1. Lumbar RF Neurotomy of a Medial Branch Nerve Proximate a Lumbar Facet Joint.

This process may include using a needle that enables the creation of lesions that are offset from the central longitudinal axis. The procedure will be described as being performed on the L5 vertebra **1101** of FIG. **12** and the needle **103** of FIG. **2**A. It should be understood that other embodiments of needles described herein and/or other lumbar vertebra may be used in the described procedure or variations thereof.

The lumbar RF neurotomy process may include positioning the tip **201** of the needle **103** (e.g., using fluoroscopic navigation) such that the tip **201** is in contact with, or proximate to, the groove **1102** between the transverse process **1103** and the superior articular process **1104** of the targeted lumbar vertebra **1101**. Such positioning is shown in FIG. **12**. By contacting the lumbar vertebra **1101**, a positive determination of the position of the needle **103** may be made. By way of example, such positioning may be performed such that the needle **103** is within 30° of being perpendicular to the lumber vertebra **1101** at the point of contact with the lumbar vertebra **1101**, or at the point of the lumbar vertebra **1101** closest to the tip **201** of the needle **103**. Optionally, from such a position, the needle **103** may be retracted a predetermined amount (e.g., between about 3 mm and about 5 mm), for example as measured by markers **224** on the needle **103**, as determined using the collar about the elongated member **203** discussed herein, and/or by fluoroscopic navigation.

The process may include rotating the needle **103** such that the midpoint **502** is oriented toward the superior articular process **1104** and a medial branch nerve **1105** that is positioned along a lateral face **1106** of the superior articular process **1104**. Next, the filaments **206***a*, **206***b* may be advanced to the deployed position, as shown in FIG. **12**. The positions of the needle **103** and the deployed filaments **206***a*, **206***b* may be verified using fluoroscopy and/or patient stimulation (e.g., motor and/or sensory). The RF probe **401** may then be inserted into the lumen **222** such that RF energy emanating from the probe **103** will be conducted by the tip **201** and filaments **206***a*, **206***b* to the target medial branch nerve **1105** and away from the intermediate branch of the posterior primary ramus.

Next, RF energy may be applied to the RF probe **401**. The RF energy emanating from the needle **103** may be preferentially biased toward the target medial branch nerve **1105**. The lesion created by such a procedure may, for example,

have a maximum cross-sectional dimension of between about 8 mm and about 10 mm, and may ablate a corresponding portion of the medial branch nerve **1105**, thus denervating the facet joint.

In some embodiments, the needle may be operable to create a generally symmetric lesion relative to its central longitudinal axis (e.g., as illustrated in FIG. **9**). In certain such embodiments, the sequence of steps may include insert needle, deploy filaments, and apply RF energy.

In some embodiments, the needle may be inserted to be along the length of a portion of the nerve (as illustrated by needle **103'** outlined by broken lines). Such positioning may be similar to known methods of RF neurotomy performed using needles without filaments. After positioning the needle, the filaments may be deployed and a lesion may be created. As noted herein, a needle with deployable filaments that is capable of producing a lesion equivalent to that of a needle without deployable filaments may be smaller in diameter than the needle without deployable filaments. Although positioning of the needle **103'** may be similar to known processes, the process utilizing the needle **103'** with deployable filaments may cause less trauma and be safer than procedures using a needle without deployable filaments due to the smaller size of the needle with deployable filaments. As discussed herein, the peak temperatures capable of producing the desired lesion volume may be less when using the needle **103'** with deployable filaments as compared to a needle without deployable filaments, further contributing to patient safety. The filaments of the needle **103'** may be partially or fully deployed to achieve a desired lesion location, shape, and/or size.

It is noted that the illustrated deployment of needle **103** with the filaments **206***a*, **206***b* deployed may be used to create a lesion that approximates a lesion that would be created with the needle without filaments that is placed in the position of needle **103'** (e.g., parallel to the target nerve **1105**). The placement of needle **103** generally perpendicular to the surface of the L5 vertebra **1101** may be less difficult to achieve than the parallel placement of the needle **103'**.

2. Sacroiliac Joint (SIJ) RF Neurotomy of the Posterior Rami.

This process may include using a needle that enables the creation of lesions which are offset from the central longitudinal axis. The procedure will be described as being performed on the posterior rami **1201** of the SIJ of FIG. **12** and using the needle **103** of FIG. **2**A. It should be understood that other embodiments of needles described herein and/or other portions of the SIJ may be used in the described procedure or variations thereof.

As part of the SIJ RF neurotomy process, it may be desirable to create a series of lesions in a series of lesion target volumes **1203***a*-**1203***h* lateral to the sacral foramina **1211**, **1212**, **1213** of a side of the sacrum **1200** to ablate posterior rami **1201** that are responsible for relaying nociceptive signals from the SIJ. Since the exact positions of the rami **1201** may not be known, ablating such a series of target volumes **1203***a*-**1203***h* may accommodate the variations in rami **1201** positions. The series of target volumes **1203***a*-**1203***h* may be in the form of one or more interconnected individual target volumes, such as the target volumes **1203***a*, **1203***b*. In some embodiments, the process further comprises forming a lesion **1208** between the L5 vertebra **1209** and the sacrum **1200** to ablate the L5 dorsal ramus.

The SIJ RF neurotomy process may include positioning the tip **201** of the needle **103** (e.g., using fluoroscopic navigation) such that it is in contact with, or proximate to, and in lateral relation to the S1 posterior sacral foraminal aperture (PSFA) **1211** at a first point **1204** that is at the intersection of the two target volumes **1203***a*, **1203***b*. Such positioning may be performed such that the needle **103** is oriented within 30° of being perpendicular to the sacrum **1200** at the point of contact (or at the point of the sacrum **1200** closest to the tip **201** of the needle **103**). By contacting the sacrum **1200**, a positive determination of the position of the needle **103** may be made. Optionally, from such a position, the needle **103** may be retracted a predetermined amount (e.g., between about 3 mm and about 5 mm) as measured, for example, by markers **224** on the needle **103**, as determined using the collar about the elongated member **203** discussed herein, and/or by fluoroscopic navigation. For example, a contralateral posterior oblique view may be obtained to ascertain that the tip **201** has not entered the spinal canal. For example, a fluoroscopic view may be obtained looking down the length of the needle **103** to verify that the needle **103** is properly offset from the S1 PSFA **1211** and/or a fluoroscopic view may be obtained looking perpendicular to the central longitudinal axis **223** to verify that the needle **103** is not below the surface of the sacrum (e.g., in the S1 PSFA **1211**). An electrical signal may be applied to the needle **103** to stimulate nerves proximate to the tip **201** to verify correct needle **103** placement.

The SIJ RF neurotomy process may include rotating the needle **103** such that the midpoint **502** is oriented toward the first target volume **1203***a* in the direction of arrow **1205***a*. Next, the filaments **206***a*, **206***b* may be advanced to the deployed position. The position of the needle **103** and the deployed filaments **206***a*, **206***b* may be verified using fluoroscopy and/or stimulation (e.g., motor and/or sensory). The RF probe **401** may be inserted into the lumen **222** before, during, and/or after filament deployment such that RF energy emanating from the needle **103** will be conducted by the tip **201** and the filaments **206***a*, **206***b* to the first target volume **1203***a*. Next, RF energy may be applied to the RF probe **401**. The RF energy emanating from the needle **103** may be preferentially biased toward the first target volume **1203***a*. The lesion created by such an application of RF energy may, for example, have a maximum cross-sectional dimension of between about 8 mm and about 10 mm, and may ablate a corresponding portion of the rami **1201**.

Next, the filaments **206***a*, **206***b* may be retracted and the needle **103** may be rotated approximately 180° such that the midpoint **502** is oriented toward the second target volume **1203***b* in the direction of arrow **1205***b*. Optionally, some lateral repositioning of the needle may performed (e.g., without any needle pull back or with a small amount of needle pull back and reinsertion). Next, the filaments **206***a*, **206***b* may be advanced to the deployed position. The position of the needle **103** and the deployed filaments **206***a*, **206***b* may be verified using fluoroscopy and/or stimulation (e.g., motor and/or sensory). The RF probe **401** may remain in the lumen **222** during the repositioning, or may be removed and then reinserted. Next, RF energy may be applied to the RF probe **401** to create a lesion corresponding to the second target volume **1203***b*.

In this regard, with a single insertion of the needle **103**, two interconnected lesions (which may also be considered to be a single oblong lesion) may be created. Compared to methods in which an RF probe must be repositioned prior to each application of RF energy, the number of probe repositioning steps may be greatly reduced, reducing patient trauma and procedure duration. In this regard, a continuous region of lesioning may be achieved about the S1 PSFA **1211** such that the lesion occupies a volume surrounding the S1 PSFA **1211** from about the 2:30 clock position to about the

5:30 clock position (as viewed in FIG. **13**). Such lesioning may help to achieve denervation of the posterior rami proximate to the S1 PSFA **1211**.

The herein procedure may be repeated as appropriate to create lesions corresponding to the entire series of target volumes **1203***a*-**1203***h*, thus denervating the SIJ. For example, a first insertion may ablate the volumes **1203***a*, **1203***b*, a second insertion may ablate the volumes **1203***c*, **1203***d*, a third insertion may ablate the volumes **1203***e*, **1203***f*, and a fourth insertion may ablate the volumes **1203***g*, **1203***h*. In this regard, a similar continuous region of lesioning may be achieved about the S2 PSFA **1212** and a region of lesioning from about the 12:00 clock position to about the 3:00 clock position (as viewed in FIG. **13**) relative to the S3 PSFA may be achieved about the S3 PSFA **1213**. A lesion **1208** may also be created at the base of the superior articular process of the L5 **1209** dorsal ramus in the grove between the superior articular process and the body of the sacrum. The needle **103** may be inserted generally perpendicular to the plane of FIG. **13** to produce the lesion **1208**.

In some embodiments, three or more lesions may be created with a needle in a single position. For example, a needle positioned at a point **1206** proximate to three target volumes **1203***c*, **1203***d*, **1203***e*, may be operable to create lesions at each of the three target volumes **1203***c*, **1203***d*, **1203***e*, thus further reducing the number of needle repositionings.

In some embodiments, each individual lesion corresponding to the series of target volumes **1203** may be created using a needle with deployable filaments in which the needle is repositioned prior to each application of RF energy. In certain such embodiments, the sequence of steps may be insert needle, deploy filaments, apply RF energy, retract filaments, reposition needle, and repeat as appropriate to create each desired lesion. Such a procedure may be conducted, for example, using a needle capable of producing a lesion symmetric to a central longitudinal axis of the needle (e.g., the needle of FIG. **9**).

3. Thoracic RF Neurotomy of a Medial Branch Nerve.

This process may include using a needle that enables the creation of lesions which are offset from the central longitudinal axis of the needle. Successful treatment of thoracic z-joint pain using radiofrequency ablation of relevant medial branch nerves can be challenging owing to the inconsistent medial branch location in the intertransverse space, especially levels T5-T8. A needle without filaments is generally positioned at multiple locations in the intertransverse space to achieve sufficient tissue ablation for successful medial branch neurotomy. The procedure will be described as being performed on an intertransverse space between adjacent vertebrae **1301**, **1302** of the T5 to T8 thoracic vertebrae using FIG. **14** and the needle **103** of FIG. **2**A. It should be understood that other embodiments of needles described herein and/or other vertebrae may be used in the described procedure or variations thereof.

The process may include obtaining a segmental anteroposterior image at target level defined by counting from T1 and T12. This may be followed by obtaining an image that is ipsalateral oblique about 8° to about 150 off-sagittal plane of the spine to visualize costotransverse joint lucency clearly. This can allow improved visualization of the superior-lateral transverse process, especially in osteopenic patients. The angle can aid in directing the probe to a thoracic anatomic safe zone medial to the lung, reducing risk of pneumothorax.

The skin entry site for the needle **103** may be over the most inferior aspect of transverse process slightly medial to costotransverse joint. Inserting the needle **103** may include navigating the device over the transverse process over the bone to touch the superior transverse process slightly medial to the costotransverse joint. The process may include checking anteroposterior imaging to demonstrate that the tip **201** of the needle **103** is at the superolateral corner of the transverse process. The process may also include checking a contralateral oblique image view (e.g., at 15°) to demonstrate, for example in "Pinnochio" view, the target transverse process in an elongate fashion. This view can be useful for showing the tip **201** of the needle **103** in relationship to the superolateral margin of the transverse process subadjacent to the targeted medial branch nerve. The process may include retracting the tip **201** slightly (e.g., about 1 mm to about 3 mm). In some embodiments, retracting the tip **201** positions the ports at the superior edge of the process (e.g., visible with a radiopaque marker).

In some embodiments, medial to lateral placement may be performed entering the skin beneath the segmental spinous process, and navigating the needle **103** over the transverse process to contact a point just proximal to the superolateral corner of the transverse process. The tip **201** may then be advanced to approximate the exit port **304***a*, **304***b* of the filaments **206***a*, **206***b* with the superior margin of the transverse process, and the filaments **206***a*, **206***b* are deployed.

The process may include rotating the needle **103** such that the midpoint **502** is oriented toward the intertransverse space between the vertebrae **1301**, **1302** and the medial branch nerve **1303** that is positioned therein. Next, the filaments **206***a*, **206***b* may be advanced ventral into the intertransverse space between the vertebrae **1301**, **1302** to the deployed position. The position of the needle **103** and deployed filaments **206***a*, **206***b* may be verified using fluoroscopy (e.g., using lateral imaging) and/or stimulation (e.g., motor and/or sensory), for example to rule out proximity to ventral ramus. In some embodiments, the filaments **206***a*, **206***b* are deployed in a ventral direction in the intratransverse space, which may be confirmed by obtaining lateral. The RF probe **401** may be inserted into the lumen **222** such that RF energy emanating from the probe **103** will be conducted by the tip **201** and the filaments **206***a*, **206***b* to the target medial branch nerve **1303**. Next, RF energy may be applied to the RF probe **401**. The RF energy emanating from the needle **103** may be preferentially biased toward the volume between the vertebrae **1301**, **1302**. The lesion created by such a procedure may, for example, have a maximum cross-sectional dimension of between about 8 mm and about 10 mm, and may ablate a corresponding portion of the medial branch nerve **1303**. This method can treat the medial branch as it curves out of the intratransverse space emerging into the posterior compartment of the back. The directional bias of the lesion may advantageously heat towards the target and away from the skin.

It is noted that thoracic RF neurotomy performed on other thoracic vertebrae may call for different sizes of lesions. For example, thoracic RF neurotomy performed on the T3-T4 vertebrae may require a smaller lesion volume than the herein-described procedure, and thoracic RF neurotomy performed on the T1-T2 vertebrae may require a still smaller lesion volume. As described herein, the deployment of the filaments of the needle **103** may be varied to achieve such desired target lesion volumes, or different needles may be used (e.g., having shorter filaments in the fully deployed position).

4. Cervical Medial Branch RF Neurotomy.

Embodiments of needles described herein (e.g., the needle **103** of FIG. **2**A) are capable of creating a volume of tissue

ablation necessary for complete denervation of the cervical zygapophyseal joints, including the C2/3 cervical zygapophyseal joint (z-joint). Tissue ablation for cervical z-joint using embodiments of needles described herein may be accomplished using a single placement and single heating cycle. Such single placement and single heating cycle may avoid unnecessary tissue damage from multiple placements of a filament-free needle, and unintended injury to collateral tissue caused by excessive lesioning. The zone of ablation can be designed to provide sufficient and necessary tissue coagulation for a successful procedure, and thus may be expected to improve the outcomes of patients undergoing spinal radiofrequency neurotomy.

A cervical medial branch RF neurotomy procedure will be described as being performed on the third occipital nerve at the C2/3 z-joint using the needle **103** as shown in FIG. **15**. In FIG. **15**, the needle **103** is positioned between the C2 vertebra **1401** and the C3 vertebra **1402**.

In a first step, the patient may be placed in a prone position on a radiolucent table suited to performing fluoroscopically guided spinal procedures. Sedation may be administered. The patient's head may be rotated away from the targeted side. Sterile skin prep and draping may be performed using standard well-described surgical techniques.

For Third Occipital Nerve (TON) ablation (C2/3 joint innervation) the lateral aspect of the C2/3 Z-joint is located under either parasagittal or, alternatively, ipsilateral oblique rotation of less than or equal to about 30° (e.g., between about 20° and about 30°) of obliquity relative to the true sagittal plane of the cervical spine. The skin entry point may be infiltrated with local anesthetic. Then, the tip **201** of the needle **103** is moved over the most lateral aspect of bone of the articular pillar at the juncture of the C2/3 z-joint to a first position contacting bone proximate to the most posterior and lateral aspect of the z-joint complex, for example using a "gun-barrel" technique to touch the most lateral and posterior aspect of the articular pillar at the point of maximal concavity for level below C2/3 or at the point of maximal convexity at the C2/3 level when targeting the TON.

Once boney contact is made, the needle **103** may be retracted a predetermined distance (e.g., between about 1 mm and about 3 mm) and the filaments are deployed towards the lateral aspect of the C2/3 z-joint. The filaments will spread to encompass anticipated rostrocaudal variation in the target nerve location. The angle of the filaments with respect to the tip may effectively cover the ventral aspect of the articular pillar up to the border of the superior articular process, thus incorporating benefits of a 30° oblique pass. The needle **103** may be rotated about a central longitudinal axis prior to filament deployment to ensure that deployment will occur in the desired direction.

Multiplanar fluoroscopic imaging may then be employed to verify that the tip and the filaments are positioned as desired. For example, it may be verified that the filaments are positioned straddling the lateral joint lucency, and posterior to the C2/3 neural foramen. Useful imaging angles include anterior-posterior (AP), lateral, and contralateral oblique (Sluijter) views. To further verify adequate positioning of the needle **103**, motor stimulation may be performed by delivering a voltage (e.g., up to about 2 volts) at about 2 Hz to the tip **201** and filaments and/or sensory stimulation may be performed at appropriate voltage (e.g., between about 0.4 volts and about 1 volt) and frequency (e.g., about 50 Hz).

After position verification, RF energy may be applied to the tip and the plurality of filaments to generate heat that ablates a portion of the third occipital nerve. The cross-sectional dimensions of the lesion (e.g., between about 8 mm and about 10 mm) can incorporate all medial branches as well as the TON, which has a nerve diameter of about 1.5 mm. The directional nature of the lesion, offset towards the filaments, provides a beneficial measure of safety regarding undesired thermal damage to the skin and to collateral structures. Safety concerns may be further satisfied by fluoroscopic observation of the filaments dorsal to the intervertebral foramen and/or lack of ventral ramus activation during stimulation (e.g., with 2 Hz and 2 volts). After lesioning, the device may be removed. For levels below the C2/3 z-joint, the procedure may be similar than as described herein with respect to the third occipital nerve, with the exception that the initial boney contact target is at the waist of inflection point of the articular pillar.

Other spinal RF procedures may also benefit from the asymmetrical application of RF energy from embodiments of the needles described herein. Such asymmetry may, for example, be used to project RF energy in a desired direction and/or limit the projection of RF energy in undesired directions. The configuration of the filaments may be selected for a particular application to produce a desired size, shape, and/or location (relative to the needle tip) of a lesion within the patient. The location of the lesion may be offset distally and/or laterally from the tip of the needle as desired for a particular application.

It will be appreciated that the delivery of RF energy to tissue in the anatomy can be practiced for a multitude of reasons, and embodiments of the needles described herein may be adapted (e.g., modified or scaled) for use in other medical procedures. For example, embodiments of needles described herein could be used to deliver RF energy as a means to cauterize "feeder vessels," such as in bleeding ulcers and/or in orthopedic applications. For another example, embodiments of the needles described herein could be adapted for use in procedures such as cardiac ablation, in which cardiac tissue is destroyed in an effort to restore a normal electrical rhythm in the heart. Certain such uses could further benefit from the ability of embodiments of needles described herein to deliver fluid through a lumen since, for example, emerging procedures in cardiac therapy may require the ability to deliver stem cells, vascular endothelial growth factor (VEGF), or other growth factors to cardiac tissue. The ability to steer embodiments of the needle described herein may provide significant benefit in the field of cardiovascular drug delivery.

For example, a needle may be adapted for use in vertebral disc heating. A primary longer needle (e.g., having a length of about 15 cm and a tip with an uninsulated active portion having a length of about 2 mm, although other dimensions are also possible), is placed into the post posterolateral margin of a painful intervertebral disc, for example as described elsewhere for provocation discography and/or therapeutic disc access procedures such as Dekompressor® discectomy and disc biacuplasty. Once positioned in the posterior annulus, as confirmed with fluororscopy, tactile feedback, and/or characteristic impedance readings, a single filament is deployed to traverse the posterior annulus in a lateral to medial fashion in the lamella of the annulus fibrosis, for example as illustrated in FIG. **18**A, which is an axial view of posterior oblique needle entry with the main axial tip in the posterior annulus and deployed a filament moving lateral to medial in the lamella of the posterior annulus, and FIG. **18**B, which is a saggital view with a filament moving across the posterior annulus from lateral to medial.

In some embodiments, the filament may act as a thermocouple (e.g., comprising a material having thermosensing properties as described herein) to allow precise measurement of actual temperatures of the annulus. In some embodiments, the filament includes a lumen configured to allow injection of therapeutic substances (e.g., methylene-blue) upon withdrawal for substantially simultaneous chemo-thermo-neurolysis and/or to allow injection of contrast agent for confirmation of intraannular placement that is definite, for example as opposed to potentially dangerous placement in the spinal canal or futile placement in the nucleus pulposus. In some embodiments, the filament has an exit angle greater than about 30°. In some embodiments, the filament includes a beveled Quincke tip oriented to bias away from the spinal canal upon advancement, as needles in tissue track away from bevel angles. In some embodiments, the deployed filament has a length between about 10 mm and about 12 mm. In some embodiments, the needle does not include a lumen for injection of liquid. In certain such embodiments, the area not occupied by a lumen may be used for the filament, which may be more complicated due to use as a thermocouple and/or including a lumen.

Bipolar or monopolar RF energy is applied to the tip and to the filament, creating a zone of therapeutic heating across the posterior disc annulus and resulting in destruction of the pain fibers in approximately the outer third of the annulus. The procedure may be repeated on the opposite side. In some embodiments, the needle includes a plurality of deployable filaments, and gap between the filaments (e.g., the distance **604** in FIG. **6**) is between about 2 mm and about 10 mm, between about 4 mm and about 8 mm, between about 5 mm and about 7 mm (e.g., about 6 mm), combinations thereof, and the like.

Example 1

Sections of raw muscle tissue were allowed to equilibrate to 37° C. in a distilled water bath. A needle with tines deployed was positioned to contact the tissue surface in 10 trials and was inserted into tissue in 10 trials. A Radionics RFG 3C RF generator energy source was set at 75° C. for 80 seconds. Propagation of tissue coagulation was documented with video and a calibrated Flir T-400 thermal camera. Tissue samples were sectioned and coagulation zones measured. Infrared observation demonstrated symmetric and homogenous lesion progression without hot spots or focal over-impeding. Calculated volume averaged 467±71 $mm^3$/lesion. Topography was elongate spheroid offset from the central axis toward the filaments. Thus, the needle reliably produced lesions that are potentially useful in spinal applications.

Example 2

A 47 year-old male with recalcitrant right-sided lumbar zygapophysial joint pain presented for radiofrequency medial branch neurotomy. The diagnosis had been made by greater than 80% relief documented following both intraarticular z-joint injection and confirmatory medial branch blocks.

The patient was placed in a prone position on the fluoroscopy table and standard monitors were applied. No sedation was administered. The lumbar region was extensively prepped with chlorhexidine-alcohol and draped in routine sterile surgical fashion. The C-arm was adjusted to visualize a true AP of the L4/5 intervertebral disc space with vertebral end plates squared-off, and spinous process positioned between the pedicle shadows. The C-arm was rotated 30°-40° ipsilateral to the target joint until the base of the SAP of the L4 and L5 were clearly visualized. A target point was identified at the midpoint of the base of the SAP, and the overlying skin and subcutaneous tissues were infiltrated with 1.5% lidocaine. A small skin nick was made with an 18-gauge needle to facilitate placement of an embodiment of the needles described herein. Once skin anesthesia was established, the needle, with filaments in the retracted position, was advanced using a gun-barrel approach until boney contact was made with the base of the SAP. The needle was then retracted off the bone slightly, and using the indentation on the hub for orientation, the actuator was rotated 360° to fully deploy the filaments. Filaments were felt to touch bone at the base of the SAP. AP, oblique, and lateral images were obtained to document the placement and to confirm that the filaments were directed toward the SAP. In this position, the lesion was biased to cover any variant medial branch situated higher up the SAP. If the filaments were not directed in an ideal fashion, they were retracted, the device was rotated as necessary, and the filaments were redeployed. Motor stimulation at a frequency of 2 Hz up to 2 volts was incrementally administered with brisk activation of the multifidus, but with no activation of any ventral root inenervated musculature. Sensory stimulation at 50 Hz at 0.6 volts elicited a concordant aching in the distribution of the patient's pain. A 22-gauge, 10 cm, 10 mm active tip RFK connected to an independently grounded second RF generator was placed sequentially at the following targets for in vivo thermometry: (1) Most inferior and dorsal location in the supra-segmental neural foramen evaluating the potential for thermal injury of spinal nerve; (2) At a point lateral on the transverse process approximating the location of intermediate/lateral branches of the posterior primary rami; (3) At or near the central axis of the needle during stable heating; (4) On the SAP at the base and successively higher on mamilliary process to evaluate heating on the region of potential MB variation (up the SAP). The process was then repeated for denervation of the L5.

Following the confirmation of safe and optimal placement by fluoroscopy and stimulation, the heating protocol was initiated based on previous branch testing in egg white and chicken meat. The protocol included: 45° C. for 15-30 seconds, await rapid temperature increase signaling primary consolidation of heating and biophysical changes around core axis; 50° C. for 15 seconds; 60° C. for 15 seconds; 70° C. for 10 seconds to record foraminal temperatures only.

Generator parameters during ablation were appropriate and within the tolerance range for a generically programmed RF generator. The lower starting impedance, relative to a monopolar needle, may be explained by greatly increased conductive surface of the needle. Brief temperature fluctuation was noted as the lesion propagated to encompass the central axis housing the thermocouple. It is anticipated that changes in the generator software may be useful to support various embodiments of the described device. Impedance readings were 75 ohms to 250 ohms. Power ranges were 2 watts to 11 watts, typically 3 watts to 4 watts after 10 seconds into the procedure.

The thermal mapping results were as follows: (1) Perineural temperatures (neurogram obtained via TC2) at the supra-adjacent spinal nerve did not increase from a 38° C. baseline; (2) Temperature readings from the TC2 placed near the central axis of the needle reflected delivered temperature from the generator; (3) Temperature readings from the base of the SAP to relatively dorsal position on the SAP exceed the neuroablative threshold of 45° C.

The patient experienced minimal discomfort following the procedure. For the sake of full disclosure, it is noted that the patient is an inventor of the present application. No postoperative analgesics were required. The patient reported near complete relieve of his right-sided low back pain within 10 days of the procedure. Bilateral paraspinal EMG at L3, L4, and L5 was performed 20 days after the RF procedure, as documented in Table 1:

TABLE 1

| Paraspinal EMG | | | | | | |
|---|---|---|---|---|---|---|
| Side | Muscle | Nerve | Root | Ins Act | Fibs | Psw |
| Left | L3 Parasp | Rami | L3 | Nml | Nml | Nml |
| Left | L4 Parasp | Rami | L4 | Nml | Nml | Nml |
| Left | L5 Parasp | Rami | L5 | Nml | Nml | Nml |
| Right | L3 Parasp | Rami | L3 | Nml | Nml | Nml |
| Right | L4 Parasp | Rami | L4 | *Incr | *1+ | *1+ |
| Right | L5 Parasp | Rami | L5 | *Incr | *1+ | *1+ |

*Needle evaluation of the right L4 paraspinal and the right L5 paraspinal muscles showed increased insertional activity and slightly increased spontaneous activity.
*All remaining muscles showed no evidence of electrical instability.

There was electrodiagnostic evidence of active and acute denervation of the right lumbar paraspinals at the L4 and L5 levels. The contralateral left-sided paraspinals appeared normal. These findings are consistent with the clinical history of recent right lumbar radiofrequency rhizotomy.

Thus, the needle was safely and effectively used to accomplish lumbar medial branch neurotomy. Thermal mapping demonstrated a safe and effective isotherm consistent with bench predictions, and EMG of the lumbar paraspinals demonstrated objective evidence of medial branch coagulation. The needle appears to extend beneficially on existing techniques and technology. For a first example, facilitated placement for lumbar medial branch neurotomy using "down-the-beam" technique akin to diagnostic medial branch block. This approach can be applied to other spinal targets such as cervical z-joint neurotomy, thoracic z-joint neurotomy, sacroiliac joint denervation, central innercation of the lateral C1-2 joint, RF neurotomy thoracic sympathetic chain, RF neurotomy sphlancnic chain at T10, 11, 12, RF neurotomy lumbar sympathetic pain, and RF neurotomy superior hypogastric plexus. For a second example, lab testing and in vivo thermal data demonstrates a large volume suited for efficiently dealing with common variations in afferent sensory pathways. The lesion can be directed relative to the central longitudinal axis of the needle toward targets and away from sensitive collateral structures. For a third example, the needle can deliver meaningful motor and/or sensory stimulation for documentation of safe placement. For a fourth example, lesion topography is driven by needle design, and does not require high temperatures (e.g., greater than 80° C.) for extended times. It is believed that 60° C. for 60 seconds is adequate for most targets. Reduced procedural time and/or lower temperatures should translate to fewer complications, expedited recovery, and/or diminished incidence of postoperative pain syndromes/dysesthesias. For a fifth example, relative to other large field lesion technology, the needle is of a uncomplicated and robust design, does not require additional support equipment, and is economical to manufacture.

Although this invention has been disclosed in the context of certain embodiments and examples, it will be understood by those skilled in the art that the invention extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. In addition, while several variations of the embodiments of the invention have been shown and described in detail, other modifications, which are within the scope of this invention, will be readily apparent to those of skill in the art based upon this disclosure. It is also contemplated that various combinations or sub-combinations of the specific features and aspects of the embodiments may be made and still fall within the scope of the invention. It should be understood that various features and aspects of the disclosed embodiments can be combined with, or substituted for, one another in order to form varying modes of the embodiments of the disclosed invention. Thus, it is intended that the scope of the invention herein disclosed should not be limited by the particular embodiments described herein.

What is claimed is:

**1**. A system comprising:

a radiofrequency probe; and

a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising:

a conductive portion at a distal end of the radiofrequency neurotomy needle;

a tip configured to pierce tissue of a patient;

an elongate member comprising a lumen configured to accept the radiofrequency probe therein such that the radiofrequency probe physically contacts and is electrically connected to the conductive portion, the tip being at a distal end of the elongate member;

a filament electrically connected to the conductive portion and the tip due to physical contact of conductive materials at the distal end of the radiofrequency neurotomy needle such that the filament and the tip operate together as a single electrode, the filament being movable between a retracted position, in which the filament is at least partially in the elongate member, and a deployed position, in which at least a portion of the filament is out of the elongate member; and

an actuator interconnected to the filament to move the filament between the retracted position and the deployed position,

wherein the filament and the tip are configured to transmit radiofrequency energy from the radiofrequency probe and operate together as the single electrode in a monopolar mode when the filament is in the deployed position and the radiofrequency probe is accepted in the lumen and is in physical contact with the conductive portion at the distal end of the radiofrequency neurotomy needle.

**2**. The system of claim **1**, wherein the filament is formed of one of the conductive materials and the tip is formed of another of the conductive materials, and wherein the conductive materials of the filament and the tip are in physical contact when the filament is in the deployed position.

**3**. The system of claim **2**, wherein the tip comprises the conductive portion at the distal end of the radiofrequency neurotomy needle, and wherein the conductive portion is configured to physically contact the distal end of the radiofrequency probe when the radiofrequency probe is accepted in the lumen.

**4**. The system of claim **1**, wherein the tip comprises the conductive portion at the distal end of the radiofrequency neurotomy needle.

**5**. The system of claim **4**, wherein the conductive portion is configured to physically contact the distal end of the radiofrequency probe when the radiofrequency probe is accepted in the lumen.

**6**. The system of claim **4**, wherein the tip comprises a tip lumen that is configured to receive the distal end of the radiofrequency probe.

**7**. The system of claim **1**, wherein the needle further comprises a tube that is separate from the elongate member, and wherein the tube is positioned within the elongate member.

**8**. The system of claim **7**, wherein the lumen is within the tube.

**9**. The system of claim **7**, wherein the tube comprises the conductive portion of the needle.

**10**. The system of claim **1**, wherein the tip and the elongate member are a single unitary structure or are separate components that are fixedly interconnected.

**11**. The system of claim **1**, further comprising an additional filament electrically connected to the conductive portion such that both filaments and the tip operate together as the single electrode, wherein the additional filament is interconnected to the actuator such that both filaments are deployed and retracted by the actuator.

**12**. The system of claim **11**, wherein when the filaments are deployed, the tip and the filaments are configured to produce a lesion at a target volume of tissue within the patient.

**13**. The system of claim **12**, wherein when the tip and the filaments are configured to produce the lesion so as to be asymmetrical and offset relative to the central longitudinal axis of the radiofrequency neurotomy needle.

**14**. The system of claim **12**, wherein when the filaments are deployed, distal tips of the filaments are distal to the tip of the radiofrequency neurotomy needle such that the filaments and the tip are configured to produce the lesion so as to be distally offset from the tip of the radiofrequency neurotomy needle.

**15**. The system of claim **12**, wherein the tip and the filaments are configured to operate together as the single electrode in a monopolar mode to produce the lesion to have a volume between about 250 $mm^3$ and about 750 $mm^3$.

**16**. The system of claim **12**, wherein when the target volume includes a target nerve such that formation of the lesion ablates at least a portion of the target nerve to inhibit the ability of the target nerve to transmit pain signals.

**17**. The system of claim **1**, wherein the lumen is further configured to accept the radiofrequency probe therein such that a distal end of the radiofrequency probe is proximate the tip when the radiofrequency probe physically contacts and is electrically connected to the conductive portion.

**18**. The system of claim **1**, further comprising a fitting configured to provide a connection to a fluid source for injection of fluid through the lumen.

**19**. The system of claim **18**, wherein the radiofrequency neurotomy needle is operable in a first state in which the radiofrequency probe is fully separated from the radiofrequency neurotomy needle in a non-inserted state and in which the fitting is connected to the fluid source for injection of fluid through the lumen, and wherein the radiofrequency neurotomy needle is operable in a second state in which the fitting is disconnected from the fluid source and in which the radiofrequency probe is inserted through the fitting into the lumen for delivery of the radiofrequency energy.



**20**. The system of claim **1**, wherein the actuator is configured to rotate about the central longitudinal axis to move the filament between the retracted position and the deployed position.

**21**. The system of claim **1**, wherein a distal tip of the filament is closer to a central longitudinal axis of the radiofrequency neurotomy needle when the filament is in the retracted position as compared with when the filament is in the deployed position.

**22**. The system of claim **1**, wherein the filament and the tip are configured to operate together as the single electrode in a monopolar mode when the radiofrequency probe is accepted in the lumen and is in physical contact with the conductive portion.

**23**. The system of claim **1**, further comprising a radiofrequency generator and a return electrode pad that is configured to be attached to the patient, wherein the filament and the tip are configured to operate together as the single electrode in the monopolar mode when the electrode pad is attached to the patient to complete a circuit from the radiofrequency generator, through the radiofrequency probe, through the needle, through a portion of the patient, through the return electrode pad, and to the radiofrequency generator.

**24**. A system comprising:

a radiofrequency probe; and

a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising:

- a conductive portion at a distal end of the radiofrequency neurotomy needle;
- a tip configured to pierce tissue of a patient;
- a tube configured to accept the radiofrequency probe therein;
- a filament electrically connected to the conductive portion at the distal end of the radiofrequency neurotomy needle due to physical contact, at the distal end of the radiofrequency neurotomy needle, of conductive materials, wherein the filament and the tip are operative together as a single electrode, the filament being movable between a retracted position and a deployed position, a distal tip of the filament being closer to a central longitudinal axis of the radiofrequency neurotomy needle when the filament is in the retracted position as compared with when the filament is in the deployed position; and
- an actuator interconnected to the filament to move the filament between the retracted position and the deployed position,

wherein the filament and the tip are configured to transmit radiofrequency energy from the radiofrequency probe and operate together as the single electrode in a monopolar mode when the filament is in the deployed position and the radiofrequency probe is accepted in the lumen and in physical contact with the conductive portion at the distal end of the radiofrequency neurotomy needle.

**25**. The system of claim **24**, wherein the filament is formed of one of the conductive materials and the tip is formed of another of the conductive materials, and wherein the conductive materials of the filament and the tip are in physical contact when the filament is in the deployed position.

**26**. The system of claim **25**, wherein the tip comprises the conductive portion at the distal end of the radiofrequency neurotomy needle, and wherein the conductive portion is

configured to physically contact the distal end of the radiofrequency probe when the radiofrequency probe is accepted in the lumen.

**27**. The system of claim **24**, wherein the tube comprises the conductive portion of the needle.

**28**. A system comprising:

a radiofrequency probe; and

a radiofrequency neurotomy needle operable with the radiofrequency probe, the radiofrequency neurotomy needle comprising:

an elongate member comprising a lumen configured to accept the radiofrequency probe therein;

a tip coupled to a distal end of the elongate member and being configured to pierce tissue of a patient, the tip comprising a conductive portion configured to physically contact a distal end of the radiofrequency probe when the radiofrequency probe is accepted in the lumen;

a filament comprising a conductive material, the filament being electrically connected to the tip by way of physical contact with the tip at a distal end of the radiofrequency neurotomy needle such that the filament and the tip are operative together as a single electrode, the filament being movable between a retracted position, in which the filament is in a cross-sectional envelope of the tip, and a deployed position, in which a portion of the filament is outside the cross-sectional envelope of the tip; and

an actuator interconnected to the filament to move the filament between the retracted position and the deployed position,

wherein the filament and the tip are configured to transmit radiofrequency energy from the radiofrequency probe and operate together as the single electrode in a monopolar mode when the filament is in the deployed position and the radiofrequency probe is accepted in the lumen and in physical contact with the conductive portion of the tip.

**29**. The system of claim **28**, wherein the tip comprises a further lumen that is configured to receive the distal end of the radiofrequency probe.

* * * * *

US010925664B2

(12) **United States Patent**
**Wright et al.**

(10) **Patent No.: US 10,925,664 B2**
(45) **Date of Patent: *Feb. 23, 2021**

(54) **METHODS FOR RADIO FREQUENCY NEUROTOMY**

(71) Applicant: **Stratus Medical, LLC**, Salt Lake City, UT (US)

(72) Inventors: **Robert E. Wright**, Clayton (AU); **Scott A. Brandt**, Denver, CO (US)

(73) Assignee: **Stratus Medical, LLC**, Salt Lake City, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/933,995**

(22) Filed: **Jul. 20, 2020**

(65) **Prior Publication Data**

US 2020/0345412 A1 Nov. 5, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/098,673, filed on Apr. 14, 2016, now Pat. No. 10,736,688, which is a (Continued)

(51) **Int. Cl.**
***A61B 18/14*** (2006.01)
***A61B 18/12*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ...... ***A61B 18/1477*** (2013.01); ***A61B 18/1206*** (2013.01); *A61B 2018/00434* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... A61B 18/1477; A61B 2018/00434; A61B 2018/1253; A61B 2018/00577;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,011,872 A 3/1977 Kamiya
4,206,761 A 6/1980 Cosman
(Continued)

FOREIGN PATENT DOCUMENTS

AU 2017203754 6/2017
CN 1211171 A 3/1999
(Continued)

OTHER PUBLICATIONS

David Lawson Morris, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 17, 2020, 29 pages.
(Continued)

*Primary Examiner* — Eun Hwa Kim
(74) *Attorney, Agent, or Firm* — Med Venture Management, LLC; Daniel C. Higgs

(57) **ABSTRACT**

Methods and systems for spinal radio frequency neurotomy. Systems include needles capable of applying RF energy to target volumes within a patient. Such target volumes may contain target medial branch nerves along vertebrae or rami proximate the sacrum. Such procedures may be used to ablate or cauterize a portion of the targeted nerve, thus blocking the ability of the nerve to transmit signals to the central nervous system. Disclosed needles may be operable to asymmetrically, relative to a central longitudinal axis of the needle, apply RF energy. Such asymmetry facilitates procedures where a tip of the needle is placed proximate to anatomical structures for location verification. Then RF energy may be applied in a selectable direction relative to the needle tip to ablate volumes that include the targeted medial branch nerves or rami, thus denervating facet joints or the sacroiliac joint, respectively, to relieve pain in a patient.

**29 Claims, 19 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 12/940,974, filed on Nov. 5, 2010, now abandoned.

(60) Provisional application No. 61/347,351, filed on May 21, 2010, provisional application No. 61/280,557, filed on Nov. 5, 2009.

(51) **Int. Cl.**
*A61B 18/00* (2006.01)
*A61B 90/00* (2016.01)

(52) **U.S. Cl.**
CPC .............. *A61B 2018/00577* (2013.01); *A61B 2018/00595* (2013.01); *A61B 2018/00642* (2013.01); *A61B 2018/00791* (2013.01); *A61B 2018/00821* (2013.01); *A61B 2018/00875* (2013.01); *A61B 2018/126* (2013.01); *A61B 2018/1253* (2013.01); *A61B 2018/1467* (2013.01); *A61B 2090/376* (2016.02); *A61B 2090/3762* (2016.02)

(58) **Field of Classification Search**
CPC ...... A61B 2018/1467; A61B 2218/001; A61B 2218/002; A61B 2218/003
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


4,206,762 A 6/1980 Cosman
4,281,667 A 8/1981 Cosman
4,353,371 A 10/1982 Cosman
4,375,220 A 3/1983 Matvias
4,378,809 A 4/1983 Cosman
4,385,636 A 5/1983 Cosman
4,411,266 A 10/1983 Cosman
4,565,200 A 1/1986 Cosman
4,573,980 A 3/1986 Karrasch et al.
4,583,538 A 4/1986 Onik et al.
4,593,703 A 6/1986 Cosman
4,618,978 A 10/1986 Cosman
4,646,752 A 3/1987 Swann et al.
4,653,508 A 3/1987 Cosman
4,660,568 A 4/1987 Cosman
4,676,255 A 6/1987 Cosman
4,698,207 A 10/1987 Bringham et al.
4,787,886 A 11/1988 Cosman
4,796,615 A 1/1989 Bullock et al.
4,827,927 A 5/1989 Newton
4,838,265 A 6/1989 Cosman et al.
4,886,506 A 12/1989 Lovgren et al.
4,907,589 A 3/1990 Cosman
4,966,597 A 10/1990 Cosman
5,010,897 A 4/1991 Leveen
5,160,337 A 11/1992 Cosman
5,217,457 A 6/1993 Delahuerga et al.
5,230,623 A 7/1993 Guthrie et al.
5,233,515 A 8/1993 Cosman
5,244,462 A 9/1993 Delahuerga et al.
5,257,630 A 11/1993 Braitman et al.
5,291,896 A 3/1994 Fonger et al.
5,304,114 A 4/1994 Cosman et al.
5,304,115 A 4/1994 Pflueger et al.
5,312,329 A 5/1994 Beaty et al.
5,312,391 A 5/1994 Wilk
5,318,013 A 6/1994 Wilk
5,324,255 A 6/1994 Passafaro et al.
5,334,183 A 8/1994 Wuchinich
5,342,292 A 8/1994 Nita et al.
5,370,645 A 12/1994 Klicek et al.
5,370,675 A 12/1994 Edwards et al.
5,372,596 A 12/1994 Klicek et al.
5,377,685 A 1/1995 Kazi et al.
5,383,917 A 1/1995 Desai et al.
5,397,301 A 3/1995 Pflueger et al.
5,401,272 A 3/1995 Perkins
5,421,923 A 6/1995 Clarke et al.
5,422,567 A 6/1995 Matsunaga
5,423,809 A 6/1995 Klicek
5,433,739 A 7/1995 Sluijter et al.
5,447,417 A 9/1995 Kuhl et al.
5,458,597 A 10/1995 Edwards et al.
5,472,441 A 12/1995 Edwards et al.
5,472,442 A 12/1995 Klicek
5,474,057 A 12/1995 Makower et al.
5,484,398 A 1/1996 Stoddard
5,486,161 A 1/1996 Lax et al.
5,496,312 A 3/1996 Klicek
5,507,743 A 4/1996 Edwards et al.
5,507,802 A 4/1996 Imran
5,511,564 A 4/1996 Wilk
5,514,129 A 5/1996 Smith
D372,086 S 7/1996 Grasso et al.
5,536,267 A 7/1996 Edwards et al.
5,541,376 A 7/1996 Ladtkow et al.
5,560,358 A 10/1996 Arnold et al.
5,562,703 A 10/1996 Desai
5,571,147 A 11/1996 Sluijter et al.
5,580,665 A 12/1996 Taguchi et al.
5,599,345 A 2/1997 Edwards et al.
5,599,346 A 2/1997 Edwards et al.
5,611,709 A 3/1997 McAnulty
5,613,966 A 3/1997 Makower et al.
5,628,743 A 5/1997 Cimino
5,662,111 A 9/1997 Cosman
5,662,620 A 9/1997 Lieber et al.
5,662,680 A 9/1997 Desai
5,667,488 A 9/1997 Lundquist et al.
5,669,904 A 9/1997 Platt, Jr. et al.
5,672,173 A 9/1997 Gough et al.
5,672,174 A 9/1997 Gough et al.
5,683,349 A 11/1997 Makower et al.
5,683,384 A 11/1997 Gough et al.
5,701,575 A 12/1997 Taguchi et al.
5,720,744 A 2/1998 Eggleston et al.
5,728,143 A 3/1998 Gough et al.
5,735,847 A 4/1998 Gough et al.
5,738,648 A 4/1998 Lands et al.
5,748,703 A 5/1998 Cosman
5,749,689 A 5/1998 Konig
5,749,846 A 5/1998 Edwards et al.
5,755,754 A 5/1998 Rudie et al.
5,768,679 A 6/1998 Taguchi et al.
5,772,659 A 6/1998 Becker et al.
5,778,043 A 7/1998 Cosman
5,782,827 A 7/1998 Gough et al.
5,792,146 A 8/1998 Cosman
5,797,906 A 8/1998 Rhum et al.
5,800,484 A 9/1998 Gough et al.
5,807,309 A 9/1998 Lundquist et al.
5,810,804 A 9/1998 Gough et al.
5,827,271 A 10/1998 Buysse et al.
5,827,276 A 10/1998 LeVeen et al.
5,848,967 A 12/1998 Cosman
5,855,576 A 1/1999 LeVeen et al.
5,863,290 A 1/1999 Gough et al.
5,868,740 A 2/1999 LeVeen et al.
5,893,847 A 4/1999 Kordis
5,911,739 A 6/1999 Kordis et al.
5,913,855 A 6/1999 Gough et al.
5,921,992 A 7/1999 Costales et al.
5,925,042 A 7/1999 Gough et al.
5,928,229 A 7/1999 Gough et al.
5,935,123 A 8/1999 Edwards et al.
5,951,547 A 9/1999 Gough et al.
5,968,040 A 10/1999 Swanson et al.
5,980,517 A 11/1999 Gough
5,983,141 A 11/1999 Sluijter et al.
6,006,126 A 12/1999 Cosman
6,013,076 A 1/2000 Goble et al.
6,014,590 A 1/2000 Whayne et al.
6,015,406 A 1/2000 Goble et al.
6,016,452 A 1/2000 Kasevich


Petitioner's Exhibit 1003
Avanos v. Stratus

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 6,039,733 | A | 3/2000 | Buysse et al. |
| 6,041,260 | A | 3/2000 | Stern et al. |
| 6,044,846 | A | 4/2000 | Edwards |
| 6,045,532 | A | 4/2000 | Eggers et al. |
| 6,050,992 | A | 4/2000 | Nichols |
| 6,053,937 | A | 4/2000 | Edwards et al. |
| 6,059,780 | A | 5/2000 | Gough et al. |
| 6,068,627 | A | 5/2000 | Orszulak et al. |
| 6,071,280 | A | 6/2000 | Edwards et al. |
| 6,080,150 | A | 6/2000 | Gough |
| 6,090,105 | A | 7/2000 | Zepeda et al. |
| 6,105,581 | A | 8/2000 | Eggers et al. |
| 6,106,521 | A | 8/2000 | Blewett et al. |
| 6,117,134 | A | 9/2000 | Cunningham et al. |
| 6,122,341 | A | 9/2000 | Butler et al. |
| 6,129,726 | A | 10/2000 | Edwards et al. |
| 6,132,425 | A | 10/2000 | Gough |
| 6,139,519 | A | 10/2000 | Blythe |
| 6,139,547 | A | 10/2000 | Lontine et al. |
| 6,143,003 | A | 11/2000 | Cosman |
| 6,146,380 | A | 11/2000 | Racz et al. |
| 6,161,048 | A | 12/2000 | Sluijter et al. |
| 6,165,169 | A | 12/2000 | Panescu et al. |
| 6,167,295 | A | 12/2000 | Cosman |
| 6,179,834 | B1 | 1/2001 | Buysse et al. |
| 6,210,403 | B1 | 4/2001 | Klicek |
| 6,210,406 | B1 | 4/2001 | Webster |
| 6,213,999 | B1 | 4/2001 | Platt, Jr. et al. |
| 6,216,043 | B1 | 4/2001 | Swanson et al. |
| 6,217,554 | B1 | 4/2001 | Green |
| 6,221,071 | B1 | 4/2001 | Sherry et al. |
| 6,228,080 | B1 | 5/2001 | Gines |
| 6,228,083 | B1 | 5/2001 | Lands et al. |
| 6,231,570 | B1 | 5/2001 | Tu et al. |
| 6,234,178 | B1 | 5/2001 | Goble et al. |
| 6,235,023 | B1 | 5/2001 | Lee et al. |
| 6,241,725 | B1 | 6/2001 | Cosman |
| 6,241,726 | B1 | 6/2001 | Chia et al. |
| 6,246,912 | B1 | 6/2001 | Sluijter et al. |
| 6,251,106 | B1 | 6/2001 | Becker et al. |
| 6,259,952 | B1 | 7/2001 | Sluijter et al. |
| 6,268,200 | B1 | 7/2001 | Tucker et al. |
| 6,275,725 | B1 | 8/2001 | Cosman |
| 6,277,117 | B1 | 8/2001 | Tetzlaff et al. |
| 6,280,441 | B1 | 8/2001 | Ryan |
| 6,287,304 | B1 | 9/2001 | Eggers et al. |
| 6,312,426 | B1 | 11/2001 | Goldberg et al. |
| 6,330,478 | B1 | 12/2001 | Lee et al. |
| 6,331,180 | B1 | 12/2001 | Cosman et al. |
| 6,334,861 | B1 | 1/2002 | Chandler et al. |
| 6,352,536 | B1 | 3/2002 | Buysse et al. |
| 6,402,743 | B1 | 6/2002 | Orszulak et al. |
| 6,402,747 | B1 | 6/2002 | Lindermann et al. |
| 6,405,072 | B1 | 6/2002 | Cosman |
| 6,416,520 | B1 | 7/2002 | Kynast et al. |
| 6,419,653 | B2 | 7/2002 | Edwards et al. |
| 6,419,680 | B1 | 7/2002 | Cosman et al. |
| 6,419,798 | B1 | 7/2002 | Topolkaraev et al. |
| 6,425,887 | B1 | 7/2002 | McGuckin et al. |
| 6,440,127 | B2 | 8/2002 | McGovern et al. |
| 6,447,477 | B2 | 9/2002 | Burney et al. |
| 6,447,505 | B2 | 9/2002 | McGovern et al. |
| 6,451,018 | B1 | 9/2002 | Lands et al. |
| 6,454,765 | B1 | 9/2002 | Leveen et al. |
| 6,458,130 | B1 | 10/2002 | Frazier et al. |
| 6,459,769 | B1 | 10/2002 | Cosman |
| 6,461,314 | B1 | 10/2002 | Pant et al. |
| 6,464,704 | B2 | 10/2002 | Schmaltz et al. |
| 6,468,273 | B1 | 10/2002 | Leveen et al. |
| 6,471,695 | B1 | 10/2002 | Behl |
| 6,471,698 | B1 | 10/2002 | Edwards et al. |
| 6,478,793 | B1 | 11/2002 | Cosman et al. |
| 6,500,175 | B1 | 12/2002 | Gough et al. |
| 6,506,189 | B1 | 1/2003 | Rittman, III et al. |
| 6,517,534 | B1 | 2/2003 | McGovern et al. |
| 6,530,922 | B2 | 3/2003 | Cosman et al. |
| 6,533,987 | B2 | 3/2003 | Topolkaraev et al. |
| 6,551,311 | B2 | 4/2003 | Lee et al. |
| 6,562,033 | B2 | 5/2003 | Shah et al. |
| 6,565,562 | B1 | 5/2003 | Shah et al. |
| 6,569,159 | B1 | 5/2003 | Edwards et al. |
| 6,575,967 | B1 | 6/2003 | Leveen et al. |
| 6,575,969 | B1 | 6/2003 | Rittman, III et al. |
| 6,585,735 | B1 | 7/2003 | Frazier et al. |
| 6,602,249 | B1 | 8/2003 | Stoddard et al. |
| 6,605,085 | B1 | 8/2003 | Edwards |
| 6,610,054 | B1 | 8/2003 | Edwards et al. |
| 6,622,731 | B2 | 9/2003 | Daniel et al. |
| 6,623,481 | B1 | 9/2003 | Garbagnati et al. |
| 6,632,221 | B1 | 10/2003 | Edwards et al. |
| 6,632,222 | B1 | 10/2003 | Edwards et al. |
| 6,638,275 | B1 | 10/2003 | McGaffigan et al. |
| 6,641,580 | B1 | 11/2003 | Edwards et al. |
| 6,645,201 | B1 | 11/2003 | Utley et al. |
| 6,652,515 | B1 | 11/2003 | Maguire et al. |
| 6,652,516 | B1 | 11/2003 | Gough |
| 6,660,002 | B1 | 12/2003 | Edwards et al. |
| 6,660,362 | B1 | 12/2003 | Lindsay et al. |
| 6,663,624 | B2 | 12/2003 | Edwards et al. |
| 6,669,693 | B2 | 12/2003 | Friedman |
| 6,682,526 | B1 | 1/2004 | Jones et al. |
| 6,682,528 | B2 | 1/2004 | Frazier et al. |
| 6,685,701 | B2 | 2/2004 | Orszulak et al. |
| 6,689,127 | B1 | 2/2004 | Gough et al. |
| 6,690,210 | B2 | 2/2004 | Hadjizada et al. |
| 6,692,490 | B1 | 2/2004 | Edwards |
| 6,699,242 | B2 | 3/2004 | Heggeness |
| 6,706,152 | B2 | 3/2004 | Burazin et al. |
| 6,723,092 | B2 | 4/2004 | Brown et al. |
| 6,740,080 | B2 | 5/2004 | Jain et al. |
| 6,743,226 | B2 | 6/2004 | Cosman et al. |
| 6,743,229 | B2 | 6/2004 | Buysse et al. |
| 6,746,570 | B2 | 6/2004 | Burazin et al. |
| 6,749,719 | B2 | 6/2004 | Burazin et al. |
| 6,752,804 | B2 | 6/2004 | Simpson et al. |
| 6,770,070 | B1 | 8/2004 | Balbierz |
| 6,780,180 | B1 | 8/2004 | Goble et al. |
| 6,803,549 | B2 | 10/2004 | Yu |
| 6,814,712 | B1 | 11/2004 | Edwards et al. |
| 6,837,956 | B2 | 1/2005 | Cowell et al. |
| 6,846,448 | B2 | 1/2005 | Rymer et al. |
| 6,847,848 | B2 | 1/2005 | Sterzer et al. |
| 6,852,091 | B2 | 2/2005 | Edwards et al. |
| 6,866,663 | B2 | 3/2005 | Edwards et al. |
| 6,881,214 | B2 | 4/2005 | Cosman et al. |
| 6,889,089 | B2 | 5/2005 | Behl et al. |
| 6,896,675 | B2 | 5/2005 | Leung et al. |
| 6,932,810 | B2 | 8/2005 | Ryan |
| 6,958,062 | B1 | 10/2005 | Gough et al. |
| 6,958,064 | B2 | 10/2005 | Rioux et al. |
| 6,961,602 | B2 | 11/2005 | Fuimaono et al. |
| 6,962,587 | B2 | 11/2005 | Johsnon et al. |
| 6,964,660 | B2 | 11/2005 | Maguire et al. |
| 6,966,908 | B2 | 11/2005 | Maguire et al. |
| 6,974,455 | B2 | 12/2005 | Garabedian et al. |
| 6,989,004 | B2 | 1/2006 | Hinchliffe et al. |
| 6,997,925 | B2 | 2/2006 | Maguire et al. |
| 7,025,767 | B2 | 4/2006 | Schaefer et al. |
| 7,033,353 | B2 | 4/2006 | Stoddard et al. |
| 7,044,949 | B2 | 5/2006 | Orszulak et al. |
| 7,048,733 | B2 | 5/2006 | Hartley et al. |
| 7,056,320 | B2 | 6/2006 | Utley et al. |
| 7,074,484 | B2 | 7/2006 | Topolkaraev et al. |
| 7,076,399 | B2 | 7/2006 | Godara |
| 7,087,051 | B2 | 8/2006 | Bourne et al. |
| 7,099,712 | B2 | 8/2006 | Fuimaono et al. |
| 7,108,696 | B2 | 9/2006 | Daniel et al. |
| 7,112,197 | B2 | 9/2006 | Hartley et al. |
| 7,115,124 | B1 | 10/2006 | Xiao |
| 7,138,088 | B2 | 11/2006 | Wariar et al. |
| 7,150,743 | B2 | 12/2006 | Zvuloni et al. |
| 7,150,744 | B2 | 12/2006 | Edwards et al. |
| 7,160,296 | B2 | 1/2007 | Pearson et al. |
| 7,163,536 | B2 | 1/2007 | Godara |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,179,256 | B2 | 2/2007 | Mest |
| 7,179,258 | B2 | 2/2007 | Buysse et al. |
| 7,207,990 | B2 | 4/2007 | Lands et al. |
| 7,229,438 | B2 | 6/2007 | Young |
| 7,258,688 | B1 | 8/2007 | Shah et al. |
| 7,266,414 | B2 | 9/2007 | Cornelius et al. |
| 7,270,660 | B2 | 9/2007 | Ryan |
| 7,270,661 | B2 | 9/2007 | Dahla et al. |
| 7,270,662 | B2 | 9/2007 | Visram et al. |
| 7,276,064 | B2 | 10/2007 | Paul et al. |
| 7,281,666 | B2 | 10/2007 | Smith |
| 7,294,127 | B2 | 11/2007 | Leung et al. |
| 7,306,596 | B2 | 12/2007 | Hillier et al. |
| 7,311,702 | B2 | 12/2007 | Tallarida et al. |
| 7,318,822 | B2 | 1/2008 | Darmos et al. |
| 7,340,307 | B2 | 3/2008 | Maguire et al. |
| 7,344,533 | B2 | 3/2008 | Pearson et al. |
| RE40,279 | E | 4/2008 | Sluijter et al. |
| 7,354,436 | B2 | 4/2008 | Rioux et al. |
| 7,357,798 | B2 | 4/2008 | Sharps et al. |
| 7,371,234 | B2 | 5/2008 | Young |
| RE40,388 | E | 6/2008 | Gines |
| 7,387,626 | B2 | 6/2008 | Edwards et al. |
| 7,387,630 | B2 | 6/2008 | Mest |
| 7,393,351 | B2 | 7/2008 | Woloszko et al. |
| 7,399,299 | B2 | 7/2008 | Daniel et al. |
| 7,416,549 | B2 | 8/2008 | Young et al. |
| 7,419,487 | B2 | 9/2008 | Johnson et al. |
| 7,449,020 | B2 | 11/2008 | Edwards et al. |
| 7,458,971 | B2 | 12/2008 | Zerfas et al. |
| 7,468,062 | B2 | 12/2008 | Oral et al. |
| 7,480,533 | B2 | 1/2009 | Cosman et al. |
| 7,517,346 | B2 | 4/2009 | Sloan et al. |
| 7,524,318 | B2 | 4/2009 | Young et al. |
| 7,533,002 | B2 | 5/2009 | Godara |
| 7,549,986 | B2 | 6/2009 | Rioux et al. |
| 7,561,907 | B2 | 7/2009 | Fuimaono et al. |
| 7,593,778 | B2 | 9/2009 | Chandran et al. |
| 7,596,469 | B2 | 9/2009 | Godara |
| 7,615,050 | B2 | 11/2009 | Cross et al. |
| 7,670,336 | B2 | 3/2010 | Young et al. |
| 7,670,337 | B2 | 3/2010 | Young |
| 7,678,106 | B2 | 3/2010 | Lee |
| 7,678,107 | B2 | 3/2010 | Young |
| 7,699,844 | B2 | 4/2010 | Utley et al. |
| 7,704,248 | B2 | 4/2010 | Dicarlo |
| 7,771,420 | B2 | 8/2010 | Butty et al. |
| 7,794,458 | B2 | 9/2010 | McIntyre et al. |
| 7,794,459 | B2 | 9/2010 | Faure |
| 7,797,049 | B2 | 9/2010 | Christopherson et al. |
| 7,799,021 | B2 | 9/2010 | Leung et al. |
| 7,815,571 | B2 | 10/2010 | Deckman et al. |
| 7,819,869 | B2 | 10/2010 | Godara et al. |
| 7,819,871 | B2 | 10/2010 | Paul et al. |
| 7,824,404 | B2 | 11/2010 | Godara et al. |
| 7,828,796 | B2 | 11/2010 | Wong et al. |
| 7,846,157 | B2 | 12/2010 | Kozel |
| 7,874,986 | B2 | 1/2011 | Deckman et al. |
| 7,875,025 | B2 | 1/2011 | Cockburn et al. |
| 7,892,231 | B2 | 2/2011 | Elliott |
| 7,896,871 | B2 | 3/2011 | Bhushan et al. |
| 7,896,874 | B2 | 3/2011 | Young et al. |
| 7,918,852 | B2 | 4/2011 | Tullis et al. |
| 8,262,574 | B2 | 9/2012 | Placek et al. |
| 8,512,330 | B2 | 8/2013 | Epstein et al. |
| 8,518,037 | B2 | 8/2013 | Young |
| 8,753,335 | B2 | 6/2014 | Moshe et al. |
| 9,402,560 | B2 | 8/2016 | Organ et al. |
| 9,675,406 | B2 | 6/2017 | Moss et al. |
| 10,716,618 | B2 | 7/2020 | Wright et al. |
| 10,736,688 | B2 | 8/2020 | Wright et al. |
| 2001/0012956 | A1 | 8/2001 | Behl et al. |
| 2002/0022864 | A1 | 2/2002 | Mahvi et al. |
| 2002/0026185 | A1 | 2/2002 | Gough |
| 2002/0029037 | A1 | 3/2002 | Kim |
| 2002/0133148 | A1 | 9/2002 | Daniel et al. |
| 2002/0143302 | A1 | 10/2002 | Hinchliffe et al. |
| 2002/0188275 | A1 | 12/2002 | McGuckin, Jr. |
| 2003/0018332 | A1 | 1/2003 | Schmaltz et al. |
| 2003/0078595 | A1 | 4/2003 | Cosman |
| 2003/0199862 | A1 | 10/2003 | Simpson et al. |
| 2004/0006336 | A1 | 1/2004 | Swanson |
| 2004/0015176 | A1 | 1/2004 | Cosman |
| 2004/0015218 | A1 | 1/2004 | Finch et al. |
| 2004/0059328 | A1 | 3/2004 | Daniel et al. |
| 2004/0064137 | A1 | 4/2004 | Pellegrino et al. |
| 2004/0100376 | A1 | 5/2004 | Lye et al. |
| 2004/0122482 | A1 | 6/2004 | Tung et al. |
| 2004/0143262 | A1 | 7/2004 | Visram et al. |
| 2004/0158239 | A1 | 8/2004 | Behl et al. |
| 2004/0176759 | A1 | 9/2004 | Krishnamurthy et al. |
| 2004/0199179 | A1 | 10/2004 | Elliott |
| 2004/0230187 | A1 | 11/2004 | Lee et al. |
| 2004/0260282 | A1 | 12/2004 | Gough et al. |
| 2005/0033279 | A1 | 2/2005 | Edwards et al. |
| 2005/0059964 | A1 | 3/2005 | Fitz |
| 2005/0085804 | A1 | 4/2005 | McGaffigan |
| 2005/0101944 | A1 | 5/2005 | Williams |
| 2005/0101950 | A1 | 5/2005 | Gough et al. |
| 2005/0165391 | A1 | 7/2005 | Maguire et al. |
| 2005/0171522 | A1 | 8/2005 | Christopherson |
| 2005/0177209 | A1 | 8/2005 | Leung et al. |
| 2005/0177211 | A1 | 8/2005 | Leung et al. |
| 2005/0203503 | A1 | 9/2005 | Edwards et al. |
| 2005/0234445 | A1 | 10/2005 | Conquergood et al. |
| 2005/0240174 | A1 | 10/2005 | Pearson et al. |
| 2005/0267552 | A1 | 12/2005 | Conquergood et al. |
| 2005/0277918 | A1 | 12/2005 | Shah et al. |
| 2006/0015161 | A1 | 1/2006 | Longo et al. |
| 2006/0084965 | A1 | 4/2006 | Young et al. |
| 2006/0089635 | A1 | 4/2006 | Young et al. |
| 2006/0095029 | A1 | 5/2006 | Young et al. |
| 2006/0095115 | A1 | 5/2006 | Bladillah et al. |
| 2006/0111702 | A1 | 5/2006 | Oral et al. |
| 2006/0122686 | A1 | 6/2006 | Gilad et al. |
| 2006/0122692 | A1 | 6/2006 | Gilad et al. |
| 2006/0142756 | A1 | 6/2006 | Davies et al. |
| 2006/0173359 | A1 | 8/2006 | Lin et al. |
| 2006/0189972 | A1 | 8/2006 | Grossman |
| 2006/0200121 | A1 | 9/2006 | Mowery |
| 2006/0206111 | A1 | 9/2006 | Young |
| 2006/0206127 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206128 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206129 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206130 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206131 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206132 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206133 | A1 | 9/2006 | Conquergood et al. |
| 2006/0206134 | A1 | 9/2006 | Conquergood et al. |
| 2006/0217705 | A1 | 9/2006 | Godara et al. |
| 2006/0229645 | A1 | 10/2006 | Bonnette et al. |
| 2006/0247616 | A1 | 11/2006 | Edwards et al. |
| 2006/0259026 | A1 | 11/2006 | Godara et al. |
| 2006/0259027 | A1 | 11/2006 | Kwan et al. |
| 2006/0271036 | A1 | 11/2006 | Garabedian et al. |
| 2007/0006215 | A1 | 1/2007 | Epstein et al. |
| 2007/0010809 | A1 | 1/2007 | Hovda et al. |
| 2007/0016183 | A1 | 1/2007 | Lee et al. |
| 2007/0027449 | A1 | 2/2007 | Godara et al. |
| 2007/0060921 | A1 | 3/2007 | Janssen et al. |
| 2007/0112340 | A1 | 5/2007 | Thomas et al. |
| 2007/0112342 | A1 | 5/2007 | Pearson et al. |
| 2007/0118191 | A1 | 5/2007 | Godara |
| 2007/0123964 | A1 | 5/2007 | Davies et al. |
| 2007/0156136 | A1 | 7/2007 | Godara et al. |
| 2007/0161905 | A1 | 7/2007 | Munrow |
| 2007/0167943 | A1 | 7/2007 | Janssen et al. |
| 2007/0179380 | A1 | 8/2007 | Grossman |
| 2007/0179491 | A1 | 8/2007 | Kratoska et al. |
| 2007/0185522 | A1 | 8/2007 | Davies et al. |
| 2007/0203402 | A1 | 8/2007 | Godara et al. |
| 2007/0203486 | A1 | 8/2007 | Young |
| 2007/0213703 | A1 | 9/2007 | Naam et al. |
| 2007/0260234 | A1 | 11/2007 | Mccullagh et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0282321 | A1 | 12/2007 | Shah et al. |
| 2007/0287996 | A1 | 12/2007 | Rioux |
| 2008/0015569 | A1 | 1/2008 | Saadat et al. |
| 2008/0033493 | A1 | 2/2008 | Deckman et al. |
| 2008/0045939 | A1 | 2/2008 | Lee |
| 2008/0045940 | A1 | 2/2008 | Lee |
| 2008/0048786 | A1 | 2/2008 | Feldkamp et al. |
| 2008/0065062 | A1 | 3/2008 | Leung et al. |
| 2008/0154259 | A1 | 6/2008 | Gough et al. |
| 2008/0161804 | A1 | 7/2008 | Rioux et al. |
| 2008/0167646 | A1 | 7/2008 | Godara et al. |
| 2008/0167649 | A1 | 7/2008 | Edwards et al. |
| 2008/0208121 | A1 | 8/2008 | Youssef et al. |
| 2008/0228180 | A1 | 9/2008 | Epstein |
| 2008/0228181 | A1 | 9/2008 | Godara et al. |
| 2008/0249392 | A1 | 10/2008 | Mest |
| 2008/0249523 | A1 | 10/2008 | McPherson et al. |
| 2008/0269558 | A1 | 10/2008 | Yahagi et al. |
| 2008/0269739 | A1 | 10/2008 | Young et al. |
| 2008/0275443 | A1 | 11/2008 | Oral et al. |
| 2009/0024124 | A1 | 1/2009 | Lefler et al. |
| 2009/0054962 | A1 | 2/2009 | Lefler et al. |
| 2009/0099544 | A1 | 4/2009 | Munrow et al. |
| 2009/0131790 | A1 | 5/2009 | Munrow et al. |
| 2009/0138011 | A1 | 5/2009 | Epstein |
| 2009/0187177 | A1 | 7/2009 | Epstein |
| 2009/0187182 | A1 | 7/2009 | Epstein et al. |
| 2009/0187183 | A1 | 7/2009 | Epstein |
| 2009/0198232 | A1 | 8/2009 | Young et al. |
| 2009/0221998 | A1 | 9/2009 | Epstein et al. |
| 2009/0228001 | A1 | 9/2009 | Pacey |
| 2009/0287081 | A1 | 11/2009 | Grossman et al. |
| 2009/0292259 | A1 | 11/2009 | Delano et al. |
| 2009/0299358 | A1 | 12/2009 | Lafontaine |
| 2009/0306604 | A1 | 12/2009 | Darmos et al. |
| 2010/0004651 | A1 | 1/2010 | Biyani |
| 2010/0042098 | A1 | 2/2010 | Cross et al. |
| 2010/0049192 | A1 | 2/2010 | Holtz et al. |
| 2010/0056926 | A1 | 3/2010 | Deckman et al. |
| 2010/0076303 | A1 | 3/2010 | McKinley |
| 2010/0076340 | A1 | 3/2010 | Eckstein et al. |
| 2010/0099980 | A1 | 4/2010 | Godara et al. |
| 2010/0114095 | A1 | 5/2010 | Janssen et al. |
| 2010/0130974 | A1 | 5/2010 | Young et al. |
| 2010/0185082 | A1 | 7/2010 | Chandran et al. |
| 2010/0222677 | A1 | 9/2010 | Placek et al. |
| 2011/0184403 | A1 | 7/2011 | Brannan |
| 2011/0288540 | A1 | 11/2011 | Wright et al. |
| 2013/0096549 | A1 | 4/2013 | Organ et al. |
| 2017/0065334 | A1 | 3/2017 | Wright et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 2418844 | 2/2001 |
| CN | 1338909 A | 3/2002 |
| DE | 2124684 | 11/1972 |
| EP | 1059067 B1 | 4/2005 |
| EP | 1645235 B1 | 11/2010 |
| EP | 2571439 B1 | 6/2020 |
| GB | 2423024 | 8/2006 |
| JP | 2000-507844 | 6/2000 |
| JP | 2001-527428 | 12/2001 |
| JP | 2003-527888 | 9/2003 |
| JP | 2004-267759 | 9/2004 |
| JP | 2008-516667 | 5/2008 |
| JP | 2009-504201 | 2/2009 |
| JP | 4290894 B2 | 4/2009 |
| JP | 2013-509966 | 3/2013 |
| WO | 96/04860 | 2/1996 |
| WO | 96/16606 | 6/1996 |
| WO | WO 96/29946 | 10/1996 |
| WO | 97/06740 | 2/1997 |
| WO | 97/06855 | 2/1997 |
| WO | 97/06857 | 2/1997 |
| WO | WO 97/06739 | 2/1997 |
| WO | 97/29702 | 8/1997 |
| WO | 99/25260 | 5/1999 |
| WO | 00/06046 | 2/2000 |
| WO | 01/28446 | 4/2001 |
| WO | 01/57655 | 8/2001 |
| WO | 02/22032 | 3/2002 |
| WO | 02/54941 | 7/2002 |
| WO | 2006/044105 | 4/2006 |
| WO | 2006/104682 | 10/2006 |
| WO | 2007/005830 | 1/2007 |
| WO | 2008/083044 | 7/2008 |
| WO | WO 2011/057157 | 5/2011 |
| WO | 2011/113943 | 9/2011 |
| WO | 2011/146243 | 11/2011 |

OTHER PUBLICATIONS

Susanne Monica Hantos, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 21, 2020, 765 pages.

Peter Darmos, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 21, 2020, 716 pages.

William Samual Hunter, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 6, 2020, 158 pages.

Biomerics LLC, Statement of Claim, *Biomerics LLC* v *Diros Technology Inc & M Medical PTY LTD*, NSD438/2019, Federal Court of Australia, Mar. 22, 2019, 10 pages.

Diros Technology Inc, Statement of Cross Claim, *Biomerics LLC* v *Diros Technology Inc & M Medical PTY LTD*, NSD438/2019, Federal Court of Australia, May 13, 2019, 5 pages.

Diros Technology Inc., RF Trident Cannulae, Last Accessed Aug. 20, 2019, available at https://dirostech.com/product-details/rf-tridenttrident-hybrid-cannulae/, 7 pages.

Diros Technology Inc., RF Trident Hybrid Cannulae, Last Accessed Aug. 20, 2019, available at https://dirostech.com/product-details/rf-trident-hybrid-cannulae/, 10 pages.

Food and Drug Administration, 510(k) Summary for Diros OWL Sterile Single Use Trident R.F. Insulated Cannulae Models DTR and DTRH, Jul. 30, 2015, 11 pages.

Ahmed et al., Principles of and Advances in Percutaneous Ablation, Radiology, Feb. 2011, pp. 351-369, vol. 258, No. 2.

Chen et al., Optimizing Electrode Placement Using Finite-Element Models in Radiofrequency Ablation Treatment Planning, IEEE Transactions on Biomedical Engineering, Feb. 2009, pp. 237-245, vol. 56, No. 2.

Haemmerich et al., Hepatic Bipolar Radio-Frequency Ablation Between Separated Multiprong Electrodes, IEEE Transactions on Biomedical Engineering, Oct. 2001, pp. 1145-1152, vol. 48, No. 10.

Haemmerich et al., Large-Volume Radiofrequency Ablation of ex Vivo Bovine Liver with Multiple Cooled Cluster Electrodes, Radiology, Feb. 2005, pp. 563-568, vol. 234, No. 2.

Laeseke et al., Multiple-Electrode RF Ablation Creates Confluent Areas of Necrosis: Results in in vivo Porcine Liver, Radiology, Oct. 2006, pp. 116-124.

Quaranta et al., FEM Analysis of RF Breast Ablation: Multiprobe versus Cool-tip Electrode, Anticancer Research, 2007, pp. 775-784.

Scharf et al., Ablation of Persistent Atrial Fibrillation Using Multielectrode Catheters and Duty-Cycled Radiofrequency Energy, Journal of the American College of Cardiology, Oct. 6, 2009, pp. 1450-1456, vol. 54, No. 15.

Shirato et al., Small Hepatocellular Carcinoma: Therapeutic Effectiveness of Percutaneous Radio Frequency Ablation Therapy With a LeVeen Needle Electrode, American Institute of Ultrasound in Medicine, 2002, pp. 67-76.

IP Australia, Patent Examination Report No. 2, Australian Patent Application No. 2014200132, dated Apr. 8, 2015, 3 pages.

IP Australia, Examination Report No. 1 for standard patent application, Australian Patent Application No. 2015261694, dated Sep. 27, 2017, 3 pages.

Brazilian National Institute of Industrial Property, Search Report, Brazilian Patent Application No. BR112012010199-4, dated Jul. 23, 2019, 6 pages.

(56) **References Cited**

OTHER PUBLICATIONS

Canadian Intellectual Property Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,778,997, dated Jun. 9, 2017, 7 pages.
Canadian Intellectual Property Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,778,997, dated May 23, 2019, 5 pages.
Intellectual Property India, Examination Report, Indian Patent Application No. 3638/DELNP/2012, dated Mar. 13, 2019, 5 pages.
Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2012-538056, dated Feb. 2, 2015, 7 pages.
Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2015-215570, dated Oct. 24, 2016, 15 pages.
IP Australia, Patent Examination Report No. 1, Australian Patent Application No. 2014200126, dated May 27, 2016, 6 pages.
Canadian Intellectual Proprety Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,799,505, dated Mar. 17, 2017, 5 pages.
Canadian Intellectual Proprety Office, Notification of Requisition by the Examiner, Canadian Patent Application No. 2,799,505, dated Apr. 15, 2019, 10 pages.
CNIPA, National Intellectual Property Administration, PRC, Office Action, Chinese Patent Application No. 201510151627.1, dated Feb. 22, 2017, 8 pages.
CNIPA, National Intellectual Property Administration, PRC, Office Action, Chinese Patent Application No. 201510148998.4, dated Mar. 2, 2017, 10 pages.
European Patent Office, Communication Pursuant to Article 94(3) EPC, European Patent Application No. 11 783 944.9-1124, dated Feb. 28, 2018, 4 pages.
Israel Patent Office, Office Action, Israeli Patent Application No. 222965, dated May 14, 2015, 3 pages.
Intellectual Property India, Examination Report, Indian Patent Application No. 9943/DELNP/2012, dated Jul. 30, 2019, 6 pages.
Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2013-511205, dated Feb. 9, 2015, 5 pages.
Japan Patent Office, Decision of Rejection, Japanese Patent Application No. 2013-511205, dated Aug. 10, 2015, 4 pages.
Japan Patent Office, Appeal No. 2015-21839, Notice of Reasons for Rejection, Japanese Patent Application No. 2013-511205, dated Oct. 3, 2016, 8 pages.
Japan Patent Office, Notice of Reasons for Rejection, Japanese Patent Application No. 2015-240011, dated Jan. 4, 2017, 12 pages.
Korean Intellectual Property Office, Notice to Submit Response, Korean Patent Application No. 10-2012-7033363, dated May 4, 2015, 14 pages.
Korean Intellectual Property Office, Notice to Submit Response, Korean Patent Application No. 10-2015-7004378, dated Sep. 25, 2017, 13 pages.
Mexican Institute of Industrial Property, Requirement 1, Mexican Patent Application No. MX/a/2012/013280, dated Feb. 17, 2015, 4 pages.
Mexican Institute of Industrial Property, Requirement 2, Mexican Patent Application No. MX/a/2012/013280, dated May 27, 2015, 8 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 13/101,009, dated Apr. 6, 2015, 26 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 15/092,945, dated Jun. 4, 2018, 6 pages.
United States Patent and Trademark Office, Office Action, U.S. Appl. No. 15/092,945, dated Mar. 14, 2019, 15 pages.
United States Patent and Trademark Office, Applicant-Initiated Interview Summary, U.S. Appl. No. 15/092,945, dated Aug. 27, 2019, 4 pages.
Leslie W. Organ, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jul. 5, 2020, 19 pages.
William Samuel Hunter, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jul. 20, 2020, 32 pages.
Marc Andrew Russo, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jul. 20, 2020, 70 pages.
Peter Darmos, Amended Statement of Cross Claim Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Jun. 5, 2020, 32 pages.
Barauskas et al., Investigation of radiofrequency ablation process in liver tissue by finite element modeling and experiment, *Medicine (Kaunas)*, vol. 43(4), pp. 310-325, 2007.
Berjano, Theoretical modeling for radiofrequency ablation: state-of-the-art and challenges for the future, *BioMedical Engineering OnLine*, vol. 5(24), 17 pages, Apr. 18, 2006.
Burdio et al., Bipolar Saline-enhanced Electrode for Radiofrequency Ablation: Results of Experimental Study of in Vivo Porcine Liver, *Radiology*, vol. 229(2), pp. 447-456, Nov. 2003.
Choi et al., Overlapping Ablation Using a Coaxial Radiofrequency Electrode and Multiple Cannulae System: Experimental Study in ex-Vivo Bovine Liver, *Korean Journal of Radiology*, vol. 4(2), pp. 117-123, Jun. 2003.
Chua, Clinical Anatomy of the Thoracic Dorsal Rami, Thesis at the University of Newcastle, New South Wales, Australia, 220 pages, 1994.
Derby et al., The Efficacy of a Two Needle Electrode Technique in Percutaneous Radiofrequency Rhizotomy: An Investigational Laboratory Study in an Animal Model, *Pain Physician*, vol. 9, pp. 207-214, 2006.
Govind et al., Radiofrequency neurotomy for the treatment of third occipital headache, *Journal of Neurology, Neurosurgery & Psychiatry*, vol. 74(1), pp. 88-93, Jan. 2003.
Liu et al., Abstract, Computer modeling of factors that affect the minimum safety distance required for radiofrequency ablation near adjacent nontarget structures, *Journal of Vascular and Interventional Radiology*, vol. 19(7), pp. 1079-1086, Jul. 2008, Epub. May 27, 2008.
Lord et al., Percutaneous Radio-Frequency Neurotomy for Chronic Cervical Zygapophyseal-Joint Pain, *New England Journal of Medicine*, vol. 335(23), pp. 1721-1726, Dec. 5, 2006.
Mulier et al., Electrodes and multiple electrode systems for radiofrequency ablation: a proposal for updated terminology, *European Radiology*, vol. 15, pp. 798-808, 2005, Epub Feb. 12, 2005.
O'Rourke et al., Current status of liver tumor ablation devices, *Expert Rev. Med. Devices*, vol. 4(4), pp. 523-537, 2007.
AngioDynamics® Incorporated, RITA® StarBurst® Model 75; StarBurst® SOE Electrosurgical Device, StarBurst® XL Electrosurgical Device, MRI Compatible StarBurst® XL Device, MRI Compatible StarBurst® Semi-Flex Electrosurgical Device; Instructions for Use, (no date) in 5 pages.
AngioDynamics®, StarBurst® XL RFA Device; StarBurst® Semi-Flex RFA Device, http://www.angiodynamics.com/products/starburst-semiflex, 2011, in 2 pages.
Baylis Medical Company, Inc., Pain Management; SInergy™ System, Apr. 2008, in 6 pages.
Baylis Medical Company, Inc., Pain Management; RF Generator V3 Platform, May 2008, in 6 pages.
Baylis Medical Company, Inc., For Thoracic Medial Branch Neurotomy; ThoraCool™ Pain Management System, 2009, in 3 pages.
Boston Scientific, LeVeen® Needle Electrodes; The Choice for Open, Laparoscopic or Percutaneous Radiofrequency Ablation, 2006, in 2 pages.
Boston Scientific, LeVeen® CoAccess™ Electrode System; Coaxial Radiofrequency Ablation Device, 2006, in 2 pages.
Diros Technology Inc., OWL Pain Management Sets, http://www.dirostech.com/22.php, (no date), in 3 pages.
Diros Technology Inc., OW Sterile Single Use (Disposable) RF Probes, http://www.dirostech.com/productdetail.php?a=16&b+3, 2007, in 1 page.
Diros Technology Inc., OWL Re-Usable RF Probes, http://www.dirostech.com/productdetail.php?a=17&b=3, 2007, in 1 page.
FDA, Design Control Guidance for Medical Device Manufacturers, Mar. 11, 1997, in 53 pages.
Leibinger®, Electrodes for Neurosurgical Applications, pp. 4-10, 12 (no date).
Leibinger®, Accessories for RF-Electrosurgery; Bipolar and Monoplar Electrodes; Active and Inactive Cannulas; User Manual, Feb. 2000, in 24 pages.

(56) **References Cited**

OTHER PUBLICATIONS

NeuroTherm®, http://www.neurotherm.com/interventional_pain_prod_electrodes.htm, 2007, in 2 pages.
NeuroTherm®, One System, Multiple Applications, Mar. 2007, in 2 pages.
NeuroTherm®, RF for Pain Management; Disposable RF Electrode, (no date) in 2 pages.
NeuroTherm®, RF for Pain Management; Simplicity, (no date) in 2 pages.
Rex Medical, Quadra-Fuse; Multi-pronged Injection Needle, http://www.rexmedical.com/quadra-fuse.html, 2010, in 2 pages.
Smith & Nephew Endoscopy, Electrothermal 20S Spine System, http://endo.smith-nephew.com/fr/node.asp?NodeId=3592, (no date) in 2 pages.
Stryker Instruments, "MultiGen™ One Machine; Four Lesions; Multiple Options," Jul. 2008, in 8 pages.
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2010/055744, dated Mar. 1, 2011, in 34 pages.
International Preliminary Report on Patentability issued in PCT/US2011/035253, dated Nov. 27, 2012.
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2011/035253 dated Aug. 18, 2011.
Patent Examination Report issued in Australian Application No. 2011256709, dated Mar. 22, 2013.
Patent Examination Report issued in Australian Application No. 2010314930, dated Jul. 26, 2013.
Notice of Acceptance issued in Australian Application No. 2010314930, dated Oct. 14, 2013.
Notice of Acceptance issued in Australian Application No. 2011256709, dated Oct. 10, 2013.
Office Action issued in U.S. Appl. No. 13/101,009, dated Mar. 6, 2014.
Office Action issued in Japanese Application No. 2012-538056, dated May 19, 2014.
Supplemental European Search Report and Search Opinion issued in EP Application No. 10829203.8, dated May 9, 2014.
Final Office Action issued in U.S. Appl. No. 13/101,009, dated Jul. 3, 2014.
Supplemental European Search Report and Search Opinion issued in EP Application No. 11783944, dated Jun. 23, 2014.
Office Action issued in Japanese Application No. 2013-511205, dated Aug. 4, 2014.
Office Action issued in U.S. Appl. No. 13/101,009, dated Oct. 17, 2014.
Office Action issued in Chinese Application No. 201180035655.7, dated Aug. 25, 2014.
Office Action issued in Korean Application No. 10-2012-7033363, dated Dec. 23, 2014.
Patent Examination Report issued in Australian Application No. 2014200132, dated Dec. 1, 2014.
Office Action issued in Japanese Application No. 2012-538056, dated Feb. 2, 2015.
IP Australia, Examination Report No. 1 for Standard Patent Application for Australian Patent Application No. 2019200358, dated Apr. 20, 2020, 3 pages.
Canadian Intellectual Property Office, Office Action for Canadian Patent Application No. 2,778,997, dated May 15, 2020, 3 pages.
European Patent Office, European Search Report and EPO Form 1703 01.91 TRI for European Patent Application No. EP 18215729.7, dated Sep. 6, 2019, 5 pages.
European Patent Office, Communication Under Rule 71(3) EPC for European Patent Application No. EP 11783944.9, dated Dec. 18, 2019, 125 pages.
Instituto Nacional Da Propriedade Industrial, Search Report for Brazilian Patent Application No. BR112012029263-3, dated Dec. 6, 2019, 8 pages.
United States Patent and Trademark Office, Applicant-Initiated Interview Summary for U.S. Appl. No. 15/092,945, dated Feb. 18, 2020, 4 pages.
Peter Darmos, Further Amended Statement of cross claim, as proposed for submission in Federal Court of Australia Case No. NSD 438 of 2019, dated Oct. 2020, 7 pages
David Lawson Morris, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Oct. 21, 2020, 37 pages.
United States Patent and Trademark Office, Office Action in U.S. Appl. No. 16/933,811, dated Aug. 19, 2020, 34 pages.
Daniel Christopher Higgs, Affidavit Submitted in Federal Court of Australia Case No. NSD 438 of 2019, dated Apr. 6, 2020, 26 pages.
Canadian Intellectual Property Office, Office Action for Canadian Patent Application No. 2,799,505, dated Apr. 8, 2020, 4 pages.
European Patent Office, Decision to Grant a European Patent Pursuant to Article 97(1) EPC for European Patent Application No. 11783944.9, dated May 28, 2020, 2 pages.
United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 15/092,945, dated Mar. 16, 2020, 16 pages.




FIG.1

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.2A

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.2B

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.2C




FIG.3A

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.3B




FIG.3C

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.4




FIG.5

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.6

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.7

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.8




FIG.9




FIG.10

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.11A




FIG.11B




FIG.11C

Petitioner's Exhibit 1003
Avanos v. Stratus




FIG.12

Petitioner's Exhibit 1003
Avanos v. Stratus


1200
1209
1211
1208
1205a
1203a
1204
1203c
1203b
1205b
1203d
1206
1203
1203e
1212
1203f
1203g
1213
1203h
1201

FIG.13




FIG.14




FIG.15

Petitioner's Exhibit 1003
Avanos v. Stratus

# METHODS FOR RADIO FREQUENCY NEUROTOMY

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/098,673, filed on Apr. 14, 2016, titled METHODS AND SYSTEMS FOR RADIO FREQUENCY NEUROTOMY, which is a continuation of U.S. patent application Ser. No. 12/940,974, filed on Nov. 5, 2010, titled METHODS AND SYSTEMS FOR SPINAL RADIO FREQUENCY NEUROTOMY, which claims the benefit of U.S. Provisional Patent Application No. 61/280,557, filed on Nov. 5, 2009, titled NOVEL MEDICAL NEEDLE INCORPORATING MULTIPLE FILAMENTS FOR IMPROVED ENERGY DELIVERY and U.S. Provisional Patent Application No. 61/347,351, filed on May 21, 2010, titled METHODS AND SYSTEMS FOR SPINAL RADIO FREQUENCY NEUROTOMY; the entire contents of each of the foregoing applications are hereby incorporated by reference herein in their entirety.

## FIELD OF THE INVENTION

The present invention relates to thermal ablation systems and methods and, more specifically, to improved systems and methods for performing Radio Frequency (RF) neurotomy. The invention is particularly apt for spinal RF neurotomy procedures.

## BACKGROUND OF THE INVENTION

Thermal ablation involves the creation of temperature changes sufficient to produce necrosis in a specific volume of tissue within a patient. The target volume may be, for example, a nerve or tumor. A significant challenge in ablation therapy is to provide adequate treatment to the targeted tissue while sparing the surrounding structures from injury.

RF ablation uses electrical energy transmitted into a target volume through an electrode to generate heat in the area of the electrode tip. The radio waves emanate from a non-insulated distal portion of the electrode tip. The introduced radiofrequency energy causes molecular strain, or ionic agitation, in the area surrounding the electrode as the current flows from the electrode tip to ground. The resulting strain causes the temperature in the area surrounding the electrode tip to rise. Temperature calibration or measurement devices, for example thermocouples, in the electrode may provide feedback and allow precise control of the temperatures produced at the electrode tip.

RF neurotomy uses RF energy to cauterize a target nerve to disrupt the ability of the nerve to transmit pain signals to the brain. Known RF neurotomy methods typically use a single RF probe generating a generally oval or oblate spheroid lesion. The RF probe is positioned in an attempt to include the target nerve within the oval or oblate spheroid lesion. In various procedures, access to a target nerve may be limited (e.g., limited to a restricted angular range), thereby raising significant challenges to medical personnel to create sufficient lesions to provide optimal clinical outcomes. Additionally, anatomical variations of the nerve location relative to anatomical landmarks provide additional challenges.

## SUMMARY OF THE INVENTION

The present invention is directed toward improved methods, systems, and related apparatuses for performing thermal



ablation in general, and in particular, improved methods, systems, and related apparatuses for performing RF neurotomy, specifically in the region of the spine of a patient.

In one aspect, a needle is provided for use (e.g., insertion into a patient) during an RF ablation procedure that comprises a hub, an elongate member fixed to the hub, a tip fixed to the elongate member at a distal end thereof, and a plurality of filaments disposed within at least a portion of the elongate member. The needle may further include an actuator interconnected to the plurality of filaments, wherein the actuator may move relative to the hub so as to move the plurality of filaments relative to the tip of the needle.

In one approach, the tip and first and second ones of the plurality of filaments are operable as a single monopolar RF electrode. By way of example, in one implementation the needle may include a lumen disposed within the elongate member, wherein the lumen and tip are configured to receive an RF probe, wherein the tip and the first and second filaments may be electrically connected to the RF probe for delivery of an RF energy signal. In another implementation, an RF probe may be integrated into the needle structure for communication of an RF signal to the tip and plurality of filaments.

In another approach, the tip and the plurality of filaments may be operable in a bipolar manner. For example, the tip and/or one or more of the plurality of filaments may be electrically interconnected to an RF energy source to combinatively operate as an active RF electrode. In turn, one or a plurality of additional ones of the plurality of filaments may be electrically interconnected to combinatively function as a return RF electrode.

In a further aspect, the actuator may be operable to move the plurality of filaments relative to the tip between a retracted position and a deployed position, wherein in the deployed position the plurality of filaments extend outwardly from the tip. In this regard, each filament may comprise a distal end, wherein in a deployed position the distal ends of the filaments each define a point, and wherein the average of all the points is offset from a central longitudinal axis of the elongate member.

In one embodiment, the average of distal end points of first and second filaments may be at midpoint between such distal ends. In certain embodiments, the distal end of each of the plurality of filaments defines a vertex of a polygon, wherein an average of corresponding points is a centroid of the polygon.

In certain embodiments, a first filament and a second filament may have corresponding distal ends which, together with a distal end of the tip, define a polygon therebetween. In this regard, in various implementations the plurality of filaments may be disposed asymmetrically about a central longitudinal axis of the elongate member in their deployed position.

In another aspect, a method for performing RF neurotomy in a patient is provided (e.g., spinal RF neurotomy), and includes the steps of moving a tip of a needle to a first position proximate to a target nerve along the spine of a patient, and after achieving the first position, advancing a plurality of filaments relative to the tip to a deployed position. After such positioning, the method may include the step of applying RF energy to the tip and/or at least one of the plurality of filaments, wherein said RF energy application generates heat to ablate at least a portion of the target nerve.

In one approach, the RF energy may be applied to the needle tip and each of the plurality of filaments to yield monopolar operation. In another approach, the RF energy

may be applied to the tip and/or one or more of the plurality of filaments to define an active electrode, while one or more additional one of the plurality of filaments are electrically isolated to function as a return electrode for bipolar operation.

In relation to the present invention it is recognized that, as RF energy penetrates biological tissue, protein and water molecules oscillate in response to the RF current and the tissue adjacent to the active needle tip heats secondary to ionic friction. As the tissue heats, and coagulates, the biophysical properties of the tissue change. These tissue changes limit penetration of the RF energy beyond a leading edge defined by the shape and size of the active needle tip. The size of a radiofrequency lesion using conventional needle technology is limited regardless of the duration of lesion or maximum temperature delivered.

The described invention overcomes this obstacle and expands the effective area of RF energy delivery by increasing the overall active tip surface area from which the RF energy emanates. The use of multiple filaments provides additional conduits for RF energy creating a multipolar RF field effect. The size and specific conformation of the RF lesion may be dictated by the location and orientation of the filaments, and may be beneficially modified to suit a specific anatomical application by changing the size, placement, and number of filaments.

Additional aspects and advantages of the present invention will become apparent to one skilled in the art upon consideration of the further description that follows. It should be understood that the detailed description and specific examples are intended for purposes of illustration only and are not intended to limit the scope of the invention. Furthermore, any of the above arrangements, features and/or embodiments may be combined with any of the above aspects where appropriate.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and further advantages thereof, reference is now made to the following Detailed Description of the Invention taken in conjunction with the accompanying drawings, wherein:

FIG. **1** is a schematic diagram of an RF neurotomy system being used to perform RF neurotomy on a patient.

FIG. **2**A is a perspective view of a needle that may be used in an RF neurotomy procedure.

FIG. **2**B is a cut away perspective view of a portion of the needle of FIG. **2**A.

FIG. **2**C is a cut away view of a portion of an alternate embodiment of a needle that may be used in an RF neurotomy procedure.

FIG. **3**A is a detailed view of a tip of the needle of FIG. **2**A with filaments disposed in a fully deployed position.

FIG. **3**B is a detailed view of a tip of the needle of FIG. **2**A with filaments disposed in a retracted position.

FIG. **3**C is a detailed view of an alternate tip of the needle of FIG. **2**A with filaments disposed in a deployed position.

FIG. **4** is a schematic diagram of an RF probe assembly.

FIG. **5** is an end view of the needle of FIG. **2**A.

FIG. **6** is a side view of the tip of the needle of FIG. **2**A.

FIG. **7** is an end view of another alternate embodiment of the needle of FIG. **2**A.

FIG. **8** is an end view of another alternate embodiment of the needle of FIG. **2**A.

FIG. **9** is an end view of another alternate embodiment of the needle of FIG. **2**A.



FIG. **10** is a side view of another alternate embodiment of the needle of FIG. **2**A.

FIG. **11**A is an illustration of an exemplary set of isotherms that may be created with the needle of FIG. **2**A.

FIG. **11**B is an illustration of an exemplary lesion that may be created with the needle of FIG. **2**A.

FIG. **11**C is an illustration of an exemplary lesion that may be created with a single-filament needle.

FIG. **12** is a perspective view of the needle of FIG. **2**A positioned relative to a lumbar vertebra for performing RF neurotomy.

FIG. **13** is an illustration of a sacrum including target lesion volumes for performing Sacroiliac Joint (SIJ) RF neurotomy.

FIG. **14** is a perspective view of the needle of FIG. **2**A positioned relative to a thoracic vertebra for performing RF neurotomy.

FIG. **15** is a perspective view of the needle of FIG. **2**A positioned relative to the C2/3 cervical zygapophyseal joint (z joint) for performing cervical medial branch RF neurotomy on the third occipital nerve.

## DETAILED DESCRIPTION OF THE INVENTION

In the following description, the invention is set forth in the context of apparatus and methods for performing RF ablation. More particularly, the systems and methods may be used to perform RF neurotomy to ablate portions of target nerves. Even more particularly, the systems and methods may be used to perform spinal RF neurotomy to ablate portions of target nerves along the spine of a patient to relieve pain. For example, embodiments of methods and apparatuses described herein relate to lumbar RF neurotomy to denervate a facet joint between the L4 and L5 lumbar vertebrae. Denervation is achieved by application of RF energy to a portion of a medial branch nerve to ablate or cauterize a portion of the nerve, thus interrupting the ability of the nerve to transmit signals to the central nervous system. In another example, embodiments described herein relate to sacroiliac joint RF neurotomy.

FIG. **1** is an illustration of an RF neurotomy system **100** for performing RF neurotomy on a patient **101**. The patient **101** may be positioned face down on a table **109** or surface to allow access along the spine of the patient **101**. The table **109** may be made of radiolucent materials substantially transparent to x-rays, such as carbon fiber.

The system **100** may include an RF generator **102** capable of generating an RF energy signal sufficient to ablate target tissue (e.g. cause lesions in targeted volumes; cauterize targeted portions of target nerves). The RF generator **102** may, for example, be capable of delivering RF energy of about 460,000-500,000 Hz. A needle **103** capable of conducting (e.g., transmitting or directing) RF energy may be interconnected to the RF generator **102** and may be used to deliver an RF energy signal to a specific site within the patient **101**. Where the needle **103** is a monopolar device, a return electrode pad **104** may be attached to the patient **101** to complete a circuit from the RF generator **102**, through the needle **103**, through a portion of the patient **101**, and back to the RF generator **102** through the return electrode pad **104**. In other bipolar arrangements the needle **103** may comprise at least one supply electrode and at least one return electrode to define the circuit.

The RF generator **102** may be operable to control the RF energy emanating from the needle **103** in a closed-loop fashion. For example, the needle **103** and/or an RF probe

disposed within the needle **103** may contain a temperature measurement device, such as a thermocouple, to measure the temperature at the target tissue. Data may also be available from the RF generator **102**, such as power level and/or impedance, which may also be used for closed-loop control of the needle **103**.

Turning to FIG. **4**, an exemplary RF probe assembly **400** compatible with the needle **103** is illustrated. The RF probe assembly **400** includes an RF probe **401** that may be inserted into a patient (e.g., through needle **103**) and may direct RF energy to the target tissue. The RF probe **401** may include a thermocouple operable to measure temperature at a distal end **402** of the RF probe **401**. The RF probe assembly **400** may include a connector **403** and a cable **404** for use in connecting the RF probe **401** to the RF generator **102**.

Returning to FIG. **1**, the system **100** may include an imaging system **105** capable of producing internal images of the patient **101** and the needle **103** to facilitate navigation of the needle **103** during a procedure. The system **100** may further include a display for displaying the generated images to a physician performing the RF ablation procedure. In one example, the imaging system **105** may be a fluoroscope capable of generating real-time two dimensional images of the needle **103** and internal structures of the patient **101**. As such, the imaging system may include an X-ray source **106**, an X-ray detector **107** and a controller **108**. The X-ray source **106** and X-ray detector **107** may be mounted on a movable structure (e.g., a C-arm), to facilitate capturing a variety of images of the patient **101** (e.g., at various angles or projection views). Alternatively, the imaging system **105** may be any other appropriate imaging system, such as, for example, a computed tomography (CT) scanner.

FIG. **2**A is a detailed view of the needle **103** of the system **100** for performing RF neurotomy. The needle **103** may include a tip **201** that tapers to a point **301** capable of piercing the skin of a patient. The needle **103** may further include an elongate member **203** connected to the tip **201** at a distal end **202** of the needle **103** and connected to a hub **204** at a proximal end **205** of the needle **103**. The needle **103** includes a central longitudinal axis **223** that is disposed along the center of the elongate member **203**.

The needle **103** may include a self-contained mechanical mechanism, in the form of deployable filaments **206***a*, **206***b*, operable to expand the volume of effective RF energy delivery as compared to known single-electrode RF probes. The filaments **206***a*, **206***b* may be at least partially disposed within the elongate member **203** and may be operable to emerge through a side wall of the needle **103** proximate to the distal end **202** of the needle **103**. Alternatively, the needle **103** may include a single filament or three or more filaments. The filaments **206***a*, **206***b* allow offsetting and/or contouring of the lesion geometry produced using the needle **103** to match a desired target volume. The filaments **206***a*, **206***b* may be deployable and/or retractable by moving an actuator **216** relative to the hub **204**.

As will be further described, the needle **103** may further include a tube **207** that includes a lumen therethrough. The lumen may be used to transport fluids to and/or from the target volume. The lumen may also accept the RF probe **401** for delivery of RF energy to the target volume. In an alternate embodiment, the RF probe **401** may be integrated into the needle **103**. In such an embodiment, the tube **207** need not be present for RF energy delivery, although it may be included to facilitate fluid delivery. The filaments **206***a*, **206***b* may include lumens therethrough for the transportation of fluid to and/or from the target volume. The filaments **206***a*, **206***b* may function as thermocouples.

As RF energy penetrates biological tissue, protein and water molecules oscillate in response to the RF current and the tissue adjacent to the RF electrode is heated. As the tissue heats and coagulates, the biophysical properties of the tissue change. These tissue changes limit penetration of the RF energy beyond a leading edge defined by the shape and size of an active needle tip. Accordingly, the size of a radiofrequency lesion using conventional single needle technology is thus practically limited after achievement of a certain temperature delivered for a certain time.

The needle **103** with deployable filaments **206***a*, **206***b* overcomes this obstacle and expands the effective area of RF energy delivery by providing multiple locations (e.g., tip **201** and filaments **206***a*, **206***b*) from which the RF energy emanates. The use of multiple filaments **206***a*, **206***b* provides additional conduits for RF energy creating a multiple electrode RF field effect. The size, shape and location of a lesion created with the needle **103** may be established by the quantity, location and orientation of the filaments, and may be beneficially modified to suit a specific anatomical application by changing various aspects of the filaments as discussed below.

Where it is desired to create a lesion offset from the central longitudinal axis **223**, the lesion may be preferentially offset in a desired direction from the central longitudinal axis **223** by rotationally orienting the needle **103**. Moreover, the needle **103** may be used to create a lesion offset from the central longitudinal axis **223** in a first direction. Then, the filaments **206***a*, **206***b* may be retracted, the needle **103** rotated, and the filaments **206***a*, **206***b* redeployed to create a lesion offset from the central longitudinal axis **223** in a second direction.

FIGS. **3**A and **3**B are detailed views of the distal end **202** of the needle **103** that includes the tip **201**. The tip **201** may include the sharpened point **301** for piercing the skin of a patient and facilitating advancement through tissue. The tip **201** may further include a tapered portion **302** that transitions the tip **201** from the point **301** to a body portion **303**. The body portion **303** is the portion of the tip **201** that is disposed proximal to the tapered portion **302**. The body portion **303** may be cylindrical as illustrated, or it may be of any other appropriate shape. The body portion **303** may have a cross-section that coincides with the cross section of the elongate member **203**.

The tip **201** may act as an RF energy delivery element. As such, the tip **201** may be made from a conductive material such as, for example, stainless steel. The tip **201** may be coated. The tip **201** material and optional coating may be selected to improve radiopacity, improve and/or alter RF energy conduction, improve lubricity and/or reduce tissue adhesion.

The tip **201** may include filament port or slot **304***a* (not visible in the views of FIGS. **3**A and **3**B) and filament port or slot **304***b*. The geometry of the filament slots **304***a*, **304***b* may be selected to allow filaments **206***a*, **206***b* to be adequately retracted (e.g., such that they are disposed within a cross-sectional envelope of the body portion **303** of the tip **201**) while the needle **103** is inserted into the body, so that the filaments **206***a*, **206***b* do not cause any unintended damage to the patient. Such positioning of the filament slots **304***a*, **304***b* avoids having filament exit features on the tapered portion **302** and thus avoids potential coring that could be caused by such positioning.

The internal geometry of the filament slots **304***a*, **304***b* may be designed such that the filaments **206***a*, **206***b* may be easily retracted and advanced. For example, the internal geometry of the filament slots **304***a*, **304***b* may include a

transition region **305** that meets the outer surface of the body portion **303** at an angle of about 30 degrees. The transition region **305** may, for example, be curved or planar. Thus, when the filaments **206***a*, **206***b* are in the form of a member without a pre-set bias (e.g., substantially straight), advancement of the filaments **206***a*, **206***b* relative to the filament slots **304***a*, **304***b*, will cause the filaments **206***a*, **206***b* to be deflected outwardly as the filaments **206***a*, **206***b* move distally along the transition region **305**. Depending on the positioning of the transition region **305** relative to where the filaments **206***a*, **206***b* are confined (e.g., in the needle **103** of FIG. **3**A the filaments **206***a*, **206***b* are confined to only longitudinal movement where they enter into the elongate member **203**) and on the mechanical properties of the filaments **206***a*, **206***b*, various deployment angles of the filaments **206***a*, **206***b* relative to the central longitudinal axis **223** may be achieved. Generally, the portions of the filaments **206***a*, **206***b* that extend outwardly away from the filament slots **304***a*, **304***b* may be unrestrained and thus may take any appropriate form. For example, where there is no pre-set bias, the portions of the filaments that extend outwardly away from the filament slots (and therefore from the tip) may be substantially straight, such as shown in FIGS. **2**A, **3**A, **3**C, **6**, **11**A-**11**C and **14**. Where a pre-set bias is present, the portions of the filaments that extend outwardly away from the filament slots may take any appropriate shape, such as, for example, curved as shown in FIG. **10**.

The radial orientation of the filament slots **304***a*, **304***b* may be selected such that a center point between the filament slots **304***a*, **304***b* does not coincide with the central longitudinal axis **223**. For example, as shown in FIGS. **2**A, **3**A and **3**B, the filament slots **304***a*, **304***b* may be positioned such that they are about 120 degrees apart about the circumference of the tip **201**. Other filament slot configurations may be configured to achieve the filament placements discussed below. These configurations may be achieved by varying the quantity of filament slots, the placement of filament slots about the circumference of the tip **201**, and/or the placement of filament slots along the center longitudinal axis **223** to achieve the filament placements discussed below.

As noted above, and illustrated in FIGS. **3**A and **3**B, the needle **103** may comprise a tube **207** that includes a lumen **222** therethrough. The lumen **222** may be employed to accept the RF probe **40** for delivery of RF energy and/or for the transport of fluids. In this regard, the tip **201** may further include a fluid port **210** that may be in fluid communication via a channel through the tip **201** with the lumen **222**. The fluid port **210** may be centrally located or it may be located offset from the center longitudinal axis **223** as shown in FIGS. **2**A and **3**A. The fluid port **210** may be used to transfer fluid between the region of the tip **201** and the proximal end **205** of the needle **103**. For example, during an RF neurotomy procedure, an anesthetic and/or an image enhancing dye may be introduced into the region of tissue around the tip **201** through the fluid port **210**. In an alternate embodiment, the fluid port **210** may be located along the body portion **303** of the tip **201**.

As may be appreciated, the channel through the tip **201** may be sized to accommodate a tip of the RF probe **401** that may be inserted into the needle **103**. The channel may be sized such that RF energy from the inserted RF probe **401** is satisfactorily passed from the RF probe **401** to the tip **201** and filaments **206***a*, **206***b*.

The elongate member **203** may be in the form of a hollow tube (e.g., sheath, cannula) interconnecting the tip **201** with the hub **204**. The elongate member **203** may be configured with adequate strength to allow the needle **103** to pierce the patient's skin and advance to a target area through various tissue types, including, for example, fat and muscle tissue. The elongate member **203** may also be capable of resisting kinking as it is advanced. In an alternate embodiment, the elongate member **203** may be a rod with a plurality of lumens along its length to accommodate filaments **206***a*, **206***b*, the RF probe **401**, and/or a fluid passage.

The elongate member **203** houses portions of the filaments **206***a*, **206***b* and the tube **207**, and allows for relative movement of the filaments **206***a*, **206***b*. The elongate member **203** may be of any appropriate size and internal configuration to allow insertion into the patient **101** and to house componentry therein. In an exemplary embodiment, the elongate member **203** may, for example, be a 16 gauge round tube or smaller. For example, the elongate member **203** may be 18 or 20 gauge. For example, the elongate member may have a maximum cross dimension of at most about 1.7 mm. In another example, the elongate member may have a maximum cross dimension of at most about 1 mm. The elongate member **203** may have a length selected for performing a specific spinal RF neurotomy procedure on a particular patient. The elongate member **203** may be constructed from an insulative material to reduce the amount of RF energy emitted along the length of the elongate member **203** when the RF probe **401** is disposed therein. For example, the elongate member **203** may be constructed from polymeric, ceramic or other insulative material. The elongate member **203** may include a coating that may improve radiopacity to aid in visualization of the position of the needle **103** using fluoroscopy. The elongate member **203** may include a coating to improve its insulative properties. The elongate member **203** may include a lubricious coating to improve its ability to be inserted and positioned within the patient and to reduce tissue adhesion. The elongate member **203** may include markers **224** along its length to assist in determining the depth to which the needle **103** has entered into the anatomy. Such markers **224** may be radiopaque so that they may be viewed under fluoroscopy. A collar (not shown) may be disposed about the elongate member **203** to assist in placement of the tip **201** of the needle **103**. For example, the tip **201** may be positioned in a first position, the collar may then be placed against the patient's **101** skin, and then the needle **103** may be withdrawn a certain distance. Such a distance will be indicated by the distance between the collar and the patient's **101** skin.

The elongate member **203** may be fixedly interconnected to the tip **201** and hub **204** in any appropriate manner. For example, the tip **201** may be press fit into the elongate member **203** and the elongate member **203** may be press fit into the hub **204**. Other possible methods of attachment include adhesive bonding and welding. In an alternate embodiment, the elongate member **203** and the tip **201** may be a single unitary structure. The elongate member **203** may be steerable and incorporate controlling mechanisms allowing the elongate member **203** to be deflected or steered after insertion into the anatomy.

The tube **207** containing the lumen **222** may be constructed from any appropriate material. For example, the tube **207** may be constructed from a conductive material, such as stainless steel, such that when the RF probe **401** is inserted within the tube **207**, the RF energy emitted by the RF probe **401** may be conducted through the tube **207** and into and through the tip **201** and filaments **206**A, **206***b*. The tube **207** may be interconnected to the tip **201** such that the lumen **222** is in sealed, fluid communication with the channel through the tip **201**. This may be accomplished by a press fit, weld, or any other appropriate method.

As noted, the lumen **222** may be in fluid communication with the tip **201** at the distal end **202**. A proximal end of the lumen **222** may be disposed at the proximal end **205** of the needle **103**. In this regard, the lumen **222** may run from the distal end **202** to the proximal end **205** with the only access being at the distal and proximal ends. Furthermore, the lumen **222** may be the only lumen of the needle **103** disposed along the elongate member **103**.

Accordingly, the RF probe **401** inserted into the lumen **222** may be positioned such that an end of the RF probe **401** is proximate the tip **201**. For example, the RF probe **401** may be positioned such that the distal end **402** of the RF probe **401** is in the lumen **222** near the tip **201** or in the channel through the tip **201**. Thus, RF energy transmitted through the RF probe **401** may be conducted by the tip **201** and filaments **206***a*, **206***b*. The size of the lumen **222** may be selected to accommodate a particular size of RF probe **401**. For example, for a 22 gauge RF probe **401**, at least a 21 gauge or larger lumen **222** may be employed. For example, the lumen **222** may have a maximum cross-dimension of less than about 0.85 mm.

The proximal end of the tube **207** may be operable to receive the RF probe **401**. Moreover, the proximal end of the tube **207** and the actuator **216** may be configured to accept a connector, such as a Luer fitting, such that a fluid source may be connected to the tube **207**.

As illustrated in FIGS. **2**A and **3**A, the needle **103** includes two filaments **206***a*, **206***b* disposed within and along elongate member **203**. Distal ends of the filaments **206***a*, **206***b* are disposed proximate to the tip **201** and proximal ends of the filaments **206***a*, **206***b* are fixed to a filament hub **221** discussed below. The filaments **206***a*, **206***b* are movable along the central longitudinal axis **223** between a fully deployed position as illustrated in FIGS. **2**A and **3**A and a retracted position illustrated in FIG. **3**B. Moving the filaments **206***a*, **206***b* distally from the retracted position moves the filaments **206***a*, **206***b* toward the fully deployed position, while moving the filaments **206***a*, **206***b* proximally from the deployed position moves the filaments **206***a*, **206***b* toward the retracted position. The filaments **206***a*, **206***b* may be deployed in intermediate positions between the fully deployed positions and the retracted positions.

In the fully deployed position as shown in FIG. **3**A, the distal ends of the filaments **206***a*, **206***b* are disposed away from the tip **201**. In the refracted position as shown in FIG. **3**B, the distal ends of the filaments **206***a*, **206***b* are disposed entirely within an outer perimeter (e.g., circumference where the non-tapered portion **303** of the tip **201** is round) of the tip **201**. In the deployed position, the filaments **206***a*, **206***b* act as broadcast antennae for the RF probe **401** (e.g., RF energy passes from the RF probe **401** to tip **201** and filaments **206***a*, **206***b*, and into a target volume within the patient **101**). In this regard, together, the RF probe **401** inserted into the lumen **222**, the tip **201**, and the filaments **206***a*, **206***b*, may form a monopolar electrode for application of RF energy to the target volume. The filaments **206***a*, **206***b* allow the RF energy from the RF probe **401** to be dispersed over a larger volume than would be possible with the tip **201** alone.

The filaments **206***a*, **206***b* may be constructed from a material operable to conduct RF energy, e.g., a metal such as stainless steel, Nitinol or shape memory alloy. The filaments **206***a*, **206***b* may be coated to enhance their ability to conduct RF energy. The filaments **206***a*, **206***b* may include a lubricious coating to aid in insertion and/or reduce tissue adhesion. The distal ends of the filaments **206***a*, **206***b* may be shaped (e.g., pointed) to improve their ability to move through tissue.

The positioning of the filaments **206***a*, **206***b* of the embodiment illustrated in FIGS. **2**A and **3**A will now be described in relation to FIG. **5**. FIG. **5** is an end view of the tip **201** and deployed filaments **206***a*, **206***b* of the embodiment illustrated in FIGS. **2**A and **3**A. The filaments **206***a*, **206***b* are positioned at a filament angle **503** of about 120 degrees apart from each other about the central longitudinal axis **223**. This coincides with the positions of the filament slots **304***a*, **304***b* discussed above since the filaments **206***a*, **206***b* emerge from the filament slots **304***a*, **304***b*. Accordingly, a filament-free angle **504** of about 240 degrees is defined as the largest angle about the circumference of the tip **201** that is free of filaments **206***a*, **206***b*. In an embodiment consisting of two filaments, the filament angle **503** may be less than 180 degrees and the filament-free angle **504** may be correspondingly greater than 180 degrees (e.g., greater than 200 degrees or greater than 240 degrees).

In FIG. **5**, the central longitudinal axis **223** is perpendicular to the plane of the illustration. A midpoint **502** is defined between distal ends **501***a*, **501***b* of the filaments **206***a*, **206***b*, respectively. The midpoint **502** is offset from the central longitudinal axis **223**. For example, in an embodiment, the midpoint **502** may be offset from the central longitudinal axis **223** by about 2 mm. Accordingly, when RF energy is transmitted from the tip **201** and filaments **206***a*, **206***b*, it will be transmitted asymmetrically with respect to the central longitudinal axis **223** as energy will be emitted from the tip **201** and the filaments **206***a*, **206***b*. As oriented in FIG. **5**, the energy will be biased in an upward direction in the direction from the point **301** toward the midpoint **502**. Thus, when RF energy is transmitted during an RF neurotomy procedure, a lesion will be created that is correspondingly offset from the central longitudinal axis **223** in the direction from the point **301** toward the midpoint **502**.

FIG. **6** is a side view of the tip **201** and filaments **206***a*, **206***b* oriented such that deployed filament **206***b* is disposed entirely within the plane of the figure. The filaments **206***a*, **206***b* extend from the tip **201** at a common distance, or location, along the central longitudinal axis **223**. The filament **206***b* is deflected radially outwardly from the central longitudinal axis **223**. The filament **206***b* emerges from the tip **201** at an angle **601** of about 30 degrees as dictated by the positioning of the transition region **305** relative to where the filament **206***b* is confined and on the mechanical properties of the filament **206***b* (as previously discussed). Also, it is noted that the distal tips **501***a*, **501***b* are positioned distally beyond the point **301** by a distance **602** and are disposed at a distance **603** from the central longitudinal axis **223**. In the embodiment illustrated in FIG. **6**, the distance **602** may be about 3.5 mm and the distance **603** may be about 3 mm. Such an arrangement may distally offset a lesion created by the needle **103** as compared to a lesion created with a tip without filaments or a lesion created with the needle **103** with the filaments **206***a*, **206***b* in the retracted position.

Accordingly, the filament **206***a*, **206***b* arrangement illustrated in FIGS. **2**A, **3**A, **3**B, **5** and **6** may be operable to produce lesions that are radially offset from the central longitudinal axis **223** and distally offset from the point **301** as compared to a lesion created by the tip **201** without the filaments or a lesion created with the needle **103** with the filaments **206***a*, **206***b* in the retracted position.

Variations of filament positions and configurations from those illustrated in FIGS. **2**A, **3**A, **3**B, **5** and **6** will now be addressed. Variations in the relative shapes, positions and

sizes of lesions created with the needle **103** may be achieved by repositioning the filaments. For example, as noted above, the lesion produced by the needle **103** will be in different positions depending on whether the filaments are in the deployed or refracted positions. Accordingly, intermediately shaped, positioned and/or sized lesions may be achieved by positioning the filaments in intermediate positions between the fully deployed or refracted positions. Thus, for any given configuration of deployable filaments discussed herein, the positions and/or sizes of lesions created by those configurations may be varied by varying the positioning of the filaments to intermediate positions between the fully deployed and retracted positions. As noted above, the needle **103** with deployed filaments is operable to produce larger lesion volumes than the needle **103** with retracted filaments. For example, the needle **103** with fully deployed filaments may be operable to produce lesion volumes of about 500 $mm^3$.

Further variation in the shape, position and/or size of lesions created by needles with deployable filaments may be achieved by different configurations of filaments. Variations may include variations in materials, the number of filaments, the radial positioning of the filaments, the axial positioning of the filaments, the length of the filaments, the angle at which the filaments exit the tip, and the shape of the filaments. By varying these parameters the needle may be configured to produce lesions of various sizes and shapes that are positioned at various locations relative to the tip. Such variations may be specifically tailored to be used in specific procedures, such as RF neurotomy procedures of particular nerves adjacent to particular vertebrae.

Variations of the materials used for the tip and/or the filaments may be selected to achieve particular lesion sizes, positions and/or shapes. For example, the tip may be made form a material that does not conduct RF energy. In such an embodiment, RF energy from the RF probe **401** may be conducted by substantially only the deployed filaments. Such an arrangement may provide for a lesion with a larger offset from the central longitudinal axis **223** than would be produced where the tip conducts RF energy and acts as an electrode along with the filaments.

Another material-related variation that may affect lesion shape, size and/or position is the addition and placement of insulation over the tip and/or filaments. For example, by placing a layer of insulation over the proximal half of the portions of the filaments that extend from the tip when in the deployed position, the shape of the lesion may be altered since RF energy may primarily emanate from the distal, non-insulated portion of the filaments. Similarly, insulation may be added to the tip to alter the RF energy delivered from the tip.

Moreover, the materials used in making the filaments and tip may be selected based on RF conductivity. For example, by using a material for the tip that is less conductive of RF energy, the proportion of RF energy emanating from the tip as compared to that emanating from the filaments may be altered resulting in a corresponding change in lesion size, position and/or shape.

The RF needles and RF probes discussed herein may be constructed from materials that are Magnetic Resonance Imaging (MRI) compatible. As such, MRI equipment may be used to verify the positioning of such RF needles and/or monitor the progress of an ablation procedure (e.g., RF neurotomy) using such RF needles.

Variations of the number of filaments used for needle may be selected to achieve particular lesion sizes, positions and/or shapes. For example, as illustrated in FIG. **7**, a third filament **701** may extend from tip **201'** in a position between filaments **206***a*, **206***b*. The tips **501***a*, **501***b* of the filaments **206***a*, **206***b* and a tip **702** of filament **701** may form a polygon **703** that has a centroid **704**. The centroid **704** is offset from the central longitudinal axis **223**. Such an arrangement may produce a lesion that is offset from the central longitudinal axis **223** to a different degree than, and shaped differently than, a lesion created by the needle of FIG. **5**. In general, where a centroid of a polygon formed by the tips of filaments (or, in the case where there are two filaments, the midpoint between them) is offset from the central longitudinal axis **223**, a lesion created by such a configuration will be correspondingly offset from the central longitudinal axis **223**. The filaments **206***a*, **206***b*, **702** are positioned within the same filament angle **503** of about 120 degrees as in the embodiment of FIG. **5**. Furthermore, the embodiment of FIG. **7** has a filament-free angle **504** of about 240 degrees, also the same as in the embodiment of FIG. **5**. In general, where the filaments are positioned within an arc that is less than 180 degrees, resultant lesions will be offset from the central longitudinal axis **223** in the direction of the filaments. In general, in an embodiment consisting of three or more filaments where the filaments are positioned within an arc that is less than 180 degrees, the filament-free angle may be correspondingly greater than 180 degrees (e.g., greater than 200 degrees or greater than 240 degrees).

Variations in the radial positioning of filaments of a needle may be selected to achieve particular lesion sizes, positions and/or shapes. For example, as illustrated in FIG. **8**, four filaments **801***a*-**801***d* are positioned about a tip **201"**. The tips of the filaments **801***a*-**801***d* may form a polygon **802** that has a centroid **803**. Such an arrangement may produce a lesion whose center is offset from the central longitudinal axis **223** in the direction of the centroid **803**. The filaments **801***a*-**801***d* are positioned within a filament angle **804** of about 200 degrees. Furthermore, the embodiment of FIG. **8** has a filament-free angle **805** (i.e., the largest angle about the circumference of the tip **201"** that is free of filaments) of about 160 degrees. It will be appreciated that, as illustrated in FIG. **8**, a configuration capable of producing a lesion offset from the central longitudinal axis **223** may have a filament-free angle that is less than 180 degrees.

In the above-described embodiment of FIGS. **2**A, **3**A, **3**B, **5**, and **6** with two filaments, a midpoint **502** between the filaments was discussed. In embodiments with more than two filaments, a centroid of a polygon formed by the distal ends of the filaments was discussed. Both the midpoints and the centroids may be considered to be “average” points of the filaments for their particular configurations. In such embodiments, the midpoint between filaments in two-filament embodiments and the centroid of the polygon in embodiments with more than two filaments may be offset from the central longitudinal axis of the elongate member. For example, the midpoint or centroid may be offset from the central longitudinal axis by 1 mm or more. In embodiments, the polygon may lie in a plane perpendicular to the central longitudinal axis.

As illustrated in, for example, FIGS. **2**A, **3**A, **3**C, **5**, **7**, **8** and **9** the distal ends of the filaments when fully deployed may be disposed in a common plane. In an embodiment, the common plane may be disposed perpendicular to the central longitudinal axis. Such a common plane for the distal ends of deployed filaments may be disposed distally from the distal end of the tip.

As illustrated in, for example, FIGS. **2**A, **3**A, **3**C, **5** and **7** the filaments of the needle may be deployed on a common side of a central plane of the needle (where the central

longitudinal axis is disposed entirely within the central plane). In such embodiments, the distal ends of the fully deployed filaments may all be disposed on a common side of the central plane. Such a configuration may enable the needle to be used to create a lesion that is offset from the tip of the needle to the same side of the central plane as the deployed filament ends.

As illustrated, inter alia, in FIG. **2**A, the filaments when fully deployed may point in an at least partially distal direction. In this regard, a vector extending axially from the distal end of a filament and coinciding with a central axis of the filament at the end of the filament has at least some distal component. Accordingly, the fully deployed filaments embodiments shown in FIGS. **2**A, **3**A and **10** all point in an at least partially distal direction.

In another variation of the radial positioning of filaments of a needle, the filaments may be uniformly distributed about the circumference of the tip. Such an embodiment is illustrated in FIG. **9**. The needle of FIG. **9** includes 3 equally distributed filaments **901***a*, **901***b*, **901***c*. Consequently, the angles **902***a*, **902***b*, **902***c* between the filaments **901***a*, **901***b*, **901***c* may each equal 120 degrees. Such a needle may be operable to produce a lesion that is generally centered along the central longitudinal axis **223**. However, the position of the produced lesion axially along the central longitudinal axis **223** may be determined by the configuration of the filaments. For example, relatively longer filaments may be operable to produce lesions that are positioned distal to lesions produced by configurations with relatively shorter filaments.

Variations in the axial positioning of where deployed filaments emerge from the tip of a needle may be selected to achieve particular lesion sizes, positions and/or shapes. For example, returning to FIG. **7**, if the third filament **701** of the embodiment of FIG. **7** were axially positioned such that it is distal to filaments **206***a*, **206***b*, the resultant lesion may be produced may be longer along the central longitudinal axis **223** than that of an embodiment where the filaments **206***a*, **206***b*, **701** are positioned at the same point along the central longitudinal axis **223**. In another variation, as deployed, two or more filaments may be disposed at the same radial position and at different axial positions. Such embodiments may include multiple rows of filaments.

The lengths of filaments beyond the tip (when the filaments are in the deployed position) in a needle may be varied to achieve particular lesion sizes, positions and/or shapes. For example, increasing the length of the deployed portions of the filaments **206***a* and **206***b* of the embodiment illustrated in FIGS. **5** and **6** may result in a needle capable of producing lesions that are more distally positioned than those created by the embodiment as shown in FIGS. **5** and **6**. The effects of lengthening or shortening the deployed length of the filaments are similar to those discussed above with respect to partially deploying filaments.

Embodiments of a needle may include deployed filaments of different lengths. Where all of the filaments of a particular needle are moved by a common actuator, such variations may be achieved by varying the overall length of the filaments. In such an embodiment, the end points of the shorter filaments may be retracted further into the tip or elongate member than longer filaments. The effects of lengthening or shortening the deployed length of the filaments are similar to those discussed above with respect to variations in the axial positioning of where deployed filaments emerge from the tip of the needle.

The angle (such as angle **601** of FIG. **6**) at which a filament exits a tip may be varied to achieve particular lesion



sizes, positions and/or shapes. For example, an embodiment similar to the embodiment of FIGS. **5** and **6**, but where the deployed filaments are at a 60 degree angle instead of the 30 degree angle shown in FIG. **6**, may be operable to produce a lesion that has a larger maximum cross-sectional dimension in a plane perpendicular to the central longitudinal axis **223** than the embodiment of FIGS. **5** and **6**. This may be due to the filaments emanating RF energy at a distance further away from the central longitudinal axis than the embodiment of FIGS. **5** and **6**. A particular embodiment of the needle may include deployed filaments at different angles relative to the central longitudinal axis.

The shapes of the portions of the filaments that extend away from the tip may be varied to achieve particular lesion sizes, positions and/or shapes. For example, FIG. **10** illustrates the tip **201** and filaments **1001***a*, **1001***b*, where the portions of the filaments **1001***a*, **1001***b* that extend beyond the tip **201** are curved. Such curvatures may be achieved by, for example, filaments that comprise a shape memory alloy (e.g., Nitinol) or spring material. When the filaments **1001***a*, **1001***b* are retracted, the shape of the tip **201** and/or elongate member **203** may keep the filaments **1001***a*, **1001***b* in a constrained straightened position. As the filaments **1001***a*, **1001***b* are advanced toward the fully deployed position, they become unconstrained and return to their curved shape as shown in FIG. **10**. The deployed shape of the filaments **1001***a*, **1001***b* may be predetermined, or the filaments **1001***a*, **1001***b* may be made from a material that may be shaped by a user prior to insertion.

The curved filaments **1001***a*, **1001***b* of FIG. **10** are positioned within planes that include the central longitudinal axis **223**. In other embodiments, the filaments **1001***a*, **1001***b* may be curved in other directions, such as in a corkscrew arrangement. This may be beneficial to assist the filaments in remaining anchored to the tissue during delivery of RF energy. The curved filaments **1001***a*, **1001***b* of FIG. **10** may be operable to produce a flatter (in a plane perpendicular to the central longitudinal axis **223**) lesion than the straight filaments **206***a*, **206***b* of FIG. **6**.

FIG. **3**C is a detailed view of the distal end **310** of a needle **309** that is an alternate embodiment of the needle **103**. The distal end **310** includes a tip **311** that may include a sharpened point **312** for piercing the skin of a patient and facilitating advancement through tissue. The tip **311** may further include a tapered portion **313** that transitions the tip **311** from the point **312** to a first body portion **314**. The first body portion **314** may be connected to a second body portion **315** at an angle **316**. In an exemplary embodiment, the angle **316** may be about 15°. The second body portion **315** may be aligned with an elongate member **317**. The elongate member **317** may be similarly configured as the elongate member **203** of FIGS. **3**A and **3**B. The angle **316** between the first body portion **314** and the second body portion **315** may aid the physician in navigating the needle **309** to a desired position. For example, by rotating the needle **309** such that the first body portion **314** is pointing in a desired direction, subsequent advancement of the needle **309** may result in the needle **309** following a non-straight path biased toward the desired direction.

The first and second body portions **314**, **315** may be cylindrical as illustrated, or they may be of any other appropriate shape. The first and second body portions **314**, **315** may have cross-sections that coincide with the cross section of the elongate member **317**.

The tip **311**, or a non-insulated portion thereof, may act as an RF energy delivery element. As such, the tip **311** may be made from a conductive material such as, for example,

stainless steel. The tip **311** may be coated. The tip **311** material and optional coating may be selected to improve radiopacity, improve and/or alter RF energy conduction, improve lubricity and/or reduce tissue adhesion.

The tip **311** may include filament slot **318***a* and filament slot **318***b*. The geometry of the filament slots **318***a*, **318***b* may be selected to allow filaments **319***a*, **319***b* to be adequately retracted (e.g., such that they are disposed within a cross-sectional envelope of the second body portion **315**) while the needle **309** is inserted into the body, so that the filaments **319***a*, **319***b* do not cause any unintended damage to the patient. Such positioning of the filament slots **318***a*, **318***b* avoids having filament exit features on the tapered portion **313** and on the first body portion **314** and thus avoids potential coring that could be caused by such positioning.

The internal geometry of the filament slots **318***a*, **318***b* may be designed such that the filaments **319***a*, **319***b* may be retracted and advanced. For example, the internal geometry of the filament slots **318***a*, **318***b* may be configured such that advancement of the filaments **319***a*, **319***b* relative to the filament slots **318***a*, **318***b*, will cause the filaments **319***a*, **319***b* to be deflected outwardly as the filaments **319***a*, **319***b* move distally relative to the second body portion **315**. Depending on the configuration of the filament slots **318***a*, **318***b* and on the mechanical properties of the filaments **319***a*, **319***b*, various deployment angles of the filaments **319***a*, **319***b* relative to a central longitudinal axis of the second body portion **315** may be achieved.

The configuration and orientation of the filament slots **318***a*, **318***b* may be selected such that deployed filaments **319***a*, **319***b* may achieve the positioning illustrated in FIG. 3C. In FIG. **3**C, the filaments **319***a*, **319***b* are generally positioned in a plane that is perpendicular to a plane that includes the angle **316** between the first and second body portions **314**, **315**. As illustrated, the filaments **319***a*, **319***b* may be positioned such that they extend at an angle relative to the plane that includes the angle **316**. Other filament slot **318***a*, **318***b* configurations may be configured to achieve other desired filament **319***a*, **319***b* placements. These configurations may be achieved by varying the quantity of filament slots and filaments, the placement of filament slots about the circumference of the tip **311**, the angle at which the filaments extend away from the first and second body portions **314**, **315**, and/or the placement of filament slots along the first and second body portions **314**, **315**.

Similar to the embodiment of FIGS. **3**A and **3**B, the needle **309** may comprise a tube that includes a lumen therethrough. The lumen may be employed to accept an RF probe for delivery of RF energy and/or for the transport of fluids. In this regard, the tip **311** may further include a fluid port **320** that may be in fluid communication via a channel through the tip **311** with the lumen. The fluid port **320** may be used to transfer fluid between the region of the tip **311** and a proximal end of the needle **309**.

In the deployed position as shown in FIG. **3**C, the distal ends of the filaments **319***a*, **319***b* are disposed away from the tip **311**. In a retracted position (not shown, but similar to as shown in FIG. 3B), the distal ends of the filaments **319***a*, **319***b* are disposed entirely within an outer perimeter (e.g., circumference where the second body portion **315** of the tip **311** is round) of the tip **311**. In the deployed position, the filaments **319***a*, **319***b* act as broadcast antennae for an RF probe inserted into the needle **309**. In this regard, together, the RF probe inserted into the lumen, the tip **311**, and the filaments **319***a*, **319***b*, may form a monopolar electrode for application of RF energy to the target volume. The filaments **319***a*, **319***b* may allow the RF energy from the RF probe to be dispersed over a larger volume than would be possible with the tip **311** alone.

The filaments **319***a*, **319***b* may be constructed in a manner similar to as described with respect to the filaments **206***a*, **206***b*.

In general, any or all of the above variables may be incorporated into a particular embodiment of a needle to yield a needle capable of producing a lesion with a particular size, position and shape relative to the tip of the needle. Such custom sizes, positions and shapes may be designed for specific procedures. For example, a particular lesion size, position and shape may be selected to enable a physician to navigate the needle to a particular landmark (e.g., proximate or touching a bone visible using fluoroscopy) and then orient the needle such that deployed filaments will be operable to produce a lesion at a particular location relative to the landmark. By navigating to a particular internal landmark, as opposed to attempting to visualize a relative position of a needle offset from a landmark, a more accurate and/or consistent positioning of the needle may be achieved. In this regard, the skill level required to accurately position the needle for a particular procedure may be reduced.

The lesion shapes achievable through selection of the above variables may include, for example, generally spherical, oblong, conical, and pyramidal shapes. The orientation relative to, and the amount of offset from, the tip of such shapes may be selectable. In an embodiment, the tips of the deployed filaments may be positioned distally relative to the point of the tip to provide for a facile positioning of the lesion relative to the tip. Such capability may allow for the needle to be inserted directly toward a target volume. In other embodiments, the tips of the deployed filaments may be positioned at the same axial position along the central longitudinal axis as the point of the tip or the tips of the deployed filaments may be positioned proximally relative to the point of the tip. In other embodiments, some filament endpoints may be located distal to the point of the tip while others are disposed proximal to the point of the tip.

In the embodiment of FIGS. **2**A, **2**B, **3**A, **3**B, **5** and **6**, the filaments **206***a*, **206***b* have been illustrated as running the entire length of the elongate member **203** from the filament hub **221** to the tip **201**. In an embodiment, a single member may run along at least part of the elongate member **203** and the filaments may be interconnected to the single member at some point proximal to the tip **201**. Furthermore, the filaments **206***a*, **206***b* have been illustrated as being straight within the elongate member **203**. In alternate embodiments, the filaments within the elongate member **203** may be braided, wrapped or twisted together. Such embodiments may have increased column strength, providing resistance to buckling and/or bending within the elongate member **203**.

The filaments discussed herein may be encased within lumens sized to help prevent buckling or bending of the filaments within the elongate member **203**. Such lumens may be part of the elongate member or they may be separate members (e.g., tubes within the elongate member). Such lumens may be formed by an inner member (not shown) within the elongate member where the inner member includes channels along its periphery in which the filaments may lie with the elongate member forming a portion of the lumens. Lumens used for filaments may also serve as lumens for the transfer of liquid to and/or from the region surrounding the tip. In another variation, the filaments may be hollow and may be used for transfer of liquid to and/or from the region surrounding the tip.

The illustrated embodiments show all of the filaments of a given embodiment as commonly deployed or refracted. In a variation, one or more filaments may be separately deployed and/or refracted such that the physician could selectively engage a desired number of elements. In another variation, a plurality of filaments may exit from the tip at a common location and form a fan-like arrangement as they are deployed.

Deployment of filaments discussed above has been described as the filaments moving relative to a stationary tip. Alternatively, embodiments may be deployed by pulling the tip back relative to the filaments. Such embodiments may be beneficial where the needle is initially advanced such that it is in contact with bone to ensure proper positioning. Then the tip may be withdrawn, leaving the filaments (e.g., curved shape memory filaments) in a precise, known position.

Returning to FIGS. **2**A and **2**B, as noted, the hub **204** may be fixedly attached to the elongate member **203**. The hub **204** may be the primary portion of the needle **103** gripped by the physician during insertion and manipulation of the needle **103**. The hub **204** may have an asymmetric feature, such as indicator **225**, that is oriented in a known fashion relative to the asymmetry of the tip **201**. In this regard, the indicator **225** may be used to communicate to the physician the orientation of the tip **201** within the patient **101**. Internally, the hub **204** may include a cavity **213** sized to house a protrusion **218** of the actuator **216**. The hub **204** may include a hole through which a projection **215** may project into the interior of the cavity **213** to control the motion of the actuator **216** relative to the hub **204** and to secure the actuator **216** to the hub **204**. The hub **204** may be made from any appropriate material, e.g., a thermoset plastic.

The actuator **216** may be used to control the motion to deploy and/or retract the filaments **206***a*, **206***b*. The actuator **216** is operable to move along the central longitudinal axis **223** relative to the hub **204**, elongate member **203** and tip **201**. The actuator **216** includes the protrusion **218** extending into the cavity **213** of the hub **204**. The outer surface of the protrusion **218** includes a helical track **219** sized to accommodate the projection **215**. In this regard, as the actuator is rotated relative to the hub **204** (e.g., by a physician to deploy the filaments **206***a*, **206***b*), the helical track **219** and projection **215** combine to cause the actuator **216** to move axially along the central longitudinal axis **223**. The actuator **216** has an interface portion **217** that may be gripped by a user when twisting the actuator **216**. The interface portion **217** may be knurled or otherwise textured to enhance the physician's ability to twist the actuator **216**. The protrusion **218** may include an inner cavity **226** sized to accept the filament hub **221** and to allow the filament hub **221** to rotate freely relative to the actuator **216**. In this regard, the linear motion of the actuator **216** may be transmitted to the filament hub **221** while the rotational motion of the actuator **216** may not be transmitted to the filament hub **221**.

The actuator **216** may include a Luer fitting **220** or any other appropriate fitting type on a proximal end thereof. The Luer fitting **220** may be in fluid communication with the lumen **222** and provide a connection such that fluid may be delivered into the lumen **222** and to the fluid port **210** of the tip **201**. The Luer fitting **220** may also be configured to allow for the insertion of the RF probe **401** into the lumen **222**. The actuator **216** may be made from any appropriate material.

The filaments **206***a*, **206***b* may be fixedly interconnected to the filament hub **221**. In this regard, the axial movement of the filament hub **221** due to the actuator **216** may be communicated to the filaments **206***a*, **206***b* to deploy and retract the filaments **206***a*, **206***b* when the actuator **216** is rotated. The filament hub **221** may be made from any appropriate material.

Thusly, the physician may be able to deploy or retract the filaments **206***a*, **206***b* by twisting the actuator **216**. For example, as illustrated, a counterclockwise (as seen from the viewpoint of FIG. **5**) rotation of the actuator **216** relative to the hub **204** will result in the deployment (extension) of the filaments **206***a*, **206***b*. Relatedly, a clockwise rotation of the actuator **216** relative to the hub **204** will result in the retraction of the filaments **206***a*, **206***b*. Additionally, by partially rotating the actuator **216** relative to the hub **204**, the filaments **206***a*, **206***b* may be partially deployed or refracted. The actuator **216** and/or the hub **204** may include markings to indicate the position of the filaments **206***a*, **206***b* (e.g., the depth of deployment). The actuator **206** and/or hub **204** may include detents to provide a tactile feedback of the position of the filaments **206***a*, **206***b*.

Other types of mechanisms may be used to control the deployment and retraction of the filaments **206***a*, **206***b*. For example, a spring loaded mechanism may be used. Such a configuration may use a spring that acts upon the filaments **206***a*, **206***b* to bias the filaments **206***a*, **206***b* toward a predetermined position (e.g., either deployed or retracted). Such a mechanism may be analogous to a spring loaded mechanism used in retractable ballpoint pens. In another example, a roll clamp mechanism may be incorporated. A roller wheel could be incorporated into the hub **204** such that as the wheel is rotated with the user's thumb, the filaments **206***a*, **206***b* would advance or retract. In another example, the hub **204** and actuator **216** may interact via complimentary threaded features. As the actuator **216** is threaded into the hub **204**, the filaments **206***a*, **206***b* would advance. As the actuator **216** is threaded out of the hub **204**, the filaments **206***a*, **206***b* would retract. In another example, a Touhy-Borst type mechanism could be incorporated to control the deployment and retraction of the filaments **206***a*, **206***b*. Any other appropriate mechanism for controlling linear motion of the filaments **206***a*, **206***b* may be incorporated into the needle **103**.

FIG. **2**C is a cut away view of a portion of an alternate embodiment of a hub **231** and actuator **232** that may be part of RF needle **103** used in an RF neurotomy procedure. The hub **231** may be fixedly attached to the elongate member **203**. The hub **231** may be the primary portion of the needle **103** gripped by the physician during insertion and manipulation of the needle **103**. The hub **231** may have an asymmetric feature, such as indicator **233**, that is oriented in a known fashion relative to the asymmetry of the tip **201**. In this regard, the indicator **233** may be used to communicate to the physician the orientation of the tip **201** within the patient **101**. Internally, the hub **231** may include a cavity **234** sized to house a protrusion **235** of a slide member **236**. The protrusion **235** may include a keyway or key slot **237** that may run along a longitudinal direction of the protrusion **235**. The internal surface of the hub **231** through which the protrusion **235** moves may include a mating key (not shown) configured to fit and slide within the key slot **237**. Together, the key slot **237** and mating key of the hub **231** may limit the slide member **236** to a linear motion along the central longitudinal axis **223**.

Filaments **206***a*, **206***b* may be fixedly connected to the protrusion **235** of the slide member **236** for movement therewith. In this regard, distal movement (e.g., movement to the right as shown in FIG. **2**C) of the protrusion **235** relative to the hub **231** may cause extension of the filaments **206***a*, **206***b* relative to the hub **231**, elongate member **203**

and tip **201** (not shown in FIG. 2C). For example, distal movement of the protrusion **235** may be used to move the filaments **206***a*, **206***b* from a retracted position to a deployed position. Similarly, proximal movement (e.g., movement to the left as shown in FIG. 2C) of the protrusion **235** relative to the hub **231** may result in retraction of the filaments **206***a*, **206***b* relative to the hub **231**, elongate member **203** and tip **201** (not shown in FIG. 2C).

The hub **231** may be made from any appropriate material, e.g., a thermoset plastic. The hub **231** may be at least partially transparent such that the position of the protrusion **235** and/or other components within the hub **231** may be observable by a user. The hub **231** may further include demarcations (e.g., molded or printed marks) such that the amount of extension of the filaments **206***a*, **206***b* may be determined from the position of the protrusion **235** and/or other components relative to the demarcations.

An actuator **232** may be used to control the motion to deploy and/or retract the filaments **206***a*, **206***b* fixedly connected to the protrusion **235**. The actuator **232** may be generally tubular such that it may fit around a hub projection **238** projecting from the proximal end of the hub **231**. At least a portion of the cavity **234** may be disposed within the hub projection **238**. The actuator **232** may also include an annular feature **239** configured to fit within an annular slot **240** in the slide member **236**. The annular feature **239** may be sized relative to the annular slot **240** such that the actuator **232** may rotate relative to the slide member **236** about the central longitudinal axis **223** (or an axis parallel thereto) while the position of the actuator **232** relative to the slide member **236** along the central longitudinal axis **223** remains fixed. In this regard, the actuator **232** and the slide member **236** may be configured to move in tandem relation along the central longitudinal axis **223**. The annular feature **239** and annular slot **240** may be configured such that, during assembly, the actuator **232** may be pressed onto the slide member **236** and the annular feature **239** may snap into the annular slot **240**.

The inner surface of the actuator **232** may include a helical track **241** sized to accommodate a corresponding mating helical thread **242** on the hub projection **238**. In this regard, as the actuator **232** is rotated relative to the slide member **236** and hub **231** (e.g., by a physician to deploy the filaments **206***a*, **206***b*), the helical track **241** and helical thread **242** combine to cause the actuator **232** and the slide member **236** to move axially along the central longitudinal axis **223**. In this regard, a linear motion of the slide member **236** relative to the hub **231** may be created while the rotational motion of the actuator **232** may not be transmitted to the slide member **236** and the hub **231**. An outer surface of the actuator **232** may be textured or include features to assist the user in gripping and twisting the actuator **232**. In an alternative configuration, the helical track **241** may be disposed on the hub projection **238** and the helical thread **242** may be disposed on the inner surface of the actuator **232**.

The slide member **236** may include a Luer fitting **243** or any other appropriate fitting type on a proximal end thereof. The Luer fitting **243** may be in fluid communication with a lumen passing through the slide member **236** and may provide a connection such that fluid may be delivered through the Luer fitting **243** and into the lumen of the slide member **236**. In turn, the lumen of the slide member **236** may be in fluid communication with the cavity **234** of the hub **231**, which may in turn be in fluid communication with a lumen disposed within the elongate member **223**. The lumen disposed within the elongate member **223** may be in fluid communication with the tip **201**. In this regard, fluid may flow into the Luer fitting **243**, into and through the lumen within the slide member **236**, into and through the cavity **234** of the hub **231**, into and through the elongate member **223**, and out from the tip **201**. The Luer fitting **243**, the lumen within the slide member **236**, the cavity **234** of the hub **231**, and the lumen of the elongate member **223** may all also be configured to allow for the insertion of the RF probe **401** therethrough. Moreover, the protrusion **235** and cavity **234** of the hub projection **238** may be sized and/or configured to form a fluid seal therebetween. Accordingly, fluid delivered under pressure through the Luer fitting **220** may flow through the cavity **238** and into the elongate member **203** substantially without leaking past the interface between the protrusion **235** and the cavity **234** of the hub projection **238**.

As noted, the filaments **206***a*, **206***b* may be fixedly interconnected to the slide member **236**. In this regard, the axial movement of the slide member **236** due to the actuator **232** may be communicated to the filaments **206***a*, **206***b* to deploy and retract the filaments **206***a*, **206***b* when the actuator **232** is rotated. The slide member **236** may be made from any appropriate material. The actuator **232** may be made from any appropriate material.

Thusly, the physician may be able to deploy or retract the filaments **206***a*, **206***b* by twisting the actuator **232**. Additionally, by partially rotating the actuator **232** relative to the hub **231**, the filaments **206***a*, **206***b* may be partially deployed or refracted. The actuator **232** and/or hub **231** may include detents to provide a tactile feedback of the position of the filaments **206***a*, **206***b*. The detents may be configured such that tactile feedback associated with engagement of a detent coincides with a predetermined amount of deployment or retraction of the filaments **206***a*, **206***b*. In this regard, such tactile feedback may be used in determining filament position.

In alternate embodiments, the needle **103** may be a bipolar device instead of the monopolar device described above. In such embodiments, the filaments may be isolated from each other and the tip to enable bipolar operation. Where more than two filaments are included, elements may be included to allow for selection of the polarity of the filaments to aid in lesion shape, size and position control. In another variation, the needle **103** may be used in either a monopolar or a bipolar mode as selected by the physician.

The above-described embodiments of needles may used in spinal RF neurotomy procedures, which will now be described. In general, for an RF neurotomy procedure, the patient may lie face down on a table so that the spine of the patient is accessible to the physician. At any appropriate time before, during, and/or after the procedure, the physician may use imaging equipment, such a fluoroscope, to visualize the patient's anatomy and/or to visualize the positioning of equipment (e.g., the needle relative to a target volume).

The patient may be administered sedatives and/or intravenous fluids as appropriate. The skin of the patient surrounding where the procedure will take place may be prepared and maintained using an appropriate sterile technique. Where the needle is a monopolar device, a return electrode pad may be attached to the patient. A local anesthetic may be injected subcutaneously where the needle will be inserted. Anesthetic may also be administered along the approximate path the needle will take.

With the filaments in the retracted position, the needle may be introduced into the patient and moved to a target position relative to a target portion of a target nerve or to a target position relative to a target volume in which the target

nerve is likely situated (all of which are generally referred to herein as the target nerve or portion of the target nerve). The target nerve may be an afferent nociceptive nerve such as, for example, a medial branch nerve proximate a lumbar facet joint. Introduction into the patient may include percutaneously using the tip of the needle to pierce the skin of the patient. The moving of the needle may include navigating toward the target position using fluoroscopic guidance. Furthermore, the moving of the needle may include advancing the needle to an intermediate position and then repositioning the needle to the target position. For example, the needle may be advanced until it contacts a bone or other structure to achieve the intermediate position. This may be followed by retracting the needle a predetermined distance to achieve the target position. Such a procedure may be facilitated by the markers **224** or collar previously discussed.

During the moving of the needle or after the target position has been achieved, the needle may be used to inject an anesthetic and/or a dye. The dye may increase contrast in fluoroscopic images to assist in visualizing the patient's anatomy, which may aid the physician in guiding and/or verifying the position of the needle.

The needle may be rotated about the central longitudinal axis of the elongate member of the needle to achieve a desired orientation relative to the target nerve. For example, the needle may be rotated such that a lesion created with the needle with the filaments deployed will be offset from the central longitudinal axis toward the target nerve. Such rotation of the needle may be performed prior to insertion of the needle into the patient and/or after insertion into the patient. For example, the physician may rotate the needle prior to insertion such that the needle is generally in the desired rotational orientation. Then, after achieving the target position, the physician may fine tune the rotational orientation of the needle by rotating the needle to a more precise orientation.

Once the target position and desired rotational orientation have been achieved, the next step may be to advance one or more filaments of the needle relative to the tip of the needle. The particular needle used for a procedure may have been selected to enable the creation of a particular sized and shaped lesion at a particular position relative to the needle. As such, the particular needle used may be of any appropriate configuration (e.g., any appropriate number of filaments, any appropriate filament positioning) discussed above.

Where the needle is configured as shown in FIG. **5**, the advancement of filaments may include advancing the filaments such that when the filaments are in their respective deployed positions, a midpoint between a distal end of the first filament and a distal end of the second filament is offset from the central longitudinal axis of the needle and the filament endpoints are disposed distal to the tip of the needle. Such deployment may enable the needle to be used to create a lesion that is offset from the tip of the needle toward the midpoint between the deployed filament ends. The lesion created may also be positioned at least partially distal to the tip of the needle.

FIG. **11**A is an illustration of an exemplary set of isotherms **1010***a*-**1010***c* that may be created with the needle **103** of FIG. **2**A. As illustrated by the set of isotherms **1010***a*-**1010***c*, RF energy emanating from the tip **201** and filaments **206***a*, **206***b*, may produce a region of elevated temperatures disposed about the tip **201** and filaments **206***a*, **206***b*. The isotherms **1010***a*-**1010***c* may be offset from the central longitudinal axis **223** such that a centroid of the isotherms as viewed in FIG. **11**A is offset from the central longitudinal axis **223** in the direction of the filaments **206***a*, **206***b*. The centroid of the isotherms **1010***a*-**1010***c* as viewed in FIG. **11**A may also be disposed distally relative to the tip **201** such that it is disposed between the tip **201** and the distal ends of the deployed filaments **206***a*, **206***b*. The isotherms **1010***a*-**1010***c* may also be shaped such that, as viewed in FIG. **11**A, the isotherms **1010***a*-**1010***c* have a maximum cross dimension along the central longitudinal axis **223** that is greater than a maximum cross dimension in the plane of FIG. **11**A perpendicular to the central longitudinal axis **223**. Similarly, as shown in FIG. **11**B discussed below, the isotherms **1010***a*-**1010***c* may have a maximum cross dimension along the central longitudinal axis **223** that is greater than a maximum cross dimension perpendicular to the plane of FIG. **11**A and perpendicular to the central longitudinal axis **223**.

The offset of the centroid of the isotherms **1010***a*-**1010***c* from the central longitudinal axis **223** results in greater lesion width in a plane perpendicular to the central longitudinal axis **223**, as compared to a similarly sized straight needle with no filaments. The offset of the centroid of the isotherms **1010***a*-**1010***c* also allows for projection of the centroid of a corresponding lesion volume in a direction away from the central longitudinal axis **223**. By way of example, such offsets may advantageously enable the execution of the exemplary procedures described herein. In addition, such offsets may advantageously enable the creation of lesion volumes distal (relative to the needle **103**) to potentially interfering structures (e.g., an ossified process). Moreover, such offsets may advantageously enable the needle **103** to be inserted into a patient at a more desirable angle (e.g., closer to perpendicular to the surface of the patient such as within 30° of perpendicular to the surface of the patient) than would be required using a needle without offset lesion capabilities.

FIG. **11**B is an illustration of an exemplary lesion **1011** that may be created with the needle **103** of FIG. **2**A. In FIG. **11**B, the needle **103** has been placed perpendicular to a surface **1012**. The surface **1012** may, for example, be the surface of a bone, such as a lumbar vertebra. As illustrated, the filaments **206***a*, **206***b* are deployed such they are proximate to the surface **1012**. As such, the lesion **1011** has a width along the surface **1012** that is wider than would be created by the needle **103** if the filaments **206***a*, **206***b* were not deployed. Such capabilities may, for example, be advantageous where a target structure (e.g., a nerve) is known to be positioned along the surface **1012**, but its exact position is unknown. In such a case, the needle **103** may be positioned generally perpendicular to the surface **1012** to achieve the illustrated lesion width along the surface **1012**, whereas the needle **103** without the filaments **206***a*, **206***b* deployed, would require either multiple repositioning steps or for the needle **103** to be placed generally parallel to the surface **1012** to achieve the same lesion width along the surface **1012**.

FIG. **11**C is an illustration of an exemplary lesion **1022** that may be created with a single-filament needle **1020**. The single-filament needle **1020** is similar to the needle **103** with a difference that the single-filament needle **1020** includes only a single filament **1021**. The filament **1021** may be configured similarly to the filaments **206***a*, **206***b*. The single-filament needle **1020** with the filament **1021** deployed may be operable to produce a lesion **1022** that is a flattened version (e.g., thinner in a direction perpendicular to the central longitudinal axis **223**—the left to right direction as illustrated in FIG. **11**C) of a lesion that may be produced by the needle **103** with its filaments **206***a*, **206***b* deployed. The

capability to produce such a lesion shape may be beneficial when it is desirable to have a relatively large lesion in a particular direction (e.g., to compensate for the variability of location of a target nerve) and a relatively small lesion width in another direction (e.g., to avoid a structure such as viscera or a patient's skin).

Where the needle is configured such that all of the filaments of the needle are deployed on a common side of a central plane of the needle (where the central longitudinal axis is disposed entirely within the central plane), the advancement of filaments may include advancing the filaments such that when the filaments are in their respective deployed positions, the distal ends of all of the filaments are disposed on a common side of the central plane. Such deployment may enable the needle to be used to create a lesion that is offset from the tip of the needle to the same side of the central plane as the deployed filament ends. The lesion created may also be positioned at least partially distal to the tip of the needle.

Where the needle is configured as shown in FIG. **8**, the advancement of filaments may include advancing the filaments such that when the filaments are in their respective deployed positions, each filament distal end defines a vertex of a polygon whose centroid is offset from a central longitudinal axis of the needle. Such deployment may enable the needle to be used to create a lesion that is offset from the tip of the needle toward the centroid. The lesion created may also be positioned at least partially distal to the tip of the needle.

The advancement of the filaments may be achieved using any of the mechanisms discussed above. For example, in the embodiment of FIG. **2**A, rotating the actuator **216** relative to the hub **104** may cause the filaments to advance to the deployed position. The advancement of the filaments may be performed such that each of the plurality of filaments passes through a surface of the needle that is parallel to the central longitudinal axis of the needle. In an embodiment, the filaments of the needle may be advanced to a position that is an intermediate position between the retracted position and the fully deployed position. The degree of deployment may be based on the desired lesion size and/or the accuracy of the placement of needle. For example, the same needle may be used in two different procedures where the variability of the location of a target nerve is greater in the first procedure than it is in the second procedure. In such situation, the greater deployment of the filaments may be used in the first procedure, whereas in the second procedure, a smaller degree of deployment may be used since a smaller lesion may suffice to ensure that the target nerve has been lesioned. In another example, after placement of the needle during a procedure, the position of the needle may be determined to be slightly offset from a target position. In such a case, the filaments may be deployed to a greater degree than would have been required if the needle were placed exactly on target. In such a case, the greater degree of deployment may be used to compensate for the needle positioning inaccuracy. In such a case, needle repositioning and possible associated trauma may be avoided.

After advancing the filaments to the deployed position, their positions may be confirmed using the imaging system (e.g., using a fluoroscope). Furthermore, proper positioning may be verified by using the needle to stimulate the target nerve. An electrical signal (e.g., up to about 2 volts applied at about 2 Hz) may be applied to the needle and the physician may observe any related patient movement (e.g., muscle fasciculation in the territory supplied by the nerve). In another example, an electrical signal (e.g., up to about 1 volt applied at about 50 Hz) may be applied to the needle and the patient may indicate if they feel any associated sensations and their locations to assist in verifying correct needle positioning. Such stimulation (either physician-observed or patient reported) may be used to stimulate a targeted nerve to determine if the deployed position is adequate to achieve denervation of the targeted nerve. In this regard, it is desirable for the stimulation to affect the targeted nerve.

Such stimulation may be used to attempt to stimulate a nerve that is not targeted for denervation (e.g., a nerve where no denervation is desired) to determine the position of the needle relative to such a non-targeted nerve. In this regard, if the stimulation signal does not stimulate the non-targeted nerve, it may be assumed that the position of the needle relative to the non-targeted nerve is such that the application of RF energy to the needle will not result in significant damage to the non-targeted nerve. And if the stimulation does stimulate the non-targeted nerve, the needle may be repositioned to avoid damaging the non-targeted nerve. In this regard, it is desirable for the stimulation not to affect the non-targeted nerve.

After correct needle positioning has been verified (e.g., by imaging and/or patient response), an anesthetic may be injected through the needle.

After the filaments have been advanced to the desired position, the next step may be to apply RF energy to the needle using the interconnected RF generator. In embodiments that use a separate RF probe to deliver RF energy, the RF probe may be inserted into a lumen of the needle prior to application of the RF energy. Additionally, when using such a configuration, the application of RF energy may include applying RF energy to the RF probe and conducting the RF energy away from the probe by the tip and/or filaments.

The resultant RF energy emanating from the tip and filaments may generate heat that ablates the target nerve. Such ablation may be achieved by creating a lesion that includes the target nerve. It is desired that the target nerve be completely ablated to prevent incomplete neurotomy which may result in dysesthesia and patient discomfort. In an exemplary embodiment, a lesion with a maximum cross dimension of 8-10 mm may be created. Larger or smaller lesions may be created by varying filament characteristics (e.g., filament advancement distance) and/or RF energy levels. The created lesion may be offset from the central longitudinal axis of the needle. The center of the lesion may be positioned distal to the tip of the needle. Of note, since the RF energy is emanating from the tip and filaments, a particularly sized lesion may be created with a lower peak temperature (the maximum temperature experienced in the patient) than would be possible if a needle without filaments were to be used to create the same-sized lesion. For example, a particular lesion may be achieved with the needle with deployed filaments where the peak temperature is about 55-60° C., whereas creation of the same lesion using a needle without filaments could require a peak temperature of about 80° C. Such lower temperatures required by the needle with deployed filaments may result in greater patient safety.

Before, during, and after the application of RF energy, a temperature sensor (e.g., thermocouple) at or near the tip of the needle may be used to monitor the temperature at or near the tip. Such readings may be used as control signals (e.g., a feedback loop) to control the application of RF energy to the needle. If it is desired to ablate additional target nerves or to ablate an additional volume to ensure ablation of the original target nerve, the spinal RF neurotomy procedure may continue.

Where the particular needle is configured to create lesions offset from the central longitudinal axis of the needle, and the additional target nerve or target volume is within a volume that may be lesioned using the needle in its current position but in a different rotational orientation, the procedure may continue as follows. First, after the initial RF energy application, the filaments may be retracted into the needle. Once retracted, the needle may be rotated, and the filaments redeployed. Next, the reoriented needle may be used to at least partially ablate the additional target nerve or target volume. Such retargeting of ablation volumes without repositioning (e.g., without withdrawing the needle from the patient and reinserting), may result in reduced patient trauma as compared to known spinal RF neurotomy procedures which may require removal and reinsertion of a needle to achieve lesioning of the second target volume. Moreover, such retargeting of ablation volumes without repositioning may result in the ability to create uniquely shaped lesions from a single insertion position. Such shaped lesions may include, for example, lesions that are in the shape of two or more intersecting spheres. The steps of retracting the filaments, rotating the needle, redeploying the filaments, and applying RF energy may be repeated a plurality of times.

Where the additional target nerve or target volume is not within a volume that may be lesioned using the needle in its current position, the needle may be repositioned. Such repositioning may include partially or fully removing the needle from the patient and then repositioning the needle and repeating the above-described steps.

At any point where no additional lesioning is desired, the filaments of the needle may be retracted, and the needle may be removed from the patient. After removal of the needle, a sterile bandage may be placed over the needle insertion site or sites. The patient may then be held for observation and recovery from the effects of any sedative that may have been administered.

Examples of specific spinal RF neurotomy procedures will now be described. Generally, steps unique to each procedure will be discussed while steps common to any spinal RF neurotomy procedure (e.g., site preparation, needle removal) will not be further discussed. Each of the procedures is described as being performed with the needle **103** of FIGS. **2**A-**6**. It will be appreciated that the variations in needle configuration discussed above may be used in these procedures. For example, to increase the offset of the created lesion relative to the central longitudinal axis, curved (e.g., FIG. **10**) and/or partially insulated filaments may be used that may create a lesion with a greater offset from the central longitudinal axis than the embodiment of FIG. **2**A-**6**.

1. Lumbar RF Neurotomy of a Medial Branch Nerve Proximate a Lumbar Facet Joint.

This process may include using a needle that enables the creation of lesions which are offset from the central longitudinal axis of the needle. The procedure will be described as being performed on the L5 vertebra **1101** using FIG. **12** and the needle **103** of FIG. **2**A. It should be understood that other embodiments of needles described herein may be used in the procedure.

The lumbar RF neurotomy process may include positioning the tip **201** of the needle **103** (e.g., using fluoroscopic navigation) such that it is in contact with, or proximate to the groove **1102** between the transverse **1103** and superior articular **1104** processes of the targeted lumbar vertebra **1101**. Such positioning is shown in FIG. **12**. By contacting the lumbar vertebra **1101**, a positive determination of the position of the needle **103** may be made. By way of example, such positioning may be performed such that the needle **103** is within 30° of being perpendicular to the lumber vertebra **1101** at the point of contact with the lumbar vertebra **1101**, or at the point of the lumbar vertebra **1101** closest to the tip **201** of the needle **103**. Optionally, from such a position, the needle **103** may be retracted a predetermined amount (e.g., between about 3 mm and 5 mm) as measured by markers **224** on the needle **103**, as determined using the collar about the elongated member **203** discussed above, and/or by fluoroscopic navigation.



The process may include rotating the needle **103** such that the midpoint **502** is oriented toward the superior articular process **1104** and a medial branch nerve **1105** that is positioned along a lateral face **1106** of the superior articular process **1104**. Next, the filaments **206***a*, **206***b* may be advanced to the deployed position (as shown in FIG. **12**). The position of the needle **103** and deployed filaments **206***a*, **206***b* may be verified using fluoroscopy and/or patient stimulation. The RF probe **401** may then be inserted into the lumen **222** such that RF energy emanating from the probe **103** will be conducted by the tip **201** and filaments **206***a*, **206***b* to the target medial branch nerve **1105** and away from the intermediate branch of the posterior primary ramus.

Next, RF energy may be applied to the RF probe **401**. The RF energy emanating from the needle **103** may be preferentially biased toward the target medial branch nerve **1105**. The lesion created by such a procedure may, for example, have a maximum cross dimension of 8-10 mm, and may ablate a corresponding portion of the medial branch nerve **1105**, thus denervating the facet joint.

In a variation, the needle may be operable to create a generally symmetric lesion relative to its central longitudinal axis. In such a variation the sequence of steps may include insert needle, deploy filaments, and apply RF energy.

In another variation, the needle may be inserted so it is positioned along the length of a portion of the nerve (as illustrated by needle **103'**). Such positioning is similar to known methods of RF neurotomy performed with needles without filaments. After positioning the needle, the filaments may be deployed and a lesion may be created. As noted above, a needle with deployable filaments that is capable of producing a lesion equivalent to that of a needle without deployable filaments may be smaller in diameter than the needle without deployable filaments. Accordingly, although the positioning of needle **103'** may be similar to known processes, the process utilizing the needle with deployable filaments may cause less trauma and be safer than procedures using a needle without deployable filaments due to the smaller size of the needle with deployable filaments. Moreover, as discussed above, the peak temperatures required to produce the desired lesion volume may be less when using the needle with deployable filaments as compared to the needle without deployable filaments, further contributing to patient safety. Furthermore, the filaments of needle **103'** may be partially or fully deployed to achieve a desired lesion location, shape and/or size.

It is noted that the illustrated deployment of needle **103** with the filaments **206***a*, **206***b* deployed may be used to create a lesion that approximates a lesion that would be created with the a prior art (non filament) needle placed in the position of needle **103'** (e.g., parallel to the target nerve **1105**). Moreover, the placement of needle **103** generally perpendicular to the surface of the L5 vertebra **1101** may be less difficult to achieve than the parallel placement of the needle **103'**.

2. Sacroiliac Joint (SIJ) RF Neurotomy of the Posterior Rami.

This process may include using a needle that enables the creation of lesions which are offset from the central longitudinal axis of the needle. The procedure will be described as being performed on the posterior rami **1201** of the SIJ referencing FIG. **13** and using the needle **103** of FIGS. **2**A-**6**. It should be understood that other embodiments of needles described herein may be used in the procedure.

As part of the SIJ RF neurotomy process, it may be desirable to create a series of lesions in a series of lesion target volumes **1203***a*-**1203***h* lateral to the sacral foramina **1211**, **1212**, **1213** of a side of the sacrum **1200** to ablate posterior rami **1201** that are responsible for relaying nociceptive signals from the SIJ. Since the exact positions of the rami **1201** may not be known, lesioning such a series of target volumes **1203***a*-**1203***h* may accommodate the variations in rami **1201** positions. The series of target volumes **1203** may be in the form of one or more interconnected individual target volumes, such as target volumes **1203***a* and **1203***b*. In addition, the process may include an additional lesion **1208** between the L5 vertebra **1209** and the sacrum **1200**.

The SIJ RF neurotomy process may include positioning the tip **201** of the needle **103** (e.g., using fluoroscopic navigation) such that it is in contact with, or proximate to, and in lateral relation to the S1 posterior sacral foraminal aperture (PSFA) **1211** at a first point **1204** that is at the intersection of the two target volumes **1203***a* and **1203***b*. Such positioning may be performed such that the needle **103** is oriented within 30° of being perpendicular to the sacrum **1200** at the point of contact (or at the point of the sacrum **1200** closest to the tip **201** of the needle **103**). By contacting the sacrum **1200**, a positive determination of the position of the needle **103** may be made. Optionally, from such a position, the needle **103** may be retracted a predetermined amount (e.g., between 3 mm and 5 mm) as measured by markers **224** on the needle **103**, as determined using the collar about the elongated member **203** discussed above, and/or by fluoroscopic navigation. For example, a contralateral posterior oblique view may be obtained to ascertain that the tip **201** has not entered the spinal canal. For example, a fluoroscopic view may be obtained looking down the length of the needle **103** to verify that the needle **103** is properly offset from the S1 PSFA **1211** and/or a fluoroscopic view may be obtained looking perpendicular to the central longitudinal axis **223** of the needle **103** to verify that the needle is not below the surface of the scrum (e.g., disposed within the S1 PSFA **1211**). Additionally, an electrical signal may be applied to the needle **103** to stimulate nerves proximate to the tip **201** to verify correct needle **103** placement.

The process may include rotating the needle **103** such that the midpoint **502** is oriented toward the first target volume **1203***a* in the direction of arrow **1205***a*. Next, the filaments **206***a*, **206***b* may be advanced to the deployed position. The position of the needle **103** and deployed filaments **206***a*, **206***b* may be verified using fluoroscopy and/or stimulation. The RF probe **401** may then be inserted into the lumen **222** such that RF energy emanating from the needle **103** will be conducted by the tip **201** and filaments **206***a*, **206***b* to the first target volume **1203***a*. Next, RF energy may be applied to the RF probe **401**. The RF energy emanating from the needle **103** may be preferentially biased toward the first target volume **1203***a*. The lesion created by such an application of RF energy may, for example, have a maximum cross dimension of 8-10 mm, and may ablate a corresponding portion of the rami **1201**.

Next, the filaments **206***a*, **206***b* may be retracted and the needle **103** may be rotated approximately 180 degrees such that the midpoint **502** is oriented toward the second target volume **1203***b* in the direction of arrow **1205***b*. Optionally, some lateral repositioning of the needle may performed (e.g. without any needle pull back or with a small amount of needle pull back and reinsertion). Next, the filaments **206***a*, **206***b* may be advanced to the deployed position. The position of the needle **103** and deployed filaments **206***a*, **206***b* may be verified using fluoroscopy and/or stimulation. Next, RF energy may be applied to the RF probe **401** to create a lesion corresponding to the second target volume **1203***b*.

In this regard, with a single insertion of the needle **103**, two interconnected lesions (which may also be considered to be a single oblong lesion) may be created. Thus, as compared to known methods where an RF probe must be repositioned prior to each application of RF energy, the number of probe repositioning steps may be greatly reduced, thus reducing patient trauma and procedure duration. In this regard, a continuous region of lesioning may be achieved disposed about the S1 PSFA **1211** such that the lesion occupies a volume surrounding the S1 PSFA **1211** from about the 2:30 clock position to about the 5:30 clock position (as viewed in FIG. **13**). Such lesioning may help to achieve denervation of the posterior rami proximate to the S1 PSFA **1211**.

The above procedure may be repeated as appropriate to create lesions corresponding to the entire series of target volumes **1203***a*-**1203***h*, thus denervating the SIJ. In this regard, a similar continuous region of lesioning may be achieved disposed about the S2 PSFA **1212** and a region of lesioning from about the 12:00 clock position to about the 3:00 clock position (as viewed in FIG. **13**) relative to the S3 PSFA may be achieved disposed about the S3 PSFA **1213**. Furthermore, a lesion **1208** may be created at the base of the superior articular process of the L5 **1209** dorsal ramus in the grove between the superior articular process and the body of the sacrum. The needle **103** may be inserted generally perpendicular to the plane of FIG. **13** to produce lesion **1208**.

In a variation of the above procedure, three or more lesions may be created with a needle in a single position. For example, a needle positioned at a point **1106** proximate to three target volumes **1203***c*, **1203***d*, and **1203***e*, may be operable to create lesions at each of the three target volumes **1203***c*, **1203***d*, and **1203***e*, thus further reducing the number of needle repositionings.

In another variation, each individual lesion corresponding to the series of target volumes **1203** may be created using a needle with deployable filaments where the needle is repositioned prior to each application of RF energy. In such a variation the sequence of steps may be insert needle, deploy filaments, apply RF energy, retract filaments, reposition needle, and repeat as appropriate to create each desired lesion. Such a procedure may be conducted using a needle capable of producing a lesion symmetric to a central longitudinal axis of the needle (e.g., the needle of FIG. **9**).

3. Thoracic RF Neurotomy of a Medial Branch Nerve.

This process may include using a needle that enables the creation of lesions which are offset from the central longitudinal axis of the needle. Successful treatment of thoracic z-joint pain using radiofrequency ablation of relevant medial branch nerves is challenging owing to the inconsistent medial branch location in the intertransverse space, especially levels T5-T8. A conventional RF cannula must be

positioned at multiple locations within the intertransverse space to achieve the sufficient tissue ablation for successful medial branch neurotomy. The procedure will be described as being performed on an intertransverse space between adjacent ones **1301**, **1302** of the T5 to T8 thoracic vertebrae using FIG. **14** and the needle **103** of FIGS. **2A-6**. It should be understood that other embodiments of needles described herein may be used in the procedure.

The process may include obtaining an optimized segmental anteroposterior image at target level defined by meticulous counting from T1 and T12. This may be followed by obtaining an image that is ipsalateral oblique 8-15 degrees off sagittal plane of the spine to visualize costotransverse joint lucency clearly. This allows improved visualization of superior-lateral transverse process (especially in osteopenic patients). This angle aids in directing the probe to a thoracic anatomic safe zone medial to the lung, minimizing risk of pneumothorax.

The skin entry site for the needle **103** may be over the most inferior aspect of transverse process slightly medial to costotransverse joint. Inserting the needle **103** may include navigating the device over transverse process over bone to touch superior transverse process slightly medial to costotransverse joint. The process may include checking anteroposterior imaging to demonstrate active tip **201** of the needle **103** is at the superolateral corner of the transverse process. The process may also include checking a contralateral oblique (e.g., +/−15 degrees) image view to demonstrate the target transverse process in an elongate fashion. This view is useful for demonstrating the tip **201** of the needle **103** in relationship to the superolateral margin of the transverse process subadjacent to the targeted medial branch nerve. The process may include retracting the active tip **201** slightly (e.g., 1 mm to 3 mm).

The process may include rotating the needle **103** such that the midpoint **502** is oriented toward the intertransverse space between the vertebrae **1301**, **1302** and the medial branch nerve **1303** that is positioned therein. Next, the filaments **206***a*, **206***b* may be advanced ventral into the intertransverse space between the vertebrae **1301**, **1302** to the deployed position. The position of the needle **103** and deployed filaments **206***a*, **206***b* may be verified using fluoroscopy (e.g., using lateral imaging). The RF probe **401** may then be inserted into the lumen **222** such that RF energy emanating from the probe **103** will be conducted by the tip **201** and filaments **206***a*, **206***b* to the target medial branch nerve **1303**. Stimulation (e.g., motor and/or sensory) may be performed to verify positioning. Next, RF energy may be applied to the RF probe **401**. The RF energy emanating from the needle **103** may be preferentially biased toward the volume between the vertebrae **1301**, **1302**. The lesion created by such a procedure may, for example, have a maximum cross dimension of 8-10 mm, and may ablate a corresponding portion of the medial branch nerve **1303**.

It is noted that thoracic RF neurotomy performed on other thoracic vertebrae may require different sized lesions. For example, thoracic RF neurotomy performed on the T3-T4 vertebrae may require a smaller lesion volume than the above-described procedure, and thoracic RF neurotomy performed on the T1-T2 vertebrae may require a still smaller lesion volume. As described herein, the deployment of the filaments of the needle **103** may be varied to achieve such desired target lesion volumes.

4. Cervical Medial Branch RF Neurotomy.

Embodiments of needles described herein (e.g., the needle **103** of FIG. **2**A) are capable of creating a volume of tissue ablation necessary for complete denervation of the cervical zygapophyseal joints, including the C2/3 cervical zygapophyseal joint (z-joint). Tissue ablation for cervical z-joint using embodiments of needles described herein may be accomplished using a single placement and single heating cycle. Such single placement and single heating cycle may avoid unnecessary tissue damage from multiple placements of a conventional probe, and unintended injury to collateral tissue caused by excessive lesioning. The zone of ablation created by various embodiments of the device is designed to provide sufficient, and necessary tissue coagulation for a successful procedure, and thus may be expected to improve the outcomes of patients undergoing this spinal radiofrequency neurotomy.

A cervical medial branch RF neurotomy procedure will be described as being performed on the third occipital nerve at the C2/3 z-joint using the needle **103** as shown in FIG. **15**. In FIG. **15**, the needle **103** is positioned between the C2 **1401** and C3 **1402** vertebrae.

In a first step, the patient may be placed in a prone position on a radiolucent table suited to performing fluoroscopically guided spinal procedures. Sedation may be administered. The patient's head may be rotated away from the targeted side. Sterile skin prep and draping may be performed using standard well-described surgical techniques.

For Third Occipital Nerve (TON) ablation (C2/3 joint innervation) the lateral aspect of the C2/3 Z-joint is located under either parasagittal or alternatively, ipsilateral oblique rotation of less than/equal to 30 degrees of obliquity relative to the true sagittal plane of the cervical spine. The skin entry point may be infiltrated with local anesthetic. Then the tip **201** of the needle **103** is moved over the most lateral aspect of bone of the articular pillar at the juncture of the C2/3 z-joint to a first position contacting bone proximate to the most posterior and lateral aspect of the z-joint complex

Once boney contact is made, the needle **103** may be retracted a predetermined distance (e.g., 1-3 mm) and the filaments are deployed towards the lateral aspect of the C2/3 z-joint. The needle **103** may be rotated about a central longitudinal axis prior to filament deployment to ensure that deployment will occur in the desired direction.

Multiplanar fluoroscopic imaging may then be employed to verify that the tip and filaments are positioned as desired. For example, it may be verified that the filaments are positioned straddling the lateral joint lucency, and posterior to the C2/3 neural foramen. Useful imaging angles include anterior-posterior (AP), lateral, and contralateral oblique (Sluijter) views. To further verify adequate positioning of the needle **103**, motor stimulation may be performed by delivering a voltage (of up to 2 volts) at 2 Hz to the tip **201** and filaments. Furthermore, sensory stimulation may be performed at appropriate voltage (e.g., 0.4 to 1 volt) and frequency (e.g., 50 Hz).

After position verification, RF energy may be applied to the tip and the plurality of filaments to generate heat that ablates a portion of the third occipital nerve. After lesioning, the device may be removed. For levels below the C2/3 z-joint, the procedure may be similar than as described above with respect to the third occipital nerve, with the exception that the initial boney contact target is at the waist of inflection point of the articular pillar.

Similar to the above procedures, other spinal RF procedures may benefit from the asymmetrical application of RF energy from embodiments of probes described herein. Such asymmetry may, for example, be used to project RF energy in a desired direction and/or limit the projection of RF energy in undesired directions. The configuration of the

filaments may be selected for a particular application to produce a desired size, shape and location (relative to the needle tip) of a lesion within the patient. The location of the lesion may be offset distally and/or laterally from the tip of the needle as required for a particular application.

It will be appreciated that the delivery of RF energy to tissue in the anatomy is practiced for a multitude of reasons and embodiments of needles described herein may be adapted (modified or scaled) for use in other medical procedures. For example, embodiments of needles described herein could be used to deliver RF energy as a means to cauterize "feeder vessels," such as in bleeding ulcers and/or in orthopedic applications. Further, embodiments of needles described herein could also be adapted to procedures such as cardiac ablation, in which cardiac tissue is destroyed in an effort to restore a normal electrical rhythm in the hart. This application could further benefit from the ability of embodiments of needles described herein to deliver fluid through a lumen since, for example, emerging procedures in cardiac therapy require the ability to deliver stem cells, vascular endothelial growth factor (VEGF), or other growth factors to cardiac tissue. The ability to steer embodiments of the needle (previously discussed) may provide significant benefit to the in the field of cardiovascular drug delivery.

While various embodiments of the present invention have been described in detail, it is apparent that further modifications and adaptations of the invention will occur to those skilled in the art. However, it is to be expressly understood that such modifications and adaptations are within the spirit and scope of the present invention.

What is claimed is:

**1**. A method comprising:

inserting a needle into a patient, the needle comprising:

an elongate member;

a piercing tip at a distal end of the elongate member;

a lumen within the elongate member; and

a filament in a retracted position in which the filament is at least partially disposed within the elongate member;

moving the filament to a deployed position within the patient in which at least a distal end of the filament is out of the elongate member and disposed away from the tip;

inserting a radiofrequency probe into the lumen of the needle such that the radiofrequency probe contacts a conductive portion of the needle at a distal end of the needle to thereby establish an electrically conductive path from the radiofrequency probe to the filament; and

operating the radiofrequency probe, the tip, and the filament as a monopolar electrode, with radiofrequency energy from the radiofrequency probe being conducted to the filament through the electrically conductive path and transmitted by the filament.

**2**. The method of claim **1**, wherein said moving the filament to a deployed position within the patient takes place prior to said inserting the radiofrequency probe into the lumen of the needle.

**3**. The method of claim **1**, wherein the needle further comprises a fitting in fluid communication with the lumen, the method further comprising:

connecting a fluid source to the fitting;

transporting fluid through the lumen of the needle to a target volume within the patient; and

disconnecting the fluid source from the fitting.

**4**. The method of claim **3**, wherein said inserting the radiofrequency probe into the lumen is achieved by passing the radiofrequency probe through the fitting.

**5**. The method of claim **3**, wherein said inserting the radiofrequency probe into the lumen takes place after said disconnecting the fluid source from the fitting.

**6**. The method of claim **1**, wherein said moving the filament to the deployed position comprises positioning the distal end of the filament distally beyond the tip of the needle.

**7**. The method of claim **1**, wherein said moving the filament to the deployed position places the distal end of the filament at a position that is spaced from a central longitudinal axis of the needle by a distance greater than a radius of the elongate member.

**8**. The method of claim **1**, further comprising attaching a return electrode pad to the patient prior to said operating the radiofrequency probe, the tip, and the filament as the monopolar electrode.

**9**. The method of claim **1**, wherein the conductive portion comprises a conductive material in the tip, and wherein said inserting the radiofrequency probe into the lumen of the needle such that the radiofrequency probe contacts the conductive portion of the needle comprises contacting a distal end of the radiofrequency probe to the conductive material of the tip.

**10**. The method of claim **1**, further comprising:

after said inserting the needle into the patient, moving the needle to a target volume within the patient that includes a nerve; and

ablating the nerve to relieve pain of the patient.

**11**. The method of claim **10**, wherein said inserting the needle into the patient comprises inserting the needle within 30 degrees of perpendicular to a surface of the patient.

**12**. The method of claim **10**, wherein the nerve comprises a medial branch nerve proximate a lumbar facet joint of the patient.

**13**. The method of claim **12**, wherein said inserting the needle into the patient comprises inserting the needle within 30 degrees of perpendicular to a surface of the patient.

**14**. The method of claim **10**, wherein the nerve comprises a medial branch nerve positioned in an intertransverse space between adjacent thoracic vertebrae of the patient.

**15**. The method of claim **10**, wherein the nerve is proximate a cervical zygapophyseal joint of the patient.

**16**. The method of claim **10**, wherein the nerve comprises a posterior ramus of a sacroiliac joint of the patient.

**17**. The method of claim **10**, wherein the nerve comprises an afferent nociceptive nerve.

**18**. The method of claim **10**, wherein said ablating comprises forming a lesion that includes the nerve and has a maximum cross dimension that is 10 millimeters or larger.

**19**. The method of claim **10**, wherein said ablating comprises forming a lesion that includes the nerve and has a volume of about 500 $mm^3$.

**20**. The method of claim **1**, wherein the probe directly contacts the tip during said operating the radiofrequency probe, the tip, and the filament as the monopolar electrode.

**21**. A method comprising:

introducing a needle into a patient, the needle comprising:

an elongate member;

a lumen within the elongate member; and

a filament in a retracted position relative to the elongate member;

moving the filament to a deployed position within the patient;

inserting a radiofrequency probe into the lumen of the needle;

physically contacting the radiofrequency probe to a conductive portion of the needle at a distal end of the needle; and

operating the radiofrequency probe and the filament as a monopolar electrode while the radiofrequency probe contacts the conductive portion of the needle, such that radiofrequency energy from the radiofrequency probe passes through the conductive portion of the needle and is transmitted by the filament.

**22**. The method of claim **21**, wherein the needle further comprises a piercing tip at a distal end of the elongate member, and wherein said operating the radiofrequency probe and the filament the monopolar electrode further comprises operating the tip together with the radiofrequency probe and the filament as the monopolar electrode.

**23**. The method of claim **22**, wherein said physically contacting the radiofrequency probe to the conductive portion of the needle at the distal end of the needle comprises physically contacting the radiofrequency probe to the tip.

**24**. The method of claim **21**, wherein said moving the filament to a deployed position within the patient takes place prior to said inserting the radiofrequency probe into the lumen of the needle.

**25**. The method of claim **21**, wherein the needle further comprises a fitting in fluid communication with the lumen, the method further comprising:

connecting a fluid source to the fitting;

transporting fluid through the lumen of the needle to a target volume within the patient; and

disconnecting the fluid source from the fitting.

**26**. The method of claim **21**, further comprising:

after said inserting the needle into the patient, moving the needle to a target volume within the patient that includes a nerve; and

ablating the nerve to relieve pain of the patient.

**27**. The method of claim **26**, wherein the nerve is a medial branch nerve proximate a lumbar facet joint of the patient, a medial branch nerve positioned in an intertransverse space between adjacent thoracic vertebrae of the patient, a cervical zygapophyseal joint of the patient, or a posterior ramus of a sacroiliac joint of the patient.

**28**. The method of claim **26**, wherein said ablating comprises forming a lesion that includes the nerve and has a maximum cross dimension that is 10 millimeters or larger.

**29**. The method of claim **26**, wherein said ablating comprises forming a lesion that includes the nerve and has a volume of about 500 $mm^3$.

* * * * *